**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MICHAEL AND JOYCE HALLORAN, KENNETH AND VICTORIA MASCIOVECCHIO, STEVEN AND PATRICIA BROZEK, AND MICHAEL DYER, Individually and on behalf of those similarly situated,<br><br>PLAINTIFFS,<br><br>V.<br><br>HARLEYSVILLE PREFERRED INSURANCE CO., HARLEYSVILLE WORCESTER INSURANCE CO., HOMESITE INSURANCE CO., THE HANOVER INSURANCE CO., AMERICAN MODERN HOME INSURANCE CO., ACE AMERICAN INSURANCE COMPANY, UNITED SERVICES AUTOMOBILE ASSOC., CALIFORNIA CASUALTY INDEMNITY EXCH., AMICA MUTUAL INSURANCE CO., ELECTRIC INSURANCE CO., CHUBB NATIONAL INSURANCE CO., AMERICAN AUTOMOBILE ASSOC., STATE FARM FIRE & CASUALTY CO., NATIONWIDE PROPERTY & CASUALTY INSURANCE CO., FOREMOST PROPERTY AND CASUALTY INSURANCE CO., METROPOLITAN PROPERTY AND CASUALTY INSURANCE CO., KEMPER INDEPENDENCE INSURANCE CO., ALLSTATE INSURANCE CO OF AMERICA, FIREMAN'S FUND INSURANCE CO., SAFECO INSURANCE COMPANY OF AMERICA, HARTFORD INSURANCE CO. OF THE MIDWEST, HARTFORD CASUALTY INSURANCE CO., EMPLOYERS MUTUAL CASUALTY CO., AMERICAN INSURANCE | DOCKET NO.<br><br><br><br><br><br><br><br>JANUARY 28, 2016 |

1

CO., AIG PROPERTY CASUALTY CO.,
LIBERTY MUTUAL FIRE INSURANCE CO.,
CINCINNATI INSURANCE CO.,
HORACE MANN INSURANCE
CO., UNIVERSAL NORTH AMERICA
INSURANCE CO., ARMED FORCES
INSURANCE EXCH., 21ST CENTURY
PREMIER INSURANCE CO., UNIVERSAL
NORTH AMERICA INSURANCE CO.,
AMERICAN STRATEGIC INSURANCE
CORP., GREAT NORTHERN INSURANCE
CO., VIGILANT INSURANCE CO., LIBERTY
INSURANCE CORP., GENERAL
INSURANCE COMPANY OF AMERICA,
USAA CASUALTY INSURANCE CO.,
BANKERS STANDARD
INSURANCE CO., FEDERAL INSURANCE
CO., MASSACHUSETTS HOMELAND
INSURANCE CO., NATIONWIDE MUTUAL
FIRE INSURANCE CO., PATRONS MUTUAL
INSURANCE COPANY OF CONNECTICUT,
METROPOLITAN GROUP PROPERTY AND
CASUALTY INSURANCE CO.,
MASSACHUSETTS BAY INSURANCE CO.,
PROPERTY AND CASUALTY INSURANCE
CO. OF HARTFORD, UTICA FIRST
INSURANCE CO., MERRIMACK MUTUAL
FIRE INSURANCE CO., AMERICAN
COMMERCE INSURANCE CO., VERMONT
MUTUAL INSURANCE CO., QUINCY
MUTUAL FIRE INSURANCE
CO., NGM INSURANCE CO., ASSOCIATED
INDEMNITY CORP., PRIVILEGE
UNDERWRITERS RECIPROCAL EXCH.,
CSAA FIRE & CASUALTY INSURANCE
CO.,  PACIFIC SPECIALTY INSURANCE
CO., UNION MUTUAL FIRE INSURANCE
CO., CENTRAL MUTUAL INSURANCE
CO., BUNKER HILL INSURANCE CO.,
CITIZENS INSURANCE CO. OF AMERICA,
TRUCK INSURANCE EXCH.,
IDS PROPERTY CASUALTY INSURANCE
CO., USAA GENERAL INDEMNITY CO.,
CAMBRIDGE MUTUAL FIRE INSURANCE
CO., PACIFIC INDEMNITY CO.,

2

NATIONWIDE GENERAL INSURANCE CO.,
TOWER INSURANCE CO. OF NEW YORK,
GENERAL CASUALTY CO.
OF WISCONSIN, PROVIDENCE MUTUAL
FIRE INSURANCE CO., REPUBLIC-
FRANKLIN INSURANCE CO.,
ECONOMY PREMIER ASSURANCE CO.,
LM INSURANCE CORP., ENCOMPASS
INDEMNITY CO., ENCOMPASS
INSURANCE CO. OF AMERICA, ALLSTATE
PROPERTY AND CASUALTY INSURANCE
CO., ALLSTATE INDEMNITY CO.,
AMERICAN BANKERS INSURANCE CO.
OF FLORIDA, FARM FAMILY CASUALTY
INSURANCE CO., UNITRIN PREFERRED
INSURANCE CO., TWIN CITY FIRE
INSURANCE CO., STILLWATER
PROPERTY AND CASUALTY
INSURANCE CO., FOREMOST INSURANCE
CO. GRAND RAPIDS MI, NATIONAL
SURETY CORP., TEACHERS INSURANCE
CO., GRAPHIC ARTS MUTUAL CO.,
INTEGON NATIONAL INSURANCE CO.,
PRAETORIAN INSURANCE CO., CASCO
 INDEMNITY CO., FIRST AMERICAN
PROPERTY & CASUALTY INSURANCE CO.,
UNITRIN DIRECT PROPERTY &
CASUALTY CO., AEGIS
SECURITY INSURANCE CO., AFFILIATED
FM INSURANCE CO., MERASTAR
INSURANCE CO., PHARMACISTS MUTUAL
INSURANCE CO., UTICA MUTUAL
INSURANCE CO., ONEBEACON
AMERICAN INSURANCE CO., VALLEY
FORGE INSURANCE CO., BALBOA
INSURANCE CO., HINGHAM MUTUAL
FIRE INSURANCE CO., DANBURY
INSURANCE CO., SENTRY INSURANCE A
MUTUAL CO., BEDIVERE INSURANCE
CO., AIU INSURANCE CO., COUNTRYWAY
INSURANCE CO., ASPEN AMERICAN
INSURANCE CO., INDEMNITY
INSURANCE CO. OF NORTH AMERICA,
ACE FIRE UNDERWRITERS INSURANCE
CO., MERITPLAN INSURANCE CO.,

3

INSURANCE CO. OF NORTH AMERICA,
STONINGTON INSURANCE CO.,
CONTINENTAL CASUALTY CO.,
MIDDLESEX INSURANCE CO.,
PEERLESS INSURANCE CO.,
INSURANCE SERVICES OFFICE,INC.
                    DEFENDANTS.

# CLASS ACTION COMPLAINT

## I.    Summary.

1.      The Plaintiffs in this case own homes in Manchester, Ellington, Andover and

Stafford Springs, Connecticut.  Each of their homes has basement walls that are irreversibly

deteriorating as a result of defective concrete supplied by J. J. Mottes & Co. (Mottes).  They sue

their homeowners' insurance companies and an association to which these companies belong

(collectively Defendants), for being part of a concerted scheme to deny them coverage for their

failing basement walls, which experts say must be replaced.

2.      Plaintiffs' basement walls are in a state of collapse because they were built with

defective concrete containing deleterious iron sulfide minerals mined by Mottes.[1]  The oxidation

(rusting) of these minerals, some of which are pyrrhotite, pyrite, and marcasite, produces a

chemical reaction that causes the concrete to swell and crack and the cement paste to break

down.  This is a continuous and irreversible condition.  Ultimately, the Plaintiffs' homes will fall

into their basements.

3.      The Plaintiffs have filed claims for coverage with their insurance companies.

These claims will only get denied.  In fact, repeated complaints are filtering into the Courts.  In

all of these cases, the Defendant Insurance Companies have all signed on to standardized

language peddled to them by Defendant Insurance Services Office, Inc. and they have refused to

---

[1] See Exhibit 1 – Picture of J.J. Mottes cement displaying pattern cracking from pyrrohtite.

do what they promised, namely – provide coverage should hidden decay occur in or defective material be found in the basement walls.  The homeowners in all of those cases all had the same problems, made the same kind of claims based on standardized policy language, and got the same type of denial letters.  These people have been operating in isolation but, actually, they are all saying the same thing — their basement walls are in a state of collapse and their insurance should pay to replace them.

4.      Now, after discovering their deteriorating basement walls, Plaintiffs have homes that are practically impossible to sell, practically impossible to refinance and, eventually, will be impossible to safely live in.  They sue Defendants individually and on behalf of others who are similarly situated because they (1) have basement walls that are irreversibly deteriorating and failing due to defective concrete and (2) have claims that have been denied or will be denied by the Defendant Insurance Companies.  The net result of these twin problems leaves those whose homes have Mottes concrete in a heap of trouble.  In fact, the only remedy for these people is, as a matter of science, to replace their basement walls.  They seek a Court order for, among other things, new basement walls, their attorneys' fees, their costs, pre- and post-judgment interest and for other equitable relief.

## II.     Jurisdiction and Venue.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 as this action involves citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

6.      This Court has personal jurisdiction over this action pursuant to Connecticut General Statutes §§ 33-929(e) and (f) and Connecticut General Statutes § 38a-41.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) (1) and (2) as a substantial part of the events and omissions giving rise to this action occurred in Connecticut.

## III.   Plaintiffs.

8.      Plaintiffs, Michael and Joyce Halloran are residents of Ellington, Connecticut. They own and live in a single-family home at 127 Pinney Street in Ellington.  The home was built in 1985.  The home's basement walls were built with defective concrete supplied by Mottes.  The Hallorans bring this lawsuit individually and on behalf of all similarly-situated homeowners.

9.      Plaintiffs, Kenneth and Victoria Masciovecchio are residents of Ashford, Connecticut.  They own and live in a single-family home at 54 Portland Drive in Ashford.  The home was built in 1985.  The home's basement walls were built with defective concrete supplied by Mottes.  The Masciovecchios bring this lawsuit individually and on behalf of all similarly-situated homeowners.

10.     Plaintiffs, Steven and Patricia Brozek are residents of Stafford Springs, Connecticut.  They own and live in a single-family home at 27 Laurel Drive in Stafford Springs. The home was built between 1984 and 1985.  The home's basement walls were built with defective concrete supplied by Mottes.  The Brozeks bring this lawsuit individually and on behalf of all similarly-situated homeowners.

11.     Plaintiff, Michael Dyer is a resident of Manchester, CT.  He owns and lives in a single-family home at 83 Bentley Drive in Manchester.  The home was built in 1995.  The home's basement walls were built with defective concrete supplied by Mottes.  Mr. Dyer brings this suit individually and on behalf of all similarly-situated homeowners.

## IV. Defendants.

### *Insurance Defendants*

12. Harleysville Preferred Insurance Company (Harleysville) is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

13. Harleysville Worcester Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

14. Homesite Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Massachusetts.

15. The Hanover Insurance Company is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

16. American Modern Home Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio.

17. ACE American Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

18. United Services Automobile Association is incorporated in Texas and its principal place of business is in the State of Texas.

19. California Casualty Indemnity Exchange is incorporated in California and its principal place of business is in the State of California.

20. Amica Mutual Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

7

21.     Electric Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

22.     Chubb National Insurance Company is incorporated in Indiana and its principal place of business is in the State of New Jersey.

23.     American Automobile Insurance Company is incorporated in Missouri and its principal place of business is in the State of Illinois.

24.     State Farm Fire & Casualty Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

25.     Nationwide Property & Casualty Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio.

26.     Foremost Property and Casualty Insurance Company is incorporated in Michigan and its principal place of business is in the State of Michigan.

27.     Metropolitan Property and Casualty Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

28.     Kemper Independence Insurance Company is incorporated in Illinois and its principal place of business is in the State of Florida.

29.     Allstate Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

30.     Firemans Fund Insurance Company incorporated in California and its principal place of business is in the State of Illinois.

31.     SAFECO Insurance Company of America is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

32.     Hartford Insurance Company of the Midwest is incorporated in Indiana and its principal place of business is in the State of Connecticut.

33.     Hartford Casualty Insurance Company is incorporated in Indiana and its principal place of business is in the State of Connecticut.

34.     Employers Mutual Casualty Company is incorporated in Iowa and its principal place of business is in the State of Iowa.

35.     American Insurance Company is incorporated in Ohio and its principal place of business is in the State of California.

36.     AIG Property Casualty Company is incorporated in Pennsylvania and its principal place of business is in the State of New York.

37.     Liberty Mutual Fire Insurance Company is incorporated in Wisconsin and its principal place of business is in the State of Massachusetts.

38.     Cincinnati Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio.

39.     Horace Mann Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

40.     Universal North America Insurance Company is incorporated in Texas and its principal place of business is in the State of Florida.

41.     Armed Forces Insurance Exchange is incorporated in Kansas and its principal place of business is in the State of Kansas.

42.     21st Century Premier Insurance Company (21st Century) is incorporated in Pennsylvania and its principal place of business is in the State of Michigan.

43.     American Strategic Insurance Corporation is incorporated in Florida and its principal place of business is in the State of Florida.

44.     Great Northern Insurance Company is incorporated in Indiana and its principal place of business is in the State of New Jersey.

45.     Vigilant Insurance Company is incorporated in New York and its principal place of business is in the State of New Jersey.

46.     Liberty Insurance Corporation is incorporated in Illinois and its principal place of business is in the State of Massachusetts.

47.     General Insurance Company of America is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

48.     USAA Casualty Insurance Company is incorporated in Texas and its principal place of business is in the State of Texas.

49.     Bankers Standard Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

50.     Federal Insurance Company is incorporated in Indiana and its principal place of business is in the State of New Jersey.

51.     Massachusetts Homeland Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of New York.

52.     Nationwide Mutual Fire Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio.

53.     Patrons Mutual Insurance Company of Connecticut is incorporated in Connecticut and its principal place of business is in the State of Ohio.

54.     Metropolitan Group Property and Casualty Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

55.     Massachusetts Bay Insurance Company is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

56.     Property and Casualty Insurance Company of Hartford is incorporated in Indiana and its principal place of business is in the State of Connecticut.

57.     Utica First Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

58.     Merrimack Mutual Fire Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

59.     American Commerce Insurance Company is incorporated in Ohio and its principal place of business is in the State of Massachusetts.

60.     Vermont Mutual Insurance Company is incorporated in Vermont and its principal place of business is in the State of Vermont.

61.     Quincy Mutual Fire Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

62.     NGM Insurance Company is incorporated in Florida and its principal place of business is in the State of New Hampshire.

63.     Associated Indemnity Corporation is incorporated in California and its principal place of business is in the State of Illinois.

64.     Privilege Underwriters Reciprocal Exchange is incorporated in Florida and its principal place of business is in the State of New York.

65.     CSAA Fire & Casualty Insurance Company is incorporated in Indiana and its principal place of business is in the State of California.

66.     Pacific Specialty Insurance Company is incorporated in California and its principal place of business is in the State of California.

67.     Union Mutual Fire Insurance Company is incorporated in Vermont and its principal place of business is in the State of Vermont.

68.     Central Mutual Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio

69.     Bunker Hill Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

70.     Citizens Insurance Company of America is incorporated in Michigan and its principal place of business is in the State of Michigan.

71.     Truck Insurance Exchange is incorporated in California and its principal place of business is in the State of California.

72.     IDS Property Casualty Insurance Company is incorporated in Wisconsin and its principal place of business is in the State of Wisconsin.

73.     USAA General Indemnity Company is incorporated in Texas and its principal place of business is in the State of Texas.

74.      Cambridge Mutual Fire Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

75.     Pacific Indemnity Company is incorporated in Wisconsin and its principal place of business is in the State of New Jersey.

76.     Nationwide General Insurance Company is incorporated in Ohio and its principal place of business is in the State of Ohio.

77.     Tower Insurance Company of New York is incorporated in New York and its principal place of business is in the State of New York.

78.     General Casualty Company of Wisconsin is incorporated in Wisconsin and its principal place of business is in the State of Wisconsin.

79.     Providence Mutual Fire Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

80.     Republic-Franklin Insurance Company is incorporated in Ohio and its principal place of business is in the State of New York.

81.     Economy Premier Assurance Company is incorporated in Illinois and its principal place of business is in the State of Rhode Island.

82.     LM Insurance Corporation is incorporated in Illinois and its principal place of business is in the State of Massachusetts.

83.     Encompass Indemnity Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

84.     Encompass Insurance Company of America is incorporated in Illinois and its principal place of business is in the State of Illinois.

85.     Allstate Property and Casualty Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

86.     Allstate Indemnity Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

13

87.     American Bankers Insurance Company of Florida is incorporated in Florida and its principal place of business is in the State of Florida.

88.     Farm Family Casualty Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

89.     Unitrin Preferred Insurance Company is incorporated in New York and its principal place of business is in the State of Florida.

90.     Twin City Fire Insurance Company is incorporated in Indiana and its principal place of business is in the State of Connecticut.

91.     Stillwater Property and Casualty Insurance Company is incorporated in New York and its principal place of business is in the State of Florida.

92.     Foremost Insurance Company Grand Rapids MI is incorporated in Michigan and its principal place of business is in the State of Michigan.

93.     National Surety Corporation is incorporated in Illinois and its principal place of business is in the State of Illinois.

94.     Teachers Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

95.     Graphic Arts Mutual Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

96.      Integon National Insurance Company is incorporated in North Carolina and its principal place of business is in the State of North Carolina.

97.     Praetorian Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Wisconsin.

98.     Casco Indemnity Company is incorporated in Maine and its principal place of business is in the State of Ohio.

99.     First American Property & Casualty Insurance Company is incorporated in California and its principal place of business is in the State of California.

100.    Unitrin Direct Property & Casualty Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

101.    Aegis Security Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

102.    Affiliated FM Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

103.    Merastar Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

104.    Pharmacists Mutual Insurance Company is incorporated in Iowa and its principal place of business is in the State of Iowa.

105.    Utica Mutual Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

106.    OneBeacon American Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

107.    Valley Forge Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Illinois.

108.    Balboa Insurance Company is incorporated in California and its principal place of business is in the State of California.

109.     Hingham Mutual Fire Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

110.     Danbury Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

111.     Sentry Insurance A Mutual Company is incorporated in Wisconsin and its principal place of business is in the State of Wisconsin.

112.     Bedivere Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

113.     AIU Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

114.     Countryway Insurance Company is incorporated in New York and its principal place of business is in the State of New York.

115.     Aspen American Insurance Company is incorporated in Texas and its principal place of business is in the State of Connecticut.

116.     Indemnity Insurance Company of North America is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

117.     ACE Fire Underwriters Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

118.      Meritplan Insurance Company is incorporated in California and its principal place of business is in the State of California.

119.     Insurance Company of North America is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

120.   Stonington Insurance Company is incorporated in Pennsylvania and its principal place of business is in the State of Texas.

121.   Continental Casualty Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

122.   Middlesex Insurance Company is incorporated in Wisconsin and its principal place of business is in the State of Wisconsin.

123.   Peerless Insurance Company is incorporated in New Hampshire and its principal place of business is in the State of New Massachusetts.

124.   Collectively, all of the aforementioned insurance companies are herein referred to as the "Defendant Insurance Companies."  Each of the Defendant Insurance Companies are incorporated under the laws of a state outside of Connecticut and/or have a principal place of business outside of Connecticut.  At all times relevant to this complaint, the Defendant Insurance Companies were writing homeowners' insurance policies and issuing such policies to Connecticut residents.  At all times relevant to this complaint, the Defendant Insurance Companies were also members of the defendant Insurance Services Office, Inc. (ISO) and/or were advised by ISO, which party is defined in the next paragraph.

### ***Insurance Services Office, Inc.***

125.   Defendant, Insurance Services Office, Inc. (ISO), is headquartered in Jersey City, New Jersey.  ISO is generally an underwriting and consulting firm, which serves the insurance industry, in principal part, by drafting policy language and advising insurers how to deny claims based on policy language.

126.   ISO is an association of approximately 1,400 property and casualty insurers, including the Insurance Defendants.  ISO is almost without exception the exclusive source of

17

support services in the country for insurance companies who underwrite property and casualty insurance. ISO develops standard policy forms and files or lodges them with each state's insurance regulators, including the Connecticut Department of Insurance. Most of the property and casualty insurance written in the United States is written on these forms. For each of its standard policy forms, ISO also supplies actuarial and rating information — it collects, aggregates, interprets, and distributes data on the premiums charged, claims filed and paid, and defense costs expended with respect to each form. Based on this data, ISO predicts future loss trends and calculates advisory premium rates. While insurance companies can file their own rates, in practice they rely on ISO's advice before they file anything with a regulator.

## V.   Facts

### A.   The Defendant Insurance Companies and ISO led Plaintiffs and Putative Class Members into a sinkhole of financial trouble.

127.   Each Plaintiff and putative Class Member owns real property that is crumbling and/or exhibiting a pattern cracking consistent with cement that contains pyrrhotite and/or other iron sulfides that cause their basement walls to fail.

128.   Each Plaintiff and proposed Class Member holds an insurance policy that provides coverage should their basement walls collapse (i.e., decay or be built with defective materials).

129.   Each Plaintiff's and each proposed Class Member's home was built using cement from Mottes.

130.   Each Plaintiff and proposed Class Member has either:

    a.   made a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes and been denied by their insurer based on reasons contrary to the express provisions of their respective policy; or

b.   made a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes pursuant to their respective insurance policy and their insurer has expressed an intent to deny coverage, and at least at the time that this action was filed, failed to respond; or

c.   considered making a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes pursuant to their respective insurance policy but determined that doing so would be futile.

131.    Even if a respective plaintiff or putative Class Member submits a claim pursuant to their respective insurance policy, each and every claim will be denied.  Indeed, submitting a claim for insurance coverage by the Plaintiffs or putative Class Members is an exercise in futility.

132.    Modern insurance practices reveal why filing a bad concrete claim is futile. Insurance companies these days belong to associations that put time and resources into developing standardized language for insurance policies.  Member insurance companies in Connecticut adopt this uniform language and then all of these member companies interpret it the same way.  That is what happened in this case.  Each of the Defendant Insurance Companies is either a member of ISO, and/or owns shares in ISO's publicly traded parent company (Verisk Analytics) and/or heavily relies upon copyrighted advice from ISO.  Each of the Defendant Insurance Companies adopted the language drafted by ISO.  And each of the Defendant Insurance Companies has denied or will deny claims based on this uniform language.

133.    While there is no requirement for any Plaintiff or putative Class Member to file a claim for coverage pursuant to their policies, filing a bad concrete claim at this time is futile because the Connecticut Department of Insurance (DOI) has concluded that insurance companies in Connecticut are collectively denying these claims.   For instance, DOI has acknowledged this consistent and collective position of insurance companies in conversations with the Plaintiffs'

attorneys.  DOI has even gone so far as to make a public declaration of this "deny" position at a public forum attended by hundreds of affected homeowners.

134.     The futility of filing a bad concrete claim is also highlighted by the repeated complaints filed in this Court over the past few years.  One jury has already reached a verdict in favor of the plaintiffs who sued their insurance company over their denial of a bad concrete claim.  See, e.g., Bacewicz v. NGM Insurance Co., 3:08-CV-1530 (JCH), 2010 WL 3023882 (D.Conn. Aug. 2, 2010) (awarding homeowner $215,963.74 to replace basement walls).  In all of the other bad concrete cases, the plaintiffs made the same types of claims and the insurance companies issued standard denial letters.[2]

135.     Indeed, it is no coincidence that the language, terms and conditions contained in the ISO copyrighted contracts of insurance are virtually the same language, terms and conditions cited by the Defendant Insurance Companies to support claim denials.

---

[2] See Jones v. Standard Fire Insurance Co., No. TTD-CV-116004270, 2013 WL 541015 (Conn. Super. Ct. Jan. 11, 2013); Gambacorta v. Covenant Insurance Co., No. TTD-CV-136006583, 2015 WL 1867090 (Conn. Super. Ct. March 23, 2015); Waters v. Liberty Mutual Insurance Group, Inc., No. TTD-CV-065000709, 2009 WL 4282809 (Conn. Super. Ct. November 9, 2009); Tofolowsky v. Bilow, No. TTD-CV-970063795, 2003 WL 1475141 (Conn. Super. Ct. March 17, 2003); R.I. Pools, Inc. v. Paramount Concrete, Inc. 149 Conn. App. 839 (2014); Musgrave et al. v. State Farm Fire and Casualty Company et al., No. TTD-CV15-6009840 (Conn. Super. Ct. 2015); Cote et al. v. Travelers Indemnity Company of America, No., TTD-CV-15-6008838 (Conn. Super. Ct. 2014); Bacewicz v. NGM Insurance Co., No. 3:08-CV-01530, Judgment (D. Conn. Feb. 11, 2011); Possardt et al. v. General Casualty Co., 3:13-cv-00055-SRU (D. Conn. 2013); Panciera et. al. v. Kemper Independent Insurance Co., No. 3:13-CV-1009 (JBA), 2014 WL 1690387 (D. Conn. April 29, 2014); Belz et al. v. Peerless Insurance Co., No. 3:13-CV-01315, 2013 WL 4984704, (D. Conn. Sept 6, 2013); Karas et al. v. Liberty Insurance Corp., No. 3:13-CV-01836, 2013 WL 6778455 (D. Conn. Dec. 11, 2013); Lincoln et al. v. United Services Automobile Association, No. 3:14-CV-00333 (D. Conn. 2014); Metsack et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01150 (VLB), 2015 WL 5797016 (D. Conn. Sept. 30, 2015); Gabriel et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01435, 2015 WL 5684063 (D. Conn. Sept. 28, 2015); Roberts et al. v. Amica Mut. Ins. Co., No. 3:14-CV-1589 (SRU), 2015 WL 7458510 (D. Conn. Nov. 24, 2015); Ray et al. v. Pacific Specialty Insurance Co., No. 3:15-CV-00871 (D. Conn. 2015); Kim et al. v. State Farm Fire & Casualty Co., No. 3:15-CV-00879 (D.Conn. 2015); Mensher et al. v. Liberty Mutual Fire Insurance Co., No. 3:15-CV-01007 (D.Conn. 2015); Carlson et al. v. Allstate Insurance Co., No., 3:15-CV-01045 (D.Conn. 2015); Lees et al. v. Allstate Insurance Co., No., 3:15-CV-01050 (D.Conn. 2015); Jang et al. v. Liberty Mutual Fire Insurance Co., 3:15-CV-01243 (D.Conn. 2015); Roberge et al. v. Amica Mutual Insurance Co., No. 3:15-CV-01262 (D.Conn. 2015); Sabonis v. Kemper Independence Insurance Co., No., 3:14-CV-00694 (D.Conn. 2014).

136.    Upon information and belief, ISO and the Defendant Insurance Companies have formed a cartel that agreed to deny the Plaintiffs and putative Class Members coverage under their policies for defective concrete claims.

137.    In addition to this stonewalling scheme, the Defendant Insurance Companies repeatedly and baselessly covered its refusal to payout on bad concrete claims behind a smokescreen of actuarial-motivated policy language.

138.    The widespread pattern of defective concrete claim denials has led Plaintiffs and hundreds of similarly-situated homeowners to decry this insurance practice in forums of meaning — from town halls, to the statehouse, to the courthouse.  The cost of replacing the basement walls is generally between $100,000.00 and $250,000.00.  After paying insurance premiums for years, or even decades, Plaintiffs and putative Class Members are left to face this massive expense all alone.

**B**.    **While ISO was shoring up the "collapse" definition to minimize liability for defective concrete claims, the Plaintiffs and Putative Class Members continued to be deprived of the benefits of their insurance policies.**

139.    In order to deny bad foundation claims, Defendant Insurance Companies have relied, in part, on ISO-authored amendments to the homeowners' policies issued to Plaintiffs and/or the putative Class Members.  See ISO Language Chart, attached hereto as Exhibit 2.

140.    The amendments were made to the terms of the homeowners' policies, in Section I — Property Coverages, E.  Additional Coverages, Para. 8, Collapse.  Certain amendments to the ISO Forms were made in 1990 (HO 00 03 04 91), in 1999 (HO 00 03 10 00), in 2004 (HO 01060205) and in 2011 (HO 01 06 12 11). In 1990, ISO amended its Form to protect the Defendant Insurance Companies, in part, from bad concrete claims.  See Exhibit 3, Harleysville Policy Collapse Language. Specifically, ISO added new language to the definition of collapse

21

that (1) excluded loss to a 'foundation' and 'retaining wall' and (2) excluded 'settling, cracking, shrinkage, bulging, or expansion."  In 1999, ISO once again amended its Form to change the definition of "collapse" to mean an "abrupt falling down or caving in of a building or any part of a building…"  See "Insurance Coverage for Collapse: How Has It Changed and Why?," adjustersinternational.com attached hereto as Exhibit 4; see also, e.g., Halloran Kemper Policy at P. 2 of 5 attached hereto as Exhibit 5 (incorporating copyrighted material of ISO); see ISO Language Chart, 1999 language, attached hereto as Exhibit 2.

141.    In 2004, ISO again changed its Form language removing from the defective material coverage any such material "if the collapse occurs during the course of construction, remodeling, or renovation." See ISO Language Chart, Form HO 01 06 02 05, attached hereto as Exhibit 2. In 2011, ISO again narrowed its Form language by adding an entirely new paragraph stating "The coverage provided under this Additional Coverage-Collapse applies only to an abrupt Collapse (emphasis added)." See ISO Language Chart, Form HO 01 06 12 11, attached hereto as Exhibit 2.

142.    Prior to the amendments, the word collapse, as used in the Additional Coverages section of homeowner policies issued in Connecticut, was construed by the Supreme Court of Connecticut to mean a "substantial impairment in the structural integrity of a building."  See Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252 (1987).

143.    Prior to making the changes to the Collapse Coverage and then peddling it to the Plaintiffs and/or putative Class Members, the Defendant Insurance Companies and ISO well knew that the Defendant Insurance Companies had insured a legion of homes in the northeastern section of Connecticut that had been constructed between 1984 and 1998 with defective concrete.

144.     The Defendant Insurance Companies and ISO knew that it was only a matter of time before some number of those insureds' homes would develop pattern cracking as a manifestation of the defective concrete used in the original construction of the basement walls.

145.     The Defendant Insurance Companies and ISO also knew that all of the insureds' homes constructed between 1984 and 1998 with the defective concrete would eventually collapse once the concrete disintegrated to the point that the basement walls could no longer perform as intended.

146.     The Defendant Insurance Companies and ISO were aware of cases that had been filed and claims that had been made at least as early as 1996 involving defective concrete in homes in northeastern Connecticut.  See, e.g., Parker v. Worcester Ins. Co., 247 F.3d 1, 3 (1st Cir. 2001)(Court noting that insurance company denied plaintiff's claim for coverage for collapsing basement walls due to defective concrete).  Through the discovery process, Plaintiffs intend to show that the Insurance Company Defendant's knowledge of the issue in northeastern Connecticut was one of the factors that led ISO to change the definition of collapse in the policy language.

147.     The Defendant Insurance Companies and ISO, on notice of the Beach Court's construction of the word "collapse" and on notice of the defective concrete claims in northeastern Connecticut, deliberately changed their policies' definition of "collapse" to avoid or minimize liability for potential claims brought by the Plaintiffs and putative Class Members, which they all knew would come to pass someday in Northeastern Connecticut.

148.     The Defendant Insurance Companies and ISO expanded the definition of "collapse" to mean a "sudden" or "abrupt" collapse.  This change would allow the Defendant Insurance Companies to deny claims on the basis that "collapse" meant more than a "substantial

impairment of the structural integrity of a building".  What makes this actuarial sleight of hand so deceitful is these changes were made in 2005 -- years after the Defendants knew about the defective concrete claims.

149.     Besieged by insureds raising this issue, the Defendant Insurance Companies kept denying claims, providing bogus responses when they knew they were good claims while at the same time casting about for a way to shore up the language in their policies.

150.     While scrambling to rewrite their policies, the Defendant Insurance Companies engaged in a scheme to deny people coverage by providing misleading responses to claims, holding off on deciding claims while the statute of limitations was running and by defending unnecessary lawsuits.

151.     After changing the policy language to better suit them, the Defendant Insurance Companies made no offer to continue to provide the original coverage at an additional premium.

152.     Upon information and belief, by making the changes to the Additional Coverages section, the Defendant Insurance Companies attempted to reduce their financial risk under the homeowners' policies issued to the Plaintiffs and putative Class Members, but they made no corresponding reduction in premiums.

153.     The Defendant Insurance Companies made a unilateral change to the policy without providing adequate notice or adequate disclosure.  This unilateral change was ineffective to alter or amend the terms of the original contract of insurance between the Defendant Insurance Companies and the Plaintiffs and/or putative Class Members.

154.      As a consequence of the ineffectiveness of the Amendment to the Additional Coverages section, the original provisions of the Additional Coverages section remain in full force and effect.

155.    The Plaintiffs and putative Class Members are homeowners without the requisite knowledge and resources to make the many intricate observations needed to determine whether their insurance policies will cover certain events.  The Plaintiffs did not and could not negotiate with the Defendant Insurance Companies at arms' length.  The changes the Defendant Insurance Companies made to the Additional Coverages section were complicated attempts to reduce their financial risk under the homeowner's policies.  For example, one of the Defendant Insurance Companies, the Harleysville, touts itself as having "a track record of risk management expertise" and employees who have "robust technical skills and expertise."  The Harleysville boasts of "employ[ing] a special team of insurance veterans to oversee the underwriting and servicing of this business" and that "no matter what specific needs you have, we can put your mind at ease with comprehensive coverage and the best service around."[3]  Harleysville promises its clients that it "has the solutions you need to prepare for and live in retirement."[4]  The Plaintiffs and putative Class Members relied to their detriment on the Defendant Insurance Companies', including the Harleysville's, superior knowledge and skill in purchasing their homeowners' insurance policies and paying the yearly premiums for such policies.

156.    The Defendant Insurance Companies delivered to these insureds unsuitable insurance policies in exchange for lucrative premium payments.  What's worse is the Defendant Insurance Companies were a mouthpiece for ISO, frequently selling and reinforcing the ISO-copyrighted policy and the wisdom of paying for it.  What they were actually selling was an egregiously unsuitable product wrapped in a veneer of respectability.  The Defendant Insurance Companies knew or should have known that the policies were nothing of the sort and that its real

---

[3] https://www.harleysvillegroup.com/pro/pro_2.html
[4] https://www.harleysvillegroup/pro/pro_2.html.

25

interest was selling the policies to reap an enormous bounty — decades of premium payments — without fear of the otherwise inevitable claim.

**VI.     Count I:  Plaintiff Hallorans' Breach of Contract Claim vs. Harleysville, Nationwide and Kemper.**

157.     The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

158.     The Plaintiffs, Michael and Joyce Halloran (the "Hallorans") own and occupy the residential property located at 127 Pinney St., Ellington, CT 06029 ("subject property").

159.     At all times material to this claim, Harleysville was writing homeowner's insurance policies and issuing such policies to residents in this state.

160.     The Hallorans purchased the subject property in August 2004.  The residence was constructed in 1985.

161.     The Hallorans insured the subject property with Harleysville from August 27, 2015 to the present date with a homeowners' policy issued by Harleysville ("Halloran Policy").  Although Nationwide has purchased Harleysville, Harleysville continues to write policies for Nationwide.

162.     The Hallorans paid any and all premiums charged by Harleysville, at all times and without default.  The relevant portions of the Halloran Policy are attached hereto as Exhibit 3.

163.     Prior to being insured by Harleysville, the Hallorans insured the subject property with homeowners' policies issued by Kemper insurance company and The Automobile Insurance Company of Hartford.  The Hallorans have been provided with continuous coverage under these insurance policies throughout the time that they have owned the subject property.

164.     The Hallorans paid any and all premiums charged by Kemper at all times and without default.  The relevant portions of the Halloran policy issued by Kemper are attached hereto as Exhibit 5.

165.     Pursuant to the terms of the Halloran's Harleysville Policy, Paragraph 8. Collapse, Harleysville agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of building caused only by one more or more of the following:

> …
>
> b.     hidden decay; …
>
> f.     use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.  <u>See</u> Exhibit 3, Section I-Property Coverages; Additional Coverages; at P. 5 of 18, Section 8, Form HO 00 03 04 91.

166.     The language cited in paragraph 165 above, comes from a 1990 copyrighted form HO 00 03 04 91, which was produced by ISO and used virtually the same as the language that is quoted in paragraph 165 above in homeowners' insurance policies by all of the Insurance Company Defendants.

167.     Pursuant to the terms of the Halloran's Kemper Policy, Paragraph 8.  Collapse, Kemper agreed to provide coverage for "b. (1) … an abrupt falling down or caving in of a building or any part of a building that cannot be occupied for its current intended purpose.  (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.  (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.  (4) A building or any

part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."

168.    Pursuant to the terms of the Halloran's Kemper Policy, Paragraph 8.  Collapse, Kemper also agreed to provide coverage if a collapse is caused by "c. … one or more of the following: (2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse; … or (6) Use of defective material or methods in construction, remodeling or renovation."  See Exhibit 5, Section I-Property Coverages; Additional Coverages; at P. 2 of 5, Section 8, Form AK 3923 (08 13).

169.    In September of 2015, the Hallorans discovered horizontal and vertical cracks in their basements walls and on visible portions of the outside of their basement walls.

170.    The Hallorans immediately hired a structural engineering firm, Fuss & O'Neill ("F & O") to investigate the cause of the failing concrete in their home.  See Expert Report attached hereto as Exhibit 6.

171.    F & O inspected the basement walls to observe and document the defects in the cement, including any cracks, spalls or other signs of deterioration.

172.    F & O then obtained core samples of concrete from the basement wall and basement slab.

173.    F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of defects.

174.    The laboratory testing was performed in two (2) phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction.

175.    Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was Pyrrhotite or Pyrite.

176.    F & O evaluated the results of the laboratory testing and concluded that the Hallorans, like their fellow Plaintiffs and putative Class Members, had failing basement walls due to the defective cement.

177.    F & O concluded that the cement forming the basement walls was defective due to the presence of a sulfide mineral known as Pyrrhotite.

178.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

179.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

180.    On December 22, 2015, F & O told the Hallorans that their basement walls were substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

181.    Specifically, F & O told the Hallorans that "it is our professional engineering judgment that a chemical reaction of the concrete mix is occurring due to the presence of pyrrhotite and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended."  In other words, the sulfate attack will continue to deteriorate the cement until such time that the basement walls are destroyed and the home caves into its basement.

182.    It is certain that the sulfate attack will continue to fracture the cement until such time that the basement walls are destroyed and the home caves into its basement.

183.     Upon learning this, on January 25, 2016, the Hallorans filed timely claims with Harleysville and Kemper pursuant to the terms of their homeowners' insurance policies.

184.     At the time the Hallorans filed their claims, they were aware that filing such claims would be futile.  The Hallorans were also aware of the many concrete cases brought because of denials of claims.  See, e.g., Stavinksy v. Harleysville Worcester Insurance Co., TTD-CV13-6006135S, Judicial District of Tolland at Rockville (Plaintiff's virtually identical foundation claim was denied by Harleysville); Panciera, et. al. v. Kemper Independent Insurance Co., No. 3:13-CV-1009 (JBA), 2014 WL 1690387 (D. Conn. April 29, 2014) (Same).

185.     The Hallorans have a good faith basis to believe that their claims will be denied and that the filing of their claim is futile.

186.     The Hallorans are well aware of their obligation to file a timely lawsuit and know that there is no assurance that Harleysville or Kemper will deny any claims they make within the one (1) year statute of limitations.  Necessarily, the Hallorans file this suit prior to any denial of their claims for coverage.

187.     By failing to provide coverage, Harleysville and Kemper have breached their contractual obligations under the homeowners' policies they entered into with the Hallorans.  These breaches have resulted in enormous financial loss and damage to the Hallorans.

188.     The Halloran's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  The cost to fix the Halloran's basement wall problem, which is typical of hundreds of other homeowners, is estimated to exceed $150,000.00.

189.     As a consequence of Harleysville's and Kemper's breach of contract with the Hallorans, the Hallorans bring this claim individually and on behalf of all similarly situated homeowners in Connecticut.

VII.    **Count II:  Plaintiff Masciovecchio's Breach of Contract Claim vs. 21st Century, Homesite and AIG.**

190.    The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

191.    The Plaintiffs, Kenneth Masciovecchio and Victoria Masciovecchio (the "Masciovecchios") own and occupy the residential property located at 54 Portland Drive, Ashford, CT 06278 ("subject property").

192.    At all times material to this claim, 21st Century, Home site and AIG were writing homeowners' insurance policies and issuing such policies to residents in this state.

193.    The Masciovecchios built the subject property in 1985.

194.    The Masciovecchios insured the subject property with 21st Century from July 10, 2009 to the present date with a homeowners' policy underwritten by Homesite ("Masciovecchio Policy").

195.    The Masciovecchios paid any and all premiums charged by 21st Century, at all times and without default.  The relevant portions of the Masciovecchio Policy are attached hereto as Exhibit 7.  The Masciovecchios intend to obtain a copy of their policies issued by Homesite and AIG through the discovery process.

196.    Prior to being insured by 21st Century, the Masciovecchios insured the subject property with a homeowners' policy issued by AIG.  Between these policies, the Masciovecchios have been provided with continuous coverage under these insurance policies the entire time that they have owned the subject property.

197.    Pursuant to the terms of the Masciovecchio Policy, Paragraph 8.  Collapse, 21st Century agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one more or more of the following:        …

      b.    Hidden decay; …

      f.    Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.  <u>See</u> Exhibit 7, Section I-Property Coverages; Additional Coverages; at P. 5 of 17, Section 8, Form HO 00 03 04 91.

198.    The language cited in paragraph 197 above, comes from a 1990 copyrighted form HO 00 03 04 91, which was produced by ISO and used virtually exactly as quoted in paragraph 197 above in homeowners' insurance policies by all of the named defendants.

199.    In September of 2015, the Masciovecchio's discovered horizontal and vertical cracks in their basement walls and on visible portions of the outside of their basement walls.

200.     On September 15, 2015, the Masciovecchio's made a claim with Homesite over the telephone. During that conversation, Masciovecchio's reported the condition of their basement walls and asked for coverage. Homesite told the Masciovecchio's that the claim was not covered.

201.    The Masciovecchios immediately hired a structural engineering firm, Fuss & O'Neill ("F & O") to investigate the cause of the failing concrete in their home.  <u>See</u> Expert Report attached hereto as Exhibit 8.

202.    F & O inspected the basement walls to observe and document the defects in the cement, including any cracks, spalls or other signs of deterioration.

203.    F & O then obtained core samples of concrete from the basement wall and basement slab.

204.    F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of defects.

205.    The laboratory testing was performed in two (2) phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction.

206.    Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was Pyrrhotite or Pyrite.

207.    F & O evaluated the results of the laboratory testing and concluded that the Masciovecchios, like their fellow Plaintiffs, and putative Class Members, had failing basement walls due to the defective cement.

208.    F & O concluded that the cement forming the basement walls was defective due to the presence of sulfide minerals known as pyrrhotite, pyrite and marcasite.

209.    Pyrrhotite, pyrite and marcasite are all destructive chemicals that, when exposed to water and air produce a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

210.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

211.    On December 22, 2015, F & O told the Masciovecchios that their basement walls were substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

212.    Specifically, F & O told the Masciovecchios that "it is our professional engineering judgment that a chemical reaction of the concrete mix is occurring due to the presence of pyrrhotite and the other iron sulphide minerals and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended."  In other words, the sulfate attack will continue to deteriorate the cement until such time that the basement walls are destroyed and the home caves into its basement.

213.    Upon learning this, on January 25, 2016, the Masciovecchios filed a timely claim with Homesite pursuant to the terms of their homeowners' insurance policy. In fact, Homesite told the Masciovechios that their September 15, 2015 claim would be reopened.  The Masciovecchios attempted to file a claim with AIG but were told that the company does not have a record of any insurance policies that ever covered them on their home.

214.    At the time the Masciovecchios filed their claim, they were aware that filing such a claim would be futile.  The Masciovecchios were were also aware of the many bad concrete cases brought because of denials of claims.  See, e.g., Sushil Nanda et al v. Homesite Insurance Company, HHD-CV-12-6030612-S, Judicial District of Hartford at Hartford (Plaintiff's virtually identical bad concrete claim was denied by Homesite).  See also, supra, ¶¶ 133-135.

215.    The Masciovecchios have a good faith basis to believe that their claim will be denied and that the filing of their claim is futile.

216.    By failing to provide coverage, Homesite has breached or will breach its contractual obligation under the homeowners' policy it entered into with the Masciovecchios. This breach has resulted in enormous financial loss and damage to the Masciovecchios.

217.    The Masciovecchios basement wall problem is affecting hundreds of other homeowners in their region of this state.  The estimated cost to fix the Masciovecchio's

basement wall problem, which is typical of hundreds of other homeowners, is estimated to exceed $150,000.00.

218.    As a consequence of Homesite's, 21st Century's and AIG's breach of contract with the Masciovecchios, the Masciovecchios bring this claim individually and on behalf of all similarly situated homeowners in Connecticut.

**VIII.   Count III:  Plaintiff Brozeks' Breach of Contract Claim vs. MetLife.**

219.    The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

220.    The Plaintiffs, Steven and Patricia Brozek (the "Brozeks") own and occupy the residential property located at 27 Laurel Drive, Stafford Springs, CT 06067 ("subject property").

221.    At all times material to this claim, MetLife was writing homeowners' insurance policies and issuing such policies to residents in this state.

222.    The Brozeks built the subject property between 1984 and 1985.

223.    The Brozeks insured the subject property with MetLife from the date of construction to the present date with a homeowners' policy issued by MetLife ("Brozek Policy").

224.    The Brozeks paid any and all premiums charged by MetLife, at all times and without default.  The relevant portions of the current Brozek Policy are attached hereto as Exhibit 9.  The Brozeks intend to obtain a copy of all of their previous policies issued by MetLife through the discovery process.  Pursuant to all of these policies, MetLife has provided the Brozeks with continuous coverage the entire time that they have owned the subject property.

225.    Pursuant to the terms of the Brozek Policy, Section D-1, Paragraph 16.  Collapse, MetLife agreed to provide coverage for "sudden and accidental direct physical loss to covered

property involving the entire collapse of a building or any part of building caused only by one more or more of the following: …

> b.    hidden decay of the structure; …
>
> f.    use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.  [ . . . ] Collapse means an abrupt falling down or caving in of a building or any part of a building.  Collapse does not include settling, cracking, sagging, bowing, bending, leaning, shrinking, bulging or expansion.  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse."  See Exhibit 9, Section I- paragraph 16; Additional Coverages; at P. 7 of 8, Section D-5, Form HP 2000 0205.

226.    The language cited in paragraph 225 above, comes directly from two sources: (1) a 1999 copyrighted form HO 01 06 03 06, which was produced by ISO and virtually copied identically in paragraph 225 above (through the language in paragraph f) in the Brozek Policy and (2) a 2005 copyrighted form HO 01 06 03 06, which was produced by ISO and virtually copied identically in paragraph 225 above (beginning with the words "Collapse means an abrupt…) in the Brozek Policy.

227.    In September of 2015, the Brozeks discovered horizontal and vertical cracks in their basements walls and on visible portions of the outside of their basement walls.

228.    The Brozeks immediately hired a structural engineering firm, Fuss & O'Neill ("F & O") to investigate the cause of the failing concrete in their home.  See Expert Report attached hereto as Exhibit 10.

229.    F & O inspected the basement walls to observe and document the defects in the cement, including any cracks, spalls or other signs of deterioration.

230.    F & O then obtained core samples of concrete from the basement wall and basement slab.

231.    F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of defects.

232.    The laboratory testing was performed in two (2) phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction.

233.    Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was Pyrrhotite or Pyrite.

234.    F & O evaluated the results of the laboratory testing and concluded that the Brozeks, like their fellow Plaintiffs, and putative Class Members, had failing basement walls due to the defective cement.

235.    F & O concluded that the cement forming the basement walls was defective due to the presence of a sulfide mineral known as Pyrrhotite.

236.    Pyrrhotite is a destructive chemical that, when exposed to water and air, produces a chemical reaction, that expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

237.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

238.    On December 22, 2015, F & O told the Brozeks that their basement walls are substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

239.    Specifically, F & O told the Brozeks that "it is our professional engineering judgment that a chemical reaction of the concrete mix due to the presence of pyrrhotite is occurring and is expected to continue, resulting in increased deterioration and eventual failure of

the foundation to function as originally intended." <u>See</u> Exhibit 10 at pp. 5-6.  In other words, the sulfate attack will continue to deteriorate the cement until such time that the basement walls are destroyed and the home caves into its basement.

240.    Upon learning this, on January 20, 2016, the Brozeks filed a timely claim with MetLife pursuant to the terms of their homeowners' insurance policy.

241.    At the time the Brozeks filed their claim, they were aware that filing such a claim would be futile, specifically, the State Department of Insurance told the public that insurance companies were denying all claims for defective concrete.  The Brozeks were also aware of the many bad concrete cases brought because of denials of claims.  <u>See</u>, e.g., <u>Clarke v. Auto. Ins. Co., et al.</u>, No. TTD-CV13-6006996-S (Conn. Super. Ct. 2013) (Plaintiff's virtually identical bad concrete claim was denied by Metropolitan Group Property and Casualty Company).  <u>See also, supra</u>, ¶¶ 133-135.

242.    The Brozeks have a good faith basis to believe that their claim will be denied and that the filing of their claim is futile.

243.    By failing to provide coverage, MetLife has breached or will breach its contractual obligation under the homeowner's policy it entered into with the Brozeks.  This breach has resulted in enormous financial loss and damage to the Brozeks.

244.    The Brozek's basement wall problem is affecting hundreds of other homeowners in their region of this state.  The estimated cost to fix the Brozeks' basement wall problem, which is typical of hundreds of other homeowners, is estimated to exceed $150,000.00.

245.    As a consequence of MetLife's breach or anticipated breach of contract with the Brozeks, the Brozeks bring this claim individually and on behalf of all similarly situated homeowners in Connecticut.

**IX. Count IV:  Plaintiff Dyer's Breach of Contract Claim vs. Harleysville.**

246.    The Plaintiff incorporates in this count all allegations made elsewhere in this complaint.

247.    The Plaintiff, Michael Dyer ("Dyer") owns and occupies the residential property located at 83 Bentley Drive, Manchester, CT 06042 ("subject property").

248.    At all times material to this claim, Harleysville was writing homeowner's insurance policies and issuing such policies to residents in this state.

249.    Dyer purchased the subject property in July 2015.  The residence was constructed in 1995.

250.    Dyer insured the subject property with Harleysville from June 30, 2015 to the present date with a homeowners' policy issued by Harleysville ("Dyer Policy"). It was recently brought to Dyer's attention that Nationwide has purchased his Harleysville policy, however the language from the Harleysville policy still governs any of his claims.

251.    Dyer paid any and all premiums charged by Harleysville and Nationwide, at all times and without default.  The relevant portions of the Dyer Policy are attached hereto as Exhibit 11.

252.    Pursuant to the terms of Dyer's Harleysville Policy, Paragraph 8.  Collapse, Harleysville agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of building caused only by one more or more of the following:

…

b.      hidden decay; …

     f.      use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation."  See Exhibit 11, Section I-Property Coverages; Additional Coverages; at P. 5 of 18, Section 8, Form HO 00 03 04 91.

253.    The language cited in paragraph 252 above, comes from a 1990 copyrighted form HO 00 03 04 91, which was produced by ISO and used virtually exactly as quoted in paragraph 252 above in homeowners' insurance policies by all of the Insurance Company Defendants.

254.    In November of 2015, Dyer discovered horizontal and vertical cracks in his basements walls and on visible portions of the outside of his basement walls.

255.    Dyer immediately hired William F. Neal ("Neal"), a Licensed Professional Engineer and a Licensed Connecticut Home Inspector, to investigate the cause of the failing concrete in his home.

256.    Neal inspected the basement walls to observe and document the defects in the cement, including any cracks, spalls or other signs of deterioration.

257.    After inspecting the house, Neal concluded that Dyer, like his fellow Plaintiffs and putative Class Members, had failing basement walls due to the defective cement.

258.    Neal concluded that the cement forming the basement walls was defective due to a chemical reaction resulting from incompatible materials used in the concrete mix.

259.    Dyer's residence is facing an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

260.    Specifically, Neal told Dyer that the condition "will continue to deteriorate the concrete and the foundation walls will very likely bulge inward until they structurally fail."

261.    He is certain that the chemical reaction will continue to destroy the cement until such time that the basement walls are deteriorated and the home caves into its basement.

262.    On January 25, 2016, Dyer filed timely claims with Harleysville/Nationwide pursuant to the terms of his homeowner's insurance policy.

263.    At the time Dyer filed his claim, he was aware that filing such a claim would be futile.  Dyer was also aware of the many concrete cases brought because of denials of claims.  See, e.g., Stavinsky v. Harleysville Worcester Insurance Co., TTD-CV13-6006135S, Judicial District of Tolland at Rockville (Plaintiff's virtually identical foundation claim was denied by Harleysville).

264.    On January 27, 2016, Michael A. Emanuel ("Emanuel"), a claims adjustor from Nationwide, was dispatched to Dyer's residence pursuant to Dyer's claim.

265.    Emanuel told Dyer that "99 out of 100" claims similar to Dyer's get rejected and he would likely be issuing a denial letter soon.

266.    Dyer has a good faith basis to believe that his claim will be denied and that the filing of his claim is futile.

267.    Dyer is well aware of his obligation to file a timely lawsuit and knows that there is no assurance that Harleysville will deny any claims they make within the one (1) year statute of limitations.  Necessarily, Dyer filed this suit prior to any denial of his claim for coverage.

268.    By failing to provide coverage, Harleysville/Nationwide has breached its contractual obligations under the homeowner's policy they entered into with Dyer.  These breaches have resulted in enormous financial loss and damage to Dyer.

269.    Dyer's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  The cost to fix Dyer's basement wall problem, which is typical of hundreds of other homeowners, is estimated to exceed $150,000.00.

270.    As a consequence of Nationwide's/Harleysville's breach of contract with Dyer, Dyer brings this claim individually and on behalf of all similarly situated homeowners in Connecticut.

**X.    Count V:  Violation of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA)against ISO, Harleysville, Nationwide, Kemper, 21st Century, Homesite, AIG and MetLife.**

271.    The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

272.    The Defendant Insurance Companies are insurance companies licensed and qualified to engage in the business of insurance within the State of Connecticut.

273.    The Defendant Insurance Companies issued homeowners' insurance policies to parties that provide virtually identical collapse coverage, to wit:

> "We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: … b. Hidden decay; …[or] f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation."

See ISO Language Chart (Exhibit 2) revealing standardized language.

274.     Upon information and belief, the Defendant Insurance Companies are either members of ISO and/or own shares in ISO's publicly traded parent company, Verisk Analytics. Each of the Defendant Insurance Companies have looked to, consulted with and taken input from ISO when drafting the insurance policies at issue, and the denials for bad concrete claims.

275.    Further, ISO is responsible for drafting uniform policy provisions and filing them with DOI, which language the Insurers use in all of their homeowner's insurance policies.  In fact, most times, the Defendant Insurance Companies have adopted the ISO language wholesale.

276.     Through its participation in ISO, the Defendant Insurance Companies know that insureds in northeastern Connecticut have made valid claims stemming from policy coverage language, including but not limited to, hidden decay and the use of defective material or methods in building the basement walls.  The Defendant Insurance Companies know that numerous claims that have been filed due to hidden decay and defective materials, and also know that insurers have denied these claims for a variety of invalid reasons.  See, e.g., Metsack v. Liberty Mutual Fire Insurance Co. et al., 2015 WL 5797016, Docket No. 3:14-CV-01150(VLB) (D. Conn.) (denying claim due to alleged "settling/earth movement or seepage from ground water"); Panciera et. al. v. Kemper Independent Insurance Co., No. 3:13-CV-1009 (JBA), 2014 WL 1690387 (D. Conn. April 29, 2014) (denying claim due to, amongst other claims, alleged "faulty construction"); Belz et al. v. Peerless Insurance Co., No. 3:13-CV-01315, 2013 WL 4984704, (D. Conn. Sept 6, 2013) (denying claim due to alleged "poor workmanship and materials used"); Karas et al. v. Liberty Insurance Corp., No. 3:13-CV-01836, 2013 WL 6778455 (D. Conn. Dec. 11, 2013) (denying claim due to alleged deterioration); ; Lincoln et al. v. United Services Automobile Association, No. 3:14-CV-00333 (D. Conn. 2014) (denying claim for a variety of reasons including, but not limited to, alleged wear and tear, marring, deterioration, settling, faulty workmanship/construction).

277.     A growing number of Connecticut cases have seen either (1) damages awarded to insureds/homeowners due to claims that defective concrete has caused their basement walls to fail or (2) settlements between insurers and insureds/homeowners due to the same claims.  All of these cases have seen claim denials based on the standardized ISO language and facts strikingly similar to those of the subject Plaintiffs and putative Class Members.  Due to their participation

in ISO, Defendant Insurance Companies are keenly aware of <u>Bacewicz</u>, <u>Panciera</u> and all of the other similarly situated cases that have settled or received judgments in favor of the insureds.

278.    Based on the foregoing, the Defendant Insurance Companies were aware that denials based on the reasons aforementioned, were false and misleading, considering the case law and the provisions of the Plaintiffs' homeowners' policies.

279.    The Defendant Insurance Companies, as part of their regular business practice, denied the Plaintiffs' claims and said denials were unfair, deceptive and have caused substantial injury to consumers (the Plaintiffs and putative Class Members).

280.    The Defendant Insurance Companies have repeatedly denied valid claims in great number, often following inadequate claim investigations.  These denials were made for disingenuous reasons and frequently made after much delay.

281.    Based on the plain language of the homeowners' policies, and reasonable lay person's interpretation of the homeowners' policies issued by the Defendant Insurance Companies, the Defendant Insurance Companies are obligated to payout the claims made by the Plaintiffs for decaying concrete and crumbling basement walls.  Despite the Defendant Insurance Companies' contractual obligation, these companies have repeatedly taken part in a uniform industry wide practice of unfairly denying coverage for these types of claims.

282.    The Plaintiffs derive no benefit from the Defendant Insurance Companies' industry wide practice of denying meritorious claims based on their misleading, deceptive, delayed and unscrupulous denials.

283.    Armed with the knowledge that there were numerous bad concrete claims and that all insurance companies were denying these claims, the Defendant Insurance Companies did not

attempt "in good faith to effectuate prompt, fair and equitable settlements in which liability has become reasonably clear."  C.G.S. § 38a-816(6)(f).

284.    In fact, the Defendant Insurance Companies repeatedly denied meritorious claims, provided misleading denial letters, failed to conduct reasonable investigations and unscrupulously delayed denying claims when they knew they were going to reject them anyway. C.G.S. § 38a-816(a), (d) and (e).  While attending to this scheme of unethical, immoral and oppressive behavior, the Plaintiffs have been substantially harmed by living in homes in a state of collapse, while worrying about the statute of limitations and pursuing unnecessary lawsuits.

285.    The outrageously unprincipled practices of these Defendant Insurance Companies are unfair and offend public policy.  Mayors, state legislators and U.S. Congressmen and Senators are pleading for government money to replace the basement walls of hundreds, perhaps thousands, of their constituents.  The Governor has set in motion a task force to examine the scope of the problem.  The Attorney General's Office, working together with the Department of Consumer Protection, Department of Insurance and the Department of Banking, are five (5) months into an investigation to determine the cause of the collapsing homes, the geographic scope of the affected homeowners and the potential fixes for the problems, including legislative reform.   The Commissioner of the Connecticut Department of Insurance has even issued a directive to insurance companies forbidding them from non-renewing affected homeowners' insurance policies.

286.    Flying in the face of public policy are the Defendant Insurance Companies' industry wide trade practices of deceit, delay and denial, which practices endanger the free flow of credit to consumers, drastically lowers property values and destabilizes the housing market.

287.    The Defendant Insurance Companies' unfair trade practices have caused the Plaintiffs' enormous harm and ascertainable damages.  They can not sell or refinance their homes.  They are paying too much in taxes for homes that are essentially worthless.  They have lost money because they paid for an insurance contract that they did not bargain for and, among other things, they have incurred attorney's fees and costs related to pursuing this lawsuit.

288.    As a result of the above conduct and engaging in conduct prohibited by CUIPA, the Defendant Insurance Companies have also violated the Connecticut Unfair Trade Practices Act.  C.G.S. § 42-110b(a).

## XI.    Count VI:    Declaratory Judgment for Class

289.    The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

290.    This action is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, to resolve an actual controversy regarding the meaning of the insurance policy language upon which the Insurance Company Defendants are relying to deny Plaintiffs and putative Class Members any coverage for bad concrete claims.

291.    An actual controversy exists between Plaintiffs, other putative Class Members similarly situated and the Insurance Company Defendants concerning whether the denials of coverage under these homeowners' policies are enforceable under applicable law or whether the language of these policies is ambiguous to such an extent that the language must be construed in favor of the Plaintiffs and putative Class Members, and against the Insurance Company Defendants.

292.    Plaintiffs and other putative Class Members are entitled to obtain a declaratory ruling as follows:

46

As a consequence of several Connecticut Federal Court rulings that certain defined terms in Plaintiffs' and Putative Class Members' homeowners' insurance policies are ambiguous, the Plaintiffs and putative Class Members seek a declaration that the Insurance Company Defendants have a duty to provide coverage for claims resulting from the iron-sulfide-infected Mottes concrete.

## XII.   Remedy for Plaintiffs and the Class

293.   The Plaintiffs incorporate in this count all allegations made elsewhere in this complaint.

294.   There are at least four common issues among all Plaintiffs and putative Class Members:

    a.   Whether Defendant Insurance Companies breached their contract of insurance with the Plaintiffs and putative Class Members by failing to provide coverage for bad concrete claims.

    b.   Whether Defendant Insurance Companies and ISO conspired to provide unsuitable homeowners insurance policies to Plaintiffs and putative Class Members all the while being previously aware of bad concrete claims and knowing full well that these policies would not provide coverage for bad concrete claims.

    c.   Whether Defendant Insurance Companies, as part of a regular business practice, denied the insureds' claims in an unfair, deceptive manner that has caused substantial injury to the Plaintiffs and putative Class Members.

    d.   Whether the Plaintiffs and putative Class Members suffered losses and, if so, the proper measure of the losses.

295.   Plaintiffs and putative Class Members seek various forms of relief that could be ordered as "common answers" to resolve the litigation.  These common answers consist of the following:

    a.   An order compelling Defendants to pay for the costs of replacing the basement walls of each of the Plaintiffs and members of the Class;

    b.   Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the denials of the bad foundation claims;

47

c. An Order awarding actual damages in the amount of any losses the Plaintiff or members of the Class suffered;

d. An Order awarding pre- and post- judgment interest pursuant to C.G.S. 37-3a and other applicable laws and regulations;

e. An Order awarding costs pursuant to C.G.S. § 42-110g and other applicable laws or regulations;

f. An Order awarding attorneys' fees pursuant to C.G.S. § 42-110g and other applicable laws or regulations;

g. An Order or affirmative injunction for disgorgement of profits, equitable restitution, contract reformation, surcharge and other appropriate equitable and injunctive relief against the Defendants;

h. An Order certifying a class action under one or more of Rule 23(b)(1), 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

i. Such other and further relief as this Court may seem just and proper.

296. While there are many ways to provide relief here and the Plaintiffs and putative Class Members wish to keep every option open, the biggest things the Plaintiffs and putative Class Members want can be simply described.  They want an order that requires the Defendant Insurance Companies and ISO to remove their existing basement walls and build brand new ones.  They want their attorneys' fees paid.  The calculations for the costs of basement wall replacements can be structured in an entirely ministerial, not discretionary way.  Rather than the Court having to look in every basement, the Court can establish a set price per square foot for which to reconstruct the basement walls and multiply that price by the total square footage of the basement.

## XIII.  Class Action Allegations.

297.    **Class Definition.**  Plaintiffs bring this action as a class action under Fed. R. Civ.

P. 23 (a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs

and the following class of persons similarly situated (the "Class"):

298.    All individuals who own a home in the Connecticut towns of Manchester,

Andover, Ellington, Stafford Springs or any other Connecticut town located east of the

Connecticut River whose homes are insured by any of the Insurance Defendants, and whose

homes have sustained 'pattern cracking' including but not limited to horizontal and vertical

cracks on their basement walls, and whose bad foundation claims have been denied or will be

denied by the Insurance Defendants, which denials are or will be based on the same standardized

language regarding the term 'collapse', the term 'basement', the term 'foundation', the term

'decay', the term 'hidden' and the term 'retaining wall.'

299.    **Numerosity.**  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class Members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are

more than 500 members of the Class, perhaps thousands.  Defendants possess the exact

information that makes it feasible to determine the actual number of Class Members.  In fact,

Defendants have business records that identify this type of information.

300.    **Commonality.** Repeated complaints are filtering into the Courts.  While these

complaints are all isolated from one another, the Plaintiffs in these cases are all saying the same

thing.  They are complaining about their basement walls having Mottes' defective concrete.

They are all making the same kind of allegations as are the Plaintiffs in the instant case.  They

are all getting the same kind of denial letters.  See, supra, fn. 2 at Sec. V(A), para. 135.  These

49

cases are all connected but the Plaintiffs don't know it.  Soon, there will be an avalanche of these similar cases if there is not a class action.

301.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

 a. whether Defendant Insurance Companies breached their contract of insurance with the Plaintiffs and putative Class Members by failing to provide coverage for bad concrete claims.

 b. whether Defendant Insurance Companies and ISO conspired to provide unsuitable homeowners insurance policies to Plaintiffs and putative Class Members all the while being previously aware of bad concrete claims and knowing full well that these policies would not provide coverage for bad concrete claims.

 c. Whether Defendant Insurance Companies, as part of a regular business practice, denied the insureds' claims in an unfair, deceptive manner that has caused substantial injury to the Plaintiffs and putative Class Members.

 d. Whether the Plaintiffs and putative Class Members suffered losses and, if so, the proper measure of the losses.

302.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is the same as to all members of the Class; and (b) the losses suffered by the Plaintiffs are caused by the standardized language, unsuitability of and inadequate disclosures associated with Defendants' homeowner's insurance product.

303.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in litigation generally.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

304.    **Rule 23 (b)(1) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(1) because prosecution of separate actions by the members of the

class would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the class and adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests. Specifically, if the policy language challenged here is ambiguous as claimed here, such a determination would be dispositive of the interests of other homeowners.

305. **Rule 23 (b)(2) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(2) because the parties opposing the class have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Specifically, the homeowner's insurance policies at the center of this lawsuit are pre-packaged using uniform advice and uniform policy language.

306. **Rule 23 (b)(3) Requirements.** Class action status is also warranted under Fed. R. Civ. P. 23 (b)(3) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIV. Requested Relief.

307. Plaintiffs request the following relief:

a.    an order compelling Defendants to pay for the costs of replacing the foundations of each of the Plaintiffs and members of the Class;

b.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the denials of the bad foundation claims;

c.    An Order awarding actual damages in the amount of any losses the Plaintiff or members of the Class suffered;

d.    An Order awarding pre- and post- judgment interest pursuant to C.G.S. 37-3a and other applicable laws and regulations;

e.    An Order awarding costs pursuant to C.G.S. § 42-110g and other applicable laws or regulations;

f.    An Order awarding attorneys' fees pursuant to C.G.S. § 42-110g and other applicable laws or regulations;

g.    An Order or affirmative injunction for disgorgement of profits, equitable restitution, contract reformation, surcharge and other appropriate equitable and injunctive relief against the Defendants;

h.    An Order certifying a class action under one or more of Rule 23(b)(1), 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

i.    Such other and further relief as this Court may seem just and proper.

## DEMAND FOR TRIAL BY JURY

308.    Plaintiffs demand a trial by jury on all the claims and counts of this Complaint.

THE PLAINTIFFS:


By__/s/_____
    Ryan P. Barry (ct21683)
    Anthony Spinella, Jr. (ct29782)
    Barry & Barall, LLC
    202 West Center Street
    Manchester, CT  06040
    (860) 649-4400
    (860) 645-7900
    rbarry@barryandbarall.com

    THEIR ATTORNEYS