**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| HALLORAN, et al. | : | DOCKET NO. 3:16-cv-00133-VAB |
| Plaintiffs | : | |
| v. | : | |
| HARLEYSVILLE PREFERRED INSURANCE CO., et al., | : | |
| Defendants. | : | March 28, 2016 |

# Plaintiffs' Memorandum of Law
# Supporting Motion for Class Certification

## 1.  Summary.

This lawsuit was brought by insureds who own homes in Manchester, Ellington, Ashford and Stafford Springs, Connecticut.  Their basement walls are irreversibly deteriorating as a result of defective concrete supplied by J.J. Mottes & Co. (Mottes). The basis for these suits is threefold.  First, the defective cement provided by Mottes has caused the Plaintiffs' basement walls to fail.  Second, the Plaintiffs' homeowners insurance companies have declined to cover these failing basement walls.  Experts say the basement walls need to be removed and replaced but the insurance companies refuse to replace the defective concrete. Because the material language in the plaintiffs' insurance policies is virtually identical due to the industry-wide adoption of language written by the Insurance Services Office, Inc. (ISO), the plaintiffs are well suited for class action treatment. The plaintiffs seek to certify the following class:

> All individuals who own a home in the Connecticut towns of Manchester, Andover, Ellington, Stafford Springs or any other Connecticut town located east of the Connecticut River whose homes are insured by any of the Insurance Defendants, and whose homes have sustained 'pattern cracking' including but not limited to horizontal and vertical cracks on their basement walls, and whose bad foundation claims have been denied or will be denied by the Insurance

Defendants, which denials are or will be based on the same standardized language regarding the term 'collapse', the term 'basement', the term 'foundation', the term 'decay', the term 'hidden', and the term 'retaining wall.'

Discovery on class certification has not begun, so plaintiffs reserve the right to modify their request for certification accordingly.

**2.      Background as alleged in the First Amended Complaint: the plaintiffs are insureds who own homes in Manchester, Ellington, Ashford, and Stafford Springs, Connecticut, whose homes' basement walls are irreversibly deteriorating and whose homeowners insurance companies have denied or will deny them coverage to fix the problem.**

Plaintiffs' basement walls are in a state of collapse because they were built with defective concrete containing deleterious iron sulfide minerals mined by Mottes.  The oxidation (rusting) of these minerals, some of which are pyrrhotite, pyrite, and marcasite, produces a chemical reaction that causes the concrete to swell and crack and the cement paste to break down.  This is a continuous and irreversible condition. Ultimately, the Plaintiffs' homes will fall into their basements.

The Plaintiffs have filed claims for coverage with their insurance companies. These claims will only get denied. In fact, repeated complaints are filtering into the Courts. In all of these cases, the Defendant Insurance Companies have all signed on to standardized language peddled to them by Defendant Insurance Services Office, Inc. and they have refused to do what they promised, namely – provide coverage should hidden decay occur in or defective material be found in the basement walls. The homeowners in all of those cases all had the same problems, made the same kind of claims based on standardized policy language, and got the same type of denial letters. These people have been operating in isolation but, actually, they are all saying the same

thing — their basement walls are in a state of collapse and their insurance should pay to replace them.

Now, after discovering their deteriorating basement walls, Plaintiffs have homes that are practically impossible to sell, practically impossible to refinance and, eventually, will be impossible to safely live in. They sue Defendants individually and on behalf of others who are similarly situated because they (1) have basement walls that are irreversibly deteriorating and failing due to defective concrete and (2) have claims that have been denied or will be denied by the Defendant Insurance Companies. The net result of these twin problems leaves those whose homes have Mottes concrete in a heap of trouble. In fact, the only remedy for these people is, as a matter of science, to replace their basement walls. They seek a Court order for, among other things, new basement walls, their attorneys' fees, their costs, pre- and post-judgment interest and for other equitable relief.

The Defendant Insurance Companies and ISO led Plaintiffs and Putative Class Members into a sinkhole of financial trouble.  Each Plaintiff and putative Class Member owns real property that is crumbling and/or exhibiting a pattern cracking consistent with cement that contains pyrrhotite and/or other iron sulfides that cause their basement walls to fail.

Each Plaintiff and proposed Class Member holds an insurance policy that provides coverage should their basement walls collapse (i.e., decay or be built with defective materials).  Each Plaintiff's and each proposed Class Member's home was built using cement from Mottes. Each Plaintiff and proposed Class Member has either: (a) made a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes and been denied by their

insurer based on reasons contrary to the express provisions of their respective policy; or (b) made a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes pursuant to their respective insurance policy and their insurer has expressed an intent to deny coverage, and at least at the time that this action was filed, failed to respond; or (c) considered making a claim for coverage with one of the Defendant Insurance Companies due to decay and/or defective cement from Mottes pursuant to their respective insurance policy but determined that doing so would be futile.

Even if a respective plaintiff or putative Class Member submits a claim pursuant to their respective insurance policy, each and every claim will be denied. Indeed, submitting a claim for insurance coverage by the Plaintiffs or putative Class Members is an exercise in futility.

Modern insurance practices reveal why filing a bad concrete claim is futile. Insurance companies these days belong to associations that put time and resources into developing standardized language for insurance policies. Member insurance companies in Connecticut adopt this uniform language and then all of these member companies interpret it the same way. That is what happened in this case. Each of the Defendant Insurance Companies is either a member of ISO, and/or owns shares in ISO's publicly traded parent company (Verisk Analytics) and/or heavily relies upon copyrighted advice from ISO. Each of the Defendant Insurance Companies adopted the language drafted by ISO. And each of the Defendant Insurance Companies has denied or will deny claims based on this uniform language.

While there is no requirement for any Plaintiff or putative Class Member to file a

claim for coverage pursuant to their policies, filing a bad concrete claim at this time is futile because the Connecticut Department of Insurance (DOI) has concluded that insurance companies in Connecticut are collectively denying these claims. For instance, DOI has acknowledged this consistent and collective position of insurance companies in conversations with the Plaintiffs' attorneys.  DOI has even gone so far as to make a public declaration of this "deny" position at a public forum attended by hundreds of affected homeowners.

The futility of filing a bad concrete claim is also highlighted by the repeated complaints filed in this Court over the past few years. One jury has already reached a verdict in favor of the plaintiffs who sued their insurance company over their denial of a bad concrete claim. See, e.g., Bacewicz v. NGM Insurance Co., 3:08-CV-1530 (JCH), 2010 WL 3023882 (D.Conn. Aug. 2, 2010) (awarding homeowner $215,963.74 to replace basement walls). In all of the other bad concrete cases, the plaintiffs made the same types of claims and the insurance companies issued standard denial letters.[1]

---

[1]  See Jones v. Standard Fire Insurance Co., No. TTD-CV-116004270, 2013 WL 541015 (Conn. Super. Ct. Jan. 11, 2013); Gambacorta v. Covenant Insurance Co., No. TTD-CV-136006583, 2015 WL 1867090 (Conn. Super. Ct. March 23, 2015); Waters v. Liberty Mutual Insurance Group, Inc., No. TTD-CV-065000709, 2009 WL 4282809 (Conn. Super. Ct. November 9, 2009); Tofolowsky v. Bilow, No. TTD-CV-970063795, 2003 WL 1475141 (Conn. Super. Ct. March 17, 2003); R.I. Pools, Inc. v. Paramount Concrete, Inc. 149 Conn. App. 839 (2014); Musgrave et al. v. State Farm Fire and Casualty Company et al., No. TTD-CV15-6009840 (Conn. Super. Ct. 2015); Cote et al. v. Travelers Indemnity Company of America, No., TTD-CV-15-6008838 (Conn. Super. Ct. 2014); Bacewicz v. NGM Insurance Co., No. 3:08-CV-01530, Judgment (D. Conn. Feb. 11, 2011); Possardt et al. v. General Casualty Co., 3:13-cv-00055-SRU (D. Conn. 2013); Panciera et. al. v. Kemper Independent Insurance Co., No. 3:13-CV-1009 (JBA), 2014 WL 1690387 (D. Conn. April 29, 2014); Belz et al. v. Peerless Insurance Co., No. 3:13-CV-01315, 2013 WL 4984704, (D. Conn. Sept 6, 2013); Karas et al. v. Liberty Insurance Corp., No. 3:13-CV-01836, 2013 WL 6778455 (D. Conn. Dec. 11, 2013); Lincoln et al. v. United Services Automobile Association, No. 3:14-CV-00333 (D. Conn. 2014); Metsack et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01150 (VLB), 2015 WL 5797016 (D. Conn. Sept. 30, 2015); Gabriel et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01435, 2015 WL 5684063 (D. Conn. Sept. 28, 2015); Roberts et al. v. Amica Mut. Ins. Co., No. 3:14-CV-1589 (SRU), 2015 WL 7458510 (D. Conn. Nov. 24, 2015); Ray et al. v. Pacific Specialty Insurance Co., No. 3:15-CV-00871 (D. Conn. 2015); Kim et al. v. State Farm Fire & Casualty Co., No. 3:15-CV-00879 (D.Conn. 2015); Mensher et al. v. Liberty Mutual Fire Insurance Co., No. 3:15-CV-01007 (D.Conn. 2015); Carlson et al. v. Allstate Insurance Co., No., 3:15-CV-01045 (D.Conn. 2015); Lees et al. v. Allstate Insurance Co., No., 3:15-CV-01050 (D.Conn. 2015); Jang et al. v. Liberty Mutual Fire Insurance Co., 3:15-CV-01243 (D.Conn.

Indeed, it is no coincidence that the language, terms and conditions contained in the ISO copyrighted contracts of insurance are virtually the same language, terms and conditions cited by the Defendant Insurance Companies to support claim denials.

Upon information and belief, ISO and the Defendant Insurance Companies have formed a cartel that agreed to deny the Plaintiffs and putative Class Members coverage under their policies for defective concrete claims. In addition to this stonewalling scheme, the Defendant Insurance Companies repeatedly and baselessly covered its refusal to payout on bad concrete claims behind a smokescreen of actuarial-motivated policy language.

The widespread pattern of defective concrete claim denials has led Plaintiffs and hundreds of similarly-situated homeowners to decry this insurance practice in forums of meaning — from town halls, to the statehouse, to the courthouse. The cost of replacing the basement walls is generally between $100,000.00 and $250,000.00. After paying insurance premiums for years, or even decades, Plaintiffs and putative Class Members are left to face this massive expense all alone.

While ISO was shoring up the "collapse" definition to minimize liability for defective concrete claims, the Plaintiffs and Putative Class Members continued to be deprived of the benefits of their insurance policies.  In order to deny bad foundation claims, Defendant Insurance Companies have relied, in part, on ISO-authored amendments to the homeowners' policies issued to Plaintiffs and/or the putative Class Members. The amendments were made to the terms of the homeowners' policies, in Section I — Property Coverages, E. Additional Coverages, Para. 8, Collapse. Certain amendments to the ISO Forms were made in

---

2015); Roberge et al. v. Amica Mutual Insurance Co., No. 3:15-CV-01262 (D.Conn. 2015); Sabonis v. Kemper Independence Insurance Co., No., 3:14-CV-00694 (D.Conn. 2014).

1990 (HO 00 03 04 91), in 1999 (HO 00 03 10 00), in 2004 (HO01060205) and in 2011 (HO 01 06 12 11). In 1990, ISO amended its Form to protect the Defendant Insurance Companies, in part, from bad concrete claims. See Harleysville Policy Collapse Language (attached to First Amended Complaint). Specifically, ISO added new language to the definition of collapse that (1) excluded loss to a 'foundation' and 'retaining wall' and (2) excluded 'settling, cracking, shrinkage, bulging, or expansion."  In 1999, ISO once again amended its Form to change the definition of "collapse" to mean an "abrupt falling down or caving in of a building or any part of a building…"

In 2004, ISO again changed its Form language removing from the defective material coverage any such material "if the collapse occurs during the course of construction, remodeling, or renovation." In 2011, ISO again narrowed its Form language by adding an entirely new paragraph stating "The coverage provided under this Additional Coverage-Collapse applies only to an abrupt Collapse (emphasis added)."

Prior to the amendments, the word collapse, as used in the Additional Coverages section of homeowner policies issued in Connecticut, was construed by the Supreme Court of Connecticut to mean a "substantial impairment in the structural integrity of a building." See Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252 (1987).

Prior to making the changes to the Collapse Coverage and then peddling it to the Plaintiffs and/or putative Class Members, the Defendant Insurance Companies and ISO well knew that the Defendant Insurance Companies had insured a legion of homes in the northeastern section of Connecticut that had been constructed between 1984 and 1998 with defective concrete.

The Defendant Insurance Companies and ISO knew that it was only a matter of

time before some number of those insureds' homes would develop pattern cracking as a manifestation of the defective concrete used in the original construction of the basement walls. The Defendant Insurance Companies and ISO also knew that all of the insureds' homes constructed between 1984 and 1998 with the defective concrete would eventually collapse once the concrete disintegrated to the point that the basement walls could no longer perform as intended.

The Defendant Insurance Companies and ISO were aware of cases that had been filed and claims that had been made at least as early as 1996 involving defective concrete in homes in northeastern Connecticut. See, e.g., Parker v. Worcester Ins. Co., 247 F.3d 1, 3 (1st Cir. 2001) (Court noting that insurance company denied plaintiff's claim for coverage for collapsing basement walls due to defective concrete). Through the discovery process, Plaintiffs intend to show that the Insurance Company Defendants' knowledge of the issue in northeastern Connecticut was one of the factors that led ISO to change the definition of collapse in the policy language.

The Defendant Insurance Companies and ISO, on notice of the Beach Court's construction of the word "collapse" and on notice of the defective concrete claims in northeastern Connecticut, deliberately changed their policies' definition of "collapse" to avoid or minimize liability for potential claims brought by the Plaintiffs and putative Class Members, which they all knew would come to pass someday in Northeastern Connecticut. The Defendant Insurance Companies and ISO expanded the definition of "collapse" to mean a "sudden" or "abrupt" collapse. This change would allow the Defendant Insurance Companies to deny claims on the basis that "collapse" meant more than a "substantial impairment of the structural integrity

of a building". What makes this actuarial sleight of hand so deceitful is these changes were made in 2005 -- years after the Defendants knew about the defective concrete claims.

Besieged by insureds raising this issue, the Defendant Insurance Companies kept denying claims, providing bogus responses when they knew they were good claims while at the same time casting about for a way to shore up the language in their policies. While scrambling to rewrite their policies, the Defendant Insurance Companies engaged in a scheme to deny people coverage by providing misleading responses to claims, holding off on deciding claims while the statute of limitations was running and by defending unnecessary lawsuits.

After changing the policy language to better suit them, the Defendant Insurance Companies made no offer to continue to provide the original coverage at an additional premium. Upon information and belief, by making the changes to the Additional Coverages section, the Defendant Insurance Companies attempted to reduce their financial risk under the homeowners' policies issued to the Plaintiffs and putative Class Members, but they made no corresponding reduction in premiums.

The Defendant Insurance Companies made a unilateral change to the policy without providing adequate notice or adequate disclosure. This unilateral change was ineffective to alter or amend the terms of the original contract of insurance between the Defendant Insurance Companies and the Plaintiffs and/or putative Class Members. As a consequence of the ineffectiveness of the Amendment to the Additional Coverages section, the original provisions of the Additional Coverages section remain in full force and effect. The Defendant Insurance Companies delivered to these insureds unsuitable insurance policies in exchange for lucrative premium payments. What's worse is the Defendant Insurance Companies were a mouthpiece for ISO, frequently selling and reinforcing the ISO copyrighted policy and the wisdom of paying for

it. What they were actually selling was an egregiously unsuitable product wrapped in a veneer of respectability. The Defendant Insurance Companies knew or should have known that the policies were nothing of the sort and that its real interest was selling the policies to reap an enormous bounty — decades of premium payments —without fear of the otherwise inevitable claim.

The plaintiffs make these claims in a Complaint with allegations in four counts:

- Count I alleges that the defendants Harleysville, Nationwide, Automobile Insurance Company of Hartford Connecticut and Kemper breached their insurance contracts with plaintiffs Michael and Joyce Halloran.
- Count II alleges that the defendants 21st Century, Homesite and AIG breached their insurance contracts with plaintiffs Kenneth and Victoria Masciovecchio.
- Count III alleges that the defendant MetLife breached its insurance contracts with plaintiffs Steven and Patricia Brozek.
- Count IV alleges that the defendant Harleysville breached its insurance contract with plaintiff Michael Dyer.

## 3.   The applicable standard: the Court must be satisfied that the plaintiffs meet each element of Rule 23.

The U.S. Supreme Court in its 1997 decision in <u>Amchem Prods., Inc. v. Windsor</u> explained that the Rule 23 class action device is to be used to remedy widespread policies or practices that violate federal or state laws.[2] Rule 23 strikes a balance between the need for and efficiency of a class action and the interests of class members in pursuing their claims individually. As <u>Moore's Federal Practice</u> puts it, the class action rules aim "to promote judicial economy and efficiency by obviating the need for multiple adjudications of the same issues."[3] Or as the Second Circuit said in <u>In re Drexel Burnham Lambert Group</u> in 1992, it is appropriate where individual adjudications would take many years and would drastically increase the legal expenses for all parties --

---

[2] 521 U.S. 591, 616, 117 S.Ct. 2231, 2246 (1997).
[3] *See Moore's Federal Practice,* vol. 5, sec. 23.02.

where joinder of all claimants would be expensive, time consuming, and logistically
unfeasible.[4]

In 2006 in <u>In re IPO</u>, the Second Circuit clarified the criteria for certifying classes
under Federal Rule of Civil Procedure 23:

> (1) a district judge may certify a class only after making determinations
> that each of the Rule 23 requirements has been met; (2) such
> determinations can be made only if the judge resolves factual disputes
> relevant to each Rule 23 requirement and finds that whatever underlying
> facts are relevant to a particular Rule 23 requirement have been
> established and is persuaded to rule, based on the relevant facts and the
> applicable legal standard, that the requirement is met; (3) the obligation
> to make such determinations is not lessened by overlap between a Rule 23
> requirement and a merits issue, even a merits issue that is identical with a
> Rule 23 requirement; (4) in making such determinations, a district judge
> should not assess any aspect of the merits unrelated to a Rule 23
> requirement; and (5) a district judge has ample discretion to circumscribe
> both the extent of discovery concerning Rule 23 requirements and the
> extent of a hearing to determine whether such requirements are met in
> order to assure that a class certification motion does not become a pretext
> for a partial trial of the merits.[5]

**4.      Rule 23's structure: plaintiffs must satisfy Rule 23 (a) and at least one
subsection of Rule 23 (b).**

According to the Second Circuit in <u>Drexel</u>: "In determining whether a class
should be certified, a district court must first consider each of the factors set forth in
Fed.R.Civ.P. 23 (a)."[6]  Rule 23 (a) of the Federal Rules of Civil Procedure says that "one
or more members of a class may sue . . . as representative parties on behalf of all" if:

(1)      "the class is so numerous that joinder of all members is impracticable,"

(2)      "there are questions of law or fact common to the class,"

(3)      "the claims ... of the representative parties are typical of the claims ... of
the class," and

---

[4] 960 F.2d 285, 290 (2d Cir. 1992).
[5] 471 F. 3d 24, 52-53 (2d Cir. 2006).
[6] <u>Drexel</u>, <u>supra</u>, 960 F.2d at 290.

(4)     "the representative parties will fairly and adequately protect the interests of the class."

In 1994, the Second Circuit, in <u>Comer v. Cisneros</u>, said that Rule 23 (b) also requires that a class action satisfy one of three subsections: Rule 23 (b)(1), (b)(2) or (b)(3).[7] But in 1997, the D.C. Circuit in <u>Eubanks v. Billington</u> said that these three categories of class actions are not mutually exclusive, and a class may be certified under more than one category.[8] Still, As a practical matter, the Second Circuit said in 2001 in <u>In re Visa Check/Mastermoney Antitrust Litig.</u>, "once a court has found that a class action is maintainable under any single category of Rule 23 (b), there is no necessity of showing that it may also be brought under any other."[9]

In 1998, the District of Connecticut, determined in <u>Messier v. Southbury Training School</u> that there are "important procedural distinctions" between classes certified under Rule 23 (b)(3) and classes certified under Rule 23 (b)(1) and (2).[10]  As explained by the District of Connecticut in 1998 in <u>Flanigan v. General Electric</u>, certifications under Rule 23 (b)(1) and (b)(2) are described as "mandatory classes" because the class member may not opt out of the action and bring separate litigation that might prejudice other class members or the defendant.[11]  By contrast, as the <u>Messier </u>Court said, Rule 23 (b)(3) allows class members an "absolute right to opt out" and pursue their claims individually.[12] The 1998 D.C. Circuit in <u>Thomas v. Albright</u> said the drafters of Rule 23

---

[7] 37 F.3d 775, 796 (2d Cir. 1994).

[8]  110 F.3d 87, 91 (D.C. Cir. 1997).

[9] 280 F.3d 124, 145 (2d Cir. 2001). <u>See</u> <u>also</u>, <u>Hilton v. Wright</u>, 235 F.R.D. 40 (N.D.N.Y. 2006) "Rule 23 requires a litigant who should bring a class action to overcome two hurdles.  First, he must satisfy all the conditions of Rule 23(a) and then he must also convince the Court that his action is appropriate under *one* of the three subdivisions of Rule 23(b)" (<u>citing</u>, <u>Green v. Wolf Corp.</u>, 406 F.2d 291, 298 (2d Cir 1968); <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 614 117 S. Ct. 2231, 2245, 138 L. Ed. 2d 689 (1997)(emphasis added)). <u>See also</u> <u>Marriott v. Montgomery</u>, 227 F.R.D. 159, 171 (N.D.N.Y. 2005).

[10] 183 F.R.D. 350, 353 (D.Conn. 1998).

[11] 1998 U.S. Dist. LEXIS 22873, *19 (D. Conn. 1998).

[12] <u>Messier</u>, <u>supra</u>.

did not provide that absolute right for Rule 23 (b)(1) and (b)(2) because the group nature of the harm alleged and the broad character of the relief sought assure that the class is relatively cohesive and homogenous.[13]

The requirements for certification under Rule 23 (b)(1) and (b)(2) are different from those for Rule 23 (b)(3). Rule 23 (b)(1) covers cases, like this one, in which "separate actions by or against individual class members would risk establishing incompatible standards of conduct for the party opposing the class", Fed. Rule Civ. Proc. 23(b)(1)(A), or would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impeded their ability to protect their interests";" while Rule 23 (b)(2) focuses on cases, also like this one, where class-wide injunctive or declaratory relief may be needed to remedy a generally applicable policy or practice.[14] By comparison, Amchem says Rule 23 (b)(3) covers cases "where class action treatment [is] not as clearly called for" but where a class action could be convenient or desirable, including complex litigation for money damages, and where, under Rule 23 (b)(3), the district court must find two additional factors--predominance and superiority--before certifying the class.[15]


5.   **Class certification is appropriate for all counts of the complaint under Rule 23 (a).**

(a)   **The class is so numerous that joinder of all members is impracticable.**

---

[13] 139 F.3d 227 (D.C. Cir. 1998).
[14] Amchem, supra, 521 U.S. at 614, 117 S.Ct. at 2245.
[15] *Id.*

There is no "magic minimum number" for a class according to this Court in its 2001 decision in <u>Russo v. CVS Pharmacy, Inc.</u>[16]  But according to its 1995 ruling in <u>Consolidated Rail Corp. v. Town of Hyde Park</u> and its 1993 ruling in <u>Robidoux v. Celani</u>, the Second Circuit has generally held that a class is sufficiently numerous when over 40 class members are involved; above that number, individual joinder of all members becomes "impracticable."[17] The <u>Robidoux</u> Court said "impracticable" simply means "difficult or inconvenient"; it does not mean impossible.[18] In the 1992 <u>Banyai v. Mazur</u> decision, the Southern District of New York said certification is appropriate when the number of class members is "sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient."[19] As this Court said in <u>Russo</u>, the court may make "common sense assumptions" about numerosity: "Precise quantification" of the size of the class is especially not required when the class is obviously far in excess of the minimum number needed to make joinder impracticable.

The State of Connecticut has publically recognized that the vertical and horizontal cracking that has been affecting basement walls in eastern Connecticut may have impacted over 500 homes. In correspondence with Plaintiffs' counsel, the Department of Insurance has indicated that over 100 insurance companies have active homeowners' insurance policies in Connecticut.  Furthermore, the Connecticut Department of Consumer Protection has recognized that the problem is so immense that the government has started its own investigation. The assumed cause of the "pattern cracking" is faulty cement that was distributed by JJ Mottes Co. who claim to have produced ready mix concrete for approximately 10,000 different residential, commercial,

---

[16] 201 F.R.D. 291 (D. Conn. 2001)(quoting <u>Jones v. CCH-LIS Legal Information Servs.</u>, 1998 U.S. Dist. LEXIS 15189 (SDNY 1998)).
[17] 47 F.3d 473, 483 (2d Cir. 1995); 987 F.2d 931, 936 (2d Cir. 1993).
[18] 987 F.2d at 935.
[19] 205 F.R.D. 160, 163 (S.D.N.Y. 2002)

municipal, and state jobs.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff asserts that there are "obviously far in excess of" the more than 40 members **of the minimum number needed to make joinder impracticable.**[20]  In fact, while a precise quantification is not required, **Plaintiffs believe the size of the class to be in excess of 500 and perhaps in the thousands.**

**(b)    There are questions of law or fact common to the class.**

Litigation involving contract interpretations that apply to large groups of individuals is perfectly tailored for class action treatment because of the common legal issues.  According to the Second Circuit in <u>Marisol A.</u> and its 1987 decision in <u>In re Agent Orange Prod. Liab. Litig.</u>**,** the commonality requirement is satisfied if the grievances of the named plaintiffs and the proposed class "share a common question of law or of fact" -- the emphasis is on "one" common question, not necessarily every question or element.[21] A finding of commonality does not require that all class members "share identical claims" – the Third Circuit said so in its 1998 ruling in <u>In re Prudential Ins. Practice Litig.</u>[22] The commonality requirement will be satisfied, according to the Third Circuit in <u>Baby Neal</u>, if the plaintiffs' grievances share "at least one" question of fact or law.[23]

The U.S. Supreme Court's 2011 articulation of the commonality standard makes clear that this case is well-suited for class action treatment. In <u>Walmart v. Dukes</u>, the Court held that: "Commonality requires the plaintiff to demonstrate that the class

---

[20] 201 F.R.D. at 295.
[21] <u>Marisol A.</u>, 126 F.3d at 376; <u>In re Agent Orange Prod. Liab. Litig.</u>, 818 F.2d 145, 166-67 (2d Cir. 1987).
[22] 148 F.3d 283, 310 (3d Cir. 1998).
[23] <u>Baby Neal</u>, <u>supra</u>, 43 F.3d at 56 (<u>citing</u> <u>In re Agent Orange</u>, <u>supra</u>).

members 'have suffered the same injury.'"[24]  The Court said the common issue shared (not all issues) must be one where "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." "What matters to class certification...is...the capacity of the classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."[25]

Here as alleged in the Complaint there are at least four common issues among all class members:

1) Whether the Defendant Insurance Companies breached their contract of insurance with the Plaintiffs and putative class Members by failing to provide coverage for bad concrete claims;

2) Whether the Defendant Insurance Companies and I.S.O. and/or Defendant Insurance Companies themselves conspired to provide unsuitable homeowners insurance policies to Plaintiffs and putative class Members all the while being previously aware of bad concrete claims and knowing full well that these policies would not provide coverage for bad concrete claims;

3) Whether the Defendant Insurance Companies as part of a regular business practice, denied the insureds' claims in an unfair, deceptive manner that has caused substantial injury to the Plaintiffs and putative class Members; and

4) Whether the Plaintiffs and putative class Members suffered losses and, if so, the proper measure of the losses.

Here, the Complaint alleges that the Defendants failed to provide coverage for concrete basements that are crumbling and will continue to crumble to the point of collapse.  The Complaint alleges the Insurance Companies all used the same policy language and all issued subsequent denials because they have all adopted contract language that has been created by I.S.O. This is unacceptable because these claims do

---

[24] 131 S. Ct. 2541 at 2551.
[25] *Id.*

fall within the contract language of the contracts held by the Plaintiffs. The Complaint

seeks various forms of relief that could be ordered as "common answers" to the problem.

As described in the Complaint the Plaintiffs request the following relief:

1) An Order compelling Defendants to pay for the costs of replacing the basement walls of each of the Plaintiffs and members of the Class;

2) Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the denials of the bad concrete claims;

3) An Order awarding actual damages in the amount of any losses the Plaintiffs or Members of the class suffered;

4) An Order awarding punitive damages;

5) An Order awarding pre- and post-judgment interest pursuant to Connecticut General Statutes § 37-3a and other applicable laws and regulations;

6) An Order awarding costs pursuant to Connecticut General Statutes § 42-110g and other applicable laws or regulations;

7) An Order awarding attorneys' fees pursuant to Connecticut General Statutes § 42-110g and other applicable laws or regulations;

8) An Order or affirmative injunction for disgorgement of profits, equitable restitution, contract reformation or surcharge and other appropriate equitable and injunctive relief against the Defendants;

9) An Order certifying a class action under one or more of Rule 23 (b)(1), 23 (b)(2) or 23 (b)(3) of the Federal Rules of Civil Procedure.

10) Such other and further relief as to this Court may deem just and proper.

While there are many ways to provide relief here and the plaintiffs wish to keep

every option open, the biggest things the plaintiffs want can be simply described.  They

want their basement walls replaced. They want their attorneys' fees paid. The

calculations can be structured in an entirely ministerial, not discretionary way. The

amounts can be established using a set dollar figure measured by the linear footage of the foundation.

There are truly common questions at the heart of this case and common answers to them.

**(c)   The claims of the representative parties are typical of the claims of the class.**

As the Supreme Court in its 1982 ruling in <u>General Telephone Co. v. Falcon</u> said and the Second Circuit in <u>Marisol, A.</u> said, the commonality and typicality requirements tend to merge when the plaintiffs allege that a common policy has caused class wide harm, including harm to the plaintiffs.[26] According to <u>Marisol, A.</u> typicality is satisfied when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."[27] In <u>Baby Neal</u>, when the same unlawful conduct affects both the named plaintiffs and the putative class, the Third Circuit said the case usually satisfies the typicality requirement.[28]  As the Eastern District of Pennsylvania held in 2000 in <u>In re IKON Office Solutions</u>, "Even quite significant factual differences will not defeat typicality so long as the legal theory upon which plaintiff seek redress is the same as those they seek to represent."[29]

For the plaintiffs' claims to be typical, the Southern District of New York in <u>Caridad v. MetroNorth R.R.</u> found the disputed issue of law or fact must "occupy essentially the same degree of centrality to the named plaintiffs' claim as to that of other members of the proposed class."[30] The same Court in a 1991 decision in <u>Dura-Bilt Corp.</u>

---

[26] 457 U.S. 147, 157 (1982); <u>Marisol A</u>, supra, 126 F.3d at 376.
[27] 126 F.3d at 376 (quoting <u>In re Drexel Burnham Lambert Group</u>, 960 F.2d 285, 291 (2d Cir. 1992)).
[28] 43 F.3d at 58.
[29] 191 F.R.D. 457, 463 (E.D. Pa. 2000).
[30] 191 F.3d 283, 293 (2d Cir. 1999)(quoting <u>Krueger v. New York Tel. Co</u>., 163 FRD 433, 442 (S.D.N.Y. 1995)).

v. Chase Manhattan Bank expressed it another way, "the proper inquiry is whether other members of the class have the same or similar injury" and "whether the action is based on conduct not special or unique to the named plaintiffs."[31]

Typicality is not destroyed merely by factual variations between the named plaintiffs' claims and the class they seek to represent.  Named representatives do not have to own typical homes.  The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' "[32] Thus, typicality is satisfied if the plaintiffs' claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical."[33] Class members here have different sized homes and the homes are in different stages of deterioration, but they will have suffered from concrete that was defective in its composition which causes their foundation to collapse and their insurance companies have or will deny them coverage. SO long as that suffering is at the center of the case, the proposed representatives' claims are typical.

**(d)    The representative parties will fairly and adequately protect the interests of the class.**

The representative party in a class action must fairly and adequately protect the interests of the class.  In the Drexel and General Telephone Co. cases discussed above, the courts said the adequacy of representation inquiry has two components: (1) whether there is a potential conflict between the named plaintiff and absent class members, and

---

[31] 89 F.R.D. 87, 99 (S.D.N.Y. 1991). See also, Pecere v. Empire Blue Cross, 194 F.R.D. 66, 72 (E.D.N.Y. 2000)(class certification denied because case would be "preoccupied with defenses unique" to the named plaintiffs' physicians).

[32] Ellis v. Costco, 657 F.3d 970, 984 (9th Cir.2011) (quoting Hanon, 976 F.2d at 508).

[33] Hanlon, 150 F.3d at 1020.

(2) whether class counsel is "qualified, experienced, and generally able to conduct the litigation."[34]

To meet the lack of conflicts test, the named representatives must be part of the class and possess the same interest and suffer the same injury as the other class members, as the Supreme Court described in its 1977 decision in East Texas Motor Freight, Inc. v. Rodriguez.[35]  Certification is not defeated by "speculative" or "hypothetical" suggestions of potential conflicts; both the Second Circuit in In re Visa Check/Mastermoney Antitrust Litig. and the Southern District of New York in Gruby v. Brady emphasized this.[36]

As explained in the *Manual for Complex Litigation*, in addition to being free of conflicts, the named representatives should understand their responsibility to vigorously pursue the litigation in the interest of the class.[37]  This does not require the plaintiffs to be steeped in the intricacies of the litigation.  More than 30 years ago, in the Supreme Court case of Surowitz v. Hilton Hotels, Hilton Hotels challenged whether a named representative in a shareholder derivative action could "fairly and adequately represent the interests" of all shareholders because she was a Polish immigrant with limited knowledge of English who relied on her son-in-law for explanations.[38] The Supreme Court ruled that the named representative was interested in her investment and reasonably relied on the investigation of others.[39]  By the same token, this District, in its 2000 ruling in Macarz v. Transworld Systems, where the named plaintiff was an

---

[34] Id.
[35] 431 U.S. 395, 403 (1977).
[36] 280 F.3d 124, 145 (2d Cir. 2001); 838 F. Supp. 820, 828 (S.D.N.Y. 1993).
[37] (3d ed. 1995) at 221.
[38] 383 U.S. 363 (1966).
[39] Id. at 371-73. See also Koch v. Dwyer, 2001 WL 289972, 2001 U.S. Dist. LEXIS 4085 (S.D.N.Y. March 23, 2001)(rejecting defense contention that plaintiff had an "alarming unfamiliarity with the facts").

attorney, rejected arguments that named plaintiffs are unfit because they happen to be more sophisticated in some respects than the average class member.[40]

Here, the proposed class representatives, Michael and Joyce Halloran and Kenneth and Victoria Masciovecchio are all middle income homeowners who purchased homeowners' policies like the ones at issue. Michael Halloran is an engineering technician at a local hospital and his wife Joyce is an office manager at a local oil company, Kenneth Masciovecchio is an engineering technician at a local hospital and his wife Victoria is a bookkeeper at Becker's Quarry. All of them are committed to being diligent class representatives and to having the issues in the complaint decided. Their interests are not antagonistic to other class members, nor do they have conflicting interests. Like the members of the class, they are interested in a speedy, class-wide resolution of these issues.

The plaintiffs also have qualified counsel.  They are represented by Attorneys Ryan Barry and Anthony Spinella of Barry & Barall, LLC, Manchester, Connecticut. Attorney Barry has practiced law for 16 years.  He has first and second chaired numerous cases in federal and state courts.  He has also appeared before the Court of Appeals for the Second Circuit.  Attorney Barry is Corporation Counsel for the Town of Manchester.  Representing a town of 65,000 people, Attorney Barry oversees litigation matters and insurance claims for the town.  Prior to forming Barry & Barall, LLC 12 years ago, Attorney Barry practiced law at Moukawsher & Walsh, LLC.  At Moukawsher & Walsh, Attorney Barry devoted 100% of his practice to litigation.  As far back as 1997, while a certified legal intern during law school (being supervised by Attorney Thomas Moukawsher), Attorney Barry worked on a number of large class actions, including

---

[40] 193 F.R.D. 46, 51 (D. Conn. 2000).

defending dozens of depositions in a complex class action based on a pension dispute governed by ERISA.  Also while in law school, Attorney Barry performed an external clerkship for Judge Dominic Squatrito of the United States District Court for the District of Connecticut.  He is also the author of "ERISA's Purpose:  The Conveyance of Information from Trustee to Beneficiary," 31 Conn. L. Rev. 735 (1999).

Attorney Barry also served 8 years in the Connecticut House of Representatives. Serving from 2003 until 2011, Attorney Barry represented approximately 20,000 people in the Town of Manchester.  During this tenure, he was House Chairman of the Banks Committee and a member of the Judiciary Committee and Finance, Revenue & Bonding Committee.  As House Banks chair, Attorney Barry led a committee having cognizance of all matters relating to the Department of Banking, and banks, savings banks, bank and trust companies, savings and loan associations, credit unions, the supervision of the sale of securities, and secured and unsecured lending.  Attorney Barry spent much of his time in the legislature working with the banking industry to successfully create a first-in-the-nation foreclosure mediation program to slow down the foreclosure process to allow people time to access services they needed to avoid foreclosure.  He also worked with the Banking industry, the Governor of the State of Connecticut and the Connecticut Housing Finance Authority to provide low cost/low interest loans and loan modifications for homeowners affected by the subprime mortgage crisis.  Attorney Barry spent the balance of his time in the Legislature working to otherwise vindicate peoples' rights in this state.

Anthony Spinella has been a litigator for over 13 years.  He has tried to verdict over 60 jury trials and over 30 court trials.  In addition, as a Senior Assistant States Attorney, he has litigated many highly complex criminal cases on behalf of the people of

the State of Connecticut.  Anthony has directed the investigation and prosecution of many money laundering, larceny, check kiting, counterfeit currency, and murder cases. As a prosecutor working in the Chief States Attorneys office, he worked in the statewide prosecution bureau where he worked on many white collar financial criminal investigations and prosecutions.

As a defense attorney, Attorney Spinella has represented many clients before the State of Connecticut Administrative bodies as well as in criminal court.  He has defended a highly visible, complex murder case to verdict and negotiated many cases on behalf of his clients.

Attorney Spinella also represents the people of the Town of Wethersfield where he serves on the Wethersfield Town Council.  In that capacity, he has been chosen to be a member of the Town's Insurance Committee where he participates in making crucial decisions relating to all areas of insurance issues for the town.


**6.   Class certification is appropriate for all counts of the complaint under Rule 23 (b)(1), 23 (b)(2) or 23 (b)(3).**

**(a)   Class certification is appropriate under Rule 23(b)(1).**

The Complaint alleges that the plaintiffs' claims are appropriate for class certification under Rule 23 (b)(1) because:

> Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(1) because prosecution of separate actions by the members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class and adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other  members not parties to the actions, or substantially impair or impede their ability to protect their interests.  Specifically, if the policies challenged here should have provided coverage for the alleged

collapse as claimed here such a determination would be dispositive of the claims of other homeowners.

In addition, the Prayer for Relief in the Complaint asks for "An Order certifying a class action under one or more of Rule 23 (b)(1), 23 (b)(2) or 23 (b)(3) of the Federal Rules of Civil Procedure."

The claims in all four counts in the Complaint run the risk of inconsistent or varying adjudications with respect to individual members of the class if they are not litigated in a class action. They involve alleged insurance policy contract wrongful denials flowing from crumbling concrete leading to collapsing basement wall issues common to all members of the proposed class. Varying adjudications would mean the defendants insurance policies could be lawfully denied under identical circumstances for some policies but not for others, leaving defendants to comply with incompatible standards.

**(b)    Class certification is appropriate under Rule 23 (b)(2).**

The First Amended Complaint alleges that the plaintiffs' claims are appropriate for class certification under Rule 23 (b)(2):

> Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(2) because the parties opposing the class have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Specifically, insurance contracts at the center of this lawsuit are substantially pre-packaged using substantially uniform advice, uniform documents, and uniform language.

As noted, the Prayer for Relief asks for certification under Rule 23 (b)(2).

Class certification under Rule 23 (b)(2) is appropriate because the named plaintiffs seek injunctive relief applicable to the entire class in the form of the following orders:

a. An Order compelling Defendants to pay for the costs of replacing the basement walls of each of the Plaintiffs and members of the class;

b. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the denials of the bad foundation claims;

c. An Order awarding actual damages in the amount of any losses the Plaintiff or members of the Class suffered;

d. An Order awarding punitive damages;

e. An Order awarding pre- and post-judgment interest pursuant to C.G.S. § 31-3a and other applicable laws or regulations;

f. An Order awarding costs pursuant to C.G.S. § 42-110g and other applicable laws or regulations;

g. An Order awarding attorneys' fees pursuant to C.G.S. § 42-110g and other applicable laws or regulations ;

h. An Order or affirmative injunction for disgorgement of profits, equitable restitution, contract reformation, surcharge and other appropriate equitable and injunctive relief against the Defendants.

**(c)   Class certification is appropriate under Rule 23 (b)(3).**

As the Northern District of New York held in 2003 in <u>LaFlamme v. Carpenters Local No. 370 Pension Plan</u>, once a court finds it appropriate to certify a class under one subsection, it is not required to consider all subsections.[41]   Here this action is suitable for certification under Rule 23 (b)(1) and (b)(2).  The plaintiffs ask the Court to certify this action under both subsections.  But if for any reason the Court finds the case unsuitable under those subsections, the Court should certify this case as a class action under Rule 23 (b)(3).

---

[41] 212 F.R.D. 448, 458-59 (N.D.N.Y. 2003).

The Complaint here also alleges that certification would be appropriate under Rule 23 (b)(3):

> Class action status is also warranted under Fed. R. Civ. P. 23 (b)(3) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

Here the common issues in this case are numerous and dominant. The plaintiffs allege the defendants are liable to them because of a concerted scheme to provide insurance policies that allege to cover "collapse" and deny coverage for failing basement walls that will eventually collapse. Whatever other issues may enter into the litigation, it is clear that these will be the central issues upon which liability turns. Therefore, if it is necessary to consider Rule 23 (b)(3), this action is suitable for class action certification under that subsection as well.

## 7.     Conclusion.

The plaintiffs ask the Court to certify this case as a class action under Fed. R. Civ. P. 23 (b)(1) and 23 (b)(2). They have alleged violations common to all members of the class and have asked for injunctive relief that would benefit all class members harmed by the violations. Alternatively they ask for certification under Rule 23 (b)(3). They ask that plaintiffs Michael and Joyce Halloran, and Kenneth and Victoria Masciovecchio, be named class representatives and that Attorney Ryan P. Barry and Attorney Anthony Spinella, Jr. be named class counsel. They ask that the proposed class, be as defined in the Complaint:

All individuals who own a home in the Connecticut towns of Manchester, Ashford, Ellington, Stafford Springs or any other Connecticut town located east of the Connecticut River whose homes are insured by any of the Insurance Defendants, and whose homes have sustained 'pattern cracking' including but not limited to horizontal and vertical cracks on their basement walls, and whose bad foundation claims have been denied or will be denied by the Insurance Defendants, which denials are or will be based on the same standardized language regarding the term 'collapse', the term 'basement', the term 'foundation', the term 'decay', the term 'hidden', and the term 'retaining wall.'

THE PLAINTIFFS:

BY_____/s/_____

    Ryan P. Barry (ct21683)
    Anthony Spinella, Jr. (ct29782)
    Barryy & Barall, LLC
    202 West Center Street
    Manchester, CT 06040
    (860) 649-4400
    (860) 645-7900
    rbarry@barryandbarall.com
    Anthony@barryandbarall.com

THEIR ATTORNEYS

## Certificate of Service

I hereby certify that on March 28, 2016, the foregoing was filed electronically with the Court and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by email to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

_____/s/_____
    Ryan P. Barry
    Anthony Spinella, Jr.