# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL AND JOYCE HALLORAN, PHIL BASQUIAT AND AMY SOMERVILLE, PATRICIA AND STEVEN BROZEK, MICHAEL DYER, DONNA FRANKENBERG, MICHAEL AND SUE ANN FURLONG, JACQUELINE GRIBBON, DAVID AND PATRICIA KANDRYSAWTZ, PETER AND PAULA LAVALLEY, ALFRED AND JEANNETTE LESPERANCE, ALFRED J. AND JEANNETTE G. LESPERANCE, TRUSTEES OF THE LESPERANCE FAMILY LIVING TRUST, GEOFFREY AND KELLY LUXENBERG, SCOTT AND DEBORAH MACGLAFLIN, ROBERT AND JODI MANSFIELD, KENNETH AND VICTORIA MASCIOVECCHIO, MARK AND CAROLYN MCKINNEY, KATHY NOBLET, DAWN L. NORRIS, MARK AND FELICE PAWELCYZK, DONALD AND NANCY POULIN, STEVEN AND COLLEEN SWART, MARY LOU THIELING, AND STANLEY ZAREMBA, | DOCKET NO. 3:16-CV-00133-VAB |
| Individually and on behalf of those similarly-situated, | |
| PLAINTIFFS, | |
| V. | |
| HARLEYSVILLE PREFERRED INSURANCE CO., AIG PROPERTY CASUALTY CO., ALLSTATE INSURANCE CO., AMERICAN COMMERCE INSURANCE CO., AMICA MUTUAL INSURANCE CO., BUNKER HILL INSURANCE CO., CITIZENS INSURANCE COMPANY OF AMERICA, CSAA FIRE & CASUALTY INSURANCE COMPANY, FIDELITY AND GUARANTY INSURANCE COMPANY, GOVERNMENT EMPLOYEES INSURANCE COMPANY, HOMESITE INSURANCE CO., KEMPER | APRIL 7, 2017 |

INDEPENDENCE INSURANCE CO.,
LIBERTY MUTUAL FIRE INSURANCE
COMPANY, MAPFRE INSURANCE
COMPANY; MERRIMACK MUTUAL FIRE
INSURANCE CO., METROPOLITAN GROUP
PROPERTY AND CASUALTY INSURANCE
CO., MIDDLESEX MUTUAL ASSURANCE
CO., NGM INSURANCE COMPANY,
NATIONWIDE PROPERTY & CASUALTY
INSURANCE CO., NEW LONDON COUNTY
MUTUAL INS. CO., PEERLESS INSURANCE
CO., SAFECO INSURANCE COMPANY OF
AMERICA, STANDARD FIRE INS. CO.,
STATE FARM FIRE & CASUALTY CO.,
THE ANDOVER COMPANIES, THE
AUTOMOBILE INS. CO. OF HARTFORD,
CONNECTICUT, THE TRAVELERS
COMPANIES, TRAVELERS HOME &
MARINE INS. CO., TRAVELERS IND. CO.
OF AMERICA, TRUMBULL INS. CO.,

DEFENDANTS.

## SUBSTITUTED THIRD AMENDED CLASS ACTION COMPLAINT

### Summary

1.      The Plaintiffs in this case own or previously owned homes in Hartford, Tolland and Windham Counties in Connecticut.  Each of their homes has basement walls that have suffered a direct physical loss.  They sue their homeowners' insurance companies (collectively "Defendants" or "Defendant Insurance Companies"), for denying them coverage for their failing basement walls, which experts say must be replaced.

2

2.       Plaintiffs' basement walls are in a state of collapse because they were built with concrete containing deleterious iron sulfide minerals.[1]  The oxidation (rusting) of these minerals, some of which are pyrrhotite, pyrite, and marcasite, produces a chemical reaction that causes the concrete to swell and crack and the concrete paste to break down.  This is a continuous and irreversible condition.  Ultimately, the Plaintiffs' homes will fall into their basements.

3.       The Plaintiffs have filed claims for coverage with their insurance companies.  Some of these claims have been denied while others are being reviewed by insurance companies that know they will reject them anyway.  Similar repeated complaints are filtering into state and federal courts.  In all of these cases, the Defendant Insurance Companies have signed on to standardized language peddled to them by the Insurance Services Office, Inc. ("ISO") and other similar insurance industry associations and they have refused to do what they promised, namely – provide coverage should hidden decay occur in or defective material be found in the basement walls.  The homeowners in all of those cases all had the same problems, made the same kind of claims based on standardized policy language, and got the same type of denial letters.  These people are all saying the same thing — their basement walls are collapsing and their insurance should pay to replace them.

4.       Now, after discovering their deteriorating basement walls, Plaintiffs have homes that are practically impossible to sell, practically impossible to refinance and, eventually, will be impossible to safely live in.  They sue Defendants individually and on behalf of others who are similarly-situated because they (1) have basement walls that are irreversibly deteriorating and failing and (2) have claims that have been denied or will be denied by the Defendant Insurance

---

[1]    See Exhibit 1  – Fuss & O'Neill Report on Hallorans' property, 127 Pinney Street in Ellington, Connecticut, at Appendix C.

Companies.  The net result of these twin problems leaves those whose homes have decaying

concrete in a heap of trouble.  In fact, the only remedy for these people is, as a matter of science,

to replace their basement walls.  They seek a court order for, among other things, a declaratory

judgment that their insurance companies are obligated to cover the costs of replacing their

basement walls, damages, their attorneys' fees, their costs, punitive damages, pre-judgment

interest and for other equitable relief.

Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d)(2) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of

interest and costs, and this matter is a class action in which members of the class of Plaintiffs are

citizens of a state different from one of the Defendants.

6.      This Court has personal jurisdiction over this action pursuant to Conn. Gen. Stat.

§§ 33-929(e) and (f) and Conn. Gen. Stat. § 38a-41.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) (1) and (2) as a

substantial part of the events and omissions giving rise to this action occurred in Connecticut.

Plaintiffs

8.      Plaintiffs Michael and Joyce Halloran are residents of Ellington, Connecticut.

They own and live in a single-family home at 127 Pinney Street in Ellington.  The home was

built in 1985.  The home's basement walls are crumbling.  The Hallorans bought homeowners

insurance from one or more of the Defendants.  The Hallorans bring this lawsuit individually and

on behalf of all similarly-situated homeowners.

9.      Plaintiffs Phil Basquiat and Amy Somerville are residents of Manchester, Connecticut.  They own and live in a single-family home at 355 Meadowbrook Drive in Manchester.  The home was built in 1999.  The home's basement walls are crumbling.  Mr. Basquiat and Ms. Somerville bought homeowners insurance from one or more of the Defendants.  Mr. Basquiat and Ms. Somerville bring this lawsuit individually and on behalf of all similarly-situated homeowners.

10.      Plaintiffs Steven and Patricia Brozek are residents of Stafford Springs, Connecticut.  They own and live in a single-family home at 27 Laurel Drive in Stafford Springs. The home was built between 1984 and 1985.  The home's basement walls are crumbling.  The Brozeks bought homeowners insurance from one or more of the Defendants.  The Brozeks bring this lawsuit individually and on behalf of all similarly-situated homeowners.

11.      Plaintiff Michael Dyer is a resident of Manchester, Connecticut.  He owns and lives in a single-family home at 83 Bentley Drive in Manchester.  The home was built in 1995 and Mr. Dyer purchased the home in 2015.  The home's basement walls are crumbling.  Mr. Dyer bought homeowners insurance from one or more of the Defendants.  Mr. Dyer brings this suit individually and on behalf of all similarly-situated homeowners.

12.      Plaintiff Donna Frankenberg is a resident of Manchester, Connecticut.  She owns and lives in a unit at 79 Deer Run Trail in Manchester.  The unit is part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1984.  Ms. Frankenberg purchased her unit in 2000.  The unit's basement walls are crumbling.  Ms. Frankenberg bought homeowners insurance from one or more of the Defendants.  Ms. Frankenberg brings this suit individually and on behalf of all similarly-situated homeowners.

13.     Plaintiffs Michael and Sue Ann Furlong are residents of Tolland, Connecticut. They own and live in a single-family home at 68 Bakos Road in Tolland. The home was built in 1997 and the Furlongs purchased the home in 2006. The home's basement walls are crumbling. The Furlongs bought homeowners insurance from one or more of the Defendants. The Furlongs bring this suit individually and on behalf of all similarly-situated homeowners.

14.     Plaintiff Jacqueline Gribbon is a resident of Manchester, Connecticut. She owns and lives in a unit at 29 Leo J Lane in Manchester. The unit is part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1984, and Ms. Gribbon purchased the home in 1986. The home's basement walls are crumbling. Ms. Gribbon bought homeowners insurance from one or more of the Defendants. Ms. Gribbon brings this suit individually and on behalf of all similarly-situated homeowners.

15.     Plaintiffs David and Patricia Kandrysawtz are residents of East Hartford, Connecticut. They own and live in a single-family home at 355 Long Hill Street in East Hartford. The home was built in 1984. The home's basement walls are crumbling. The Kandrysawtzs bought homeowners insurance from one or more of the Defendants. The Kandrysawtzs bring this suit individually and on behalf of all similarly-situated homeowners.

16.     Plaintiffs Peter and Paula LaValley are residents of Stafford, Connecticut. They own and live in a single-family home at 125 Buckley Highway in Stafford. The home was built in 1984. The home's basement walls are crumbling. The LaValleys bought homeowners insurance from one or more of the Defendants. The LaValleys bring this suit individually and on behalf of all similarly-situated homeowners.

6

17.     Plaintiffs Alfred and Jeannette Lesperance are residents of Manchester, Connecticut.  They own and live in a single-family home at 35 Hercules Drive in Manchester. The home was built in 1985, and they bought it in 1994.  They transferred ownership to the Lesperance Family Living Trust on June 18, 2012.  The home's basement walls are crumbling. The Lesperances and the Trust bought homeowners insurance from one or more of the Defendants.  The Lesperances, individually and as trustees, bring this suit on behalf of themselves and on behalf of all similarly-situated homeowners.

18.     Plaintiffs Geoffrey and Kelly Luxenberg are residents of Manchester, Connecticut.  Geoffrey Luxenberg owns a unit at 78 Deer Run Trail in Manchester and Kelly Luxenberg owns a unit at 45 Chatham Drive in Manchester, where both Luxenbergs live.  The units are part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1984, and they purchased the units in 2012.  The units' basement walls are crumbling. The Luxenbergs bought homeowners insurance from one or more of the Defendants.  The Luxenbergs bring this suit individually and on behalf of all similarly-situated homeowners.

19.     Plaintiffs Scott and Deborah MacGlaflin are residents of Manchester, Connecticut.  They own and live in a unit at 175 Deer Run Trail in Manchester.  The unit is part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1984. The unit's basement walls are crumbling.  The MacGlaflins bought homeowners insurance from one or more of the Defendants.  The MacGlaflins bring this lawsuit individually and on behalf of all similarly-situated homeowners.

20.     Plaintiffs Robert and Jodi Mansfield are residents of Fort Myers, Florida.  They owned a single-family home at 70 Bread and Milk Street in Coventry, Connecticut.  At the time

they owned the home, the home's basement walls were crumbling. The Mansfields bought homeowners insurance from one or more of the Defendants. The Mansfields bring this lawsuit individually and on behalf of all similarly-situated homeowners.

21.     Plaintiffs Kenneth and Victoria Masciovecchio are residents of Ashford, Connecticut. They own and live in a single-family home at 54 Portland Drive in Ashford. The home was built in 1985. The home's basement walls are crumbling. The Masciovecchios bought homeowners insurance from one or more of the Defendants. The Masciovecchios bring this lawsuit individually and on behalf of all similarly-situated homeowners.

22.     Plaintiffs Mark and Carolyn McKinney are residents of Manchester, Connecticut. They own and live in a single-family home at 70 Yale Drive in Manchester. The home was built in 1991 and the McKinneys purchased the home in 2006. The home's basement walls are crumbling. The McKinneys bought homeowners insurance from one or more of the Defendants. The McKinneys bring this suit individually and on behalf of all similarly-situated homeowners.

23.     Plaintiff Kathy Noblet is a resident of Manchester, Connecticut. She owns and lives in a unit at 27 Leo J Lane in Manchester. The unit is part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1986, and Ms. Noblet purchased the unit in 2012. The unit's basement walls are crumbling. Ms. Noblet bought homeowners insurance from one or more of the Defendants. Ms. Noblet brings this suit individually and on behalf of all similarly-situated homeowners.

24.     Plaintiff Dawn L. Norris is a resident of Manchester, Connecticut. She owns and lives in unit at 5 Leo J Lane in Manchester. The unit is part of the Lydall Woods Colonial Village Planned Unit Development that was built in or about 1984, and Ms. Norris purchased the

8

unit in 2004. The unit's basement walls are crumbling. Ms. Norris bought homeowners insurance from one or more of the Defendants. Ms. Norris brings this suit individually and on behalf of all similarly-situated homeowners.

25.      Plaintiffs Mark and Felice Pawelcyzk are residents of South Windsor, Connecticut. They own and live in a single-family home at 44 Evans Crossing in South Windsor. The home was built in 1985 and they purchased it in 2001. The home's basement walls are crumbling. The Pawelcyzks bought homeowners insurance from one or more of the Defendants. The Pawelcyzks bring this suit individually and on behalf of all similarly-situated homeowners.

26.      Plaintiffs Donald and Nancy Poulin are residents of Manchester, Connecticut. They owned and lived in a single-family home at 57 Colgate Drive in Manchester. The home was built in 1991, and they purchased it in 2004. They lost their home to foreclosure in 2015. During their ownership of the home, the home's basement walls were crumbling. The Poulins bought homeowners insurance from one or more of the Defendants. The Poulins bring this suit individually and on behalf of all similarly-situated homeowners.

27.      Plaintiffs Steven and Colleen Swart are residents of Willington, Connecticut. They own and live in a single-family home at 60 Hall Hill Road in Willington. The home was built in 1987. The home's basement walls are crumbling. The Swarts bought homeowners insurance from one or more of the Defendants. The Swarts bring this suit individually and on behalf of all similarly-situated homeowners.

28.      Plaintiff Mary Lou Thieling is a resident of Manchester, Connecticut. She owns and lives in a unit at 9 Leo J Lane in Manchester. The unit is part of the Lydall Woods Colonial

Village Planned Unit Development that was built in or about 1984. The unit's basement walls are crumbling. Ms. Thieling bought homeowners insurance from one or more of the Defendants. Ms. Thieling brings this suit individually and on behalf of all similarly-situated homeowners.

29.     Plaintiff Stanley Zaremba is a resident of Ashford, Connecticut. He owns and lives in a single-family home at 190 Oakes Road in Ashford. The home was built in 2002. The home's basement walls are crumbling. Mr. Zaremba bought homeowners insurance from one or more of the Defendants. Mr. Zaremba brings this suit individually and on behalf of all similarly-situated homeowners.

30.     All of the aforementioned homeowners shall collectively be referred to as the "Plaintiffs."

Defendants

31.     Harleysville Preferred Insurance Company ("Harleysville") is incorporated in Pennsylvania and its principal place of business is in the State of Pennsylvania.

32.     AIG Property Casualty Company is incorporated in Pennsylvania and its principal place of business is in the State of New York.

33.     Allstate Insurance Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

34.     American Commerce Insurance Company is incorporated in Ohio and its principal place of business is in the State of Massachusetts.

35.     Amica Mutual Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

36.     Bunker Hill Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

37.     Citizens Insurance Company of America is incorporated in Alabama and its principal place of business is in the State of Massachusetts.

38.     CSAA Fire & Casualty Insurance Company is incorporated in Alaska and its principal place of business is in the State of California.

39.     Fidelity and Guaranty Insurance Company is incorporated in Alabama and its principal place of business is in the State of Connecticut.

40.     Government Employees Insurance Company is incorporated in Alabama and its principal place of business is in the State of Alabama.

41.     Homesite Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Massachusetts.

42.     Kemper Independence Insurance Company is incorporated in Illinois and its principal place of business is in the State of Florida.

43.     Liberty Mutual Fire Insurance Company is incorporated in Wisconsin and its principal place of business is in the State of Massachusetts.

44.     MAPFRE Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

45.     Merrimack Mutual Fire Insurance Company is incorporated in Massachusetts and its principal place of business is in the State of Massachusetts.

46.     Metropolitan Group Property and Casualty Insurance Company is incorporated in Rhode Island and its principal place of business is in the State of Rhode Island.

47.     Middlesex Mutual Assurance Company is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

48.     NGM Insurance Company is incorporated in Arkansas and its principal place of business is in the State of Arkansas.

49.     Nationwide Property & Casualty Insurance Co. is incorporated in Ohio and its principal place of business is in the State of Ohio.

50.     New London County Mutual Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

51.     Peerless Insurance Company is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

52.     SAFECO Insurance Company of America is incorporated in New Hampshire and its principal place of business is in the State of Massachusetts.

53.     Standard Fire Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

54.     State Farm Fire & Casualty Company is incorporated in Illinois and its principal place of business is in the State of Illinois.

55.     The Andover Companies is incorporated in California and its principal place of business is in the State of California.

56.     The Automobile Insurance Company of Hartford, Connecticut is incorporated in Connecticut and its principal place of business is in the State of Connecticut.  The Travelers Companies is the parent company of AIC.

57.    The Travelers Companies is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

58.    Travelers Home & Marine Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

59.    Travelers Indemnity Company of America is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

60.    Trumbull Insurance Company is incorporated in Connecticut and its principal place of business is in the State of Connecticut.

61.    Collectively, all of the aforementioned insurance companies are herein referred to as the "Defendant Insurance Companies."  At all times relevant to this complaint, the Defendant Insurance Companies were writing homeowners' insurance policies and issuing such policies to Connecticut residents in Hartford County, Tolland County and Windham County.  At all times relevant to this complaint, the Defendant Insurance Companies were also members of the ISO or a similar trade association and/or were advised by ISO and/or a similar trade organization.

## FACTS

62.    Each Plaintiff and putative Class Member owns real property with basement walls that are crumbling and/or exhibiting a pattern of cracking consistent with concrete that contains pyrrhotite and/or other iron sulfides.

63.    Each of the Plaintiffs' and putative Class Members' homes were built using concrete that contains iron sulfides.

64.    Each Plaintiff and putative Class Member holds or held a homeowners insurance policy issued by one or more of the Defendants that provides coverage for "collapse."

65.    Each Plaintiff and putative Class Member has either:

a.  made a claim for coverage with one of the Defendant Insurance Companies and been denied coverage by their insurer based on reasons contrary to the express provisions of their respective policy; or

b.  made a claim for coverage with one of the Defendant Insurance Companies pursuant to their respective insurance policy and their insurer has expressed an intent to deny coverage, or, at least at the time that this action was filed, failed to respond.

66.    Even if a Plaintiff or putative Class Member submits a claim pursuant to their respective insurance policy, each and every claim has been and will be denied.

67.    Insurance companies belong to associations that put time and resources into developing standardized language for insurance policies.  Member insurance companies adopt this uniform language and then all of these member companies interpret it the same way.  That is what happened in this case.  Each of the Defendant Insurance Companies is either a member of ISO or another insurance trade association, and/or heavily relies upon copyrighted advice from ISO or another such insurance trade association.  Each of the Defendant Insurance Companies adopted some or all of the language drafted by ISO or other insurance trade associations.  And each of the Defendant Insurance Companies has denied or will deny claims alleging that this uniform language prevents coverage.

68.    Indeed, it is no coincidence that the language, terms and conditions contained in the ISO copyrighted contracts of insurance and those contracts of other insurance associations

14

are virtually the same language, terms and conditions cited by the Defendant Insurance
Companies to support claim denials.

69.     Based upon the reliance on ISO copyrighted contracts of insurance and those
contracts of other insurance associations, upon information and belief, Defendant Insurance
Companies have all agreed to deny the Plaintiffs and putative Class Members coverage under
their policies for direct physical loss caused by the presence of deleterious iron sulfide minerals
in the concrete in their basement walls.

70.     The Defendants' homeowners policies typically have provided coverage for
"collapse" in the Additional Coverages Section.

71.     Prior to the amendments at issue here, the word "collapse," as used in the
Additional Coverages section of homeowners policies issued in Connecticut, was construed by
the Supreme Court of Connecticut to mean a "substantial impairment in the structural integrity of
a building." See Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252 (1987).

72.     At least as early as 1996, claims involving crumbling walls in homes in
northeastern Connecticut began to be filed.  See, e.g., Parker v. Worcester Ins. Co., 247 F.3d 1, 3
(1st Cir. 2001) (noting that insurance company denied plaintiff's claim for coverage for
collapsing basement walls at a Connecticut home due to defective concrete).

73.     The Defendant Insurance Companies and ISO were on notice of the Beach
Court's construction of the word "collapse" and were on notice of these crumbling walls claims
in northeastern Connecticut.  Accordingly, the Defendant Insurance Companies and ISO
deliberately changed their policies' definition of "collapse" to try to avoid or minimize liability

for potential claims brought by the Plaintiffs and putative Class Members.  See ISO Language Chart, attached hereto as Exhibit 2.

74.     After the Supreme Court decided Beach, amendments were made to the terms of the homeowners policies, in Section I — Property Coverages, E.  Additional Coverages, Para. 8, Collapse.  Specifically, ISO added new language to the definition of collapse that (1) excluded loss to a "foundation" and "retaining wall" and (2) excluded "settling, cracking, shrinkage, bulging, or expansion."

75.     Other insurance trade associations did the same.  Like ISO, the American Association of Insurance Services ("AAIS") has likewise amended the terms of its own homeowners policies in an effort to avoid covering claims for defective concrete in basement walls.  Like ISO, AAIS similarly excludes foundations and retaining walls from the "collapse coverage" ostensibly provided.

76.     Despite this attempt to narrow the coverage for "collapse," the United States District Court for the District of Connecticut has held repeatedly that "foundation" and "retaining wall" are ambiguous and has construed that language against the various insurance companies when considering damage to basement walls identical to that sustained by the Plaintiffs' homes. Those courts also have held that the "settling, cracking, shrinkage, bulging or expansion" language was not sufficient to deny coverage.  See, e.g., Roberge v. Amica Mut. Ins. Co., 2015 WL 9480008 (D. Conn. Dec. 29, 2015) (Eginton, J.); Metsack v. Liberty Mut. Fire Ins. Co., 2015 WL 5797016 (D. Conn. Sept. 30, 2015) (Bryant, J.); Gabriel v. Liberty Mut. Fire Ins. Co., 2015 WL 5684063 (D. Conn. Sept. 28, 2015) (Bolden, J.); Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157 (D. Conn. 2014) (Hall, J.); Karas v. Liberty Ins. Co., 33 F. Supp. 3d 110 (D. Conn. 2016)

(Underhill, J.); Panciera v. Kemper Independence Ins. Co., 2014 WL 1690387 (D. Conn. Apr. 29, 2014) (Arterton, J.); Bacewicz v. NGM Ins. Co., 2010 WL 3023882 (D. Conn. Aug. 2, 2010) (Hall, J.).

77.     One jury already has reached a verdict in favor of the plaintiffs who sued their insurance company over their denial of a crumbling walls claim under this language.  In Bacewicz v. NGM Insurance Co., 3:08-CV-1530 (JCH), the plaintiffs recovered $215,963.74 to replace their basement walls.  Notwithstanding the posture of the insurance company in interpreting the language of its policies, the jury rejected that tortured interpretation.

78.     In another of the cases listed above, this Court denied the Defendant insurer's motion for summary judgment on the issue of whether there was a collapse or hidden decay and on the issues of whether there was a breach of the implied covenant of good faith and fair dealing and a violation of CUIPA/CUTPA.  Belz v. Peerless Ins. Co., 2016 WL 4599892 (D. Conn. Sept. 2, 2016), reconsideration denied, 2016 WL 6542828 (D. Conn. Nov. 3, 2016).

79.     In many other crumbling walls cases, the plaintiffs made the same types of claims for coverage, and the insurance companies issued standard denial letters.[2]

---

[2]     See Jones v. Standard Fire Insurance Co., No. TTD-CV-116004270, 2013 WL 541015 (Conn. Super. Ct. Jan. 11, 2013); Gambacorta v. Covenant Insurance Co., No. TTD-CV-136006583, 2015 WL 1867090 (Conn. Super. Ct. March 23, 2015); Waters v. Liberty Mutual Insurance Group, Inc., No. TTD-CV-065000709, 2009 WL 4282809 (Conn. Super. Ct. November 9, 2009); Tofolowsky v. Bilow, No. TTD-CV-970063795, 2003 WL 1475141 (Conn. Super. Ct. March 17, 2003); R.I. Pools, Inc. v. Paramount Concrete, Inc. 149 Conn. App. 839 (2014); Musgrave et al. v. State Farm Fire and Casualty Company et al., No. TTD-CV15-6009840 (Conn. Super. Ct. 2015); Cote et al. v. Travelers Indemnity Company of America, No., TTD-CV-15-6008838 (Conn. Super. Ct. 2015); Bacewicz v. NGM Insurance Co., No. 3:08-CV-01530, Judgment (D. Conn. Feb. 11, 2011); Possardt et al. v. General Casualty Co., 3:13-cv-00055-SRU (D. Conn. 2013); Panciera et. al. v. Kemper Independence Insurance Co., No. 3:13-CV-1009 (JBA), 2014 WL 1690387 (D. Conn. April 29, 2014); Belz et al. v. Peerless Insurance Co., No. 3:13-CV-01315, 2013 WL 4984704 (D. Conn. Sept 6, 2013); Karas et al. v. Liberty Insurance Corp., No. 3:13-CV-01836, 2013 WL 6778455 (D. Conn. Dec. 11, 2013); Lincoln et al. v. United Services

80.     Besieged by insureds raising this issue, the Defendant Insurance Companies kept denying claims, providing bogus responses when they knew the claims were good, while at the same time, casting about for a way to try to shore up the language in their policies.

81.     While scrambling to rewrite their policies, the Defendant Insurance Companies engaged in a scheme to deny people coverage by providing misleading responses to claims, holding off on deciding claims while the statute of limitations was running and by defending unnecessary lawsuits.

82.     In 1999, ISO amended its form to change the definition of "collapse" to mean an "abrupt falling down or caving in of a building or any part of a building. . . ." See ISO Language Chart, 1999 language, attached hereto as Exhibit 2.

83.     In 2011, ISO again narrowed its form language by adding an entirely new paragraph stating "The coverage provided under this Additional Coverage-Collapse applies only to an abrupt Collapse (emphasis added)." See ISO Language Chart, Form HO 01 06 12 11, attached hereto as Exhibit 2.

_____

Automobile Association, No. 3:14-CV-00333 (D. Conn. 2014); Metsack et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01150 (VLB), 2015 WL 5797016 (D. Conn. Sept. 30, 2015); Gabriel et al. v. Liberty Mutual Fire Insurance Co., No. 3:14-CV-01435, 2015 WL 5684063 (D. Conn. Sept. 28, 2015); Roberts et al. v. Amica Mut. Ins. Co., No. 3:14-CV-1589 (SRU), 2015 WL 7458510 (D. Conn. Nov. 24, 2015); Ray et al. v. Pacific Specialty Insurance Co., No. 3:15-CV-00871 (D. Conn. 2015); Kim et al. v. State Farm Fire & Casualty Co., No. 3:15-CV-00879 (D. Conn. 2015); Mensher et al. v. Liberty Mutual Fire Insurance Co., No. 3:15-CV-01007 (D. Conn. 2015); Carlson et al. v. Allstate Insurance Co., No. 3:15-CV-01045 (D. Conn. 2015); Lees et al. v. Allstate Insurance Co., No. 3:15-CV-01050 (D. Conn. 2015); Jang et al. v. Liberty Mutual Fire Insurance Co., 3:15-CV-01243 (D. Conn. 2015); Roberge et al. v. Amica Mutual Insurance Co., No. 3:15-CV-01262 (D. Conn. 2015); Sabonis v. Kemper Independence Insurance Co., No. 3:14-CV-00694 (D. Conn. 2014); Alexander v. General Ins. Co., No. 16-CV-59 (D. Conn. 2016); Vera et al v. Liberty Mutual Fire Insurance Company, No. 16-CV-00072 (D. Conn. 2016); Cyr et al v. CSAA Fire & Casualty Insurance Company, No. 16-CV-00085 (D. Conn. 2016).

18

84.     In recent years, the Defendants adopted these changes that purported to limit the definition of "collapse" to mean a "sudden" or "abrupt" collapse for some of the insurance policies that they sold to some of the Plaintiffs.  Prior to making the changes to the Collapse coverage and then peddling it to the Plaintiffs and/or putative Class Members, the Defendant Insurance Companies and ISO knew or should have known that insurance companies, including some of the Defendants, had lost these motions to dismiss and this trial against other homeowners in northeastern Connecticut.

85.     The Defendant Insurance Companies wanted to use this new language to deny claims by arguing that "collapse" no longer meant a "substantial impairment of the structural integrity of a building."

86.     Upon information and belief, by narrowing the term "collapse" in the Additional Coverages section, the Defendant Insurance Companies attempted to reduce their financial risk under the homeowners policies issued to the Plaintiffs and putative Class Members, yet they made no corresponding reduction in premiums.

87.     The Defendant Insurance Companies made these unilateral changes to the policy without providing adequate notice or adequate disclosure as required by Conn. Gen. Stat. § 38a-323 and Conn. Insurance Bulletin PC-66 (Dec. 21, 2009).  That Bulletin requires that any "significant reduction of coverage" requires a conditional renewal notice.  The Bulletin cites as examples, a new exclusion or deletion of coverage.  The new language in the collapse coverage section attempted to delete coverage.

88.     This unilateral change was ineffective to alter or amend the terms of the original

contract of insurance between the Defendant Insurance Companies and the Plaintiffs and/or

putative Class Members.

89.     As a consequence of the ineffectiveness of this Amendment to the Additional

Coverages section, the original provisions of the Additional Coverages section remain in full

force and effect.

90.     The Plaintiffs and putative Class Members are homeowners without the requisite

knowledge and resources to make the many intricate observations needed to determine whether

their insurance policies will cover certain events.  The Plaintiffs did not and could not negotiate

with the Defendant Insurance Companies at arms' length.  The changes the Defendant Insurance

Companies made to the Additional Coverages section were complicated attempts to reduce their

financial risk under the homeowners policies.  For example, one of the Defendant Insurance

Companies, Harleysville, touts itself as having "a track record of risk management expertise"

and employees who have "robust technical skills and expertise."  Harleysville boasts of

"employ[ing] a special team of insurance veterans to oversee the underwriting and servicing of

this business" and that "no matter what specific needs you have, we can put your mind at ease

with comprehensive coverage and the best service around."[3]  Harleysville promises its clients

that it "has the solutions you need to prepare for and live in retirement."[4]  The Plaintiffs and

putative Class Members relied to their detriment on the Defendant Insurance Companies,'

---

[3]     https://www.harleysvillegroup.com/pro/pro_2.html

[4]     https://www.harleysvillegroup/pro/pro_2.html.

including Harleysville's, superior knowledge and skill in purchasing their homeowners insurance policies and paying the yearly premiums for such policies.

91.     The Defendant Insurance Companies attempted to deliver to these insureds unsuitable insurance policies in exchange for lucrative premium payments.  What they were trying to do was sell an egregiously unsuitable product wrapped in a veneer of respectability. The Defendant Insurance Companies' real interest was selling the policies to reap an enormous bounty — decades of premium payments — without fear of the otherwise inevitable claim.

92.     The widespread pattern of crumbling walls claim denials has led Plaintiffs and hundreds of similarly-situated homeowners to decry this insurance practice in forums of meaning — from town halls, to the statehouse, to the courthouse.  The cost of replacing the basement walls is generally between $100,000.00 and $250,000.00.  After paying insurance premiums for years, or even decades, Plaintiffs and putative Class Members are left to face this massive expense all alone.

## CAUSES OF ACTION

**Count One:  Breach of Contract (Hallorans v. The Automobile Insurance Company of Hartford, Connecticut)**

93.     The Plaintiffs, Michael and Joyce Halloran (the "Hallorans") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

94.     The Hallorans own and occupy the residential property located at 127 Pinney Street, Ellington, Connecticut.

95.     The Hallorans' home was constructed in 1985 and purchased by them in August 2004.

96.     In September of 2015, the Hallorans discovered damage to their basement walls and on visible portions of the outside of their basement walls.

97.     The Hallorans immediately hired a structural engineering firm, Fuss & O'Neill ("F & O") to investigate the cause of the failing concrete in their home.

98.     F & O inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

99.     F & O obtained core samples of concrete from the basement wall and basement slab.

100.    F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of the damage.

101.    The laboratory testing was performed in two phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction. Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was pyrrhotite or pyrite.

102.    F & O evaluated the results of the laboratory testing and concluded that the Hallorans, like their fellow Plaintiffs and putative Class Members, had basement walls made of concrete that contained a sulfide mineral known as pyrrhotite.

103.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

22

104.    A sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

105.    On December 22, 2015, F & O told the Hallorans that their basement walls were substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

106.    Specifically, F & O told the Hallorans that "it is our professional engineering judgment that a chemical reaction of the concrete mix is occurring due to the presence of pyrrhotite and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended."  In other words, the sulfate attack will continue to deteriorate the concrete until such time that the basement walls are destroyed and the home caves into its basement.

107.    The sulfate attack will continue to fracture the concrete until the home caves into its basement.

108.    The Hallorans' home was insured by The Automobile Insurance Company of Hartford, Connecticut, one of The Travelers Property Casualty Companies ("AIC").

109.    The Hallorans paid any and all premiums charged by AIC at all times and without default.

110.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Hallorans' AIC policy number 977474855 633 1, which provided property coverage for the period of August 27, 2009 to August 27, 2010, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HA-300 CT (01-03), AIC agreed to provide coverage, "[e]xcept for loss caused by settling, cracking, bulging

23

or expansion . . . for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation." The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

111.    The policy does not further define Collapse.

112.    The concrete had hidden decay in it.

113.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

114.    Direct physical loss occurred during the AIC policy period.

115.    On January 25, 2016, the Hallorans filed a timely claim for coverage of the loss in accordance with the terms of their policy with AIC and the policies issued during subsequent policy years.

116.    AIC's failure to affirm coverage has damaged the Hallorans. Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Hallorans' home, the cost of replacing the basement walls is expected to be not less than $150,000.

117.    The Hallorans' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state. As a consequence of AIC's breach of contract with the Hallorans, the Hallorans bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

24

**Count Two: Breach of Contract (Hallorans v. Kemper)**

118.    The Hallorans reassert and incorporate by reference the allegations contained in Paragraphs 1-107.

119.    The Hallorans were insured by Kemper from August 27, 2011 through August 27, 2015.

120.    The Hallorans paid any and all premiums charged by Kemper at all times and without default.

121.    Pursuant to the terms of the Hallorans' Kemper "Package Plus," policy (Form VS1154, Ed. 07/92) with policy number RB 745374, which provided property coverage for the period of August 27, 2010 until August 27, 2011, Paragraph 8. Collapse, as amended by the Connecticut Endorsement (AK 3923 (03 06)), Kemper agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation." Loss to a foundation or retaining wall is not included unless the loss is a direct result of the collapse of a building. Collapse does not include settling, cracking, shrinking, bulging or expansion.

122.    The policy does not further define Collapse.

123.    The concrete had hidden decay in it.

124.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

125.    Direct physical loss occurred during the Kemper policy period.

126.    On January 25, 2016, the Hallorans filed a timely claim for coverage of the loss in accordance with the terms of their policy with Kemper and the policies issued during the preceding and subsequent policy years.

127.    Kemper denied the Hallorans' claim for coverage by way of a letter dated June 23, 2016.

128.    Kemper's denial breached the contract and damaged the Hallorans.

129.    Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Hallorans' home, the cost of replacing the basement walls is expected to be not less than $150,000.

130.    The Hallorans' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Kemper's breach of contract with the Hallorans, the Hallorans bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Three:  Breach of Contract (Hallorans v. Kemper)**

131.    The Hallorans reassert and incorporate by reference the allegations contained in Paragraphs 1-107.

132.    The Hallorans were insured by Kemper under a "Package Plus" policy with policy number RB 745374, which provided property coverage for the period of August 27, 2014 until August 27, 2015.

133.    The Hallorans paid any and all premiums charged by Kemper at all times and without default.

26

134.    Pursuant to the terms of the Hallorans' Kemper Policy, Paragraph 8. Collapse, as amended by the Connecticut Endorsement (AK 3923 (08 13)), Kemper agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: . . . (2) hidden decay; (6) use of defective material or methods in construction, remodeling or renovation." Loss to foundation or retaining wall is not included in the coverage unless the loss is a direct result of the collapse of a building or any part of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

135.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended use," the Hallorans did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

136.    The concrete had hidden decay in it.

137.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

138.    Direct physical loss occurred during the Kemper policy period.

139.    On January 25, 2016, the Hallorans filed a timely claim for coverage of the loss in accordance with the terms of their policy with Kemper and the policies issued during the preceding and subsequent policy years.

140.    Kemper denied the Hallorans' claim for coverage by way of a letter dated June 23, 2016.

141.    Kemper's denial breached the contract and damaged the Hallorans.

27

142.    Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Hallorans' home, the cost of replacing the basement walls is expected to be not less than $150,000.

143.    The Hallorans' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Kemper's breach of contract with the Hallorans, the Hallorans bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Four:  Breach of Contract (Hallorans v. Harleysville)**

144.    The Hallorans reassert and incorporate by reference the allegations contained in Paragraphs 1-107.

145.    The Hallorans' home was insured by Harleysville.

146.    The Hallorans paid any and all premiums charged by Harleysville at all times and without default.

147.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Hallorans' Harleysville policy (Form HO 03 04 91 as amended by HO 01 06 99, HO 04 76 09 02, F-4456 and F-4784) with policy number HOCBB84409, which provided property coverage for the period of August 27, 2015 to August 27, 2016, Harleysville agreed to provide coverage, under "Paragraph 8. Collapse," for "direct physical loss to covered property involving collapse of a building or any part of building caused only by one more or more of the following: . . . b. hidden decay . . ."  Collapse does not include settling, cracking, shrinking, bulging or expansion.  Loss to foundations or retaining walls is not included unless the loss is a direct result of the collapse of a building.

148.    The policy does not further define Collapse.

149.    The concrete had hidden decay in it.

150.    Direct physical loss occurred during the Harleysville policy period.

151.    On January 25, 2016, the Hallorans filed a timely claim for coverage of the loss in accordance with the terms of their policy with Harleysville and the policies issued during the preceding and subsequent policy years.

152.    Harleysville denied the claim for coverage by way of a letter dated October 7, 2016.

153.    Harleysville's denial breached the contract and damaged the Hallorans.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Hallorans' home, the cost of replacing the basement walls is expected to be not less than $150,000.

154.    The Hallorans' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Harleysville's breach of contract with the Hallorans, the Hallorans bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Five:  Breach of Contract (Phil Basquiat and Amy Somerville v. Travelers Insurance)**

155.    The Plaintiffs, Phil Basquiat and Amy Somerville ("Basquiat and Somerville") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

156.    Basquiat and Somerville own and live in a single-family home at 355 Meadowbrook Drive, Manchester, Connecticut.

157.    The home was built in 1999.

29

158.    On September 22, 2016, Basquiat and Somerville discovered damage to their basement walls and on visible portions of the outside of their basement walls.

159.    Upon information and belief, Basquiat and Somerville's basement walls contain a sulfide mineral known as pyrrhotite.

160.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

161.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

162.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

163.    Basquiat and Somerville's home was insured with Travelers from 2007 to 2015.

164.    Basquiat and Somerville paid any and all premiums charged by Travelers, at all times and without default.

165.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Basquiat and Somerville's Travelers policy number 981293697 633 1 which provided property coverage for the period of May 25, 2007 to May 25, 2008, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HA-300 CT (01-03), Travelers agreed to provide coverage, "[e]xcept for loss caused by settling, cracking, bulging or expansion . . . for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in

construction, remodeling or renovation." The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

166.   The policy does not further define Collapse.

167.   The concrete had hidden decay in it.

168.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

169.   Direct physical loss occurred during the Travelers policy period.

170.   On October 28, 2016, Basquiat and Somerville filed a timely claim for coverage of the loss in accordance with the terms of their policy with Travelers.

171.   It is anticipated that Travelers will deny coverage for Basquiat and Somerville, which will breach the contract and damage Basquiat and Somerville. Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Basquiat and Somerville's home, the cost of replacing the basement walls is expected to be not less than $150,000.

172.   Basquiat and Somerville's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state. As a consequence of Travelers breach of contract with Basquiat and Somerville, Basquiat and Somerville bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Six: Breach of Contract (Phil Basquiat and Amy Somerville v. Travelers Insurance)**

173.   Basquiat and Somerville reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 156-162.

174.    Basquiat and Somerville's home was insured with Travelers from May 25, 2011 to May 25, 2012.

175.    Basquiat and Somerville paid any and all premiums charged by Travelers, at all times and without default.

176.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Basquiat and Somerville's Travelers policy number 981293697 633 1 which provided property coverage for the period of May 25, 2011 to May 25, 2012, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HA-300 CT (03-10), Travelers agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: (a) hidden decay . . .; [or] (e) use of defective material or methods in construction, remodeling or renovation."  The coverage does not cover loss caused by settling, cracking, bulging or expansion.  Coverage also does not include loss to foundation or retaining walls unless the loss is a direct result of the collapse of a building.

177.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended use," Basquiat and Somerville did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

178.    Travelers was aware of its obligation to provide adequate notice of significant changes or reductions in coverage, as evidenced by its notices to Basquiat and Somerville in other policy periods.  For example, Travelers provided notice of a reduction in coverage pertaining to flood and earth movement exclusions contained in Special Provisions- Connecticut

HA-300 CT (07-09) for policy period May 25, 2010 to May 25, 2011.  See Exhibit 3.  Travelers

also provided notice of changes to Special Provisions- Connecticut HA-300 CT (09-12)

pertaining to the definition of "actual cash value" for policy period May 25, 2013 to May 25,

2014.  See Exhibit 4.  Travelers also provided notice of changes to Special Provisions –

Connecticut HA-300 CT (12-13) concerning the water damage exclusion and the policyholders'

duties after loss.  See Exhibit 5.  Despite these notices, Travelers did not send a similar notice to

Basquiat and Somerville when it significantly reduced coverage for collapse by switching over

from HO-3 (06-91) and Special Provisions - Connecticut EndorsementHA-300 CT (01-03) to

Form HO-3 (06-91) and Special Provisions - Connecticut Endorsement HA-300 CT (03-10)

during the 2011-2012 policy period.[5]

179.    The concrete had hidden decay in it.

180.    The basement walls were made with defective material or methods in

construction, remodeling or renovation.

181.    Direct physical loss occurred during the Travelers policy period.

182.    On October 28, 2016, Basquiat and Somerville filed a timely claim for coverage

of the loss in accordance with the terms of their policy with Travelers.

183.    It is anticipated that Travelers will deny coverage for Basquiat and Somerville,

which will breach the contract and damage Basquiat and Somerville.  Based on the estimates of

contractors who have performed replacements to the basement walls of similar structures in the

---

[5]    Nor did Travelers provide notice to Basquiat and Somerville when it switched over from Form
HO-3 (06-91) and Special Provisions - Connecticut Endorsement HA-300 CT (03-10) to Form
HO-3 (10-06) and Special Provisions - Connecticut Endorsement HA-300 CT (12-13).

area of Basquiat and Somerville's home, the cost of replacing the basement walls is expected to be not less than $150,000.

184.   Basquiat and Somerville's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Travelers breach of contract with Basquiat and Somerville, Basquiat and Somerville bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Seven: (Phil Basquiat and Amy Somerville v. American Commerce Insurance Company)**

185.   Basquiat and Somerville reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 156-162.

186.   Basquiat and Somerville's home was insured with American Commerce Insurance Company ("ACIC") from at least May 9, 2015 to May 9, 2017.

187.   Basquiat and Somerville paid any and all premiums charged by ACIC, at all times and without default.

188.   The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Basquiat's ACIC policy, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HC 01 06 CT 01 13)), ACIC agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (2) Hidden decay; . . . or (6) Use of defective material or methods in construction, remodeling or renovation."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

189.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose," Basquiat and Somerville did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

190.    The concrete had hidden decay in it.

191.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

192.    Direct physical loss occurred during the ACIC policy period.

193.    On October 30, 2016, Basquiat and Somerville filed a timely claim for coverage of the loss in accordance with the terms of their policy with ACIC.

194.    It is anticipated that ACIC will deny Basquiat and Somerville's claim, and that denial will breach the contract and damage Basquiat and Somerville.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Basquiat and Somerville's home, the cost of replacing the basement walls is expected to be not less than $150,000.00.

195.    Basquiat and Somerville's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of ACIC's breach of contract with Basquiat and Somerville, Basquiat and Somerville bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Eight:  Breach of Contract (Brozek v. Fidelity and Guaranty Insurance Company)**

196.    The Plaintiffs, Steven and Patricia Brozek (the "Brozeks") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

35

197.    The Brozeks own and live in a single-family home at 27 Laurel Drive in Stafford Springs, Connecticut.

198.    The home was built between 1984 and 1985.

199.    In September of 2015, the Brozeks discovered damage to their basement walls and on visible portions of the outside of their basement walls.

200.    The Brozeks immediately hired F & O to investigate the cause of the failing concrete in their home.

201.    F & O inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

202.    F & O then obtained core samples of concrete from the basement wall and basement slab.

203.    F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of defects.

204.    The laboratory testing was performed in two phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction. Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was Pyrrhotite or Pyrite.

205.    F & O evaluated the results of the laboratory testing and concluded that the Brozeks, like their fellow Plaintiffs and putative Class Members, had basement walls made of concrete that contained a sulfide mineral known as pyrrhotite.

206.    Pyrrhotite is a destructive chemical that, when exposed to water and air, produces a chemical reaction, that expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

207.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

208.    On December 22, 2015, F & O told the Brozeks that their basement walls are substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

209.    Specifically, F & O told the Brozeks that "it is our professional engineering judgment that a chemical reaction of the concrete mix due to the presence of pyrrhotite is occurring and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended."  In other words, the sulfate attack will continue to deteriorate the concrete until such time that the basement walls are destroyed and the home caves into its basement.

210.    The sulfate attack will continue to fracture the concrete until the home caves into the basement.

211.    The Brozeks' home was insured with Fidelity and Guaranty Insurance Company, formerly a subsidiary of the Travelers Companies.

212.    The Brozeks paid any and all premiums charged by Fidelity and Guaranty Insurance Company, at all times and without default.

213.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Brozeks' Fidelity and Guaranty Insurance Company policy number HOM-301247485-01,

37

which provided property coverage from 1985 through 1994, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HO-300 (Ed. 11-87) CONNECTICUT), Fidelity and Guaranty Insurance Company agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation."

214.    The concrete had hidden decay in it.

215.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

216.    Direct physical loss occurred during the Fidelity and Guaranty Insurance Company policy period.

217.    The Brozeks put Fidelity and Guaranty Insurance Company on notice on October 28, 2016.

218.    It is anticipated that Fidelity and Guaranty Insurance Company will deny coverage, which will damage the Brozeks.  The Brozeks received an estimate for the cost of replacing their basement walls of $203,000.

219.    The Brozeks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Fidelity and Guaranty Insurance Company's breach of contract with the Brozeks, the Brozeks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Nine:   Breach of Contract (Brozeks v. Citizens Insurance Company of America)**

220.    The Brozeks reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 196-210.

221.    The Brozeks' home was insured with Citizens Insurance Company of America from 1994 to 2006.

222.    The Brozeks paid any and all premiums charged by Citizens Insurance Company of America, at all times and without default.

223.    The failure of the basement walls was a direct physical loss.  Upon information and belief, the Brozeks' Citizens Insurance Company of America policy number HPE 4690947, which provided property coverage from May 15, 2006 to May 15, 2007, Section I – Property Coverages, Additional Coverages, ¶ 8, (Form HO0003-04/91), provided coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

224.    The policy does not further define Collapse.

225.    The concrete had hidden decay in it.

226.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

227.    Direct physical loss occurred during Citizens Insurance Company of America's policy period.

228.     The Brozeks put Citizens Insurance Company of America on notice on October 28, 2016.

229.     It is anticipated that Citizens Insurance Company of America will deny coverage, which will damage the Brozeks.  The Brozeks received an estimate for the cost of replacing their basement walls of $203,000.00.

230.     The Brozeks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Citizens Insurance Company of America's breach of contract with the Brozeks, the Brozeks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Ten:  Breach of Contract (Brozeks v. Liberty Mutual Fire Insurance Company)**

231.     The Brozeks reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 196-210.

232.     The Brozeks' home was insured with Liberty Mutual Fire Insurance Company ("Liberty Mutual") from 2006 to 2013.

233.     The Brozeks paid any and all premiums charged by Liberty Mutual, at all times and without default.

234.     The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Brozeks' Liberty Mutual policy number H32-218-074248-401 2, which provided property coverage from 5/15/11 to 5/15/12, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut endorsement (HO 01 06 06 97), Liberty Mutual agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden

decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation." Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building. Collapse does not include settling, cracking, shrinking, bulging or expansion.

235.   The policy does not further define Collapse.

236.   The concrete had hidden decay in it.

237.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

238.   Direct physical loss occurred during Liberty Mutual's policy period.

239.   The Brozeks put Liberty Mutual on notice on October 28, 2016, and Liberty Mutual responded on October 31, 2016 that the policy was cancelled in 2013 and therefore did not cover the "date of loss." Thereafter, on December 8, 2016, Liberty Mutual sent proof of loss forms to the Brozeks.

240.   It is anticipated that Liberty Mutual will deny coverage, which will damage the Brozeks. The Brozeks received an estimate for the cost of replacing their basement walls of $203,000.00.

241.   The Brozeks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state. As a consequence of Liberty Mutual's breach of contract with the Brozeks, the Brozeks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Eleven:  Breach of Contract (Brozeks v. Metropolitan Group Property and Casualty Insurance Co. ("Metropolitan"))**

242.    The Brozeks reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 196-210.

243.    The Brozeks' home was insured with Metropolitan from 2013 to the present.

244.    The Brozeks paid any and all premiums charged by Metropolitan, at all times and without default.

245.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Brozeks' Metropolitan policy number 2052301090, which provided property coverage from May 15, 2015 to May 15, 2016, Section I – Property Coverages, Paragraph 16.  Collapse, as amended by the Connecticut Amendatory Endorsement (No. HA01CT 0712), Metropolitan agreed to provide coverage for "sudden and accidental direct physical loss to covered property involving the entire collapse of a building or any part of building caused only by one more or more of the following: . . . b. hidden decay of the structure; . . . f. use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

246.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building . . .  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse," the Brozeks did not receive adequate notice of this significant reduction in coverage, and therefore, it is not effective.

247.    The concrete had hidden decay in it.

42

248.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

249.    Direct physical loss occurred during Metropolitan's policy period.

250.    On January 21, 2016, the Brozeks filed a timely claim for coverage of the loss in accordance with the terms of their policy with Metropolitan.

251.    The Brozeks, through their attorney, supplemented their claim with additional information on January 28, 2016.

252.    Metropolitan denied the claim for coverage by way of a letter dated February 19, 2016.

253.    Metropolitan's denial breached the contract and damaged the Brozeks.  The Brozeks received an estimate for the cost of replacing their basement walls of $203,000.00.

254.    The Brozeks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Metropolitan's breach of contract with the Brozeks, the Brozeks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twelve:  Breach of Contract (Michael Dyer v. Harleysville)**

255.    The Plaintiff, Michael Dyer ("Dyer") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

256.    Dyer owns and occupies a residential property located at 83 Bentley Drive in Manchester, Connecticut.

257.    Dyer's home was constructed in 1995 and purchased by Dyer in 2015.

43

258.    In November of 2015, Dyer discovered damage to his basement walls and on visible portions of the outside of his basement walls.

259.    Dyer immediately hired William F. Neal ("Neal"), a Licensed Professional Engineer and a Licensed Connecticut Home Inspector, to investigate the cause of the failing concrete in his home.

260.    Neal inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

261.    After inspecting the house, Neal concluded that Dyer, like his fellow Plaintiffs and putative Class Members, had failing basement walls due to a chemical reaction resulting from incompatible materials used in the concrete mix.

262.    Dyer's residence is facing an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

263.    Specifically, Neal told Dyer that the condition "will continue to deteriorate the concrete and the foundation walls will very likely bulge inward until they structurally fail."

264.    Neal is certain that the chemical reaction will continue to destroy the concrete until such time that the basement walls are deteriorated and the home caves into its basement.

265.    Dyer's home was insured by Harleysville with policy number HOCB82767, which provided property coverage for the period of 6/30/15-6/30/16.

266.    Dyer paid any and all premiums charged by Harleysville at all times and without default.

267.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Dyer's Harleysville policy, Section I – Property Coverages, Additional Coverages, ¶ 8, as

amended by the Special Provisions - Connecticut Endorsement (HO 01 06 11 99), Harleysville

agreed to provide coverage for "direct physical loss to covered property involving collapse of a

building or any part of a building caused only by one or more of the following: . . . (b) Hidden

decay; . . . or (f) Use of defective material or methods in construction, remodeling or

renovation."  Loss to foundations or retaining walls is not included in the coverage unless the

loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking,

shrinking, bulging or expansion.

268.    The policy does not further define Collapse.

269.    The concrete had hidden decay in it.

270.    The basement walls were made with defective material or methods in

construction, remodeling or renovation.

271.    Direct physical loss occurred during the Harleysville policy period.

272.    On January 25, 2016, Dyer filed a timely claim for coverage of the loss in

accordance with the terms of his policy with Harleysville.

273.    Dyer supplemented his claim with an addendum on February 29, 2016.

274.    On January 27, 2016, Michael A. Emanuel ("Emanuel"), a claims adjustor from

Nationwide, was dispatched to Dyer's residence pursuant to Dyer's claim.

275.    Emanuel told Dyer that "99 out of 100" claims similar to Dyer's get rejected and

he would likely be issuing a denial letter soon.

276.    On June 17, 2016, Harleysville wrote to Dyer indicating that it had been made

aware of its engineer's lab results and would conclude its investigation and coverage

determination within a reasonable time upon receipt of its engineer's report.

277.    Dyer received a denial letter on September 6, 2016.

278.    Harleysville's denial breached the contract and damaged Dyer.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Dyer's home, the cost of replacing the basement walls is expected to be not less than $150,000.

279.    Dyer's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Harleysville's breach of contract with Dyer, Dyer brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirteen:  Breach of Contract (Donna Frankenberg v. Peerless Insurance Company and Safeco Insurance Company)**

280.    The Plaintiff, Donna Frankenberg ("Frankenberg") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

281.    Frankenberg owns and occupies a residential property located at 79 Deer Run Trail in Manchester, Connecticut.

282.    Frankenberg's home was constructed in or about 1984 and purchased by Frankenberg in 2000.

283.    Frankenberg discovered damage to her basement walls and on visible portions of the outside of her basement walls.

284.    Upon information and belief, Frankenberg's basement walls contain a sulfide mineral known as pyrrhotite.

285.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

286.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

287.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

288.    In or around 2013, Safeco Insurance, like Peerless Insurance Company, became a member of the Liberty Mutual Group.  As a result, Safeco combined the personal insurance operations of Peerless Insurance Company under the Safeco brand.  Peerless Insurance Company remains focused on commercial lines insurance.

289.    Frankenberg's home was insured by Peerless and/or Safeco (collectively "Safeco") from on or about August 28, 2000 to on or about August 28, 2016.

290.    Frankenberg paid any and all premiums charged by Safeco at all times and without default.

291.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Frankenberg's Safeco policy number OK5948695, which provided coverage from 8/28/13-8/28/14, Safeco agreed to provide coverage for "12. Collapse of a building or any part of a building."  Collapse does not include settling, cracking, shrinking, bulging or expansion.

292.    The policy does not further define Collapse.

293.    Direct physical loss occurred during the Safeco policy period.

294.    Frankenberg put Safeco on notice on September 28, 2016.

295.    It is anticipated that Safeco will deny the claim, which will breach the contract and damage Frankenberg.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Frankenberg's home, the cost of replacing the basement walls is expected to be not less than $138,000.

296.    Frankenberg's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Safeco's breach of contract with Frankenberg, Frankenberg brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Fourteen:  Breach of Contract (Michael and Sue Ann Furlong v. Amica)**

297.    The Plaintiffs, Michael and Sue Ann Furlong ("the Furlongs") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

298.    The Furlongs own and occupy a residential property located at 68 Bakos Road in Tolland, Connecticut.

299.    The Furlongs' home was constructed in 1998 and purchased by the Furlongs in 2006.

300.    On July 27, 2015, the Furlongs discovered damage to their basement walls and on visible portions of the outside of their basement walls.

301.    After noticing the damage, the Furlongs notified Amica on August 15, 2015.

302.    Amica contracted with Geodesign Inc., Cianci Engineering, and TEC Services to conduct an investigation regarding cracks.

303.    Geodesign Inc. concluded, among other things, that based on a March 7, 2016 petrographic evaluation done on the Furlong's home:

48

    a.   "The pyrrhotite content in the aggregate is high and unusual;"

    b.   "The deterioration of the concrete in upper and lower levels of the house foundation is due to oxidation of the pyrrhotite in the aggregates;" and

    c.   "Less than 20% of the pyrrhotite is completely oxidized, with the remaining pyrrhotite having a potential for causing additional detrimental reactions that may further deteriorate the concrete."

304.    TEC Services adopted these conclusions in its report.

305.    Cianci Engineering concluded that "the cause of the claimed condition at the insured's residence, which consists of map cracking in the foundation, is indicative of a material defect with the original concrete used to pour the foundation.  A coradual expansive reaction, which is dependent on the foundation's ongoing exposure to water and oxygen, has resulted in map cracking."

306.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

307.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

308.    The sulfate attack will continue to fracture the concrete until the home caves into the basement.

309.    The Furlong's home was insured with Amica from 2005 through 2016.

310.    The Furlongs paid any and all premiums charged by Amica, at all times and without default.

311.   The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Furlongs' Amica policy number 660706-21UN, which provided property coverage from 3/16/06-3/16/07, Section I – Property Coverages, Paragraph 8.  Collapse, as amended by the Special Provisions-Connecticut Endorsement No. HO 01 06 01 02, Amica agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of building caused only by one more or more of the following: . . . b.  hidden decay; . . . f.  use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

312.   The policy does not further define Collapse.

313.   The concrete had hidden decay in it.

314.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

315.   Direct physical loss occurred during Amica's policy period.

316.   On August 15, 2015, the Furlongs filed a timely claim for coverage of the loss in accordance with the terms of their policy with Amica.

317.   The Furlongs filed their proof of loss on September 14, 2016.

318.   Amica has neither affirmed nor denied the Furlong's claim.

319.    Upon information and belief, Amica has denied similar claims for coverage and will deny this claim.

50

320.    Amica's failure to affirm coverage damaged the Furlongs.  The Furlongs received an estimate for the cost of replacing their basement walls of $149,000.

321.    The Furlongs' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Amica's breach of contract with the Furlongs, the Furlongs bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Fifteen:  Breach of Contract (Michael and Sue Ann Furlong v. Amica)**

322.    The Furlongs reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 297-308.

323.    The Furlong's home was insured with Amica with policy number 66030621QL, which provided property coverage from 3/16/15 to 3/16/16.

324.    The Furlongs paid any and all premiums charged by Amica, at all times and without default.

325.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Furlongs' Amica policy, as amended by Special Provisions- Connecticut Endorsement HO 01 06 01 13, Amica agreed to provide coverage for "direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following: . . . (2) hidden decay; [or] (6) use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building.

326.    Although the policy further defines Abrupt Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the

51

building cannot be occupied for its intended purpose," the Furlongs did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

327.    The concrete had hidden decay in it.

328.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

329.    Direct physical loss occurred during Amica's policy period.

330.    On August 15, 2015, the Furlongs filed a timely claim for coverage of the loss in accordance with the terms of their policy with Amica.

331.    The Furlongs filed their proof of loss on September 14, 2016.

332.    Amica has neither affirmed nor denied the Furlong's claim.

333.    Upon information and belief, Amica has denied similar claims for coverage and will deny this claim.

334.    Amica's failure to affirm coverage damaged the Furlongs.  The Furlongs received an estimate for the cost of replacing their basement walls of $149,000.

335.    The Furlongs' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Amica's breach of contract with the Furlongs, the Furlongs bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Sixteen:  Breach of Contract (Jacqueline Gribbon v. Travelers)**

336.    The Plaintiff, Jacqueline Gribbon ("Gribbon") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

337.     Gribbon owns and occupies a residential property located at 29 Leo J Lane in Manchester, Connecticut.

338.     Gribbon's home was constructed in 1986 and purchased by Gribbon in 1986.

339.     In January 2016, Gribbon discovered damage to her basement walls and on visible portions of the outside of her basement walls.

340.     Upon information and belief, Gribbon's basement walls contain a sulfide mineral known as pyrrhotite.

341.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

342.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

343.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

344.     Gribbon's home was insured with Travelers.

345.     Gribbon paid any and all premiums charged by Travelers, at all times and without default.

346.     The failure of the basement walls was a direct physical loss. Travelers agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of building caused only by one more or more of the following: . . . b.  hidden decay; . . . f.  use of defective material or methods in construction, remodeling or renovation." Although the policy defines Collapse as "an abrupt falling down or caving in of a building or any part of a

53

building with the result that the building or part of the building cannot be occupied for its current

intended purpose . . .   A building or any part of a building that is in danger of falling down or

caving in is not considered to be in a state of collapse," Gribbon did not receive adequate notice

of this significant reduction in coverage, and therefore it is not effective.

347.    The concrete had hidden decay in it.

348.    The basement walls were made with defective material or methods in

construction, remodeling or renovation.

349.    Direct physical loss occurred during Travelers' policy period.

350.    On April 1, 2016, Gribbon filed a timely claim for coverage of the loss in

accordance with the terms of her policy with Travelers.

351.    Gribbon, through her attorney, supplemented her claim with additional

information on April 7, 2016.

352.    Travelers has neither affirmed nor denied Gribbon's claim.

353.    Upon information and belief, Travelers has denied similar claims for coverage

and will deny this claim.

354.    Travelers' failure to affirm coverage damaged Gribbon.  Based on the estimates

of contractors who have performed replacements to the basement walls of similar structures in

the area of Gribbon's home, the cost of replacing the basement walls is expected to be not less

than $138,000.

355.    Gribbon's basement wall problem is affecting hundreds of other homeowners in

the northeast region of this state.  As a consequence of Travelers' breach of contract with

Gribbon, Gribbon brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Seventeen:  Breach of Contract (Gribbon v. CSAA Fire & Casualty Insurance Co.)**

356.    Gribbon reasserts and incorporates by reference the allegations contained in Paragraphs 1-92 and 336-343.

357.    Gribbon's home was insured with CSAA.

358.    Gribbon paid any and all premiums charged by CSAA, at all times and without default.

359.    The failure of the basement walls was a direct physical loss.

360.    Although the policy defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose . . .  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse," Gribbon did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

361.    The concrete had hidden decay in it.

362.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

363.    Direct physical loss occurred during CSAA's policy period.

364.    On April 1, 2016, Gribbon filed a timely claim for coverage of the loss in accordance with the terms of her policy with CSAA.

365.    Gribbon, through her attorney, supplemented her claim with additional information on April 7, 2016.

366.    CSAA has neither affirmed nor denied Gribbon's claim.

367.    Upon information and belief, CSAA has denied similar claims for coverage and will deny this claim.

368.    CSAA's failure to affirm coverage damaged Gribbon.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Gribbon's home, the cost of replacing the basement walls is expected to be not less than $138,000.

369.    Gribbon's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of CSAA's breach of contract with Gribbon, Gribbon brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Eighteen:  Breach of Contract (Gribbon v. Trumbull Insurance Company)**

370.    Gribbon reasserts and incorporates by reference the allegations contained in Paragraphs 1-92 and 336-343.

371.    Gribbon's home was insured with Trumbull Insurance Company.

372.    Gribbon paid any and all premiums charged by Trumbull Insurance Company, at all times and without default.

373.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Gribbon's Trumbull Insurance Company policy number 55 RBE589571, which provided property coverage from 2/27/15-2/27/16, Section I – Property Coverages, Paragraph 8.  Collapse,

56

as amended by the Special Provisions-Connecticut Endorsement No. HW 01 64 02 12, Trumbull Insurance Company agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:  (2) decay that is hidden from view . . . ; [or] (6) use of defective material or methods in construction, remodeling or renovation."

374.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose . . . A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse," Gribbon did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

375.    The concrete had hidden decay in it.

376.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

377.    Direct physical loss occurred during Trumbull Insurance Company's policy period.

378.    On April 1, 2016, Gribbon filed a timely claim for coverage of the loss in accordance with the terms of her policy with Trumbull Insurance Company.

379.    Gribbon, through her attorney, supplemented her claim with additional information on April 7, 2016.

380.    Trumbull Insurance Company denied Gribbon's claim on July 18, 2016.

381.     Trumbull Insurance Company's denial breached the contract and damaged Gribbon.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Gribbon's home, the cost of replacing the basement walls is expected to be not less than $138,000.

382.     Gribbon's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Trumbull Insurance Company's breach of contract with Gribbon, Gribbon brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Nineteen:  Breach of Contract (David and Patricia Kandrysawtz v. Main Street America Group (NGM Insurance Company))**

383.     The Plaintiffs, David and Patricia Kandrysawtz (the "Kandrysawtzs") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

384.     The Kandrysawtzs own and occupy the residential property located at 355 Long Hill Street, East Hartford, Connecticut.

385.     The Kandrysawtzs' home was constructed in 1984 and purchased by them in 1984.

386.     In April of 2016, the Kandrysawtzs discovered damage to their basement walls and on visible portions of the outside of their basement walls.

387.     Upon information and belief, the Kandrysawtzs' basement walls contain a sulfide mineral known as pyrrhotite.

388.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

58

389.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

390.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

391.    The Kandrysawtzs' home was insured by Main Street America Group ("NGM Insurance Company").

392.    The Kandrysawtzs paid any and all premiums charged by NGM Insurance Company at all times and without default.

393.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Kandrysawtzs' NGM Insurance Company policy number 51-050-499, which provided property coverage for the period of March 31, 2006 to March 31, 2007, Section I – Property Coverages, Additional Coverages, ¶ 8, (Form HO0003-04/91), provided coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building. Collapse does not include settling, cracking, shrinking, bulging or expansion.

394.    The policy does not further define Collapse.

395.    The concrete had hidden decay in it.

396.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

397.    Direct physical loss occurred during the NGM Insurance Company policy period.

59

398.     On May 6, 2016, the Kandrysawtzs filed a timely claim for coverage of the loss in accordance with the terms of their policy with NGM Insurance Company and the policies issued during subsequent policy years.

399.     The Kandrysawtzs, through their attorney, supplemented their claim with additional information on May 23, 2016.

400.     NGM Insurance Company has neither affirmed nor denied the Kandrysawtzs' claim.

401.     Upon information and belief, NGM Insurance Company has denied similar claims for coverage and will deny this claim.

402.     NGM Insurance Company's failure to affirm coverage damaged the Kandrysawtzs.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Kandrysawtzs' home, the cost of replacing the basement walls is expected to be not less than $150,000.

403.     The Kandrysawtzs' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of NGM Insurance Company's breach of contract with the Kandrysawtzs, the Kandrysawtzs bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty:  Breach of Contract (David and Patricia Kandrysawtz v. American Commerce Insurance Company ("ACIC"))**

404.     The Kandrysawtzs' reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 383-390.

405.     The Kandrysawtzs' home was insured by ACIC.

406.     The Kandrysawtzs paid any and all premiums charged by ACIC at all times and without default.

407.     The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Kandrysawtzs' ACIC policy number ACH3000443897, which provided property coverage for the period of 8/27/12-8/27/13, Section I – Property Coverages, Paragraph 8.  Collapse, as amended by the Special Provisions-Connecticut Endorsement No. HO 01 06 02 10, ACIC agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: (2) decay that is hidden from view . . . ; [or] (6) use of defective material or methods in construction, remodeling or renovation."

408.     Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose . . . A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse," the Kandrysawtzs did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

409.     The concrete had hidden decay in it.

410.     The basement walls were made with defective material or methods in construction, remodeling or renovation.

411.     Direct physical loss occurred during the ACIC policy period.

61

412.    On May 2, 2016, the Kandrysawtzs filed a timely claim for coverage of the loss in accordance with the terms of their policy with ACIC and the policies issued during subsequent policy years.

413.    The Kandrysawtzs, through their attorney, supplemented their claim with additional information on May 23, 2016.

414.    ACIC has neither affirmed nor denied the Kandrysawtzs' claim.

415.    Upon information and belief, ACIC has denied similar claims for coverage and will deny this claim.

416.    ACIC's failure to affirm coverage damaged the Kandrysawtzs.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Kandrysawtzs' home, the cost of replacing the basement walls is expected to be not less than $150,000.

417.    The Kandrysawtzs' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of ACIC's breach of contract with the Kandrysawtzs, the Kandrysawtzs bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-One: Breach of Contract (Paul and Paula LaValley v. Liberty Mutual Fire Insurance Company)**

418.    The Plaintiffs, Paul and Paula LaValley (the "LaValleys") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

419.    The LaValleys own and occupy the residential property located at 125 Buckley Highway in Stafford, Connecticut.

420.    The LaValleys' home was constructed in 1984 and purchased by them in 2003.

62

421.    On December 5, 2011, the LaValleys discovered damage to their basement walls and on visible portions of the outside of their basement walls.

422.    Upon information and belief, the LaValleys' basement walls contain a sulfide mineral known as pyrrhotite.

423.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

424.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

425.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

426.    The LaValleys' home was insured by Liberty Mutual.

427.    The LaValleys paid any and all premiums charged by Liberty Mutual at all times and without default.

428.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the LaValleys' Liberty Mutual policy, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HO 01 06 06 97), Liberty Mutual agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation[,]" [ ] "except for loss caused by settling, cracking, bulging or expansion."  The

Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

429.     The policy does not further define Collapse.

430.     The concrete had hidden decay in it.

431.     The basement walls were made with defective material or methods in construction, remodeling or renovation.

432.     Direct physical loss occurred during the Liberty Mutual policy period.

433.     On July 5, 2012, the LaValleys made a claim with Liberty Mutual over the telephone.  During that conversation, the LaValleys reported the condition of their basement walls and requested coverage.

434.     Liberty Mutual denied coverage on July 20, 2012.

435.     On July 20, 2012, the LaValleys got a letter in the mail indicating that the damages to their home were $0.00 and that the estimator encouraged them to get the phantom repairs done.  She then followed up with a phone call and said "there is nothing we can do; it has to be a pile of rubble."

436.     In October 2014, the LaValleys' home was inspected by the town engineer in connection with their installation of solar panels.

437.     The town engineer informed the LaValleys that their basement walls were crumbling and that they had the same crumbling concrete problem as many other people.

438.     On May 6, 2016, the LaValleys filed a timely new claim and/or a request to reopen their 2012 claim with Liberty Mutual.

439.     The LaValleys then received a phone call from an estimator who set up an appointment with a visual inspector.  The estimator told the LaValleys over the telephone that she could ask her boyfriend about their problem because he was in the construction business. She indicated that foundations are not covered and said that "the only way that it would be covered would be if there was a 'total collapse' or 'in a pile of rubble.'"

440.     Upon information and belief, Liberty Mutual has denied similar claims for coverage and will deny this claim.

441.     Liberty Mutual's 2012 denial and 2016 failure to affirm coverage breached the contract and damaged the LaValleys.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the LaValleys' home, the cost of replacing the basement walls is expected to be not less than $150,000.

442.     The LaValleys' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Liberty Mutual's breach of contract with the LaValleys, the LaValleys bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Two:  Breach of Contract (Alfred and Jeanette Lesperance v. Nationwide Property & Casualty Insurance Co.)**

443.     The Plaintiffs, Alfred and Jeanette Lesperance (the "Lesperances") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

444.     The Lesperances own and occupy the residential property located at 35 Hercules Drive in Manchester, Connecticut.

445.     The Lesperances' home was constructed in 1985 and purchased by them in 1994. They transferred title to the Lesperance Family Living Trust on June 18, 2012.

446.    On February 28, 2015, the Lesperances discovered damage to their basement walls and on visible portions of the outside of their basement walls.

447.    Upon information and belief, the Lesperances' basement walls contain a sulfide mineral known as pyrrhotite.

448.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

449.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

450.    In other words, the sulfate attack will continue to deteriorate the concrete until such time that the basement walls are destroyed and the home caves into its basement.

451.    It is certain that the sulfate attack will continue to fracture the concrete until such time that the basement walls are destroyed and the home caves into its basement.

452.    The Lesperances' home was insured by Nationwide.

453.    The Lesperances paid any and all premiums charged by Nationwide at all times and without default.

454.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Lesperances' Nationwide policy number 51 06 HO 379435, which provided property coverage for the period of May 2, 2007 to May 2, 2008, Section I – Property Coverages, Additional Property Coverages, ¶ 12, Nationwide agreed to provide coverage for "direct physical loss to covered property . . . caused by the complete collapse of a building structure or any part of a building structure.  Collapse means an abrupt falling down or caving in of a building or

other structure or any part of a building or other structure with the result that it cannot be occupied for its intended purpose. . ."

455.    The Collapse "must be sudden and accidental and caused by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs in the course of work being done."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

456.    The concrete had hidden decay in it.

457.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

458.    The direct physical loss occurred during the Nationwide policy period.

459.    On December 12, 2016, the Lesperances filed a timely claim for coverage of the loss in accordance with the terms of their policy with Nationwide and the policies issued in subsequent years.

460.    Nationwide has neither affirmed nor denied the Lesperances' claim.

461.    Upon information and belief, Nationwide has denied similar claims for coverage and will deny this claim.

462.    Nationwide's failure to affirm coverage damaged the Lesperances.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Lesperances' home, the cost of replacing the basement walls is expected to be not less than $150,000.

463.    The Lesperances' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Nationwide's breach of contract with the Lesperances, the Lesperances bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Three:  Breach of Contract (Alfred J. and Jeannette G. Lesperance, Trustees of The Lesperance Family Living Trust v. Nationwide Property & Casualty Insurance Co.)**

464.    The Lesperance Family Living Trust, Alfred J. and Jeannette G Lesperance, Trustees ("Trustees") reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 443-451.

465.    The Trustees' home was insured by Nationwide.

466.    The Trustees paid any and all premiums charged by Nationwide at all times and without default.

467.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Trustees' Nationwide policy number 51 06 HO 379435, which provided property coverage for the period of May 2, 2008 to May 2, 2009, Section I – Property Coverages, Additional Property Coverages, ¶ 12, Nationwide agreed to provide coverage for "direct physical loss to covered property . . . caused by the complete collapse of a building structure or any part of a building structure.  Collapse means an abrupt falling down or caving in of a building or other structure or any part of a building or other structure with the result that it cannot be occupied for its intended purpose. . ."

468.    The Collapse "must be sudden and accidental and caused by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction,

68

remodeling or renovation if the collapse occurs in the course of work being done." The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

469.    The concrete had hidden decay in it.

470.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

471.    The direct physical loss occurred during the Nationwide policy period.

472.    On December 12, 2016, the Trustees filed a timely claim for coverage of the loss in accordance with the terms of their policy with Nationwide and the policies issued in subsequent years.

473.    Nationwide has neither affirmed nor denied the Trustees' claim.

474.    Upon information and belief, Nationwide has denied similar claims for coverage and will deny this claim.

475.    Nationwide's failure to affirm coverage damaged the Trustees. Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Trustees' home, the cost of replacing the basement walls is expected to be not less than $150,000.

476.    The Trustees' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state. As a consequence of Nationwide's breach of contract with the Trustees, the Trustees bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

69

**Count Twenty-Four:  Breach of Contract (Alfred and Jeannette Lesperance v. Merrimack)**

477.    The Lesperances reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 443-451.

478.    The Lesperances' home was insured by Merrimack.

479.    The Lesperances paid any and all premiums charged by Merrimack at all times and without default.

480.    Under the Lesperances' policy with Merrimack, Section I – Property Coverages, Additional Coverages, ¶ 8, Merrimack agreed to provide coverage for "direct physical loss to covered property involving abrupt collapse of a building or any part of a building caused only by one or more of the following: . . . (2) decay. . . ; or (6) Use of defective material or methods in construction, remodeling or renovation[.]"  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

481.    The policy further defines abrupt collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose."

482.    The concrete had hidden decay in it.

483.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

484.    The direct physical loss occurred during the Merrimack policy period.

485.    The Lesperances provided timely notice to Merrimack regarding their claim for coverage.

486.    The Andover Companies' adjuster acknowledged that notice was provided on June 23, 2016, but Merrimack has neither affirmed nor denied the Lesperances' claim.

487.    Upon information and belief, Merrimack has denied similar claims for coverage and will deny this claim.

488.    Upon information and belief, Merrimack will deny the Lesperances' claim, which will breach the contract and damage the Lesperances.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Lesperances' home, the cost of replacing the basement walls is expected to be not less than $150,000.

489.    The Lesperances' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Merrimack's breach of contract with the Lesperances, the Lesperances bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Five**:  **Breach of Contract (Geoffrey and Kelly Luxenberg v. Merrimack)**

490.    Plaintiffs Geoffrey and Kelly Luxenberg (the "Luxenbergs") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

491.    Plaintiff Geoffrey Luxenberg owns the residential property located at 78 Deer Run Trail, Manchester, Connecticut, and Plaintiff Kelly Luxenberg owns the residential property located at 45 Chatham Drive, Manchester, Connecticut.

492.    The Luxenbergs' properties were constructed in 1984 and purchased by them in 2012.

493.    On March 31, 2016, the Luxenbergs discovered damage to their basement walls and on visible portions of the outside of their basement walls.

494.    The Luxenbergs immediately hired Neal, a Licensed Professional Engineer and a Licensed Connecticut Home Inspector, to investigate the cause of the failing concrete in their properties.

495.    Neal inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

496.    After inspecting the properties, Neal concluded that the Luxenbergs' basement walls likely contain a sulfide mineral known as pyrrhotite.

497.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

498.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

499.    In other words, the sulfate attack will continue to deteriorate the concrete until the properties cave into their basements.

500.    The Luxenbergs' properties are likely facing a condition that cannot be halted, which affects the durability and ultimately causes the failure of the concrete.

501.    Specifically, Neal told the Luxenbergs that he was concerned that the condition "will continue to deteriorate the concrete and the foundation walls will very likely bulge inward until they structurally fail."

502.    The Luxenbergs' properties were insured by Merrimack with policy number FP 5509398, which provided property coverage for the period of 6/22/15-6/22/16.

503.    The Luxenbergs paid any and all premiums charged by Merrimack at all times and without default.

504.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of one of the Luxenbergs' Merrimack policies, Section I – Property Coverages, Other Coverages, ¶ 10, as amended by Special Provisions-Connecticut Endorsement DP 0106A (02/13), Merrimack agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . b. hidden decay; . . . f. use of defective material or methods in construction, remodeling or renovation."  Loss to foundations or retaining walls is not included in the coverage unless the loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

505.    The policy does not further define Collapse.

506.    The concrete had hidden decay in it.

507.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

508.    Direct physical loss occurred during the Merrimack policy period.

509.    On April 6, 2016, the Luxenbergs filed a timely claim for coverage of the loss at 78 Deer Run Trail and on May 17, 2016, they filed a timely claim for loss at 45 Chatham Drive, in accordance with the terms of their policies with Merrimack.

510.    Merrimack has neither affirmed nor denied the Luxenbergs' claim.

73

511.    Upon information and belief, Merrimack has denied similar claims for coverage and will deny this claim.

512.    Merrimack's failure to affirm coverage damaged the Luxenbergs.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Luxenbergs' properties, the cost of replacing the basement walls for each of them is expected to be not less than $138,000.

513.    The Luxenbergs' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Merrimack's breach of contract with the Luxenbergs, the Luxenbergs bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Six:  Breach of Contract (Scott MacGlaflin v. The Travelers Indemnity Company of America, One of The Travelers Property Casualty Companies)**

514.    The plaintiff, Scott MacGlaflin ("MacGlaflin") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

515.    MacGlaflin owns and occupies the residential property located at 175 Deer Run Trail, Manchester, Connecticut.

516.    MacGlaflin's home was constructed in 1985 and purchased by him in 2003.

517.    In June 2016, MacGlaflin discovered damage to his basement walls and on visible portions of the outside of his basement walls.

518.    Upon information and belief, MacGlaflin's basement walls contain a sulfide mineral known as pyrrhotite.

74

519.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

520.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

521.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

522.    It is certain that the sulfate attack will continue to fracture the concrete until such time that the basement walls are destroyed and the home caves into its basement.

523.    MacGlaflin's home was insured by Travelers.

524.    MacGlaflin paid any and all premiums charged by Travelers at all times and without default.

525.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of MacGlafin's Travelers policy number 975092652 636 1, which provided property coverage for the period of April 24, 2004 to April 24, 2005, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HA-300 CT (01-03), Travelers agreed to provide coverage, "[e]xcept for loss caused by settling, cracking, bulging or expansion . . . for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

75

526.   The policy does not further define Collapse.

527.   The concrete had hidden decay in it.

528.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

529.   Direct physical loss occurred during the Travelers policy period.

530.   On August 4, 2016, MacGlaflin filed a timely claim for coverage of the loss in accordance with the terms of his policy with Travelers and the policies issued in subsequent years.

531.   Travelers has neither affirmed nor denied MacGlaflin's claim.

532.   Upon information and belief, Travelers has denied similar claims for coverage and will deny this claim.

533.   Travelers' failure to affirm coverage damaged MacGlaflin.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of MacGlaflin's home, the cost of replacing the basement walls is expected to be not less than $138,000.

534.   MacGlaflin's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Travelers' breach of contract with MacGlaflin, MacGlaflin brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Seven:  Breach of Contract (Scott McGlaflin v. Travelers)**

535.   MacGlaflin reasserts and incorporates by reference the allegations contained in Paragraphs 1-92 and 514-522.

76

536.    MacGlaflin's home was insured by Travelers.

537.    MacGlaflin paid any and all premiums charged by Travelers at all times and without default.

538.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of MacGlaflin's Travelers policy number 975092652 636 1, which provided property coverage for the period of April 24, 2016 to April 24, 2017, Section I – Property Coverages, Paragraph 8. Collapse, as amended by the Special Provisions-Connecticut Endorsement No. HO-300 CT (12-13), Travelers agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: (a) hidden decay . . . ; [or] (e) use of defective material or methods in construction, remodeling or renovation."  The coverage does not cover loss caused by settling, cracking, bulging or expansion.  Coverage also does not include loss to foundation or retaining walls unless the loss is a direct result of the collapse of a building.

539.    Collapse is not further defined.

540.    The concrete had hidden decay in it.

541.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

542.    Direct physical loss occurred during Travelers' policy period.

543.    On August 4, 2016, MacGlaflin filed a timely claim for coverage of the loss in accordance with the terms of his policy with Travelers.

544.    Travelers has neither affirmed nor denied MacGlaflin's claim.

77

545.     Upon information and belief, Travelers has denied similar claims for coverage and will deny this claim.

546.     Travelers' failure to affirm coverage damaged MacGlaflin.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of MacGlaflin's home, the cost of replacing the basement walls is expected to be not less than $138,000.

547.     MacGlaflin's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Travelers' breach of contract with MacGlaflin, MacGlaflin brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Eight:  Breach of Contract (Robert and Jodi Mansfield v. Amica)**

548.     Plaintiffs Robert and Jodi Mansfield (the "Mansfields") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

549.     The Mansfields are residents of Fort Myers, Florida and at all relevant times owned a single-family home at 70 Bread and Milk Street in Coventry, Connecticut.

550.     On or about September 22, 2011, the Mansfields discovered damage to their basement walls and on visible portions of the outside of their basement walls.

551.     Upon information and belief, the Mansfields' basement walls contain a sulfide mineral known as pyrrhotite.

552.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

78

553.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

554.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

555.     The Mansfields' home was insured with Amica.

556.     The Mansfields paid any and all premiums charged by Amica, at all times and without default.

557.     The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Mansfields' Amica policy number 62020621YK which provided property coverage for the period of February 8, 2011 to February 8, 2012, Amica agreed to provide coverage, "[e]xcept for loss caused by settling, cracking, bulging or expansion . . . for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

558.     The policy does not further define Collapse.

559.     The concrete had hidden decay in it.

560.     The basement walls were made with defective material or methods in construction, remodeling or renovation.

561.     Direct physical loss occurred during the Travelers policy period.

562.     On September 22, 2011, the Mansfields filed a timely claim for coverage of the loss in accordance with the terms of their policy with Amica.

79

563.   Amica denied the claim on September 29, 2011.

564.   Amica's failure to affirm coverage damaged the Mansfields.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Mansfields' home, the cost of replacing the basement walls is expected to be not less than $150,000.

565.   The Mansfields' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Amica's breach of contract with the Mansfields, the Mansfields bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Twenty-Nine:  Breach of Contract (Kenneth and Victoria Masciovecchio v. New London County Mutual Insurance Company)**

566.   The Plaintiffs, Kenneth and Victoria Masciovecchio (the "Masciovecchios") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

567.   The Masciovecchios own and occupy the residential property located at 54 Portland Drive, Ashford, Connecticut.

568.   The Masciovecchios' home was constructed in 1985 and purchased by them in 1985.

569.   In September of 2015, the Masciovecchios discovered damage to their basement walls and on visible portions of the outside of their basement walls.

570.   The Masciovecchios immediately hired F & O to investigate the cause of the failing concrete in their home.

571.   F & O inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

80

572.     F & O then obtained core samples of concrete from the basement wall and basement slab.

573.     F & O then performed laboratory testing of the defective concrete from the wall core to evaluate the condition of the concrete and identify likely causes of the damage.

574.     The laboratory testing was performed in two phases.  Phase I consisted of a petrographic analysis, which revealed information regarding the initial concrete mix and placement and possible causes of the deterioration that may have occurred since construction. Phase II consisted of X-Ray Diffraction Analysis (electron microscopy) to confirm whether the iron sulfide found during the petrographic analysis was Pyrrhotite or Pyrite.

575.     F & O evaluated the results of the laboratory testing and concluded that the Masciovecchios, like their fellow Plaintiffs, and putative Class Members, had basement walls made of concrete that contained sulfide minerals known as pyrrhotite, pyrite and marcasite.

576.     Pyrrhotite, pyrite and marcasite are all destructive chemicals that, when exposed to water and air produce a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

577.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

578.     On December 22, 2015, F & O told the Masciovecchios that their basement walls were substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house.

579.     Specifically, F & O told the Masciovecchios that "it is our professional engineering judgment that a chemical reaction of the concrete mix is occurring due to the

presence of pyrrhotite and the other iron sulphide minerals and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended."

580.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

581.    The Masciovecchios' home was insured by New London County Mutual Insurance Company.

582.    The Masciovecchios paid any and all premiums charged by New London County Mutual Insurance Company at all times and without default.

583.    The failure of the basement walls was a direct physical loss.  Upon information and belief, under the Masciovecchios' New London County Mutual Insurance Company policy number H3029747, which provided property coverage for the period of 7/10/02-7/10/03, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut endorsement, New London County Mutual Insurance Company agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation[,]" [ ] "except for loss caused by settling, cracking, bulging or expansion."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

584.    The policy does not further define Collapse.

585.    The concrete had hidden decay in it.

82

586.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

587.   Direct physical loss occurred during the New London County Mutual Insurance Company policy period.

588.   The Masciovecchios put New London County Mutual Insurance Company on notice on October 30, 2016.

589.   Upon information and belief, New London County Mutual Insurance Company has denied similar claims for coverage and will deny this claim.

590.   It is anticipated that New London County Mutual Insurance Company will deny coverage, which will breach the contract and damage the Masciovecchios.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Masciovecchios' home, the cost of replacing the basement walls is expected to be not less than $150,000.

591.   The Masciovecchios' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of New London County Mutual Insurance Company's breach of contract with the Masciovecchios, the Masciovecchios bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty:  Breach of Contract (Kenneth and Victoria Masciovecchio v. Homesite Insurance Company)**

592.   The Masciovecchios reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 566-580.

593.   The Masciovecchios' home was insured by Homesite Insurance Company. ("Homesite").

594.    The Masciovecchios paid any and all premiums charged by Homesite at all times and without default.

595.    The failure of the basement walls was a direct physical loss.  The Masciovecchios' Homesite policy number 30960653, which provided property coverage for the period of 7/10/09-7/10/10, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HO 01 06 11 99), Homesite agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation[,]" [ ] "except for loss caused by settling, cracking, bulging or expansion."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

596.    The policy does not further define Collapse.

597.    The concrete had hidden decay in it.

598.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

599.    Direct physical loss occurred during the Homesite policy period.

600.    On September 15, 2015, after the Masciovecchios discovered damage to their basement walls but before they received the F&O report, the Masciovecchios made a claim with Homesite over the telephone.  During that conversation, the Masciovecchios reported the condition of their basement walls and asked for coverage.

601.    Homesite told the Masciovecchios that the claim was not covered.

84

602.    On January 25, 2016, after the Masciovecchios received the F&O report, they filed a timely claim with Homesite pursuant to the terms of their homeowners' insurance policy.

603.    In response, Homesite informed the Masciovechios that their September 15, 2015 claim would be reopened.

604.    The Masciovecchios, through their attorney, supplemented their claim on February 29, 2016.

605.    Homesite denied the claim for coverage by way of a letter dated April 13, 2016.

606.    Homesite's denial breached the contract and damaged the Masciovecchios.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Masciovecchios' home, the cost of replacing the basement walls is expected to be not less than $150,000.

607.    The Masciovecchios' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Homesite's breach of contract with the Masciovecchios, the Masciovecchios bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-One:  Breach of Contract (Mark and Carolyn McKinney v. The Andover Companies)**

608.    The Plaintiffs, Mark and Carolyn McKinney (the "McKinneys") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

609.    The McKinneys own and occupy the residential property located at 70 Yale Drive, Manchester, Connecticut.

610.    The McKinneys' home was constructed in 1991 and purchased by them in 2006.

611.    The McKinneys discovered damage to their basement walls.

85

612.     Upon information and belief, the McKinneys' basement walls contain a sulfide mineral known as pyrrhotite.

613.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

614.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

615.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

616.     The McKinneys' home was insured by The Andover Companies.

617.     The McKinneys paid any and all premiums charged by The Andover Companies at all times and without default.

618.     The damage to the basement walls was a direct physical loss.  Upon information and belief, under the McKinneys' policy number 2486605 07, which provided property coverage for the period of 7/10/02-7/10/03 with The Andover Companies, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut endorsement, The Andover Companies agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation[,]" [ ] "except for loss caused by settling, cracking, bulging or expansion."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

619.    The policy does not further define Collapse.

620.    The concrete had hidden decay in it.

621.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

622.    Direct physical loss occurred during The Andover Companies policy period.

623.    On May 30, 2013, the McKinneys filed a timely claim for coverage of the loss in accordance with the terms of their policy with The Andover Companies.

624.    The Andover Companies denied the McKinneys' claim on July 15, 2013.

625.    The Andover Companies' denial breached the contract and damaged the McKinneys.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the McKinneys' home, the cost of replacing the basement walls is expected to be not less than $150,000.

626.    The McKinneys' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of The Andover Companies' breach of contract with the McKinneys, the McKinneys bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Two:  Breach of Contract (Mark and Carolyn McKinney v. Merrimack)**

627.    The McKinneys reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 608-615.

628.    The McKinneys' home was insured by Merrimack Mutual Fire Insurance Company ("Merrimack") with policy number HPP 2486605, which provided property coverage for the period of 2/24/16-2/24/17.

87

629.     The McKinneys paid any and all premiums charged by Merrimack at all times and without default.

630.     The failure of the basement walls was a direct physical loss.  Under the McKinneys' policy with Merrimack, Section I – Property Coverages, Additional Coverages, ¶ 8, Merrimack agreed to provide coverage for "direct physical loss to covered property involving abrupt collapse of a building or any part of a building caused only by one or more of the following: . . . (2) decay . . . ; or (6) Use of defective material or methods in construction, remodeling or renovation[.]"  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

631.     Although the policy further defines abrupt collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose," the McKinneys did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

632.     The concrete had hidden decay in it.

633.     The basement walls were made with defective material or methods in construction, remodeling or renovation.

634.     Direct physical loss occurred during Merrimack's policy period.

635.     On January 1, 2016, the McKinneys filed a timely claim for coverage of the loss in accordance with the terms of their policy with Merrimack.

636.     Upon information and belief, Merrimack has denied similar claims for coverage and will deny this claim.

88

637.    Merrimack's failure to affirm coverage damaged the McKinneys.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the McKinneys' home, the cost of replacing the basement walls is expected to be not less than $150,000.

638.    The McKinneys' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Merrimack's breach of contract with the McKinneys, the McKinneys bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Three:  Breach of Contract (Kathleen Noblet v. American Commerce Insurance Company[6])**

639.    The Plaintiff, Kathleen Noblet ("Noblet") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

640.    Noblet owns and occupies the residential property located at 27 Leo J Lane, Manchester, Connecticut.

641.    Noblet's home was constructed in 1986 and purchased by her in 2012.

642.    In January 2016, Noblet discovered damage to her basement walls and on visible portions of the outside of her basement walls.

643.    Upon information and belief, Noblet's basement walls contain a sulfide mineral known as pyrrhotite.

---

[6]    Noblet was insured by Middlesex Mutual Assurance Company (MiddleOak) which stopped offering insurance in CT in 2015.  MAPFRE arranged replacement coverage through its affiliate, ACIC for 10/10/15-10/10/16.

644.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

645.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

646.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

647.     Noblet's home was insured by ACIC with policy number ACH6-000797431, which provided property coverage for the period of 10/10/15-10/10/16.

648.     Noblet paid any and all premiums charged by ACIC at all times and without default.

649.     The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Noblet's ACIC policy, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (HC 01 06 CT 01 13)), ACIC agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (2) Hidden decay; . . . or (6) Use of defective material or methods in construction, remodeling or renovation."  The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building."

650.     Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building

cannot be occupied for its current intended purpose," Noblet did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

651.    The concrete had hidden decay in it.

652.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

653.    Direct physical loss occurred during the ACIC policy period.

654.    On April 7, 2016, Noblet filed a timely claim for coverage of the loss in accordance with the terms of her policy with ACIC and the policies issued during subsequent policy years.

655.    ACIC denied the claim for coverage by way of a letter dated April 19, 2016.

656.    ACIC's denial breached the contract and damaged Noblet.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Noblet's home, the cost of replacing the basement walls is expected to be not less than $138,000.

657.    Noblet's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of ACIC's breach of contract with Noblet, Noblet bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Four:  Breach of Contract (Dawn Norris v. Travelers)**

658.    The Plaintiff, Dawn Norris ("Norris") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

91

659.    Norris owns and occupies the residential property located at 5 Leo J Lane, Manchester, Connecticut.

660.    Norris's home was constructed in 1984 and purchased by her in 2004.

661.    On August 16, 2016, Norris discovered damage to her basement walls and on visible portions of the outside of her basement walls.

662.    Upon information and belief, Norris's basement walls contain a sulfide mineral known as pyrrhotite.

663.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

664.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

665.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

666.    Norris's home was insured by Travelers.[7]

667.    Norris paid any and all premiums charged by Travelers at all times and without default.

668.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Norris's Travelers policy number 988506484 636 1, which provided property coverage for the period of 5/26/15-5/26/16, Section I – Property Coverages, Additional Coverages, ¶ 8 (Form

---

[7]     Prior to the coverage by Travelers, Norris had coverage with Tower Insurance Company of New York from on or about 2004 to on or about 2011.  Since this litigation began, Tower went into liquidation, and Norris is pursuing her claim against Tower in that proceeding.

HO-6 (10-06) Travelers agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: (a) hidden decay . . . ; [or] (e) use of defective material or methods in construction, remodeling or renovation." The coverage does not cover loss caused by settling, cracking, bulging or expansion. Coverage also does not include loss to foundation or retaining walls unless the loss is a direct result of the collapse of a building.

669.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended use," Norris did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

670.    The concrete had hidden decay in it.

671.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

672.    Direct physical loss occurred during the Travelers policy period.

673.    On October 29, 2016, Norris filed a timely claim for coverage of the loss in accordance with the terms of her policy with Travelers and the policies issued during subsequent policy years.

674.    It is anticipated that Travelers will deny Norris's claim for coverage, which denial will breach the contract and damage Norris. Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Norris's home, the cost of replacing the basement walls is expected to be not less than $138,000.

675.   Norris's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Travelers' breach of contract with Norris, Norris brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Five:  Breach of Contract (Mark and Felice Pawelcyzk v. Allstate Insurance Company)**

676.   The Plaintiffs, Mark and Felice Pawelcyzk (the "Pawelcyzks") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

677.   The Pawelcyzks own and occupy the residential property located at 44 Evans Crossing, South Windsor, Connecticut.

678.   The Pawelcyzks' home was constructed in 1985 and purchased by them in 2001.

679.   On or about July 16, 2015, the Pawelcyzks discovered damage to their basement walls and on visible portions of the outside of their basement walls.

680.   The Pawelcyzks hired Neal, a licensed professional engineer and home inspector, to investigate the cause in March of 2016.

681.   Neal inspected the basement walls to observe and document the defects in the concrete, including any cracks, spalls or other signs of deterioration.

682.   After inspecting the house, Neal concluded that the Pawelcyzks, like their fellow Plaintiffs and putative Class Members, had failing basement walls due to the defective concrete.

683.   Neal concluded that the concrete forming the basement walls was defective due to a chemical reaction resulting from incompatible materials used in the concrete mix.

684.   The Pawelcyzks' residence is facing an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

94

685.    Specifically, Neal told the Pawelcyzks that the condition "will continue to deteriorate the concrete and the foundation walls will very likely bulge inward until they structurally fail."

686.    Neal is certain that the chemical reaction will continue to destroy the concrete until such time that the basement walls are deteriorated and the home caves into its basement.

687.    The Pawelcyzks' home was insured by Allstate Insurance Company.

688.    The Pawelcyzks paid any and all premiums charged by Allstate Insurance Company at all times and without default.

689.    The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Pawelcyzks' Allstate Insurance Company policy number 9 19 012651 06/20, which provided property coverage for the period of 6/20/01-6/20/02, Allstate agreed to cover "11. Collapse. . . . a) the entire collapse of a covered building structure; b) the entire collapse of part of a covered building structure; and c) direct physical loss to covered property caused by (a) or (b) above."  For coverage to apply, the collapse of a building structure "must be a sudden and accidental direct physical loss caused by one or more of the following: . . . b) hidden decay . . . f) defective methods or materials used in construction, repair, remodeling or renovation."

690.    The concrete had hidden decay in it.

691.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

692.    Direct physical loss occurred during the Allstate policy period.

693.    On April 1, 2016, the Pawelcyzks filed a timely claim for coverage of the loss in accordance with the terms of their policy with Allstate.

694.   On July 18, 2016, Allstate denied coverage.

695.   Allstate's denial breached the contract and damaged the Pawelcyzks.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Pawelcyzks' home, the cost of replacing the basement walls is expected to be not less than $150,000.

696.   The Pawelcyzks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Allstate's breach of contract with the Pawelcyzks, the Pawelcyzks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Six**:  **Breach of Contract (Mark and Felice Pawelcyzk v. Bunker Hill)**

697.   The Pawelcyzks reassert and incorporate by reference the allegations contained in Paragraphs 1-92 and 676-686.

698.   The Pawelcyzks' home was insured by Bunker Hill, beginning on April 30, 2012.

699.   The Pawelcyzks paid any and all premiums charged by Bunker Hill at all times and without default.

700.   The failure of the basement walls was a direct physical loss.  Pursuant to the terms of the Pawelcyzks' Bunker Hill policy number BHH00001026345, which provided property coverage for the period of 4/30/12-4/30/13, Section I – Property Coverages, Additional Coverages, ¶ 8, as amended by the Special Provisions - Connecticut Endorsement (H-100 04 06), Bunker Hill agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (f) Use of defective material or methods in construction, remodeling or

96

renovation."  Loss to foundation or retaining wall is not included under this coverage unless the loss is a direct result of the collapse of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

701.    The policy does not further define Collapse.

702.    The concrete had hidden decay in it.

703.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

704.    Direct physical loss occurred during the Bunker Hill policy period.

705.    On April 1, 2016, the Pawelcyzks filed a timely claim for coverage of the loss in accordance with the terms of their policy with Bunker Hill.

706.    On June 24, 2016, and on September 26, 2016, Bunker Hill denied coverage.

707.    Bunker Hill's denial of coverage breached the contract and damaged the Pawelcyzks.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Pawelcyzks' home, the cost of replacing the basement walls is expected to be not less than $150,000.

708.    The Pawelcyzks' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Bunker Hill's breach of contract with the Pawelcyzks, the Pawelcyzks bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Seven:  Breach of Contract (Steven and Colleen Swart v.  Allstate)**

709.    The Plaintiffs, Steven and Colleen Swart (the "Swarts") reassert and incorporate by reference the allegations contained in Paragraphs 1-92.

97

710.    The Swarts own and occupy the residential property located at 60 Hall Hill Road in Willington, Connecticut.

711.    The Swarts' home was constructed in 1985 and purchased by them in 2005.

712.    In March 2016, the Swarts discovered damage to their basement walls and on visible portions of the outside of their basement walls.

713.    Upon information and belief, the Swarts' basement walls contain a sulfide mineral known as pyrrhotite.

714.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

715.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

716.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

717.    The Swarts' home was insured by Allstate.

718.    The Swarts paid any and all premiums charged by Allstate at all times and without default.

719.    The failure of the basement walls was a direct physical loss.

720.    The concrete had hidden decay in it.

721.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

722.    Direct physical loss occurred during the Allstate policy period.

723.    On September 22, 2016, the Swarts filed a timely claim for coverage of the loss in accordance with the terms of their policy with Allstate and the policies issued in subsequent years.

724.    Allstate has neither affirmed nor denied the Swarts' claim.

725.    Upon information and belief, Allstate has denied similar claims for coverage and will deny this claim.

726.    Allstate's failure to affirm coverage damaged the Swarts.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of the Swarts' home, the cost of replacing the basement walls is expected to be not less than $150,000.

727.    The Swarts' basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Allstate's breach of contract with the Swarts, the Swarts bring this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Eight:  Breach of Contract (Mary Lou Thieling v. Travelers)**

728.    The Plaintiff, Mary Lou Thieling ("Thieling") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

729.    Thieling owns and occupies the residential property located at 9 Leo J Lane in Manchester, Connecticut.

730.    Thieling's home was constructed in 1984.

731.    On February 28, 2015, Thieling discovered damage to her basement walls and on visible portions of the outside of her basement walls.

99

732.     Upon information and belief, Thieling's basement walls contain a sulfide mineral known as pyrrhotite.

733.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

734.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

735.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

736.     Thieling's home was insured by Travelers.

737.     Thieling paid any and all premiums charged by Travelers at all times and without default.

738.     The failure of the basement walls was a direct physical loss.  Pursuant to the terms of Thieling's Travelers policy number 946518632 636 1, which provided property coverage for the period of August 8, 2015 to August 8, 2016, Section I – Property Coverages, Paragraph 8. Collapse, as amended by the Special Provisions-Connecticut Endorsement No. HO-300 CT (12-13), Travelers agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:  (a) hidden decay . . . ; [or] (e) use of defective material or methods in construction, remodeling or renovation."  The coverage does not cover loss caused by settling, cracking, bulging or expansion.  Coverage also does not include loss to foundation or retaining walls unless the loss is a direct result of the collapse of a building.

100

739.   Collapse is not further defined.

740.   The concrete had hidden decay in it.

741.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

742.   Direct physical loss occurred during Travelers' policy period.

743.   On October 30, 2016, Thieling filed a timely claim for coverage of the loss in accordance with the terms of her policy with Travelers and the policies issued in subsequent years.

744.   Travelers has neither affirmed nor denied Thieling's claim.

745.   Upon information and belief, Travelers has denied similar claims for coverage and will deny this claim.

746.   It is anticipated that Travelers will deny this claim, which will breach the contract and damage Thieling.  Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Thieling's home, the cost of replacing the basement walls is expected to be not less than $138,000.

747.   Thieling's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Travelers breach of contract with Thieling, Thieling brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Thirty-Nine:  Breach of Contract (Stanley Zaremba v. The Travelers Indemnity Company of America, One of The Travelers Property Casualty Companies)**

748.   The Plaintiff, Stanley Zaremba ("Zaremba") reasserts and incorporates by reference the allegations contained in Paragraphs 1-92.

101

749.     Zaremba owns and occupies the residential property located at 190 Oakes Road, Ashford, Connecticut.

750.     Zaremba's home was constructed in 2002 and purchased by him in 2002.

751.     In February 2016, Zaremba discovered damage to his basement walls and on visible portions of the outside of his basement walls.

752.     Upon information and belief, Zaremba's basement walls contain a sulfide mineral known as pyrrhotite.

753.     Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

754.     The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

755.     In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

756.     Upon information and belief, Zaremba's home was insured by Travelers from 2008 to 2010.

757.     Zaremba paid any and all premiums charged by Travelers at all times and without default.

758.     The failure of the basement walls was a direct physical loss.  Upon information and belief, from 2008 to 2010 Travelers issued policies to homeowners, like Zaremba, whereby it agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden

decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation." The Collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building." The coverage also did not include loss caused by settling, cracking, bulging or expansion.

759.    Upon information and belief; the policy does not further define Collapse.

760.    The concrete had hidden decay in it.

761.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

762.    Direct physical loss occurred during the Travelers policy period.

763.    Zaremba filed a timely claim for coverage of the loss in accordance with the terms of his policy with Travelers on or about July 12, 2016.

764.    Travelers has neither affirmed nor denied Zaremba's claim.

765.    Upon information and belief, Travelers has denied similar claims for coverage and will deny this claim.

766.    Travelers' failure to affirm coverage damaged Zaremba. Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Zaremba's home, the cost of replacing the basement walls is expected to be not less than $150,000.

767.    Zaremba's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state. As a consequence of Travelers' breach of contract with Zaremba, Zaremba brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Forty:  Breach of Contract (Stanley Zaremba v. Kemper Insurance Company)**

768.    Zaremba reasserts and incorporates by reference the allegations contained in Paragraphs 1-92 and 748-755.

769.    Upon information and belief, Zaremba was insured by Kemper with policy number RB 745796, which provided property coverage from 6/21/10 to 6/21/14.

770.    Zaremba paid any and all premiums charged by Kemper at all times and without default.

771.    The concrete had hidden decay in it.

772.    The basement walls were made with defective material or methods in construction, remodeling or renovation.

773.    Direct physical loss occurred during the Kemper policy period.

774.    On May 6, 2016, Zaremba filed a timely claim for coverage of the loss in accordance with the terms of his policy with Kemper and the policies issued during the preceding and subsequent policy years.

775.    Kemper denied Zaremba's claim for coverage by way of a letter dated August 9, 2016.

776.    Kemper's breach of the policy has damaged Zaremba.

777.    Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Zaremba's home, the cost of replacing the basement walls is expected to be not less than $150,000.

778.    Zaremba's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Kemper's breach of contract with

Zaremba, Zaremba brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Forty-One:  Breach of Contract (Stanley Zaremba v. Kemper Insurance Company)**

779.    Zaremba reasserts and incorporates by reference the allegations contained in Paragraphs 1-92 and 748-755.

780.    Upon information and belief, Zaremba was insured by Kemper with policy number RB 791324, which provided property coverage beginning 6/21/14.

781.    Zaremba paid any and all premiums charged by Kemper at all times and without default.

782.    Upon information and belief, under the terms of Zaremba's Kemper Policy, Paragraph 8. Collapse, as amended by the Connecticut Endorsement (AK 3923, Ed. 08 13), Kemper agreed to provide coverage for "direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: . . . (2) hidden decay; (6) use of defective material or methods in construction, remodeling or renovation."  Loss to foundation or retaining wall is not included in the coverage unless the loss is a direct result of the collapse of a building or any part of a building.  Collapse does not include settling, cracking, shrinking, bulging or expansion.

783.    Although the policy further defines Collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended use," Zaremba did not receive adequate notice of this significant reduction in coverage, and therefore it is not effective.

784.    The concrete had hidden decay in it.

785.   The basement walls were made with defective material or methods in construction, remodeling or renovation.

786.   Direct physical loss occurred during the Kemper policy period.

787.   On May 6, 2016, Zaremba filed a timely claim for coverage of the loss in accordance with the terms of his policy with Kemper and the policies issued during the preceding and subsequent policy years.

788.   Kemper denied Zaremba's claim for coverage by way of a letter dated August 9, 2016.

789.   Kemper's breach of the policy has damaged Zaremba.

790.   Based on the estimates of contractors who have performed replacements to the basement walls of similar structures in the area of Zaremba's home, the cost of replacing the basement walls is expected to be not less than $150,000.

791.   Zaremba's basement wall problem is affecting hundreds of other homeowners in the northeast region of this state.  As a consequence of Kemper's breach of contract with Zaremba, Zaremba brings this claim individually and on behalf of all similarly-situated homeowners in Connecticut.

**Count Forty-Two:  Declaratory Judgment (Plaintiffs and Putative Class Members vs. All Defendants)**

792.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 et seq.

793.   The Plaintiffs, individually and on behalf of the putative class of homeowners in Hartford, Tolland and Windham Counties who have homes with damage to their basement walls from concrete containing deleterious sulfide materials and who had homeowners insurance

issued by any of the Defendants at any time since those homes were constructed, seek a declaration that the Defendants are obligated to cover that damage.

794.    The Plaintiffs and putative class members incorporate paragraphs 1-92 by reference as part of this Count.

795.    The Defendants issued policies to the Plaintiffs and putative class members, which policies provided additional coverage for "collapse," defined as "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) Use of defective material or methods in construction, remodeling or renovation."

796.    The Connecticut Supreme Court has defined "collapse" as a "substantial impairment in the structural integrity of a building."  Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246, 252 (1987).

797.    Although the Defendants' policies also stated that the collapse coverage "does not include loss to foundation, [or] retaining wall . . . unless the loss is a direct result of the collapse of a building," the United States District Court for the District of Connecticut has held repeatedly that "foundation" and "retaining wall" are ambiguous and has construed that language against the various insurance companies when considering damage to basement walls identical to that sustained by the Plaintiffs' and putative class members' homes.  See, e.g., Roberge v. Amica Mut. Ins. Co., 2015 WL 9480008 (D. Conn. Dec. 29, 2015) (Eginton, J.); Metsack v. Liberty Mut. Fire Ins. Co., 2015 WL 5797016 (D. Conn Sept. 30, 2015) (Bryant, J.); Gabriel v. Liberty Mut. Fire Ins. Co., 2015 WL 5684063 (D. Conn. Sept. 28, 2015) (Bolden, J.); Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157 (D. Conn. 2014) (Hall, J.) and 2016 WL 4599892 (D. Conn. Sept. 2,

107

2016), reconsideration denied, 2016 WL 6542828 (D. Conn. Nov. 3, 2016) (Bolden, J.); Karas v. Liberty Ins. Corp., 33 F. Supp. 3d 110 (D. Conn. 2014) (Underhill, J.); Panciera v. Kemper Independence Ins. Co., 2014 WL 1690387 (D. Conn. Apr. 29, 2014) (Arterton, J.); Bacewicz v. NGM Ins. Co., 2010 WL 3023882 (D. Conn. Aug. 2, 2010) (Hall, J.).

798.   The Bacewicz case resulted in a verdict for the homeowners on their breach of contract claim based on the policy language quoted above.

799.   The damage to the Plaintiffs' and putative class members' basement walls is a "direct physical loss to covered property involving collapse of the building or any part of the building. . . ."

800.   The damage was caused by hidden decay of the concrete in the basement walls.

801.   The damage was caused by use of the defective concrete in the course of construction of the homes.

802.   The basement walls are not the "foundation" or "retaining walls."

803.   Policies issued by the Defendants to the Plaintiffs and putative class members provide coverage for the damage to the Plaintiffs' basement walls.

804.   The Defendants have not agreed to provide coverage to the Plaintiffs who purchased insurance policies with this language and have made claims, and therefore there is an actual and justiciable controversy between the Plaintiffs and Defendants.

805.   Plaintiffs and putative class members therefore seek a declaratory judgment that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the policies that define "collapse" as "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . .

108

(b) hidden decay; . . . or (e) use of defective material or methods in construction, remodeling or renovation."

**Count Forty-Three:  Declaratory Judgment (All Plaintiffs and Putative Class Members Against All Defendants)**

806.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 et seq.

807.    The Plaintiffs, individually and on behalf of the putative class of homeowners in Hartford, Tolland and Windham Counties who have homes with damage to their basement walls from concrete containing deleterious sulfide materials and who had homeowners insurance issued by any of the Defendants at any time since those homes were constructed, seek a declaration that the Defendants are obligated to cover that damage.

808.    The Plaintiffs and putative class members incorporate paragraphs 1-92 by reference as part of this Count.

809.    The Defendants named in this Count changed the definition of "collapse" to mean "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purposes," and to state that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse."

810.    These Defendants made these unilateral changes to the policy without providing adequate notice or adequate disclosure to the Plaintiffs and putative class members.  Section 38a-323 of the Connecticut General Statutes, as interpreted by the Connecticut Insurance Department in its Bulletin PC-66 and predecessor Bulletins, imposes on the Defendants a duty to make a full and fair disclosure of any new exclusion or deletion of coverage.

109

811.    Because these Defendants did not provide adequate notice to the Plaintiffs and the putative class members, these unilateral deletions of coverage for collapse did not take effect, and the previous language should remain in effect for collapse coverage.

812.    These Defendants have not agreed that their new language is not effective, and therefore there is an actual and justiciable controversy between the Plaintiffs named in this Count and the putative class members and these Defendants.

813.    Plaintiffs and the putative class members therefore seek a declaratory judgment that (1) this new language requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" and stating that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse" is a significant reduction of coverage, (2) that the Defendants did not provide adequate notice of this change in language, (3) that the new language is not effective, and (4) that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the previous policy language.

**Count Forty-Four:  Breach of the Implied Covenant of Good Faith and Fair Dealing (All Plaintiffs and Putative Class Members Against All Defendants)**

814.    The Plaintiffs incorporate paragraphs 1-805 by reference as part of this Count.

815.    The Plaintiffs bring this claim individually and on behalf of the putative class of homeowners in Hartford, Tolland and Windham Counties who have homes with basement walls damaged by concrete containing deleterious sulfide materials and who had homeowners insurance with any of the Defendants at any time since those homes were constructed.

110

816.    The Plaintiffs and putative class members paid for policies that the Plaintiffs reasonably expected would provide coverage for the failure of their basement walls.

817.    Those policies impose on the Defendants a duty and obligation of good faith and fair dealing and a duty to act towards the Plaintiffs and putative class members with an honesty of purpose.

818.    Notwithstanding their duty of good faith and fair dealing, the Defendants have wrongfully attempted to avoid their coverage obligations in bad faith.

819.    The Defendants' denials of coverage or failures to timely affirm coverage prevented the Plaintiffs from receiving the coverage they expected.

820.    At the time that they denied coverage or failed to timely affirm coverage for the Plaintiffs, the Defendants knew of the rulings by the United States District Court for the District of Connecticut holding that similar damage could be covered under similar language when they denied coverage.

821.    Under these circumstances, the Defendants' conduct was not prompted by an honest mistake as to their rights or duties under their policies but instead was designed to evade the spirit of those insurance contracts and to deny the coverage for losses that the Plaintiffs and the putative class members reasonably expected to receive.

822.    In attempting to avoid their coverage obligations on meritorious claims in violation of their policies, the Defendants have acted arbitrarily, wantonly, recklessly and with a dishonest purpose towards the Plaintiffs and the putative class members, intentionally placing their own interests above those of the Plaintiffs and the putative class members.

823.     As a result of the Defendants' breaches of their duties and obligations of good

faith and fair dealing to the Plaintiffs and the putative class members, the Plaintiffs and the

putative class members have suffered and will continue to suffer damages.

**Count Forty-Five:  Breach of the Implied Covenant of Good Faith and Fair Dealing (All Plaintiffs Against All Defendants)**

824.     The Plaintiffs incorporate Paragraphs 1-791 and 809-811 by reference as part of

this Count.

825.     These Defendants breached the implied covenant of good faith and fair dealing

by:

      a.     failing to give full and fair notice to Plaintiffs and putative class members that their collapse coverage was being deleted;

      b.     accepting insurance premiums in return for coverage for "collapse," despite the fact that Defendants have failed to provide such coverage;

      c.     misrepresenting that the Plaintiffs and putative class members must pay for insurance coverage for "collapse," for periods when the Defendants actually had no risk of loss at all;

      d.     imposing inadequate insurance on Plaintiff and putative class members' homes, in contravention of the Plaintiff and putative class members' reasonable expectations.

826.     Under these circumstances, the Defendants' conduct was not prompted by an

honest mistake as to their rights or duties under their policies but instead was designed to evade

the spirit of those insurance contracts and to deny the coverage for losses that the Plaintiffs and

the putative class members reasonably expected to receive.

827.     In attempting to avoid their coverage obligations on meritorious claims in

violation of their policies, the Defendants have acted arbitrarily, wantonly, recklessly and with a

112

dishonest purpose towards the Plaintiffs and the putative class members, intentionally placing their own interests above those of the Plaintiffs and the putative class members.

828.     As a result of the Defendants' breaches of their duties and obligations of good faith and fair dealing to the Plaintiffs and the putative class members, the Plaintiffs and the putative class members have suffered and will continue to suffer damages.

**Count Forty-Six:  Plaintiff Hallorans' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Harleysville, Nationwide, Kemper, Travelers and Automobile Insurance Company of Hartford Connecticut**

829.     The Hallorans incorporate by reference Paragraphs 1-154 in this Count.

830.     There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

831.     Harleysville/Nationwide, Kemper, Travelers/AIC (the "Halloran Defendants") have an obligation to exercise good faith in fulfilling their contracts to provide insurance coverage to the Hallorans.

832.     On January 25, 2016, the Hallorans filed insurance claims with the Halloran Defendants regarding the defective concrete in their "basement walls."

833.     On or about March 1, 2016, Kemper told the Hallorans that it will "take thirty days or maybe not that long" to determine the outcome of their claim.

834.     On or about March 1, 2016 Kemper told the Hallorans that "Kemper hasn't paid any claims" relating to defective concrete and "everyone is saying the same thing."

835.    In February 2016, Travelers/AIC visited the Hallorans' home to visually examine the basement walls.  The adjuster told Mr. Halloran that the coverage decision would take about a year.

836.    In February 2016 Charlie Mitchell of Nationwide conducted a visual examination of the Hallorans' basement walls.  Mr. Mitchell indicated that he was the adjuster on the case for both Nationwide and Harleysville.  During the course of the next several weeks, the Hallorans and Plaintiffs' counsel received several phone calls from Al Klopfer, an independent adjuster, demanding to see the house.  Mr. Mitchell has told the Hallorans and Plaintiffs' counsel on multiple occasions that Nationwide uses a Nationwide adjuster and that "Al Klopfer is not on the case."  Despite this confusion, after weeks of uncertainty for the Hallorans, Mr. Mitchell confirmed he was the adjustor on the case.

837.    On or about June 23, 2016, Kemper denied coverage for the defective concrete, asserting that defective concrete is not covered under the policy because, in addition to other reasons listed, "the Premises is not in a state of collapse" and "the damage occurred or commenced prior to the inception of coverage with Kemper."

838.    Kemper has offered no factual evidence that would in any way support its decision to deny the Hallorans' claim.  In fact, it went out of its way to state that it does not disagree with the Hallorans' engineering report.  Only after a two-month intensive investigation involving core testing, which included petrographic analysis, scanning electron microscopy along with energy dispersive x-ray analysis, was F&O able to verify the presence and composition of the iron sulfide minerals.  This undoubtedly should be considered hidden decay.  From this laborious and expert scientific discovery, F&O concluded that, "a chemical reaction of

114

the concrete mix is occurring due to the presence of pyrrhotite and is expected to continue" which will lead to structural failure.

839.   On or about October 6, 2016, Harleysville also denied coverage for the defective concrete asserting that "the loss occurred prior to the inception date of the policy and it also was caused by perils which are not covered, or are specifically excluded under your policy."

840.   Harleysville has offered no factual evidence that would in any way support its decision to deny the Hallorans' claim.

841.   Travelers has also exhibited bad faith by deliberately delaying their coverage decisions, despite the fact that they too will deny the Hallorans' claim.

842.   The Halloran Defendants are ignoring a growing number of state and federal cases holding that crumbling concrete in basement walls should be covered under homeowners insurance policies.

843.   Despite being given the Hallorans' 150-page expert report, the Halloran Defendants have refused to properly apply the collapse provision while they either have denied or will deny the Hallorans' claim.

844.   Upon information and belief, the Halloran Defendants are intentionally misleading the Hallorans and are trying to convince them that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

845.   Accordingly, the Halloran Defendants have impeded the Plaintiffs' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

846.   The Halloran Defendants have acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of their duties by denying their claims

and/or deliberately delaying denial of the Hallorans' claim for coverage under the Hallorans' various homeowners policies solely in order to preserve their own assets.

847.    The Halloran Defendants have breached the implied covenant of good faith and fair dealing under the policies by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive denying coverage of meritorious claims or failing to act on the Hallorans' pending claims while knowing said claims will be rejected.

848.    The Halloran Defendants' breaches of the covenant of good faith and fair dealing have damaged the Hallorans.

**Count Forty-Seven:  Plaintiff Masciovecchios' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Homesite and AIG**

849.    The Massciovecchios incorporate by reference Paragraphs 1-92 and 566-607 in this Count.

850.    The Massciovecchios have filed insurance claims with Homesite and AIG, regarding the defective concrete in their "basement walls."

851.    There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

852.    Homesite and AIG have an obligation to exercise good faith in fulfilling their contracts to provide insurance coverage to the Masciovecchios.

853.    Homesite denied coverage for the defective concrete asserting that (1) the loss was caused by wear and tear, deterioration, settling, shrinking, bulging, and expansion of foundations and/or inadequate workmanship or defective materials used in construction; (2) the

116

Collapse coverage is not applicable because there was no "abrupt collapse" of the property and (3) "coverage for 'abrupt collapse' would only apply when the damage is caused by decay of a building that is hidden from view. . . ."

854.     Homesite has offered no factual evidence that would in any way support its decision to deny the Masciovecchios' claim.  In fact, it went out of its way to state that it does not disagree with the Masciovecchios' engineering report.  Only after a two-month intensive investigation involving core testing, which included petrographic analysis, scanning electron microscopy along with energy dispersive x-ray analysis, was F&O able to verify the presence and composition of the iron sulphide minerals.  This undoubtedly should be considered hidden decay.  From this laborious and expert scientific discovery, F&O concluded the following:

> Based on our observations and the laboratory analysis, it is our professional engineering judgement that a chemical reaction of the concrete mix is occurring due to the presence of pyrrhotite and the other iron sulphide minerals and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended. The structural failure may lead to loss of support of the building structure, loss of support of the soil on the outside of the wall and/or allowance of water intrusion into the basement.

855.     AIG was the former insurer of the Masciovecchios' policy.  After the Masciovecchios attempted to file a claim with AIG, AIG indicated that AIG does not have a record of any AIG insurance policies that ever covered the Masciovecchios' property.  Upon information and belief, these assertions are without basis in fact and are calculated toward causing the Masciovecchios to withdraw their claim in this matter.

856.     Despite being given the Masciovecchios' expert report, Homesite and AIG have refused to properly apply the collapse provision when denying the Masciovecchios' claim.

117

857.     Upon information and belief, Homesite and AIG are intentionally misleading the Masciovecchios and are trying to convince them that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

858.     By denying coverage in this manner, Homesite and AIG have impeded the Plaintiffs' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

859.     Homesite and AIG have acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in denying the Masciovecchio's claim for coverage under their homeowners policies.

860.     Homesite and AIG have breached the implied covenant of good faith and fair dealing under the policies by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive denying coverage or failing to act on the Hallorans' pending claims while knowing said claims will be rejected.

861.     Homesite and AIG's breaches of the covenant of good faith and fair dealing have damaged the Masciovecchios.

**Count Forty-Eight:  Plaintiff Brozeks' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Metropolitan.**

862.     The Brozeks incorporate by reference Paragraphs 1-92 and 196-254 in this Count.

863.     The Brozeks have filed an insurance claim with Metropolitan regarding the defective concrete in their "basement walls."

864.    There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

865.    Metropolitan has an obligation to exercise good faith in fulfilling its contract to provide insurance coverage to the Brozeks.

866.    Metropolitan denied coverage for the defective concrete asserting that the Brozek claim was being denied on the basis that the problem with the concrete is "not a sudden collapse." The denial letter set forth many other ostensible reasons for the denial.

867.    Metropolitan has offered no factual evidence that would in any way support its decision to deny the Brozeks' claim.

868.    Metropolitan is ignoring a growing number of state and federal cases holding that insurers are required to provide coverage for basement walls with defective concrete.

869.    Metropolitan was provided an extensive engineering report regarding the presence of hidden decay in the form of oxidizing minerals in the Brozeks' basement walls, however despite this, Metropolitan denied coverage.

870.    Upon information and belief, Metropolitan intentionally denied the Brozeks' claim asserting that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

871.    By denying coverage in this manner, Metropolitan has impeded the Brozeks' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

872.     Metropolitan has acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in denying the Brozeks' claim for coverage under their homeowners policy.

873.     Metropolitan has breached the implied covenant of good faith and fair dealing under the policies by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive denying coverage on the Brozeks' claim.

874.     Metropolitan has breached the covenant of good faith and fair dealing and has damaged the Brozeks.

**Count Forty-Nine:  Plaintiff Dyer's Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Harleysville**

875.     Dyer incorporates by reference Paragraphs 1-92 and 255-279 in this Count.

876.     There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

877.     Harleysville and Nationwide have an obligation to exercise good faith in fulfilling their contract to provide insurance coverage to Dyer.

878.     Dyer has filed insurance claims with Harleysville and Nationwide, regarding the defective concrete in his basement walls.

879.     A representative of Nationwide told Dyer that that "99 out of 100" claims similar to Dyer's get rejected and he would likely be issuing a denial letter soon.

880.     Despite the fact that Dyer has made valid claims with Harleysville and Nationwide, Dyer's claim was denied on September 6, 2016.

120

881.    Harleysville denied coverage for the defective concrete, asserting his claim was being denied because the "loss occurred prior to the inception date of the policy and also was caused by perils which are not covered or are specifically excluded under your policy."

882.    Harleysville has offered no factual evidence that would in any way support its decision to deny Dyer's claim.

883.    Harleysville and Nationwide are ignoring a growing number of state and federal cases holding that insurers are required to provide coverage for basement walls with defective concrete.

884.    Harleysville and Nationwide were provided an extensive engineering report regarding the presence of hidden decay in the form of oxidizing minerals in Dyer's basement walls, however despite this, Harleysville denied coverage.

885.    Upon information and belief, Harleysville intentionally denied Dyer's claim, asserting that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

886.    By denying coverage in this manner, Harleysville has impeded Dyer's right to receive benefits that he reasonably expected to receive under the contract for homeowners insurance.

887.    Harleysville acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in denying Dyer's claim for coverage under his homeowners policy.

888.    Harleysville breached the implied covenant of good faith and fair dealing under the policy by, among other things, knowingly, deliberately, consciously, intentionally, recklessly,

121

negligently, and/or with dishonest, interested and/or sinister motive denying coverage on Dyer's claim.

889.    Harleysville breached the covenant of good faith and fair dealing and have damaged Dyer.

**Count Fifty:  Plaintiff Furlongs' Breach of Implied Covenant of Good Faith and Fair Dealing vs. Amica Mutual Insurance Company**

890.    The Furlongs incorporate by reference Paragraphs 1-92 and 297-335 in this Count.

891.    There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

892.    Amica has an obligation to exercise good faith in fulfilling its contract to provide insurance coverage to the Furlongs.

893.    On or about July 27, 2015, the Furlongs filed insurance claims with Amica regarding the defective concrete in their basement walls.

894.    Despite the fact that the Furlongs have made a claim with Amica, the Furlongs have not been provided an answer regarding the outcome of their claims.

895.    Despite the fact that the Furlongs had an engineering firm prepare an extensive report indicating that they had defective concrete in their basement walls, Amica has refused to provide coverage for their claim, while knowing that it intends to deny the Furlongs' claim.

896.    Upon information and belief, Amica is intentionally misleading the Furlongs and is trying to convince them that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

897.   Amica has deliberately delayed its coverage decisions despite the fact that it intends to deny the Furlongs' claim.  Accordingly, Amica has impeded the Furlongs' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

898.   Amica has acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in deliberately delaying the denial of the Furlongs' claim for coverage under the Homeowners Policy.

899.   Amica has breached the implied covenant of good faith and fair dealing under the Policy by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive failing to act on the Furlongs' pending claim while knowing said claim will be rejected.

900.   Amica has breached the covenant of good faith and fair dealing and has damaged the Furlongs.

**Count Fifty-One:  Plaintiff McKinneys' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Merrimack Mutual Fire Insurance Co., Andover Companies.**

901.   The McKinneys incorporate by reference Paragraphs 1-92 and 608-638 in this Count.

902.   There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

903.   Merrimack Mutual Fire Insurance Company and Andover Companies have an obligation to exercise good faith in fulfilling their contract to provide insurance coverage to the McKinneys.

123

904.    The McKinneys have filed an insurance claim with Merrimack Mutual Fire Insurance Company ("Merrimack") regarding the defective concrete in their basement walls.

905.    On or about July 15, 2013, Merrimack denied the McKinneys' claims and did not provide a legitimate basis for so doing.

906.    Merrimack has offered no factual evidence for the claim that the damage to the McKinneys' residence was caused in any part by the "foundation" and not the "basement walls," in support of its decision to deny the claim.

907.    Upon information and belief, Merrimack is intentionally misleading the McKinneys and is trying to convince them that the damage suffered to their basement walls is not covered solely to avoid payment of a covered loss.

908.    Merrimack acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in denying the McKinneys' claim for coverage under the Homeowners Policy.

909.    Merrimack has breached the implied covenant of good faith and fair dealing under the Policy by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive denying the McKinneys' claim.

910.    Merrimack breached the covenant of good faith and fair dealing and has damaged the McKinneys.

**Count Fifty-Two:  Plaintiffs Poulins' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. State Farm.**

911.    The Plaintiffs incorporate by reference Paragraphs 1-92 in this Count.

912.    At all relevant times, the Poulins owned and occupied the residential property located at 57 Colgate Drive in Manchester, Connecticut.

913.    The Poulins' home was constructed in 1991 and purchased by them in 2004.

914.    In February 2014, the Poulins discovered damage to their basement walls and on visible portions of the outside of their basement walls.

915.    Upon information and belief, the Poulins' basement walls contain a sulfide mineral known as pyrrhotite.

916.    Pyrrhotite is a destructive chemical that, when exposed to water and air produces a chemical reaction, which expands and breaks apart the concrete in what is commonly referred to as a "sulfate attack."

917.    The sulfate attack is an irreversible condition, which affects the durability and ultimately causes the failure of the concrete.

918.    In other words, the sulfate attack will continue to deteriorate the concrete until the home caves into its basement.

919.    The Poulins' home was insured by State Farm.

920.    The Poulins paid any and all premiums charged by State Farm at all times and without default.

921.    The failure of the basement walls was a direct physical loss. Pursuant to the terms of the Poulins' State Farm Policy No. 07-BM-4367-1, which provided property coverage for the period of January 5, 2014 to January 5, 2015, as amended by FE-3428 Homeowners Policy Endorsement (Connecticut), State Farm deleted Collapse from additional coverage. However,

that same endorsement added as a covered peril "Collapse to a building or any part of a building."

922.   Although State Farm deleted Collapse from the additional coverage, the Poulins did not receive adequate notice of any reduction in coverage, and therefore it is not effective.

923.   Direct physical loss occurred during the State Farm policy period.

924.   On February 18, 2014, the Poulins made a claim with State Farm over the telephone.  During that conversation, the Poulins reported the condition of their basement walls and asked for coverage.  State Farm told the Poulins that the claim was not covered.

925.   Following their verbal denial, the Poulins received a denial letter from State Farm on February 21, 2014.  This letter stated: ". . . the foundation of your home is settling and cracking.  Settling and cracking of foundation and walls as well as earth movement is specifically excluded under the Homeowners policy."  The damage to the Poulins' basement walls was not caused by earth movement.

926.   State Farm did not investigate the Poulins' claim.

927.   State Farm has offered no factual evidence that would in any way support its decision to deny the Poulins' claim.

928.   Upon information and belief, State Farm has denied similar claims for coverage.

929.   There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

930.   State Farm has an obligation to exercise good faith in fulfilling their contracts to provide insurance coverage to the Poulins.

126

931.    On or about March 18, 2014, State Farm sent the Poulins a letter indicating that based on their recent claim there were "some positive measures that can be taken which could reduce the potential for similar loss." Specifically State Farm stated, "The foundation of the home is cracked and in need of repair. Have a qualified contractor inspect the foundation and [sic] make the needed repairs to prevent further damage and cracking." The letter went on to indicate "Your cooperation with the above underwriting requirements within the next 90 days would be appreciated." The notice NEVER INDICATED THAT THEIR POLICY WOULD BE DISCONTINUED IF THE REPAIRS WERE NOT MADE.

932.    On or about October 28, 2014, State Farm sent a letter to the Poulins indicating they would be discontinuing their insurance policy with the Poulins stating "This risk is no longer acceptable to State Farm Fire and Casualty Company due to your failure to maintain the premises, as outlined in our letter to you dated March 18, 2014. The requirement(s) outlined in the letter were repair the cracked foundation."

933.    State Farm cancelled the Poulins' policy, despite the fact that it never told the Poulins that repairs were necessary in order for the policy to continue.

934.    Further, State Farm has offered no factual evidence for the claim that the damage to the Poulins' residence was caused in any part by earth movement, or that the damage was suffered by the "foundation" and not the "basement walls," in support of their decision to deny the claim.

935.    Upon information and belief, State Farm intentionally misled the Poulins and tried to convince them that the damage suffered to their basement walls was not covered, solely to avoid payment of a covered loss.

936.    By terminating the policy and denying coverage in this manner State Farm has impeded the Poulins' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

937.    State Farm acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of its duties in denying the plaintiff's claim for coverage under the Homeowners Policy and in doing so affirmatively operated with furtive design or ill will.

938.    State Farm breached the covenant of good faith and fair dealing and damaged the Poulins.

**Count Fifty-Three:  Plaintiffs Pawelcyzks' Breach of the Implied Covenant of Good Faith and Fair Dealing vs. Bunker Hill and Allstate.**

939.    The Pawelcyzks incorporate by reference Paragraphs 1-92 and 676-708 in this Count.

940.    There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

941.    Bunker Hill and Allstate have an obligation to exercise good faith in fulfilling their contract to provide insurance coverage to the Pawelcyzks.

942.    On or about April 7, 2016, the Pawelcyzks filed an insurance claim with Bunker Hill Insurance Co. and Allstate Insurance Co. regarding the defective concrete in their basement walls.

943.    Despite the fact that the Pawelcyzks made valid claims with Bunker Hill and Allstate, the Pawelcyzks' Allstate claim was denied on July 18, 2016 and the Bunker Hill claim was denied on September 26, 2016.

128

944.    Allstate denied coverage for the defective concrete, asserting the loss occurred outside of the policy period.  It further claimed that it denied coverage because the property "did not collapse in whole or part, within the scope of [the] Additional Coverage."

945.    Allstate offered no factual evidence that would in any way support its decision to deny the Pawelcyzks' claim.

946.    Bunker Hill denied coverage on September 26, 2016, asserting that the Pawelcyzks had failed to provide a proof of loss statement "within 60 days after [Bunker Hill's] request."

947.    In a June 24, 2016 letter, Bunker Hill's adjustor detailed the reasons why Bunker Hill would not cover the Pawelcyzks' claim.  The adjustor listed a number of reasons, including but not limited to the fact that "Bunker Hill policies clearly do not cover cracking of basement walls."  Bunker Hill further asserted that it would no longer investigate the Pawelcyzks' claim, because the Pawelcyzks "elected to file a lawsuit instead."

948.    Bunker Hill has offered no factual evidence that would in any way support the reasons listed in its June 24, 2016 letter.

949.    Allstate and Bunker Hill are ignoring a growing number of state and federal cases holding that insurers are required to provide coverage for basement walls with defective concrete.

950.    Allstate and Bunker Hill were provided an extensive engineering report regarding the presence of hidden decay in the form of oxidizing minerals in the Pawelcyzks' basement walls, however despite this, Allstate and Bunker Hill denied coverage.

951.    Upon information and belief, Allstate and Bunker Hill intentionally denied the Pawelcyzks' claim, asserting that the damage suffered to their basement walls is not covered, solely to avoid payment of a covered loss.

952.    By denying coverage in this manner, Allstate and Bunker Hill have impeded the Pawelcyzks' right to receive benefits that they reasonably expected to receive under the contract for homeowners insurance.

953.    Allstate and Bunker Hill have acted in bad faith and breached the implied covenant of good faith and fair dealing in the performance of their duties in denying the Pawelcyzks' claim for coverage under their homeowners policies.

954.    Allstate and Bunker Hill have breached the implied covenant of good faith and fair dealing under the policy by, among other things, knowingly, deliberately, consciously, intentionally, recklessly, negligently, and/or with dishonest, interested and/or sinister motive denying coverage on the Pawelcyzks' claim.

955.    Allstate and Bunker Hill have breached the covenant of good faith and fair dealing and this has damaged the Pawelcyzks.

**Count Fifty-Four**:  **Violation of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA) (All Plaintiffs and Putative Class Members Against All Defendants)**

956.    The Plaintiffs and putative class members incorporate by reference Paragraphs 1-805 as part of this Count.

957.    The Plaintiffs bring this claim individually and on behalf of the putative class of homeowners in Hartford, Tolland and Windham Counties who have homes with damage to their

130

basement walls from concrete containing deleterious sulfide materials and who had homeowners insurance issued by any of the Defendants at any time since those homes were constructed.

958.    The Defendants are insurance companies licensed and qualified to engage in the business of insurance within the State of Connecticut.

959.    The Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(4).

960.    The activities of the Defendants constitute the conduct of "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110b.

961.    The Defendants issued homeowners' insurance policies to parties that provide virtually identical collapse coverage:

> We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . b. Hidden decay; . . . [or] f. Use of defective material or methods in construction, remodeling or renovation.

962.    The Defendants knew that the United States District Court for the District of Connecticut repeatedly denied insurance companies' motions to dismiss breach of contract claims based on this language and that the one claim (<u>Bacewicz</u>) that went to a jury resulted in a verdict in the homeowner policyholders' favor.

963.    Despite this knowledge, the Defendants had a general business practice of denying the Plaintiffs' and many other homeowners' claims.

964.    The Defendants had a general business practice of issuing denials of coverage that were false and misleading about the Plaintiffs' entitlement to coverage, considering the case law

131

and the provisions of the Plaintiffs' homeowners' policies, in violation of Conn. Gen. Stat.

§ 38a-816(6)(A).

965.    The Defendants had a general business practice of  not attempting in good faith to

effectuate prompt, fair and equitable settlements of claims in which liability was reasonably

clear, based on this language and the case law, in violation of Conn. Gen. Stat. § 38a-816(6)(F).

966.    The Defendants had a general business practice of compelling the Plaintiffs to

institute litigation to recover the amounts due to them to repair and replace their basement walls,

in violation of Conn. Gen. Stat. § 38a-816(6)(G).

967.    The Defendants have caused substantial injury to consumers (the Plaintiffs and

putative class members).

968.    The Defendants' systematic and uniform denials of these claims offend public

policy because they violate the foregoing provisions of CUIPA.  In addition, mayors, state

legislators and U.S. Congressmen and Senators are pleading for government money to replace

the basement walls of hundreds, perhaps thousands, of their constituents.  The Governor has set

in motion a task force to examine the scope of the problem.  The Attorney General's Office,

working together with the Department of Consumer Protection, Department of Insurance and the

Department of Banking, are investigating to determine the cause of the collapsing homes, the

geographic scope of the affected homeowners, and potential fixes for the problems, including

legislative reform.  The Commissioner of the Connecticut Department of Insurance has even

issued a directive to insurance companies forbidding them from non-renewing affected

homeowners insurance policies.

969.     This industry-wide trade practice of denials also offends public policy because it endangers the free flow of credit to consumers, drastically lowers property values and destabilizes the housing market.

970.     The Defendants' denials under this language and case law are immoral, unscrupulous and unethical.

971.     The Plaintiffs have suffered an ascertainable loss.  Not only do they not have the coverage to which they are entitled to repair and replace their basement walls, the Plaintiffs cannot sell or refinance their homes.  They are paying too much in taxes for homes that are essentially worthless.

972.     As a result of the above conduct that is prohibited by CUIPA, the Defendants also have violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a).

973.     Punitive damages are warranted under CUTPA because the Defendants have willfully and wantonly engaged in the unfair and deceptive acts and practices described above.

974.     The Plaintiffs have incurred and are likely to incur substantial attorneys' fees in pursuing coverage for their claims, necessitated by the unfair or deceptive acts and practices described above.

975.     A copy of this Substituted Third Amended Complaint has been sent to the Attorney General and the Commissioner of Consumer Protection.

**Count Fifty-Five:  Violation of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA) (Plaintiffs Hallorans and Furlongs Against Defendants Travelers and Amica)**

976.     Plaintiffs Hallorans and Furlongs incorporate by reference Paragraphs 1-154, 297-335, 829-848 and 890-900 as part of this Count.

133

977.    The Defendants are insurance companies licensed and qualified to engage in the business of insurance within the State of Connecticut.

978.    The Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(4).

979.    The activities of the Defendants constitute the conduct of "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110b.

980.    As alleged in Counts 46 and 50, the Defendants have a general business practice of failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies in violation of Conn. Gen. Stat. § 38a-816(6)(B).

981.    The Defendants have caused substantial injury to consumers (the Plaintiffs and putative class members).

982.    The Defendants' delays and failures to respond offend public policy because they violate the foregoing provisions of CUIPA.

983.    The Defendants' delays and failures to respond are immoral, unscrupulous and unethical.

984.    The Plaintiffs have suffered an ascertainable loss.  Not only do they not have the coverage to which they are entitled to repair and replace their basement walls, the Plaintiffs cannot sell or refinance their homes.  They are paying too much in taxes for homes that are essentially worthless.

985.    As a result of the above conduct that is prohibited by CUIPA, the Defendants also have violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a).

134

986.     Punitive damages are warranted under CUTPA because the Defendants have

willfully and wantonly engaged in the unfair and deceptive acts and practices described above.

987.     The Plaintiffs have incurred and are likely to incur substantial attorneys' fees in

pursuing coverage for their claims, necessitated by the unfair or deceptive acts and practices

described above.

988.     A copy of this Substituted Third Amended Complaint has been sent to the

Attorney General and the Commissioner of Consumer Protection.

**Count Fifty-Six:  Violation of the Connecticut Unfair Trade Practices Act (CUTPA) and
the Connecticut Unfair Insurance Practices Act (CUIPA) (Plaintiffs Hallorans, Dyer,
Masciovecchios, McKinneys, Poulins and Pawelcyzks Against Defendants Harleysville,
Homesite, Metropolitan, Merrimack, State Farm, Allstate and Bunker Hill)**

989.     Plaintiffs Hallorans, Dyer, Masciovecchios, McKinneys, Poulins and Pawelcyzks

incorporate by reference Paragraphs 1-154, 255-279, 566-607,608-638, 676-708, 829-848, 849-

861, 875-889, 901-910, 911-938 and 939-955 as part of this Count.

990.     The Defendants are insurance companies licensed and qualified to engage in the

business of insurance within the State of Connecticut.

991.     The Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-

110a(4).

992.     The activities of the Defendants constitute the conduct of "trade" or "commerce"

within the meaning of Conn. Gen. Stat. § 42-110b.

993.     As alleged in Counts 46, 47, 49, 51, 52 and 53, the Defendants have a general

business practice of refusing to pay claims without conducting a reasonable investigation based

upon all available information, in violation of Conn. Gen. Stat. § 38a-816(6)(D).

994.    The Defendants have caused substantial injury to consumers (the Plaintiffs and putative class members).

995.    The Defendants' failures to reasonably investigate offend public policy because they violate the foregoing provision of CUIPA.

996.    The Defendants' failures to reasonably investigate are immoral, unscrupulous and unethical.

997.    The Plaintiffs have suffered an ascertainable loss.  Not only do they not have the coverage to which they are entitled to repair and replace their basement walls, the Plaintiffs cannot sell or refinance their homes.  They are paying too much in taxes for homes that are essentially worthless.

998.    As a result of the above conduct that is prohibited by CUIPA, the Defendants also have violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a).

999.    Punitive damages are warranted under CUTPA because the Defendants have willfully and wantonly engaged in the unfair and deceptive acts and practices described above.

1000.   The Plaintiffs have incurred and are likely to incur substantial attorneys' fees in pursuing coverage for their claims, necessitated by the unfair or deceptive acts and practices described above.

1001.   A copy of this Substituted Third Amended Complaint has been sent to the Attorney General and the Commissioner of Consumer Protection.

**Count Fifty-Seven:  Violation of Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA) (All Plaintiffs and Putative Class Members Against All Defendants)**

1002.   The Plaintiffs incorporate by reference Paragraphs 1-813 as part of this Count.

1003.   The Plaintiffs bring this claim individually and on behalf of the putative class of homeowners in Hartford, Tolland and Windham Counties who have homes with damage to their basement walls from concrete containing deleterious sulfide materials and who had homeowners insurance issued by any of the Defendants at any time since those homes were constructed.

1004.   The Defendants are insurance companies licensed and qualified to engage in the business of insurance within the State of Connecticut.

1005.   The Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(4).

1006.   The activities of the Defendants constitute the conduct of "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110b.

1007.   The Defendants and ISO and other trade associations changed the definition of "collapse" to mean a "sudden" or "abrupt" falling down or caving in and to preclude coverage unless the building could not be occupied.

1008.   The Defendant Insurance Companies made these unilateral changes to the policy without providing adequate notice or adequate disclosure to the Plaintiffs.  Section 38a-323 of the Connecticut General Statutes, as interpreted by the Connecticut Insurance Department in its Bulletin PC-66 and predecessor Bulletins, imposes on the Defendant Insurance Companies a duty to make a full and fair disclosure of any new exclusion or deletion of coverage.

1009.   The Defendants' attempt to curtail the additional coverage for "collapse" by adding the requirement that it be an "abrupt" or "sudden" "falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" and statements that "[a] building or any part of a

137

building that is in danger of falling down or caving in is not considered to be in a state of collapse," were a deletion of coverage.

1010.   These new requirements and statements were a change in Connecticut law as established by the Connecticut Supreme Court in <u>Beach</u>.

1011.   The Plaintiffs and putative class members are homeowners without the requisite knowledge and resources to make the many intricate observations needed to determine whether their insurance policies have changed to cover or not cover certain events.  The Plaintiffs did not and could not negotiate with the Defendant Insurance Companies at arms' length.  The changes the Defendant Insurance Companies made to the Additional Coverages section were complicated attempts to reduce their financial risk under the homeowners policies.

1012.   The Defendant Insurance Companies attempted to deliver to these insureds unsuitable insurance policies in exchange for lucrative premium payments.  They were trying to sell an egregiously unsuitable product wrapped in a veneer of respectability.  The Defendant Insurance Companies' real interest was selling the policies to reap an enormous bounty — decades of premium payments — without fear of the otherwise inevitable claim.

1013.   The Defendants sold this ephemeral coverage in violation of Conn. Gen. Stat. § 38a-816(1).

1014.   The Defendants made a general business practice of selling this ephemeral coverage in violation of Conn. Gen. Stat. § 38a-816(6)(A).

1015.   The Defendants have caused substantial injury to consumers (the Plaintiffs and putative class members).

1016.   The Defendants' changes to the language and failures to notify the Plaintiffs about the effects of those changes offend public policy because they violate the foregoing provisions of CUIPA.  In addition, mayors, state legislators and U.S. Congressmen and Senators are pleading for government money to replace the basement walls of hundreds, perhaps thousands, of their constituents.  The Governor has set in motion a task force to examine the scope of the problem.  The Attorney General's Office, working together with the Department of Consumer Protection, Department of Insurance and the Department of Banking, are investigating to determine the cause of the collapsing homes, the geographic scope of the affected homeowners, any unfair trade practices, and the potential fixes for the problems, including legislative reform.   The Commissioner of the Connecticut Department of Insurance has even issued a directive to insurance companies forbidding them from non-renewing affected homeowners insurance policies.

1017.   This industry-wide trade practice of selling policies that severely limit "collapse" coverage without notice to policyholders also offends public policy because it endangers the free flow of credit to consumers, drastically lowers property values and destabilizes the housing market.

1018.   The Defendants' changes to the language and failures to notify the Plaintiffs are immoral, unscrupulous and unethical.

1019.   The Plaintiffs have suffered an ascertainable loss.  Not only do they not have the coverage to which they are entitled to repair and replace their basement walls, the Plaintiffs cannot sell or refinance their homes.  They are paying too much in taxes for homes that are

essentially worthless. They have lost money because they paid for an insurance contract for which they did not bargain.

1020.   As a result of the above conduct that is prohibited by CUIPA, the Defendants also have violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a).

1021.   Punitive damages are warranted under CUTPA because the Defendants have willfully and wantonly engaged in the unfair and deceptive acts and practices described above.

1022.   The Plaintiffs have incurred and are likely to incur substantial attorneys' fees in pursuing coverage for their claims, necessitated by the unfair or deceptive acts and practices described above.

1023.   A copy of this Substituted Third Amended Complaint has been sent to the Attorney General and the Commissioner of Consumer Protection.

## **REMEDY FOR PLAINTIFFS AND THE CLASS**

1024.   The Plaintiffs incorporate all allegations made elsewhere in this complaint.

1025.   There are common issues among all Plaintiffs and putative Class Members:

    a.    Whether Defendant Insurance Companies breached their contracts of insurance with the Plaintiffs and putative Class Members by failing to provide coverage for crumbling walls claims.

    b.    Whether Defendant Insurance Companies and ISO/other insurance trade associations and/or Defendant Insurance Companies themselves conspired to attempt to provide unsuitable homeowners insurance policies to Plaintiffs and putative Class Members, all the while being previously aware of crumbling walls claims and attempting to stylize policies that would not provide coverage for crumbling walls claims.

    c.    Whether Defendant Insurance Companies, as part of a general business practice, denied the insureds' claims in an unfair, deceptive manner that has caused substantial injury to the Plaintiffs and putative Class Members.

       d.      Whether the Plaintiffs and putative Class Members suffered losses and, if so, the proper measure of the losses.

1026.   Plaintiffs and putative Class Members seek various forms of relief that could be ordered as "common answers" to resolve the litigation.  These common answers consist of the following:

       a.      Damages in the amount necessary to replace the failing concrete in the homes of each of the Plaintiffs and members of the Class;

       b.      A Declaratory Judgment that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the policies that define "collapse" as "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) use of defective material or methods in construction, remodeling or renovation;"

       c.      A Declaratory Judgment that (1) new language requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" and stating that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse" is a significant reduction of coverage, (2) that the Defendants did not provide adequate notice of this change in language, (3) that the new language is not effective, and (4) that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the previous policy language;

       d      Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

       e.      Pre-judgment interest pursuant to Conn. Gen. Stat. § 37-3a and other applicable laws;

       f.      Costs pursuant to Conn. Gen. Stat. § 42-110g and other applicable laws;

       g.      Attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g and other applicable laws;

       h.      An Order certifying a class action under one or more of Rule 23(b)(1), 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure; and

       i.      Such other and further relief as this Court may deem just and proper.

1027.   While there are many ways to provide relief here and the Plaintiffs and putative

Class Members wish to keep every option open, the biggest things the Plaintiffs and putative

Class Members want can be simply described.  They want damages that compensate them for

removing their existing basement walls and building new ones.  They want their attorneys' fees

paid.  The calculations for the costs of basement wall replacements can be structured in an

entirely ministerial, non-discretionary way.  Rather than the Court having to look in every

basement, the Court can establish a set price per linear foot for which to reconstruct the basement

walls and multiply that price by the total linear footage of each basement.

## CLASS ACTION ALLEGATIONS

1028.   Class Definition.  Plaintiffs bring this action as a class action under Fed. R. Civ.

P. 23 (a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs

and the following class of persons similarly-situated (the "Class"):

1029.   All individuals who own a home in Hartford, Tolland or Windham Counties

whose homes are insured by any of the Defendants, and whose homes' basement walls are

crumbling and/or exhibiting "pattern cracking" consistent with concrete that contains pyrrhotite

and/or other iron sulfides, and whose claims have been denied or will be denied by the Insurance

Defendants, which denials are or will be based on virtually the same standardized language

regarding the term "collapse."

1030.   Numerosity.  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class Members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are

thousands of members of the Class, perhaps over ten thousand.  Defendants possess the exact

information that makes it feasible to determine the actual number of Class Members. In fact, Defendants have business records that identify this type of information.

1031. Commonality. Repeated complaints are filtering into the Courts. While these complaints are all isolated from one another, the Plaintiffs in these cases are all saying the same thing. They are complaining about their basements having crumbling walls. They are all making the same kind of allegations as are the Plaintiffs in the instant case. They all have identical or similar policy language. They are all getting the same kind of denial letters. Soon, there will be an avalanche of these similar cases if there is not a class action.

1032. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendant Insurance Companies breached their contracts of insurance with the Plaintiffs and putative Class Members by failing to provide coverage for crumbling concrete wall claims;

b. Whether the Plaintiffs and putative Class Members suffered losses and, if so, the proper measure of the losses;

c. Whether Defendant Insurance Companies and ISO/other insurance trade associations and/or Defendant Insurance Companies themselves conspired to provide unsuitable homeowners insurance policies to Plaintiffs and putative Class Members, all the while being previously aware of crumbling walls claims and knowing full well that these policies would not provide coverage for crumbling walls claims;

d. Whether Defendants, as part of a general business practice, issued denials of coverage in an unfair and deceptive manner that has caused substantial injury to the Plaintiffs and putative Class Members;

e. Whether Defendant Insurance Companies, as part of a general business practice, issued denials of coverage that were false and misleading about the Plaintiffs' and putative class members' entitlement to coverage,

considering the case law and the provisions of the Plaintiffs' and putative class members' homeowners policies;

f.    Whether Defendants, as part of a general business practice, did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability was reasonably clear, considering the case law and the provisions of the Plaintiffs' and putative class members' homeowners policies;

g.    Whether Defendants, as part of a general business practice, compelled the Plaintiffs and putative class members to institute litigation to recover the amounts due to them to repair and replace their basement walls;

h.    Whether Defendants, as part of a general business practice, failed to affirm or deny coverage of claims within a reasonable time after proofs of loss have been completed in violation of Conn. Gen. Stat. § 38a-816-(6)(E) and failed to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies in violation of Conn. Gen. Stat. § 38a-816-(6)(B);

i.    Whether Defendants have a general business practice of refusing to pay claims without conducting a reasonable investigation based upon all available information, in violation of Conn. Gen. Stat. § 38a-816(6)(D);

j.    Whether Defendants have caused substantial injury to consumers;

k.    Whether the Plaintiffs and putative Class Members have suffered an ascertainable loss because they do not have coverage to which they are entitled to repair and replace their basement walls, because they cannot sell or refinance their homes, and because they are paying too much in taxes for homes that are essentially worthless;

l.    Whether Defendants and ISO and other trade associations changed the definition of "collapse" to mean a "sudden" or "abrupt" falling down or caving in and to preclude coverage unless the building could not be occupied without providing adequate notice or adequate disclosure to the Plaintiffs in violation of Conn. Gen. Stat. § 38a-323, as interpreted by the Connecticut Insurance Department in its Bulletin PC-66 and predecessor Bulletins;

m.    Whether Defendants acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of their duties in denying the Plaintiff's and putative class members' claims for coverage under their homeowners policies.

1033.   Typicality.  Plaintiffs' claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is the same as to all members of the Class; and (b) the losses suffered by the Plaintiffs are caused by the standardized language, unsuitability of and inadequate disclosures associated with Defendants' homeowners insurance products.

1034.   Adequacy.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in insurance coverage litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

1035.   Rule 23 (b)(1) Requirements.  Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(1) because prosecution of separate actions by the members of the class would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the class and adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.  Specifically, if the policy language challenged is ambiguous as claimed here, such a determination would be dispositive of the interests of other homeowners.

1036.   Rule 23 (b)(2) Requirements.  Class action status in this action is warranted under Fed. R. Civ. P. 23 (b)(2) because the parties opposing the class have acted on grounds that apply generally to the class so that final monetary relief, injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Specifically, the homeowners insurance

policies at the center of this lawsuit are pre-packaged using uniform advice and/or uniform policy language.

1037.   Rule 23 (b)(3) Requirements.  Class action status is also warranted under Fed. R. Civ. P. 23 (b)(3) because:  (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final monetary, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEMAND FOR RELIEF

Plaintiffs request the following relief:

a.    Damages in the amount necessary to replace the failing concrete in the homes of each of the Plaintiffs and members of the Class;

b.    A Declaratory Judgment that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the policies that define "collapse" as "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . (b) Hidden decay; . . . or (e) use of defective material or methods in construction, remodeling or renovation;"

c.    A Declaratory Judgment that (1) new language requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" and stating that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse" is a significant reduction of coverage, (2) that the Defendants did not provide adequate notice of this change in language, (3) that the new language is not effective, and (4) that the Defendants are obligated to cover the costs of replacing the concrete in the Plaintiffs' homes under the previous policy language;

d.    Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

e.    Pre-judgment interest pursuant to Conn. Gen. Stat. § 37-3a and other applicable laws;

f.    Costs pursuant to Conn. Gen. Stat. § 42-110g and other applicable laws;

g.    Attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g and other applicable laws;

h.    An Order certifying a class action under one or more of Rule 23(b)(1), 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure; and

i.    Such other and further relief as this Court may deem just and proper.

147

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on all of the claims and counts of this Complaint.

THE PLAINTIFFS:

By   /s/ Ryan P. Barry
    Ryan P. Barry (ct21683)
    Barry & Barall, LLC
    202 West Center Street
    Manchester, CT 06040
    (860) 649-4400
    (860) 645-7900
    Email:  rbarry@barryandbarall.com

By   /s/ Anthony Spinella, Jr.
    Anthony Spinella, Jr. (ct29782)
    Barry & Barall, LLC
    202 West Center Street
    Manchester, CT 06040
    (860) 649-4400
    (860) 645-7900
    Email:  anthony@barryandbarall.com

By   /s/ Elizabeth J. Stewart
    Elizabeth J. Stewart (ct01316)
    Melissa A. Federico (ct28278)
    Murtha Cullina LLP
    265 Church Street
    New Haven, CT 06510
    Telephone:  203.772.7700
    Facsimile:  203.772.7723
    Email:  estewart@murthalaw.com
           mfederico@murthalaw.com

THEIR ATTORNEYS

148

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2017, a copy of the foregoing Substituted Third Amended Class Action Complaint was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_/s/  Elizabeth J. Stewart_____
Elizabeth J. Stewart