UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------x
MICHAEL AND JOYCE HALLORAN et al.  :
             :  No. 3:16-cv-00133-VAB
      Plaintiffs,   :
             :
V.            :
             :
HARLEYSVILLE PREFERRED INSURANCE :  JUNE 2, 2017
CO. et al.,         :
             :
      Defendants.  :
-------------------------------------------------------------x

### THE TRAVELERS DEFENDANTS'
### MEMORANDUM OF LAW IN SUPPORT OF THEIR
### MOTION TO DISMISS THE SUBSTITUTED THIRD AMENDED COMPLAINT

Stephen E. Goldman
E-mail: sgoldman@rc.com
Wystan M. Ackerman
E-mail: wackerman@rc.com
Jessica A.R. Hamilton
E-mail: jhamilton@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

Attorneys for Defendants The Travelers
Home and Marine Insurance Company, The
Standard Fire Insurance Company, The
Travelers Indemnity Company of America,
The Automobile Insurance Company of
Hartford, Connecticut, Fidelity and
Guaranty Insurance Company, and The
Travelers Companies, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ....................................................................................................................... 1

SUMMARY OF PERTINENT ALLEGATIONS AGAINST THE TRAVELERS
DEFENDANTS ........................................................................................................................... 5

      A.     The Hallorans' Claims (Counts 1, 46 and 55) ....................................................... 5

      B.     The Claims of Basquiat/Somerville (Counts 5 and 6), Brozeks (Count 8),
             Gribbon (Count 16), MacGlaflin (Counts 26 and 27), Norris (Count 34),
             Thieling (Count 38) and Zaremba (Count 39) ....................................................... 7

APPLICABLE LEGAL STANDARDS ........................................................................................ 9

ARGUMENT ............................................................................................................................. 10

I.      THE BREACH OF CONTRACT CLAIMS OF THE HALLORANS,
        BASQUIAT, SOMERVILLE, BROZEKS, GRIBBON, MACGLAFLIN AND
        THIELING (COUNTS 1, 5, 6, 8, 16, 26, 27, and 38) FAIL TO STATE A CLAIM ........ 10

      A.     Based on the Facts Alleged, the Claimed Losses Are Excluded in the
             Absence of a "Collapse ...................................................................................... 11

      B.     The Halloran Plaintiffs' Allegations Fail to Adequately Allege a
             "Collapse" ........................................................................................................ 14

             1.     The Connecticut Supreme Court's Standard in *Beach*, Properly
                   Construed, Requires That the Structure Be in Imminent Danger of
                   Falling Down or Unsafe to Occupy for Its Intended Purpose ................... 16

             2.     Appellate Decisions Nationwide Following *Beach* Have
                   Repeatedly Required That a Structure Be in Imminent Danger of
                   Falling Down or Unsafe to Occupy for Its Intended Purpose ................... 19

             3.     Practical Considerations Also Support an Imminent Danger /
                   Unsafe to Occupy Standard ..................................................................... 23

              4.     The Halloran Plaintiffs Fail to Allege That Their Structures Are in
                   Imminent Danger of Falling Down, or Unsafe to Occupy for Their
                 Intended Purpose ................................................................................... 25

II.     THE BREACH OF CONTRACT CLAIMS OF NORRIS AND ZAREMBA
        (COUNTS 34 AND 39) FAIL TO STATE A CLAIM .................................................... 28

      A.     Based on the Facts Alleged, the Claimed Losses Are Excluded in the
             Absence of a "Collapse ...................................................................................... 29

      B.     Norris and Zaremba Have Failed to Allege a "Collapse" .................................. 30

III.    THE HALLORANS' BAD FAITH CLAIM (COUNT 46) FAILS TO STATE A
        CLAIM AGAINST THE TRAVELERS DEFENDANTS ............................................... 36

IV. THE HALLORANS' CUTPA/CUIPA CLAIM (COUNT 55) FAILS TO STATE A CLAIM AGAINST THE TRAVELERS DEFENDANTS ............................................38

V. PLAINTIFFS' CLAIMS AGAINST THE TRAVELERS COMPANIES, INC. ALSO FAIL FOR LACK OF STANDING ........................................................................39

CONCLUSION..............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*401 Fourth St., Inc. v. Investors Ins. Group*, 879 A.2d 166 (Pa. 2005) .........................................22

*Alexander v. Gen. Ins. Co. of Am.*,
  2017 U.S. Dist. LEXIS 5963 (D. Conn. Jan. 17, 2017)............................................4, 32, 33, 35

*Alexander v. General Ins. Co. of America*, No. 3:16-cv-0059...........................4, 32, 33, 34, 37, 38

*Arrowood Indem. Co. v. King*, 699 F.3d 735 (2d Cir. 2012) ........................................................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................9, 27

*Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Ins. Co.*,
  434 Fed. Appx. 579 (9th Cir. 2011).........................................................................................26

*Auto Owners Ins. Co. v. Allen*, 362 So. 2d 176 (Fla. Dist. Ct. App. 1978) ...................................17

*Beach v. Middlesex Mut. Assur. Co.*,
  205 Conn. 246 (1987) .............................................16, 17, 19, 20, 21, 22, 23, 24, 25, 27, 28, 30

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................9, 27, 28, 29

*Bell Power Sys. v. Hartford Fire Ins. Co.*, No. CV 92 0065538,
  1995 Conn. Super. LEXIS 448 (Conn. Super. Ct. Feb. 15, 1995)............................................13

*BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603 (2d Cir. 1996)..............................19

*Belz v. Peerless Ins. Co.*, 2016 U.S. Dist. LEXIS 118900 (D. Conn. Sept. 2,
  2016), *reconsid. denied*, 2016 U.S. Dist. LEXIS 152493 (Nov. 3, 2016) .........................19, 20

*Buell Indus. Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527 (2002)................................34

*Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760 (2013) ......................................36

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016)................................................9, 39

*Catalano v. BMW of N. Am., LLC*, 2016 U.S. Dist. LEXIS 25622 (S.D.N.Y. 2016)....................40

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
  Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005) ..............................................................................39

*Chorches v. Stewart Title Guaranty Co.*, 48 F. Supp. 3d 151 (D. Conn. 2014) ...........................37

*In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294 (S.D.N.Y. 2009) ...........................2

**Cases**                                                     **Page(s)**

*Conn. Ins. Guar. Ass'n v. Drown*, 101 A.3d 200 (Conn. 2014)......................................10

*Doheny West Homeowners' Ass'n v. American Guar. & Liab. Ins. Co.*,
    70 Cal. Rptr. 2d 260 (Cal. Ct. App. 1997)................................................21, 23, 24

*Edmond v. Hartford Ins. Co.*, 2008 U.S. Dist. LEXIS 15825, 2008 WL 616092
    (D. Conn. Mar. 3, 2008)...........................................................................13

*Employer Mut. Ins. Co. v. Nelson*, 361 S.W.2d 704 (Tex. 1962)................................18

*Fantis Foods v. N. River Ins. Co.*, 753 A.2d 176 (N.J. Super. Ct. App. Div. 2000)...............20, 23

*Government Employees Ins. Co. v. DeJames*, 261 A.2d 747 (Md. 1970)....................................17

*Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219 (2d Cir. 2015).........................................5

*HB Holdings & Realty Mgt. LLC v Tower Ins. Co. of N.Y.*,
    2016 N.Y. Misc. LEXIS 3597 (N.Y. Sup. Ct. Sept. 30, 2016)................................35

*Holiday Vill. E. Home Owners Ass'n v. QBE Ins. Corp.*,
    2011 U.S. Dist. LEXIS 145672 (D.N.J. 2011) .......................................................35

*Indiana Ins. Co. v. Liaskos*, 697 N.E.2d 398 (Ill. App. Ct. 1998) .................................20

*International Audiotext Network, Inc. v. American Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995).......................................................................5, 9

*Jemiola v. Hartford Cas. Ins. Co.*, 2017 Conn. Super. LEXIS 473 (Conn. Super.
    Ct. Mar. 2, 2017)............................................................4, 34, 35, 37, 38

*Johnson v. Priceline.com, Inc.*, 711 F.3d 271 (2d Cir. 2013) .......................................9

*KAAPA Ethanol, LLC v. Affiliated FM Ins. Co.*, 660 F.3d 299 (8th Cir. 2011) .....................22, 23

*Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co.*, No. 07-2983 (JAG),
    2008 U.S. Dist. LEXIS 28329 (D.N.J. Apr. 4, 2008) .........................................26

*Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*, 84 A.3d 1167 (Conn. 2014) ...............10

*Maher & Williams v. Ace Am. Ins. Co.*,
    2010 U.S. Dist. LEXIS 91934 (D. Conn. Sept. 3, 2010) .........................................37

*Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012).........................................39

**Cases**                                                                                                    **Page(s)**

*McCarthy v. Travelers Indemnity Company*, Docket No. CV 970345443,
  2000 Conn. Super. LEXIS 823 (Conn. Super. Ct. March 29, 2000) ......................................37

*McCulloch v. Hartford Life & Accident Ins. Co.*,
  363 F. Supp. 2d 169 (D. Conn. 2005) ...................................................................................37

*McNeill & Assocs., LLC v. Cont'l Cas. Co.*,
  2010 U.S. Dist. LEXIS 115687 (D. Conn. Nov. 1, 2010) ......................................................37

*Megna v. United Servs. Auto. Ass'n*, No. CV00439422,
  2004 Conn. Super. LEXIS 954 (Conn. Super. Ct. Apr. 13, 2004)...........................................13

*Mercedes Zee Corp. v. Seneca Ins. Co.*,
  2015 U.S. Dist. LEXIS 171253 (D. Conn. Dec. 22, 2015)......................................................19

*Miller v. First Liberty Ins. Corp.*, No. 07-1338, 2008 U.S. Dist. LEXIS 47550
  (E.D. Pa. June 17, 2008) ........................................................................................................35

*Morton v. Great Am. Ins. Co.*, 419 P.2d 239 (N.M. 1966) ....................................................18, 23

*Morton v. Travelers Indem. Co.*, 106 N.W.2d 710 (Neb. 1960)..............................................19, 23

*Mount Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*,
  808 F. Supp. 2d 1322 (N.D. Ga. 2011) ..................................................................................35

*Mulhern v. Philadelphia Indem. Ins. Co.*, 802 F. Supp. 2d 317 (D. Mass. 2011) ........................35

*Nationwide Mut. Fire Ins. Co. v. Tomlin*, 352 S.E.2d 612 (Ga. Ct. App. 1986) ..........................17

*NECA-IBEW Health & Welfare Fund*, 693 F.3d 145 (2d Cir. 2012) .......................................9, 39

*Nida v. State Farm Fire & Casualty Co.*, 454 So. 2d 328 (La. Ct. App. 1984) ...........................13

*Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co.*,
  565 S.E.2d 306 (S.C. 2002) ...............................................................................................22, 23

*Peck v. Public Serv. Mut. Ins. Co.*, 114 F. Supp. 2d 51 (D. Conn. 2000)..................................5, 9

*Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 352 P.3d
  790 (Wash. 2015) (en banc)....................................................................................................20

*Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Ins. Co.*, 633
  Fed. Appx. 415 (9th Cir. 2016).........................................................................................20, 24

**Cases**                                                                                          **Page(s)**

*Rancourt v. Allstate Ins. Co.*,
    2008 Conn. Super. LEXIS 3024 (Conn. Super. Ct. December 1, 2008) ................................38

*Rapid Park Indus. v. Great Northern Ins. Co.*, 2010 U.S. Dist. LEXIS 115747
    (S.D.N.Y. Oct. 1, 2010) ........................................................................................................13

*Rapp B. Props., LLC v. RLI Ins. Co.*,
    65 A.D.3d 923, 885 N.Y.S.2d 283 (N.Y. App. Div. 2009) ....................................................35

*Rector St. Food Enters., Ltd v. Fire & Cas. Ins. Co. of Conn.*,
    35 A.D.3d 177, 827 N.Y.S.2d 18 (N.Y. App. Div. 2006) ......................................................35

*Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3 (E.D.N.Y. 2012)....................35

*Rhoden v. State Farm Fire & Cas. Co.*, 32 F. Supp. 2d 907 (S.D. Miss. 1998)...........................13

*Ridley v. National Union Fire Ins. Co. of Pittsburgh*, Docket No. 3:11-CV-1713-
    WWE, 2014 U.S. Dist. LEXIS 99246 (D. Conn., July 22, 2014).........................................37

*Rogers v. Maryland Cas. Co.*, 109 N.W.2d 435 (Iowa 1961) .......................................................18

*Royal Indem. Co. v. Grunberg*, 553 N.Y.S.2d 527 (N.Y. App. Div. 1990).................................22

*Siena Del Lago Condo. Ass'n v. Am. Fire & Cas. Co.*, No. C12-251 TSZ,
    2013 U.S. Dist. LEXIS 69308 (W.D. Wash. May 14, 2013)..................................................26

*Sports Domain, LLC v. Max Specialty Ins. Co.*, Docket No. CV-09-5025291-S,
    2011 Conn. Super. LEXIS 3187 (Conn. Super. Ct. Dec. 19, 2011) .......................................35

*Squairs v Safeco Natl. Ins. Co.*, 136 A.D.3d 1393 (N.Y. App. Div. 2016) ..................................35

*Thornewell v. Indiana Lumbermens Mut. Ins. Co.*, 147 N.W.2d 317 (Wis. 1967).......................18

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ..........................................................39

*Vormelker v. Oleksinski*, 199 N.W.2d 287 (Mich. Ct. App. 1972)...............................................17

*Whispering Creek Condo. Owner Ass'n v. Alaska Nat'l Ins. Co.*,
    774 P.2d 176 (Alaska 1989)...................................................................................................22

*Wright v. State Farm Mutual Automobile Ins. Co.*,
    1997 Conn. Super. LEXIS 3122 (Conn. Super. Ct. Nov. 18, 1997).......................................38

*Zoo Props., LLP v. Midwest Family Mut. Ins. Co.*, 797 N.W.2d 779 (S.D. 2011).......................22

# TABLE OF AUTHORITIES

(continued)

**Cases**                                                                                    **Page(s)**

*Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367 (2008)...................................................38

**Statutes and Court Rules**

Conn. Gen. Stat. § 38a-323 ........................................................................................29

Conn. Gen. Stat. § 38a-816(6)(B) ..........................................................................7, 38

Fed. R. Civ. P. 10(c) ....................................................................................................5

Fed. R. Civ. P. 12(b)(1).........................................................................................4, 9, 39

Fed. R. Civ. P. 12(b)(6).................................................................................................9

**INTRODUCTION**

The gravamen of this putative class action is that the aggregate that was used in constructing the foundation walls of the plaintiffs' and putative class members' homes contained the mineral pyrrhotite, which, over the course of decades, has caused the concrete to gradually expand, bulge and crack. Plaintiffs claim that these alleged conditions are covered under the Additional Coverage for "Collapse" set forth in their homeowners' insurance policies.

In the Substituted Third Amended Complaint ("Complaint" or "TAC"), Plaintiffs assert various individual claims and also assert various putative class claims against numerous Defendants. In this motion, Defendants The Travelers Home and Marine Insurance Company, The Standard Fire Insurance Company, The Travelers Indemnity Company of America, The Automobile Insurance Company of Hartford, Connecticut, Fidelity and Guaranty Insurance Company, and The Travelers Companies, Inc. (hereinafter, these Defendant(s) are referred to as "Travelers Defendants") seek dismissal, as to the Travelers Defendants, of all counts specifically directed to one or more of the Travelers Defendants (rather than to "All Defendants").[1]

**Breach of Contract Claims:** The following Plaintiffs assert their own individual claims for breach of contract, based on the Additional Coverage for "Collapse," against one or more of the Travelers Defendants: Michael and Joyce Halloran (Count 1); Phil Basquiat and Amy Somerville (Counts 5 and 6); Steven and Patricia Brozek (Count 8); Jacqueline Gribbon (Count 16); Scott and Deborah MacGlafflin (Count 26 and 27); Dawn Norris (Count 34), Mary Lou

---

[1] This motion is not the only motion directed to claims against the Travelers Defendants. The Travelers Defendants are among the Defendants filing a Joint Motion to Dismiss those counts in which Plaintiffs attempt to assert class-wide claims against "All Defendants": Counts 42 and 43 (declaratory judgment), Counts 44 and 45 (breach of the implied covenant of good faith and fair dealing) and Counts 54 and 57 (violation of CUTPA/CUIPA). Taken together, this Motion to Dismiss and the Joint Motion to Dismiss establish that all of the claims set forth in the Complaint that are directed against the Travelers Defendants should be dismissed.

Theling (Count 38); and Stanley Zaremba (Count 39).[2]  Hereinafter, the foregoing Plaintiffs are referred to as "Travelers Plaintiffs," and policies under which they seek coverage are referred to as "Travelers Policies," or where applicable, specific Plaintiffs' Policies.

Every Travelers Policy issued to the Hallorans, Basquiat/Somerville, the Brozeks, Gribbon, MacGlaflin and Thieling (hereinafter, for ease of reference, these plaintiffs are referred to as the "Halloran Plaintiffs") either: (1) contains an older version of a "collapse" provision under which "collapse" does not mean "settling, cracking, shrinking, bulging or expansion"; or (2) contains a newer version of a "collapse" provision that defines "collapse" to require an "abrupt falling down or caving in" such that the home or part thereof "cannot be occupied for its current intended purpose." To the extent that a Travelers Policy contains a new version of a "collapse" provision, the Halloran Plaintiffs maintain that the newer definition must be ignored due to alleged lack of notice of a change in policy language.  However, even assuming, for purposes of this motion, that none of the Travelers Policies issued to the foregoing Travelers Plaintiffs validly define "collapse" to require an "abrupt falling down or caving in," the Halloran Plaintiffs still fail to state a claim for breach of contract. This is because they have not alleged that their homes, or part thereof, are either in imminent danger of falling down or unsafe to occupy for their intended purpose, which is likely to be the applicable legal standard under Connecticut law as explained in detail below. To the contrary, the Halloran Plaintiffs all allege that they are occupying their homes and that they fear that a falling down might eventually occur at some future point in time (which may be decades from now). That does not plead a "collapse"

---

[2] In the ten counts referenced above, the Travelers Plaintiffs not only assert their respective individual claims for breach of contract, they also attempt, in the last paragraph of each of the counts, to seek relief for breach of contract on behalf of putative class members. (*See*, *e.g.*, TAC ¶ 117.) To the extent that such claims are asserted, they must be dismissed for the same reasons as the named Plaintiffs' individual claims. Where the named Plaintiffs have no viable claim, they cannot pursue such a claim on behalf of putative class members. *See*, *e.g.*, *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 308 (S.D.N.Y. 2009) ("If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed,  even though the facts set forth in the complaint may show that others might have a valid claim.").

under applicable law, regardless of which "collapse" provision governs. The breach of contract claims asserted in Counts 1, 5, 6, 8, 16, 26, 27 and 38 therefore should be dismissed.

With respect to Norris and Zaremba, every one of the Norris and Zaremba Travelers Policies defines "collapse" as "an *abrupt falling down or caving in* of a building or any part of a building with the result that the building or part of the building *cannot be occupied* for its current intended purpose." (Emphasis added.) The Additional Coverage for "Collapse" in the Norris and Zaremba Travelers Policies further states that "[a] part of a building that is standing is *not* considered to be in a state of collapse even if it shows evidence of *cracking*, *bulging*, sagging, bending, leaning, settling, shrinkage, or *expansion*," and that "a building or any part of a building that is in danger of falling down or caving in is *not* considered to be in a state of collapse." (Emphasis added.)

Neither Norris nor Zaremba alleges that his or her home has fallen down or caved in, or that it has done so abruptly, or that the home cannot be occupied for its intended purpose.[3] Nor has either alleged that the home or any portion thereof is no longer standing. Rather, both Norris and Zaremba allege that they are currently occupying their homes, that the foundation walls have experienced cracking, bulging and/or expansion, and that they believe that the foundation walls are in danger of falling down or caving in at some unspecified future point in time. That is insufficient, as a matter of law, to allege a "collapse" under the provisions quoted above. Indeed,

---

[3] Zaremba alleges "[u]pon information and belief" that his policies did not define the term "collapse" (TAC ¶ 759), but that is incorrect, as demonstrated by the policies attached as Exs. 1-3 hereto. Norris alleges that the definition of "collapse" in her policies as requiring an "abrupt falling down or caving in" was not enforceable because she did not receive adequate notice of a "reduction in coverage" (TAC ¶ 669), but there was no reduction in coverage —all of Norris' policies, starting with the first one, contained the "abrupt falling down or caving in" definition of "collapse" quoted above (*see* Exs.4-9). There is no applicable law requiring that special notice be given of a policy provision where the provision is included in the first policy being issued to a policyholder. *See* fn. 21 below. In any event, even if Zaremba or Norris could succeed on their allegations pertaining to the purported lack of a definition of "collapse" or the unenforceability of the definition of "collapse," their claims would fail as a matter of law for the same reasons as the claims of the Halloran Plaintiffs. Neither Zaremba nor Norris alleges that his or her house, or part thereof, is in imminent danger of falling down or is unsafe to occupy for its intended purpose.

in analogous cases, Judge Underhill of this Court and the Connecticut Superior Court have concluded that such allegations do not suffice. *Alexander v. General Ins. Co. of America,* No. 3:16-cv-0059, transcript (Ex. 10); order granting motion to dismiss (Ex. 11); *Alexander v. Gen. Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 5963 (D. Conn. Jan. 17, 2017) (denying reconsideration); *Jemiola v. Hartford Cas. Ins. Co.*, 2017 Conn. Super. LEXIS 473 (Conn. Super. Ct. Mar. 2, 2017). The same result should be reached here. The breach of contact claims asserted against The Travelers Home and Marine Insurance Company ("Travelers Home and Marine") in Counts 34 and 39, should be dismissed as a matter of law.

**Hallorans' Bad Faith and Statutory Claims:** In Counts 46 and 55, the Hallorans assert individual claims against Travelers Defendant(s) for breach of the implied covenant of good faith and fair dealing (Count 46) and for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq., based on an alleged violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. 38a-816 et seq. (Count 55). The Halloran's bad faith claim is fatally flawed for two reasons. First, in the absence of a breach of contract, a claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law, and as set forth above, the Hallorans do not have a legally viable claim for breach of contract. Second, the Travelers Defendant(s)' coverage position was, at a minimum, fairly debatable and thus cannot be the basis for a bad faith claim. The Hallorans' CUTPA/CUIPA claim also fails as a matter of law in the absence of a breach of contract.[4]

---

[4] As explained below in Part V, the claims against The Travelers Companies, Inc. should be dismissed under Fed. R. Civ. P. 12(b)(1) for an additional reason: Plaintiffs lack standing to sue that company. The Travelers Companies, Inc. is not an insurance company, and it is not alleged to have issued (and did not issue) any insurance policy to any of the Plaintiffs, and is not alleged to have adjusted (and did not adjust) any of their insurance claims. *See also* Decl. of Peter Schwartz (Ex. 18).

<u>**SUMMARY OF PERTINENT ALLEGATIONS**</u>
<u>**AGAINST THE TRAVELERS DEFENDANTS**</u>

**A.     The Hallorans' Claims (Counts 1, 46 and 55)**

Plaintiffs Michael and Joyce Halloran own a home in Ellington, Connecticut (the

"Halloran Property"). (TAC, ¶ 94.) The Automobile Insurance Company of Hartford,

Connecticut ("AICOH"), which is one of the Travelers Defendants, provided homeowners'

insurance to Michael and/or Joyce Halloran, insuring the Halloran Property during six

consecutive one-year policy terms from August 27, 2004 to August 27, 2010. (*Id.*, ¶ 108 and

Exs. 12-17 hereto.[5])

The Hallorans allege that "[i]n September of 2015, the Hallorans discovered damage to

their basements walls and on visible portions of the outside of their basement walls." (*Id.*, ¶ 96.)

After this discovery, the Hallorans retained a structural engineering firm, Fuss & O'Neill, which

performed an inspection and testing. (*Id.*, ¶¶ 97-102.) Fuss & O'Neill concluded that "a chemical

reaction of the concrete mix is occurring due to the presence of pyrrhotite and is expected to

continue, resulting in increased deterioration and <u>eventual failure</u> of the foundation to function as

originally intended." (*Id.*, ¶ 106 (emphasis added).)

Fuss & O'Neill prepared a report, attached as an exhibit to the Third Amended

Complaint,[6] which finds that "[i]n general, the framed portion of the home above the foundation

is in good condition with no readily visible damage or deterioration at the time of our

inspection," the cracks in the foundation are generally between 1/16" and 1/8" in width, and

"[t]he results of hammer soundings of the concrete on each side of the cracks found the concrete

---

[5] In deciding a motion to dismiss, a court may appropriately consider a contract, such as an insurance policy, that is integral to the claims alleged. *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Peck v. Public Serv. Mut. Ins. Co.*, 114 F. Supp. 2d 51, 54 (D. Conn. 2000).
[6] An exhibit to a complaint "is part of the pleading for all purposes," and thus may be considered on this motion to dismiss. Fed. R. Civ. P. 10(c); *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015).

to be solid." (Doc. 332-2 at p. 6 of 82.) The report further explains that "it is our professional engineering judgment that a chemical reaction of the concrete mix is occurring due to the presence of pyrrhotite and is expected to continue, resulting in increased deterioration and eventual failure of the foundation to function as originally intended. The structural failure may lead to loss of support of the building structure, loss of support of the soil on the outside of the wall and/or allowance of water intrusion into the basement." (*Id.* at p. 9 of 82 (emphasis added).)

The Hallorans allege that "[t]he sulfate attack will continue to fracture the concrete until the home caves into the basement." (TAC, ¶ 107.) They further allege that "[t]he basement walls were made with defective material or methods in construction, remodeling or renovation." (*Id.*, ¶ 113.) The Hallorans allege that they are seeking coverage under the Additional Coverage for "Collapse" in their AICOH policies. (*Id.*, ¶ 110.) They further allege that AICOH's failure to provide coverage for their claimed loss constitutes a breach of the insurance policies issued by AICOH. (*Id.*, ¶¶ 116-117.)

The Hallorans also plead a claim for breach of the implied covenant of good faith and fair dealing against AICOH and other insurers (unaffiliated with the Travelers Defendants) that are alleged to have insured the Halloran Property (Count 46). This claim alleges, with respect to AICOH, that "Travelers has also exhibited bad faith by deliberately delaying their coverage decisions, despite the fact that they too will deny the Hallorans' claim." (*Id.*, ¶ 841.) The Hallorans further allege that AICOH and the other insurers who insured the Halloran Property "are ignoring a growing number of state and federal cases holding that crumbling concrete in basement walls should be covered under homeowners insurance policies." (*Id.*, ¶ 842.) They also allege that "[u]pon information and belief, the Halloran Defendants are intentionally misleading the Hallorans and are trying to convince them that the damage suffered to their basement walls is

not covered, solely to avoid payment of a covered loss." (*Id.*, ¶ 844.) They also allege that

AICOH and other insurers that insured the Halloran Property purportedly acted in bad faith "by

denying their claims and/or deliberately delaying denial of the Hallorans' claims . . . ." (*Id.*, ¶

846.) The Hallorans also make a conclusory allegation that AICOH and other insurers that

insured the Halloran Property acted "knowingly, deliberately, consciously, intentionally,

recklessly, negligently and/or with dishonest, interested and/or sinister motive [by] denying

coverage of meritorious claims or failing to act on the Hallorans' pending claims while knowing

such claims will be rejected." (*Id.*, ¶ 847.)

In Count 55, the Hallorans, along with the Furlongs (who do not allege that they were

insured by any of the Travelers Defendants) also plead a claim for violation of CUTPA based on

alleged violation of CUIPA against "Travelers" (presumably intended to refer to AICOH) and

Amica (the Furlongs' insurer, unaffiliated with the Travelers Defendants). This claim alleges that

"the Defendants have a general business practice of failing to acknowledge and act with

reasonable promptness upon communications with respect to claims arising under insurance

policies in violation of Conn. Gen. Stat. § 38a-816(6)(B)," and that such "delays and failures to

respond" violate CUIPA. (TAC, ¶¶ 980-983.)

**B.    The Claims of Basquiat/Somerville (Counts 5 and 6), Brozeks (Count 8), Gribbon (Count 16), MacGlaflin (Counts 26 and 27), Norris (Count 34), Thieling (Count 38) and Zaremba (Count 39)**

The claims of the remaining Travelers Plaintiffs are very similar to those of the

Hallorans, except that those plaintiffs, with the exception of the Brozeks,[7] did not have

engineering inspections and testing performed, and thus their allegations are less detailed than

---

[7] The Brozeks allege that they hired Fuss & O'Neill to perform an inspection and testing of the concrete. (TAC ¶¶ 200-204.) They further allege that Fuss & O'Neill concluded that the basement walls of their home contained pyrrhotite, and that "a chemical reaction of the concrete mix due to the presence of phyrrhotite is occurring and is expected to continue, resulting in increased deterioration and <u>eventual failure</u> of the foundation to function as originally intended." (*Id.*, ¶ 209 (emphasis added).)

the Hallorans' allegations. These Travelers Plaintiffs all allege that they own and live in homes in northeastern Connecticut that were insured during certain policy periods by a Travelers Defendant.[8] (TAC, ¶¶ 156-157, 197-98, 213, 337-38, 515-16, 659-60, 729-30, 749-50; Exs.1-9; 19-66.) They further allege that they "discovered damage to [the] basement walls and on visible portions of the outside of [the] basement walls." (TAC, ¶¶ 158, 199, 339, 517, 661, 731, 751.) Except for the Brozeks, they do not allege that the basement walls of their home have been tested to determine whether they contain pyrrhotite. Rather, they allege only that "[u]pon information and belief" the basement walls contain pyrrhotite, and that, assuming that is the case, a "sulfate attack" is occurring with respect to the basement walls, "which affects the durability and <u>ultimately</u> causes the failure of the concrete." (*Id.*, ¶¶ 159, 161, 340-42, 518-20, 662-64, 732-34, 752-54 (emphasis added).) They further allege that "the sulfate attack will continue to deteriorate the concrete until the home caves into the basement." (*Id.*, ¶¶ 162, 213, 343, 521, 665, 735, 755.) They also allege that the basement walls of their property "were made with defective material or methods in construction, remodeling or renovation." (*Id.*, ¶¶ 168, 180, 215, 348, 528, 541, 671, 741, 761.)

They further allege that they made a claim with "Travelers" or a specific Travelers Defendant, and are seeking coverage under the Additional Coverage for "Collapse" in their Travelers Policies. (*Id.*, ¶¶ 165, 170, 176, 217, 213, 346, 350, 525, 530, 538, 543, 668, 673, 738, 743, 758, 763.) They allege that they anticipate that their claim will be denied, and that there has been a breach of contract. (*Id.*, ¶¶ 171-172, 182-183, 218-19, 353-55, 532-34, 545-47, 674-75, 745-47, 765-67.)

---

[8] Deborah MacGlaflin is named as a plaintiff in the caption and in Paragraph 19 of the Complaint. She is not identified, however, in Counts 26 and 27, and is not a named insured in the policies at issue. To the extent she is attempting to assert claims against the Travelers Defendants, dismissal is sought on the same grounds as with respect to Scott MacGlaflin.

## <u>APPLICABLE LEGAL STANDARDS</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, which, if accepted as true, "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff "must plead more than labels and conclusions," and "[f]actual allegations must be enough to raise the right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. A complaint or portion thereof is also properly dismissed where, accepting the allegations as true, the claims fail as a matter of law. *See, e.g.*, *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). In deciding a motion to dismiss, a court may appropriately consider a contract, such as an insurance policy, that is integral to the claims alleged. *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Peck v. Public Serv. Mut. Ins. Co.*, 114 F. Supp. 2d 51, 54 (D. Conn. 2000).

The Travelers Companies, Inc. also seeks dismissal under Fed. R. Civ. P. 12(b)(1) for lack of standing. Such a dismissal is for lack of subject matter jurisdiction. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016). In order to establish standing in a putative class action, among other requirements, "for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant…." *NECA-IBEW Health & Welfare Fund*, 693 F.3d 145, 159 (2d Cir. 2012).

Under Connecticut's principles of insurance policy interpretation, "the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Conn. Ins. Guar. Ass'n v. Drown*, 101 A.3d 200, 215 (Conn. 2014); *see also Arrowood Indem. Co. v. King*, 699 F.3d 735, 739 (2d Cir. 2012). The court "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*, 84 A.3d 1167, 1173 (Conn. 2014). "In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Id.*

## ARGUMENT

## I. THE BREACH OF CONTRACT CLAIMS OF THE HALLORANS, BASQUIAT, SOMERVILLE, BROZEKS, GRIBBON, MACGLAFLIN AND THIELING (COUNTS 1, 5, 6, 8, 16, 26, 27, and 38) FAIL TO STATE A CLAIM

The policies issued by the applicable Travelers Defendants to the Halloran Plaintiffs all contain essentially the same policy language relevant to this case, for purposes of this motion to dismiss.[9] The Halloran Plaintiffs have failed to state a cause of action for breach of contract

---

[9] For the Hallorans, and for Basquiat and Somervile's policies issued by The Standard Fire Insurance Company, the base policy form is HO-3 (06-91). For the Brozeks, the base policy form is HO-3 Ed. 4-84. For Gribbon, MacGlaflin and Thieling, who own condominiums, the base policy form is HA-6 (06-91). The differences in these forms and pertinent endorsements are not material for purposes of this motion. With respect to Basquiat and Somerville, the policies issued to them by Travelers Home and Marine, starting on May 25, 2013, contained the "abrupt falling down or caving in" definition of "collapse" in Form HO-3 (10-06). With respect to Gribbon, MacGlaflin and Thieling, the "Additional Coverage" for "Collapse" was modified in 2010 or 2011 to add the "abrupt falling down or caving in" definition of "collapse" in Form HA-300 CT (03-10) and subsequent versions of the HA-300 CT endorsement. Basquiat, Somerville and Gribbon allege that they did not receive adequate notice of the change in coverage, and therefore it is not effective. (TAC, ¶¶ 177, 346.) MacGlaflin and Thieling do not make that allegation in Counts 26, 27 or 38, but those counts incorporate earlier paragraphs of the Complaint that make similar allegations. (*Id.*, ¶¶ 84-89, 514, 535, 728.) For purposes of this motion only, the Travelers Defendants will assume, for purposes of argument, that the Halloran Plaintiffs can prevail on their argument that the amended policy language is not enforceable, and thus this motion will assume that none of the Halloran Plaintiffs' policies validly

against the applicable Travelers Defendants because: (a) the alleged losses are excluded by the policies in the absence of a "collapse"; and (b) the Halloran Plaintiffs' allegations fail to allege a "collapse" of their properties under their policies and applicable law.

**A.    Based on the Facts Alleged, the Claimed Losses Are Excluded in the Absence of a "Collapse"**

The Halloran Plaintiffs' policies all provide coverage for "risks of direct physical loss" to the dwelling, with certain exceptions and exclusions. (Exs. 12-17, 19-25, Form HO-3 (06-91), at 7; Exs. 29-40, 42-66, Form HA-32 (06-91), at 1; Ex. 28, Form HO-3 Ed. 4-84, at 5.) The policies issued by the applicable Travelers Defendants to the Hallorans, Basquiat and Somerville, Gribbon, MacGlaflin and Thieling all contain the following exceptions to coverage:

**A.**    WE DO NOT COVER ANY LOSS THAT RESULTS FROM A PERIL EXCLUDED OR LIMITED BY THIS POLICY, EVEN IF A COVERED PERIL IS A CONCURRENT CAUSE OF LOSS.

**B.**    WE DO NOT COVER ANY LOSS OR DAMAGE TO YOUR DWELLING[10] OR OTHER STRUCTURES CAUSED DIRECTLY OR INDIRECTLY, CONTRIBUTED TO, OR AGGRAVATED BY DEFECTIVE, INADEQUATE, OR FAULTY PLANNING, CONSTRUCTION, OR MAINTENANCE OF ANY PROPERTY WHETHER ON OR OFF THE **insured location** RESULTING FROM:

**DEFECTIVE, INADEQUATE, OR FAULTY**:

* * *
**3.**    ALTERATION, CONSTRUCTION, REPAIRS, RENOVATION, OR REMODELING;

**4.**    <u>MATERIALS RECOMMENDED, SELECTED, SUPPLIED, OR USED IN</u> ALTERATION, <u>CONSTRUCTION</u>, REPAIRS, RENOVATION OR REMODELING;

* * *

---

defined "collapse" to require an "abrupt falling down or caving in," and thus all of those policies had essentially the same "Additional Coverage" for "Collapse."

[10] The Gribbon and MacGlaflin policies use the term "CONDOMINIUM OR COOPERATIVE APARTMENT UNIT" in place of "DWELLING." (Exs. 29-40, 42-53, Form HA-32 (06-91), at 1.)

YOU MAY NOT CLAIM ANY OF THE SITUATIONS INCLUDED IN "B." ABOVE AS A CAUSE OF LOSS. THESE ARE NOT PERILS WE INSURE AGAINST. Ensuing perils, NOT OTHERWISE EXCLUDED OR LIMITED BY THIS POLICY are covered.

**C.** WE DO NOT COVER:

   . . .

    7.  LOSS CAUSED BY:

      \* \* \*

      **f.**      SETTLING, <u>CRACKING</u>, SHRINKING, <u>BULGING OR EXPANSION OF</u> DRIVEWAYS, ROADWAYS, WALKWAYS, PAVEMENTS, PATIOS, <u>FOUNDATIONS</u>, <u>WALLS</u>, FLOORS, ROOFS OR CEILINGS;

      \* \* \*

   **8.**  <u>**LOSS CAUSED BY COLLAPSE OTHER THAN PROVIDED AS ADDITIONAL COVERAGE 8.**</u>

(Exs. 12-17, 19-25, Form HO-3 (06-91), at 7-8 (underscore added); Exs. 29-40, 42-66, Form HA-32 (06-91), at 1-2 (underscore added).)

The Brozeks' policy contains similar exceptions and exclusions providing that:

However, we do not insure loss:

**1.** <u>involving collapse, other than as provided in Additional Coverage 8</u>;

**2.** caused by:

   . . .

  f. . . .

    (6) settling, <u>cracking</u>, shrinking, <u>bulging or expansion of</u> pavements, patios, <u>foundations</u>, <u>walls</u>, floors, roofs or ceilings;

. . .

**2.** We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

  . . .

**c. Faulty, inadequate or defective:**

. . .

   (2) design, specifications, workmanship, repair, <u>construction</u>, renovation, remodeling, grading, compaction;
   (3) <u>materials used in</u> repair, <u>construction</u>, renovation or remodeling; . . . of part or all of any property whether on or off the **residence premises**.

(Ex. 28, Form HO-3 Ed. 4-84, at 5, 7 (underscore added).)

Here, based on the facts alleged, in the absence of a "collapse" within the "Additional Coverage" for "Collapse," the Halloran Plaintiffs' loss is unambiguously excluded by the above-referenced provisions. All of the Halloran Plaintiffs expressly allege that their losses were caused by the fact that "[t]he basement walls were made with defective material or methods in construction, remodeling or renovation." (TAC, ¶¶ 113, 168, 180, 215, 348, 528, 541, 741.) The exclusions for loss caused by a faulty, inadequate or defective material used in construction are therefore unambiguously applicable.[11]

Similarly, in paragraphs that are incorporated by reference into all of the Halloran Plaintiffs' claims, the Complaint alleges that there was cracking of the concrete basement walls of the Halloran Plaintiffs' properties. (TAC, ¶¶ 2, 62.) The Halloran Plaintiffs also allege that the pyrrhotite in the basement walls "expands and breaks apart the concrete . . . ." (*Id.*, ¶¶ 103, 160, 206, 341, 519, 733.) The exclusions for loss caused by cracking or expansion of walls are therefore also applicable.[12]

---

[11] *See Edmond v. Hartford Ins. Co.*, 2008 U.S. Dist. LEXIS 15825, *15-16, 2008 WL 616092 (D. Conn. Mar. 3, 2008) (Droney, J.) (evidence showed that damage to home was caused by faulty original construction, and therefore was excluded); *Megna v. United Servs. Auto. Ass'n*, No. CV00439422, 2004 Conn. Super. LEXIS 954, *4-5 (Conn. Super. Ct. Apr. 13, 2004) (DeMayo, J.) (damage caused by malfunctioning boiler fell within scope of faulty design, specifications and workmanship exclusion); *Bell Power Sys. v. Hartford Fire Ins. Co.*, No. CV 92 0065538, 1995 Conn. Super. LEXIS 448, *14 (Conn. Super. Ct. Feb. 15, 1995) (Aurigemma, J.) (contractor's failure to seal inlet and outlet holes in oil tank that later leaked constituted a "deficiency in design, specifications or workmanship" within policy exclusion).

[12] *See Rapid Park Indus. v. Great Northern Ins. Co.*, 2010 U.S. Dist. LEXIS 115747, *19-21 (S.D.N.Y. Oct. 1, 2010) (deterioration and sagging of concrete floor of parking garage fell within exclusion for "settling [and] cracking. . . of paved or concrete surfaces"); *Rhoden v. State Farm Fire & Cas. Co*., 32 F. Supp. 2d 907, 913 (S.D. Miss. 1998) (cracking of concrete in foundation was excluded, applying identical exclusion as in this case); *Nida v.*

Given that the above exclusions apply unambiguously, there can be no coverage, as a matter of law, unless the Halloran Plaintiffs' allegations state a claim for coverage under the Additional Coverage for Collapse. As explained below, however, the Halloran Plaintiffs have failed to allege a "collapse" within the meaning of their policies.

### B. The Halloran Plaintiffs' Allegations Fail to Adequately Allege a "Collapse"

The Hallorans Plaintiffs allege that the claimed damage to their properties' foundation walls falls within the Additional Coverage for "Collapse" under their insurance policies. (TAC ¶¶ 110, 165, 176, 213, 346, 525, 538, 738.) But they fail to allege facts that, if true, would establish a "collapse" under the relevant policy provision.

For purposes of this motion, the Travelers Defendants will assume that the Halloran Plaintiffs can prevail on their argument that the "abrupt falling down or caving in" definition of "collapse" contained in the policies issued by the applicable Travelers Defendants to the Halloran Plaintiffs is not enforceable, and thus all of the policies are all essentially identical with respect to the additional coverage for "Collapse." Based on that assumption (*see* fn. 9 above), all of the policies issued by the applicable Travelers Defendants to the Hallorans, Basquiat and Somerville, Gribbon, MacGlaflin and Thieling contain the following provision:

> **ADDITIONAL COVERAGES**
> . . .
> **8. Collapse.** <u>EXCEPT FOR LOSS CAUSED BY SETTLING, CRACKING, BULGING OR EXPANSION</u>, we insure for risk of direct physical loss to covered property resulting from <u>collapse of a building or any part of a building</u> CAUSED ONLY BY ONE OR MORE OF THE FOLLOWING:
>
> a.     hidden decay;
> b.     hidden bird, insect or vermin damage;
> c.     weight of contents, equipment, animals, or people;
> d.     weight of precipitation which collects on a roof;

---

*State Farm Fire & Casualty Co.*, 454 So. 2d 328, 335 (La. Ct. App. 1984) (foundation damage caused by expansion and contraction of soil was excluded from coverage).

> e. <u>use of defective material or methods in construction, remodeling or renovation</u>.
> UNDER ITEMS a. - e., THIS COVERAGE DOES NOT INCLUDE LOSS TO [A] . . . FOUNDATION . . . UNLESS THE LOSS IS A DIRECT RESULT OF THE COLLAPSE OF A BUILDING.

(Exs. 12-17,19-21, Form HO-3 (06-91), at 4-6, as modified by Form HA-300 CT (01-03), at 2;

Ex. 29-34, 41-46, 54-59, Form HA-6 (06-91), at 5-6, as modified by Form HA-300 CT (01-03),

at 2 (underscore added).)

The Brozeks' policy contains a very similar provision stating as follows:

> **ADDITIONAL COVERAGES**
> . . .
> **8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
>
> a. Perils Insured Against in Coverage C – Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage.
> b. hidden decay;
> c. hidden insect or vermin damage;
> d. weight of contents, equipment, animals, or people;
> e. weight of rain which collects on a roof; or
> f. <u>use of defective material or methods in construction, remodeling or renovation</u>.
> Loss to [a] . . . foundation . . . is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building.
>
> <u>Collapse does not include settling, cracking, shrinking, bulging or expansion</u>.

(Exhibit 28, Form HO-3 Ed. 4-84, at 3, 5, as modified by Form HO-300 (Ed. 11-87) (underscore added).)

The Halloran Plaintiffs all allege that their loss was caused by a defective material

(concrete), as explained above, and thus the central question is whether they have alleged a

"collapse of a building or any part of a building" other than mere settling, cracking, bulging or

expansion, as the term "collapse" is used in the policy provisions quoted above. They have not

alleged a "collapse," for the reasons that follow.

In addition, the Travelers Defendants join in the arguments being made by other defendants, including the Liberty Mutual Companies and Homesite Insurance Company, that there is no coverage because the Plaintiffs claim loss to a "foundation" that is not "a direct result of the collapse of a building." In the interests of judicial economy, the Travelers Defendants have not fully briefed those arguments herein, which have been thoroughly addressed by other defendants.

1. **The Connecticut Supreme Court's Standard in Beach, Properly Construed, Requires That the Structure Be in Imminent Danger of Falling Down or Unsafe to Occupy for Its Intended Purpose**

The Connecticut Supreme Court's only decision on the meaning of the term "collapse" in a property insurance policy is *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246 (1987). In *Beach*, the policy provided that "[t]his policy does not insure against loss ... by ... settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings... unless ... collapse of a building ... not otherwise excluded ensues, then this policy shall cover only such ensuing loss." *Id.* at 250. The uncontested facts were that there was a nine-inch wide crack in the north foundation wall of the house, "wooden support beams on top of the foundation wall had pulled apart," and "the foundation wall had tipped over into the basement from the top and was no longer supporting the house." *Id.* at 248 (emphasis added). The trial court concluded that the house "was in imminent danger of falling over . . . ." *Id.* at 249 (emphasis added). On these facts, the Connecticut Supreme Court concluded that the trial court had properly held that a "collapse" occurred because "[a]lthough the judicial decisions elsewhere are divided, the more persuasive authorities hold that the term 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Id.* at 252.

In attempting to glean what the Connecticut Supreme Court meant by "substantial impairment of structural integrity" in *Beach*, if that is not made sufficiently clear by the *Beach* opinion itself and the facts detailed therein, the most logical place to look first is to examine the cases from other jurisdictions that the *Beach* court found persuasive and relied upon. Those cases *all* point to the conclusion that the structure must be in imminent danger of falling down or unsafe to occupy for its intended purpose[13]:

- *Auto Owners Ins. Co. v. Allen*, 362 So. 2d 176, 177 (Fla. Dist. Ct. App. 1978): finding a collapse where concrete blocks had separated, one wall had collapsed, a second wall was leaning "a significant distance," and "the function of the wall and building (including the function of the superstructure) was impaired and the total building . . . was in <u>imminent danger</u> of falling further" (emphasis added)

- *Nationwide Mut. Fire Ins. Co. v. Tomlin*, 352 S.E.2d 612, 614 (Ga. Ct. App. 1986): finding a collapse where "[t]he exterior brick walls of the house have cracked and <u>pulled away from the structure</u>" (emphasis added)

- *Vormelker v. Oleksinski*, 199 N.W.2d 287, 293 (Mich. Ct. App. 1972): approving jury instruction defining "collapse" as "a sinking, bulging, cracking, pulling away of the wall <u>so as to impair its function of supporting the superstructure and destroying its efficiency as a habitation</u>" (emphasis added)

- *Government Employees Ins. Co. v. DeJames*, 261 A.2d 747, 750 (Md. 1970): finding sufficient evidence to establish collapse where engineer testified that building was <u>unsafe and unfit to be occupied</u> because wall could "no longer usefully sustain a load"

---

[13] Some courts have also mentioned that the structure was unfit for its function or occupancy, but those courts appear to have essentially conflated a lack of fitness for occupancy with safety for purposes of occupancy.

- *Thornewell v. Indiana Lumbermens Mut. Ins. Co.*, 147 N.W.2d 317, 320-21 (Wis. 1967): court explained that "[i]f the condition of the part of the building claimed to be in a state of collapse is such that the basic structure or substantial integrity of the part is materially impaired so that it <u>cannot perform its structural function</u> as a part of the building and is in <u>immediate danger of disintegrating</u>, then it can be said to be in a state of collapse within the meaning of the extended coverage of the policy" (emphasis added); court affirmed trial court's finding that there was no collapse where, although walls had bulged approximately two inches, "they had not fallen and there was no evidence they were in any immediate danger of falling"

- *Morton v. Great Am. Ins. Co.*, 419 P.2d 239, 240 (N.M. 1966): finding that whether there was a collapse was an issue of fact where first floor of house "had tilted about ten degrees from vertical" and "wide cracks occurred in the walls," creating an "<u>unsafe and dangerous condition</u>" (emphasis added)

- *Employer Mut. Ins. Co. v. Nelson*, 361 S.W.2d 704, 708-09 (Tex. 1962): defining "collapse" as "a sinking, bulging, breaking or pulling away of the foundation or walls or other supports <u>so as materially to impair their function and to render the house unfit for habitation</u>" (emphasis added); evidence was insufficient to support finding of a partial collapse where there was a "wide crack" in sheetrock, doors out of alignment and foundation had subsided three-and-one-fourth inches

- *Rogers v. Maryland Cas. Co.,* 109 N.W.2d 435, 437-38 (Iowa 1961): affirming jury verdict finding collapse where when house was raised, north wall fell into basement, and "[t]he jury could find [the building's] <u>basic structure was materially impaired</u> and it was <u>dangerous to occupy</u>" (emphasis added)

- *Morton v. Travelers Indem. Co.*, 106 N.W.2d 710, 715-16 (Neb. 1960): collapse occurred where testimony was that basement wall had moved four to six inches and part of it was no longer intact with the house, the basement walls "had <u>lost any holding power</u>" and "it looked like <u>total collapse could happen any time</u>" (emphasis added).

Based on all of these decisions that were cited and relied upon in *Beach*, there can be little doubt what the Connecticut Supreme Court had in mind when it described a "substantial impairment of structural integrity." It was describing a situation where a structure is "in imminent danger of falling over" or unsafe to occupy for its intended purpose, as in *Beach*.[14]

### 2. Appellate Decisions Nationwide Following Beach Have Repeatedly Required That a Structure Be in Imminent Danger of Falling Down or Unsafe to Occupy for Its Intended Purpose

This Court must predict how the Connecticut Supreme Court would rule if it were asked to elaborate on the "substantial impairment of structural integrity" standard. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 610 (2d Cir. 1996); *Mercedes Zee Corp. v. Seneca Ins. Co.*, 2015 U.S. Dist. LEXIS 171253, *6 (D. Conn. Dec. 22, 2015). Since *Beach* was decided in 1987, persuasive appellate decisions in other jurisdictions, many of them relying in part on *Beach*, have further refined, elaborated on or modified the "substantial impairment of structural integrity" test for a collapse. Consistent with *Beach* and the cases *Beach* relied upon, these more recent decisions have also required that the structure (or part thereof) be in imminent danger of falling down or unsafe to occupy for its intended purpose. It is likely that the Connecticut Supreme Court would follow these cases.[15]

---

[14] *Beach* indicated that the structure remained occupied during repairs and "was not rendered completely uninhabitable," *Beach*, 205 Conn. at 253, but it was clear that the house was in "imminent danger of falling over," and thus it appears the house was unsafe to occupy for its intended purpose, perhaps until it was shored up for repairs. *Id.* at 249.

[15] The Travelers Defendants acknowledge that this Court declined to adopt similar arguments presented by another insurer and denied a request for certification to the Connecticut Supreme Court in *Belz v. Peerless Ins. Co.*, 2016 U.S. Dist. LEXIS 118900, *13-14 (D. Conn. Sept. 2, 2016) (Bolden, J.), *reconsid. denied*, 2016 U.S. Dist. LEXIS

Most recently, the Washington Supreme Court explained that a "collapse" occurs when there is a "substantial impairment of the structural integrity of a building or part of a building that <u>renders such building or part of a building unfit for its function or unsafe</u>," and, where the policy language so provided, the damage "must be more than mere settling, cracking, shrinkage, bulging, or expansion." *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 352 P.3d 790, 791 (Wash. 2015) (en banc) (emphasis added). In other words, there must be "an impairment so severe as to <u>materially impair a building's ability to remain upright</u> . . . ." *Id.* at 794 (emphasis added). Applying this standard, the Ninth Circuit held that it was "simply implausible" that condominium walls had "collapsed" when a 1998 insurance policy was in effect, given that the condominiums were still standing in 2015. *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Ins. Co.*, 633 Fed. Appx. 415, 417 (9th Cir. 2016).

Prior to the recent decision in *Queen Anne*, appellate courts in New Jersey and Illinois adopted similar standards. *See Fantis Foods v. N. River Ins. Co.*, 753 A.2d 176, 183 (N.J. Super. Ct. App. Div. 2000) (collapse means a "<u>serious impairment of structural integrity</u> that connotes <u>imminent collapse threatening the preservation of the building as a structure</u> or the <u>health and safety</u> of occupants and passers-by"; where inspectors found building in imminent danger of collapse, that was sufficient to at least create a genuine issue of material fact) (emphasis added); *Indiana Ins. Co. v. Liaskos*, 697 N.E.2d 398, 405 (Ill. App. Ct. 1998) (finding no collapse where basement slab cracked and pushed up allowing ground water to enter, and footings may have shifted, but "[t]he evidence did not show that the basement foundation wall had moved and

---

152493 (Nov. 3, 2016). In *Belz*, however, the Court did not have the benefit of the more extensive briefing of the issue herein, including the analysis of the cases relied upon in *Beach* in Section I.B.1, most of the legal analysis in Section I.B.2, and the practical considerations discussed in Section I.B.3.

separated from the rest of the foundation, that it was <u>no longer supporting the [insured's] home</u> or that its movement caused [the insured's] home to be <u>uninhabitable</u>") (emphasis added).

Other state supreme courts have similarly required that a collapse be either an actual or imminent falling down. A leading case requiring such imminence is *Doheny West Homeowners' Ass'n v. American Guar. & Liab. Ins. Co.*, 70 Cal. Rptr. 2d 260 (Cal. Ct. App. 1997), which explained that requiring that a collapse be either actual or imminent "avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage beyond the terms of the policy," and also "avoid[s] converting th[e] insurance policy into a maintenance agreement . . . ." *Id.* at 264.

*Doheny West* extensively surveyed the case law nationwide on collapse under property insurance policies, including *Beach*, explaining that those cases referring to a "substantial impairment of structural integrity" are cases that "either implicitly or explicitly require that collapse be imminent and inevitable, or all but inevitable." *Id.* With respect to *Beach*, the court explained that *Beach* was "decided on facts that indicate <u>imminent danger</u> and a degree of damage that indicates that <u>the building will not stand</u>." *Id.* at 265 (emphasis added). The *Doheny West* court defined "imminent" as "likely to happen without delay; impending, threatening," and noted that cases finding an imminent collapse were ones where there was an "immediate danger," or "imminent danger and a degree of damage that indicates that the building will not stand." *Id.* at 264-65. The appellate court affirmed a verdict in favor of the insurer where a structural engineer testified that, even if supporting beams and columns had lost 50 percent of their capacity due to deterioration or water damage, the building was safe, not in danger of falling down, and "despite the damage, the beams and other supports were capable of supporting the building." *Id.* at 266.

The South Carolina Supreme Court reached a similar result in deciding a certified question, rejecting an undefined, vague "substantial impairment" standard and explaining that "We find a requirement of <u>imminent collapse</u> is the most reasonable construction of the policy clause covering 'risks of direct physical loss involving collapse.' We define imminent collapse to mean collapse is <u>likely to happen without delay</u>. This construction protects the insured without distorting the purpose of the clause to protect against damage from collapse." *Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co.*, 565 S.E.2d 306, 308 (S.C. 2002) (emphasis added). The South Carolina Supreme Court further noted that "collapse coverage should not be converted into a maintenance agreement by allowing recovery for damage which, while substantial, does not threaten collapse." *Id.*[16]

In light of how the law has developed across the country on this issue following *Beach*, the Connecticut Supreme Court likely would follow these persuasive decisions and rule that a "substantial impairment of structural integrity" occurs only where a structure (or part thereof) is in imminent danger of falling down, or unsafe to occupy for its intended purpose.

The Eighth Circuit made a similar prediction with respect to Nebraska law in *KAAPA Ethanol, LLC v. Affiliated FM Ins. Co.*, 660 F.3d 299 (8th Cir. 2011). Similar to the Connecticut Supreme Court, the Nebraska Supreme Court had, in 1960, in a case where the term "collapse"

---

[16] *See also Zoo Props., LLP v. Midwest Family Mut. Ins. Co.,* 797 N.W.2d 779, 782 (S.D. 2011) (following *Ocean Winds* in case involving cracking in ceiling joists, rejecting an undefined "substantial impairment" standard, and requiring an "imminent collapse," i.e., a collapse that is "likely to happen without delay"; remanding case for reconsideration under that standard); *401 Fourth St., Inc. v. Investors Ins. Group*, 879 A.2d 166, 174-76 (Pa. 2005) (requiring a "falling down, or <u>imminent</u> falling down of a building or part thereof"; where parapet wall had given way, "large, sudden movement" had occurred and engineer opined that the situation was "very dangerous," there was a genuine issue of material fact as to whether collapse was "imminent") (emphasis added); *Royal Indem. Co. v. Grunberg*, 553 N.Y.S.2d 527, 528-29 (N.Y. App. Div. 1990) (collapse occurred where "[t]he uncontradicted record evidence is that the house was in <u>imminent danger</u> of caving in"; the east wall of the house was "seven inches out of plumb," and "the house precipitously tilted eastward") (emphasis added); *Whispering Creek Condo. Owner Ass'n v. Alaska Nat'l Ins. Co.*, 774 P.2d 176, 177, 180 (Alaska 1989) (collapse coverage applied where condominium complex was in a "<u>life-threatening condition</u> and in <u>imminent danger</u> of collapse"; building department had posted warning notices after finding that ceiling joists were not capable of supporting a water or snow load) (emphasis added).

was not defined as an abrupt falling down or caving in, adopted a standard of material impairment of basic structural integrity. *Morton*, 106 N.W.2d at 720-21 (cited in *Beach*, 205 Conn. at 252). In *KAAPA*, the district court instructed the jury that a collapse requires a "substantial impairment of the structural integrity of a building or any part of a building," and that this did not require an "imminent danger of falling down" or "that the structure was either abandoned or taken out of use." *KAAPA*, 660 F.3d at 305. The Eighth Circuit reversed and remanded for a new trial, finding this jury instruction improper. Citing various more recent decisions from other jurisdictions, including *Doheny West*, *Ocean Winds*, *Zoo Properties* and *Fantis Foods*, the Eighth Circuit concluded that "we predict that the Supreme Court of Nebraska would adopt some sort of imminence requirement in applying the material-impairment standard" because such a requirement "is consistent with the facts in *Morton*, comports with the reasonable expectations of the parties to the insurance contract, and achieves an appropriate middle ground that avoids either eviscerating catastrophic coverage of collapse, or effectively nullifying the faulty workmanship and settling exclusions." *Id.* at 306.[17] The Eighth Circuit's reasoning (substituting *Beach* for *Morton*) is fully applicable in Connecticut and should be followed here.

### 3. Practical Considerations Also Support an Imminent Danger / Unsafe to Occupy Standard

In deciding what constitutes a "substantial impairment of structural integrity" as a matter of law, the Connecticut Supreme Court likely would also consider the practicalities of property insurance claim adjustment and litigation. The mere words "substantial impairment of structural integrity," without more elaboration, are amorphous, and do not have any established meaning to an engineer, building department official, insurance claim adjuster or supervisor, judge, or juror.

---

[17] The Eighth Circuit also predicted that the Nebraska Supreme Court would not impose a requirement "that a structure be taken out of service or rendered uninhabitable" in order for there to be a collapse. *Id.* at 307. Such a requirement, however, has substantial support in the case law, as discussed above.

Under such a vague standard, insureds will undoubtedly try to claim that simple cracking or minor movement of a wall or foundation is a collapse. *See, e.g.*, *Queen Anne Park*, 633 Fed. Appx. at 417 (claim was that a "collapse" consisting of hidden decay occurred 17 years ago, despite the fact that condominiums are still standing today); *Doheny West*, 70 Cal. Rptr. 2d at 251-52 (claim was that, due to cracking in parking structure, an earthquake of large magnitude could cause a collapse). Vague formulations of a "collapse" legal standard also fail to take into account that, as here, policies typically specify that collapse does not include mere settling, cracking, bulging or expansion, and also typically exclude loss caused by settling, bulging or expansion, including resulting cracking of foundations, or walls.

The standard for determining whether there has been a "collapse" within the meaning of property insurance policies that has been adopted by numerous courts before and after *Beach*— whether the structure (or part thereof) has suffered a substantial impairment of its structural integrity such that it is in imminent danger of falling down or unsafe to occupy for its intended purpose—provides guidance sufficient to ensure its proper, predictable and consistent application, and therefore will lead to fewer disputes and less litigation. Building department officials decide every day whether a structure is safe to issue a certificate of occupancy, or unsafe such that it must be evacuated. Engineers have the required training to make determinations about safety, and have an ethical responsibility to make such determinations. *See* National Society of Professional Engineers, Code of Ethics for Engineers, § I ("Engineers, in the fulfillment of their professional duties, shall: 1. Hold paramount the safety, health, and welfare of the public."); § II.1.a. ("If engineers' judgment is overruled under circumstances that endanger life or property, they shall notify their employer or client and such other authority as may be appropriate.") (available at https://www.nspe.org/resources/ethics/code-ethics).

Under the standard advocated for herein, understandable parameters will guide an insurance company's determination regarding whether there has been a "collapse" within the meaning of the insurance contract. Where appropriate, insurers and insureds will be able to rely on the judgment of engineers and building department officials, and it will be relatively rare that those professionals disagree on whether a structure is in imminent danger of falling down or unsafe to occupy for its intended purpose. It will be a rare circumstance that a court will have to step in and resolve these disputes.

<blockquote>

**4.  The Halloran Plaintiffs Fail to Allege That Their Structures Are in Imminent Danger of Falling Down, or Unsafe to Occupy for Their Intended Purpose**

</blockquote>

Here, none of the Halloran Plaintiffs have alleged facts that, if proven, would demonstrate the type of "substantial impairment of the structural integrity of a building" that the Connecticut Supreme Court found constituted a "collapse" in *Beach*. None of the Halloran Plaintiffs allege that the support beams of their house have pulled apart, or that the foundation is "no longer supporting the house," or that their house or any part of it is "in imminent danger of falling over . . . ." *Beach*, 205 Conn. at 248-49.

The Halloran Plaintiffs also do not allege that an event capable of constituting a "collapse" occurred during the time period that their respective homes were insured by Travelers Defendant(s). The Policies provide that "[t]his policy applies only to loss in Section I . . . which occurs during the policy period." (Exs. 12-17, 19-25, Form HO-3 (06-91), at 19 (capitalization removed); Exs. 29-34, 41-46, 54-59, Form HA-6 (06-91), at 17 (capitalization removed); Ex. 28, Form HO-3 Ed. 4-84, at 15.) The Brozeks, for example, allege that they first discovered damage in September 2015, more than 20 years after their last policy with Fidelity and Guaranty expired in 1994. (TAC, ¶¶ 199, 213.) It would make no sense for their home to have "collapsed" during or prior to the expiration of their last Fidelity and Guaranty policy in 1994, given that, according

to their allegations, they did not notice damage until 2015 and to this day live in their home.[18] (*Id.*, ¶¶ 197, 199.)

Moreover, none of the Halloran Plaintiffs has alleged that his or her property is in imminent danger of falling down, or unsafe to occupy for its intended purpose. As the Hallorans' expert report (attached to the Complaint) candidly acknowledges, there is <u>no</u> currently-existing structural failure or imminent danger to the Halloran Property: "In general, the framed portion of the home above the foundation is in <u>good condition</u> with <u>no readily visible damage or deterioration</u> at the time of our inspection," the cracks in the foundation are tiny, generally between 1/16" and 1/8" in width, and "[t]he results of hammer soundings of the concrete on each side of the cracks <u>found the concrete to be solid</u>." (Doc. 339-2 at p. 6 of 82.) The photographs of the Halloran Property attached to the report further demonstrate that there has been no structural failure. (Doc. 339-2, 339-3.)

The engineering firm retained by the Hallorans opines that there is a chemical reaction occurring that, at some unspecified point in the future, the engineering firm expects to result in "increased deterioration and <u>eventual failure</u> of the foundation to function as originally intended," and such a "structural failure <u>may</u> lead to loss of support of the building structure" at some future point. (Doc. 339-2, at p. 9 of 82.) The Hallorans allege that "the sulfate attack will continue to deteriorate the concrete until such time that the basement walls are destroyed and the home caves into its basement." (TAC ¶ 106.) For all that appears from the Hallorans' expert report, however, the possible structural failure might not occur, and if it does, such an "eventual"

---

[18] *See, e.g.*, *Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Ins. Co.*, 434 Fed. Appx. 579 (9th Cir. 2011) (explaining that insured "bears the burden of showing that a 'collapse' occurring during the policy period caused its loss"); *Siena Del Lago Condo. Ass'n v. Am. Fire & Cas. Co.*, No. C12-251 TSZ, 2013 U.S. Dist. LEXIS 69308, *6 n.4 (W.D. Wash. May 14, 2013) (plaintiff could not establish, as a matter of law, that "collapse" occurred during one of insurer's policy periods where "almost nine years elapsed between the end of coverage and discovery of damage"); *Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co.*, No. 07-2983 (JAG), 2008 U.S. Dist. LEXIS 28329, *20-26 (D.N.J. Apr. 4, 2008) (granting insurers' motion to dismiss where collapse of wall was alleged to have occurred outside of the insurers' policy periods).

event may not happen for another twenty years or more. The Hallorans fail to allege facts that are even remotely analogous to *Beach*, where "wooden support beams on top of the foundation wall had pulled apart," "the foundation wall had tipped over into the basement from the top and was no longer supporting the house," and the house "was in imminent danger of falling over . . . ." *Beach*, 205 Conn. at 248-49. The Hallorans also fail to allege facts that, if proven, would demonstrate that their property is in imminent danger of falling down, or unsafe to occupy for its intended purpose.[19]

The Brozeks allege that they retained the same engineering firm (Fuss & O'Neill) that was retained by the Hallorans. (TAC ¶ 200.) The Brozeks do not attach their expert report to the Complaint, but they allege that Fuss & O'Neill concluded that the foundation of their home contains pyrrhotite, and that "a chemical reaction of the concrete mix due to the presence of pyrrhotite is occurring and is expected to continue, resulting in increased deterioration and <u>eventual failure</u> of the foundation to function as originally intended." (*Id.* ¶¶ 205, 209 (emphasis added).) They further allege that "the sulfate attack will continue to deteriorate the concrete until such time that the basement walls are destroyed and the home caves into the basement." (*Id.* ¶ 209.) The Brozeks' allegations are thus essentially the same as the Hallorans' allegations. They fail to allege facts that are even remotely analogous to *Beach*, and also fail to allege facts that, if proven, would demonstrate that their property is in imminent danger of falling down, or unsafe to occupy for its intended purpose.[20]

---

[19] The Hallorans make a conclusory allegation, based on the December 22, 2015 expert report, that "F & O told the Hallorans that their basement walls were substantially impaired, in a state of collapse and no longer fit for their intended purpose of holding up the house." (TAC ¶ 105.) This allegation is unsupported by and in fact contradicts the expert report that is attached as an exhibit to the Complaint. Such a conclusory allegation must be disregarded under *Twombly*, 550 U.S. at 557. A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *see also id.* at 686 ("the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context").

[20] The Brozeks make the same conclusory, unsupported allegation as the Hallorans (TAC ¶ 208), which likewise must be disregarded under *Twombly* and *Iqbal*.

The breach of contract claims alleged by Basquiat and Somerville, Gribbon, MacGlaflin and Thieling are even more deficient. All of these plaintiffs allege simply that they "discovered damage to their [or his or her] basement walls and on visible portions of the outside of their [or his or her] basement walls." (TAC, ¶¶ 158, 339, 517, 731.) They do not allege that the basement walls of their home have been tested to determine whether they contain pyrrhotite. Rather, they allege only that "[u]pon information and belief" the basement walls contain pyrrhotite, and that, assuming that is the case, a "sulfate attack" is occurring with respect to the basement walls, "which affects the durability and <u>ultimately</u> causes the failure of the concrete." (*Id.*, ¶¶ 159-161, 341-342, 518-520, 732-734 (emphasis added).) They further allege that "the sulfate attack will continue to deteriorate the concrete until the home caves into the basement." (*Id.*, ¶¶ 162, 343, 521, 735.) The allegations made by these plaintiffs are even weaker than those asserted by the Hallorans and Brozeks. They fail to allege facts that would meet the standard articulated in *Beach*, and they also fail to allege facts that, if proven, would demonstrate that each of their properties is in imminent danger of falling down, or unsafe to occupy for its intended purpose. What they allege is the type of settling, cracking, bulging or expansion that their policies specify does not constitute a "collapse." *See* Section I.A. above. Their allegations plainly fail to "raise the right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

## II.     THE BREACH OF CONTRACT CLAIMS OF NORRIS AND ZAREMBA (COUNTS 34 AND 39) FAIL TO STATE A CLAIM

The policies issued to Norris and Zaremba were issued by Travelers Home and Marine. Those policies differ from the policies issued to the Halloran Plaintiffs in that they define the term "collapse" as an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (Ex. 1-3, at Form HO-3 (10-06), at 7; Ex. 4-9, at Form HO-6 (10-06), at 7.)  Norris and

Zaremba were not required to be given notice of any change in policy terms concerning the "collapse" coverage because there was no such change—the term "collapse" was defined as quoted above in *all* of the policies issued by Travelers Home and Marine to Norris and Zaremba, starting with the first policy issued to each of them.[21] (Exs. 1, 4.)

Like the Halloran Plaintiffs, Norris and Zaremba fail to state a claim for breach of contract because: (a) the alleged losses are excluded by their policies in the absence of a "collapse"; and (b) they fail to allege a "collapse" of their properties under their policies and applicable law.

### A. Based on the Facts Alleged, the Claimed Losses Are Excluded in the Absence of a "Collapse"

For essentially the same reasons set forth in Part I.A. above, the claimed losses of Norris and Zaremba are excluded in the absence of a "collapse." Similar to the policies issued to the Halloran Plaintiffs, the Norris and Zaremba policies exclude losses caused by "[f]aulty, inadequate or defective . . . [m]aterials used in repair, construction, renovation or remodeling . . .

---

[21] Zaremba alleges "[u]pon information and belief" that his policies did not define the term "collapse" (TAC ¶ 759), but that is incorrect, as demonstrated by the policies attached as Exs. 1-3 hereto. Such a conclusory and erroneous "information and belief" allegation must be disregarded. *Twombly*, 550 U.S. at 557.

Norris alleges that the "abrupt falling down or caving in" definition of "collapse" in her policies was not enforceable because she did not receive adequate notice of a "reduction in coverage" (TAC ¶ 669), but there was no reduction in coverage —all of Norris' policies issued by a Travelers Defendant, starting with the first one, contained the definition of "collapse" quoted above (*see* Exs. 4-9). Plaintiffs maintain that notice of a "significant reduction in coverage" was required to be given in a "conditional renewal notice" under Conn. Gen. Stat. § 38a-323 and Conn. Insurance Dept. Bulletin PC-66 (Dec. 21, 2009). (TAC ¶ 87.) Neither the statute nor the bulletin (assuming, arguendo, it has the force of law) cited by Plaintiffs requires special notice of a particular definition of "collapse" in the first policy issued to a new policyholder, or in a renewal policy that does not alter the Additional Coverage for "Collapse." Conn. Gen. Stat. § 38a-323 addresses only the renewal of certain insurance policies, and Conn. Insurance Dept. Bulletin PC-66 addresses only the cancellation, nonrenewal and renewal of certain insurance policies. There is no statute, regulation or other source of Connecticut law that requires special notice to be given with respect to a collapse coverage provision in the first policy issued to a new policyholder, or together with a renewal policy that does not make any change to that provision.

In any event, even if Zaremba or Norris could succeed on their allegations pertaining to the purported lack of a definition of "collapse" or the unenforceability of the definition of "collapse," their claims would fail as a matter of law for the same reasons that the Halloran Plaintiffs' claims fail, as set forth in Section I above. Neither Zaremba nor Norris alleges that his or her house, or part thereof, is in imminent danger of falling down or is unsafe to occupy for its intended purpose, and thus they both do not allege a "collapse" for the reasons set forth above with respect to the Halloran Plaintiffs.

of part or all of any property whether on or off the 'residence premises.'" (Ex.1-3, at Form HO-3 (10-06), at 14; Ex. 4-9 at Form HO-6 (10-06), at 13-14.) The policies also provide an exception to coverage for loss caused by "[s]ettling, shrinking, bulging or expansion, including resultant cracking, of . . . footings, foundations, walls, [or] floors . . . ." (Ex. 1-3, at Form HO-3 (10-06), at 10-11; Ex. 4-9, at Form HO-6 (10-06), at 9-10.) The policies also contain an exception to coverage for loss "[i]nvolving collapse or danger of collapse, except as provided in Additional Coverage 9. Collapse . . . ." (Ex. 1-3, at Form HO-3 (10-06), at 10; Ex. 4-9, at Form HO-6 (10-06), at 9.)

Based on the facts alleged, the claims of Norris and Zaremba are excluded in the absence of a covered "collapse." They allege that their losses were caused by the fact that "[t]he basement walls were made with defective material or methods in construction, remodeling or renovation." (TAC, ¶¶ 671, 761.) The exclusion for loss caused by a faulty, inadequate or defective material used in construction is therefore unambiguously applicable. *See* Section I.A. above. In addition, in paragraphs that are incorporated by reference into all of the Plaintiffs' claims, the Complaint alleges that there was cracking of the concrete basement walls of the Plaintiffs' properties. (TAC, ¶¶ 2, 62.) Norris and Zaremba also allege that the pyrrhotite in the basement walls "expands and breaks apart the concrete . . . ." (*Id.*, ¶¶ 663, 753.) The exclusions for loss caused by cracking or expansion of walls are therefore also applicable. Thus, there can be no coverage, as a matter of law, unless Norris's and Zaremba's allegations state a claim for coverage under the Additional Coverage for Collapse.   As explained below, they have failed to allege a "collapse" within the meaning of their policies.

### B.    Norris and Zaremba Have Failed to Allege a "Collapse"

The additional coverage for "Collapse" in the Norris and Zaremba policies is worded differently from the Halloran Plaintiffs' policies and the policy at issue in *Beach*. It provides:

## ADDITIONAL COVERAGES

. . .

### 9. Collapse

**a.** With respect to this Additional Coverage:

**(1)** Collapse means an ***abrupt falling down or caving in*** of a building or any part of a building with the result that the building or part of the building ***cannot be occupied for its current intended purpose***.

**(2)** ***A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.***

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) ***A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.***

**b.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against named under Coverage C;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse [or there are visible signs of water damage and the "insured" has not taken prompt action to prevent further damage[22]];

(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

(4) Weight of contents, equipment, animals or people;

(5) Weight of rain which collects on a roof; or

---

[22] The policies issued to Norris eliminate the words "or there are visible signs of water damage and the 'insured' has not taken prompt action to prevent further damage," but that change is not relevant to this motion.

> (6)    Use of defective material or methods in construction, remodeling or renovation.

(Exs. 1-3, Form HO-3 (10-06), at 7-8, as modified by Form HO-300 CT (08-07), at 1 or Form HO-300 CT (07-09), at 1 (emphasis added); Exs. 4-9, Form HO-6 (10-06), at 7, as modified by Form HO-300 CT (03-10), at 1, HO-300 CT (08-12), at 1 or HO-300 CT (12-13), at 1.)

Significantly, the Additional Coverage for Collapse expressly defines "collapse' to mean "an *abrupt falling down or caving in* of a building or any part of a building with the result that the building or part of the building *cannot be occupied for its current intended purpose*." (*Id.* (emphasis added).) The Additional Coverage for Collapse also expressly states that "[a] building or any part of a building that is in danger of falling down or caving in is *not* considered to be in a state of collapse"; and that "[a] building or any part of a building that is standing is *not* considered to be in a state of collapse *even if it shows evidence of cracking*, *bulging* . . . bending, leaning . . . *or expansion*."  (*Id.*, Form HO-3 (10-06), at 7 (emphasis added).)

In a case involving the same policy language and essentially identical allegations, Judge Underhill concluded that the plaintiff could not establish either the requisite "abrupt falling down or caving in" or that the structure could not be used for its intended purpose, and granted the defendant insurer's motion to dismiss for failure to state a claim.  *Alexander v. General Ins. Co. of America, No. 3:16-cv-0059*, transcript (Ex.10); order granting motion to dismiss (Ex.11); *Alexander v. Gen. Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 5963 (D. Conn. Jan. 17, 2017) (denying reconsideration).

Judge Underhill emphasized the need for the alleged damage to have occurred in an abrupt manner, even if the damage was caused by a slow process. *Alexander*, tr. at 13-14, 18. The court used the following example to demonstrate the distinction:

THE COURT: So here we go. Let's use insect damage. There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam fails.

[PLAINTIFF'S COUNSEL]: Right.

THE COURT: Now there's coverage. Now you have a collapse or falling in. The fact that it was caused by termites and it was a slow process doesn't mean you didn't have an abrupt collapse. You did, when the beam failed and there was literally a falling of the beam, a failure of the beam.

[PLAINTIFF'S COUNSEL]: But what if when that beam becomes substantially compromised and it begins to shift and move --

THE COURT: No coverage.

[PLAINTIFF'S COUNSEL]: -- is that a caving in, though?

THE COURT: No, it's not.

* * *

THE COURT: If an abrupt caving in has occurred that is something other than a bulging, sagging, bending, leaning, settling, shrinkage, cracking or expansion, you're in good shape. We don't have that allegation here.

*Id.* at 13-14.

Judge Underhill ruled that "what we have here is a building that is in danger of falling down, and that is expressly excluded from collapse coverage; and, similarly, there has been cracking, bulging, etc. Those situations are also excluded . . . . And so I just don't see any room – any wiggle room here." (*Alexander*, transcript at 23:7-13.) As he further explained in denying reconsideration:

Plaintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are "cracking" or—alleged at oral argument—that they are "bulging." Both conditions are expressly excluded under the definition of the policy and it is clear that no collapse has occurred.

*Alexander*, 2017 U.S. Dist. LEXIS 5963, at *6.

Judge Cobb of the Connecticut Superior Court, faced with an identical definition of collapse, also found the policy language to be unambiguous in another case involving an alleged crumbling concrete foundation. In *Jemiola v. Hartford Cas. Ins. Co.*, Docket No. CV-15-6008837-S, 2017 Conn. Super. LEXIS 472 (Conn. Super. Ct. Mar. 2, 2017), the court concluded that "[b]y using the phrase 'abrupt falling down or caving in of a building or part of a building,'" the policy "clarifies that a 'collapse' requires a sudden and catastrophic type event." *Id.* at *26. The court further "agree[d] with the Connecticut Federal District Court in *Alexander* and the other courts around the country that have held that the definition of collapse in the policy is unambiguous as applied to circumstances similar to this case." *Id.* at *28. Explaining that "abrupt" means "unexpectedly sudden," the *Jemiola* court agreed with those other courts that "[t]he word 'abrupt' is unambiguous and the damage to the plaintiff's basement walls was not 'abrupt,' but rather is happening over time." *Id.* at *32; *see also Buell Indus. Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 540 (2002) (explaining that "sudden" and "temporally abrupt" have the same meaning). In granting the insurer's motion for summary judgment, the court further reasoned that:

> Thus, at this point in time, the plaintiff's home and or basement walls are only in danger of falling down or caving in and her home remains standing. Under these circumstances, the plaintiff cannot meet the "abrupt falling down and caving in" portion of the definition. Additionally, under these circumstances, the plaintiff's loss is excluded under subpart b(2) of the definition, which clarifies that a "collapse" does not include a building that "is in danger" of falling down or caving in.
>
> Furthermore, the plaintiff's home can still be occupied "for its intended current purposes," pursuant to the definition. It is undisputed that the plaintiff has lived in the home continuously since 1986 and still lives there today. In addition to living in her home, the plaintiff continues to use her basement. The home is still standing and has not been condemned and she has not been forced to move out of it due to any imminent risk that the basement walls will give way. Also, under these circumstances, the plaintiff's loss is also excluded under subpart b(4) of the definition which clarifies that a building is not in a state of "collapse" if "it

is standing . . . even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion."

*Jemiola*, at *32-33; *see also Sports Domain, LLC v. Max Specialty Ins. Co.*, Docket No. CV-09-5025291-S, 2011 Conn. Super. LEXIS 3187, *7 (Conn. Super. Ct. Dec. 19, 2011) (holding that similar "collapse" provision was unambiguous, and that sagging of a canvas dome did not constitute an "abrupt falling down").[23]

Here, similar to all of the cases cited above, Norris and Zaremba fail to allege that there was "an *abrupt falling down or caving in* of a building or any part of a building with the result that the building or part of the building *cannot be occupied for its current intended purpose*." (Exs. 1-3, Form HO-3 (10-06), at 7-8; Exs. 4-9, Form HO-6 (10-06), at 7.) First, neither Norris nor Zaremba alleges a "falling down or caving in." Rather, they allege only that they anticipate that at some unspecified *future* point the deterioration of the concrete will *eventually* cause the home to cave in. (TAC, ¶¶ 665, 755.) Second, the allegations belie any claim that the Norris or Zaremba home "cannot be occupied for its intended purpose." Both Norris and Zaremba allege that they *are* currently occupying their homes. (TAC ¶¶ 659, 749.) Third, Norris and Zaremba

---

[23] Courts in other jurisdictions have also held that collapse provisions substantially identical to the Policy here are unambiguous. *Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3 (E.D.N.Y. 2012) (policy containing the same collapse definition "supplies a clear definition of 'collapse' to clarify any potential ambiguity"); *HB Holdings & Realty Mgt. LLC v Tower Ins. Co. of N.Y.*, 2016 N.Y. Misc. LEXIS 3597, *11 (N.Y. Sup. Ct. Sept. 30, 2016) (granting summary judgment in favor of insurer with respect to "collapse" coverage under same policy language where "no part of the premises fell to the ground . . . there was only sagging and cracked roof members," and the roof "sunk down nine inches"); *Mount Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*, 808 F. Supp. 2d 1322, 1325 (N.D. Ga. 2011) ("[r]egardless of the many meanings attributed to the word 'collapse,' this Court must honor the specific definition of the policy when determining whether this loss is covered"); *Mulhern v. Philadelphia Indem. Ins. Co.*, 802 F. Supp. 2d 317, 324 (D. Mass. 2011) (where concrete floor slab had heaved and cracked, the walls and ceilings had moved and separated, and the roof had split and cracked, court found that the "[p]laintiffs' own characterization of the damage" does not fall within the policy definition of an "abrupt falling down or caving in"); *Holiday Vill. E. Home Owners Ass'n v. QBE Ins. Corp.*, 2011 U.S. Dist. LEXIS 145672, *6 (D.N.J. 2011); *Miller v. First Liberty Ins. Corp.*, No. 07-1338, 2008 U.S. Dist. LEXIS 47550 (E.D. Pa. June 17, 2008); *Rapp B. Props., LLC v. RLI Ins. Co.*, 65 A.D.3d 923, 885 N.Y.S.2d 283 (N.Y. App. Div. 2009); *Rector St. Food Enters., Ltd v. Fire & Cas. Ins. Co. of Conn.*, 35 A.D.3d 177, 827 N.Y.S.2d 18 (N.Y. App. Div. 2006); *Squairs v Safeco Natl. Ins. Co*., 136 A.D.3d 1393 (N.Y. App. Div. 2016). Judge Underhill cited *Rector St. Food*, *Squairs* and *Miller* with approval in *Alexander*, 2017 U.S. Dist. LEXIS 5963 at *6. In *Jemiola*, the court relied in part on *Squairs*, *Rector St. Food*, *Residential Management*, *Miller* and *Mt. Zion. See Jemiola*, 2017 Conn. Super. LEXIS 473, at *27-28.

also fail to allege that the claimed damage to their homes occurred in an "abrupt" manner. Rather, they allege that the damage occurred gradually, over a period of a decade or more. Norris alleges that her home was built in 1984 and purchased by her in 2004, but she did not discover damage to the basement walls until August of 2016, approximately 12 years after she purchased the home. (TAC, ¶¶ 660-661.) Zaremba alleges that his home was constructed and purchased by him in 2002, but he did not discover damage to the basement walls until February of 2016, approximately 14 years after he purchased the home. (*Id.*, ¶¶ 750-751.) Based on the facts alleged, the breach of contract claims of both Norris and Zaremba thus fail as a matter of law.[24]

## III. THE HALLORANS' BAD FAITH CLAIM (COUNT 46) FAILS TO STATE A CLAIM AGAINST THE TRAVELERS DEFENDANTS

In Count 46, the Hallorans allege a claim for breach of the implied covenant of good faith and fair dealing. Because the Hallorans' breach of contract claims fail as a matter of law, as explained above, there can be no viable bad faith claim. The Connecticut Supreme Court has squarely held that "bad faith is not actionable apart from a wrongful denial of a benefit under the policy." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013). The court explained that, because the implied covenant of good faith and fair dealing "is not implicated by conduct that does not impair contractual rights," "violations of express [contractual] duties are necessary to maintain a bad faith cause of action," and there can be no viable claim for bad faith "in the absence of an underlying breach of a contractual duty . . . ." *Id.* at 795-98.

Connecticut state and federal courts have repeatedly granted insurers' dispositive motions on claims for breach of the implied covenant of good faith and fair dealing where there was no

---

[24] Alternatively, Norris and Zaremba fail to state a claim for breach of contract for the same reasons as the Halloran Plaintiffs, as set forth in Section I above. Neither Norris nor Zaremba alleges that his or her home, or part thereof, is in imminent danger of falling down, or unsafe to occupy for its intended purpose.

breach of the insurance policy.[25]  As Judge Underhill concluded in *Alexander*, "[q]uite simply, without coverage there can't be bad faith . . . ." *Alexander*, tr. at 24; *see also Jemiola*, 2017 Conn. Super. LEXIS 473, at \*34.  Because, as set forth in Part I above, the Hallorans' claim for breach of contract fails as a matter of law, Travelers is also entitled to dismissal of the bad faith claim (Count 46).

Moreover, even if the Court were to conclude that Travelers is not entitled to dismissal of the Hallorans' contract claim, Travelers still would be entitled to dismissal of the bad faith claim. "[A] plaintiff cannot recover for bad faith if the insurer denies a claim that is 'fairly debatable,' i.e., if the insurer had some arguably justifiable reason for refusing to pay or terminating the claim." *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 177 (D. Conn. 2005). The arguments and extensive authority set forth in Part I demonstrate that Travelers' coverage position was, at a bare minimum, "fairly debatable." That, by itself, warrants dismissal of the bad faith claim.  *See, e.g., McNeill & Assocs., LLC v. Cont'l Cas. Co.*, 2010 U.S. Dist. LEXIS 115687, \*11 (D. Conn. Nov. 1, 2010) (granting summary judgment in favor of insurer on bad faith claim because insurer was faced with "a complicated factual and legal question" without a clear answer, and thus its denial of coverage could not be in bad faith); *Maher & Williams v. Ace Am. Ins. Co.*, 2010 U.S. Dist. LEXIS 91934, \*57 (D. Conn. Sept. 3, 2010) (granting insurer's motion for summary judgment on bad faith claim because coverage issue "was not a simple one, and although [the insurer] read the exclusion in a manner rejected by the Court, its having taken that position does not indicate that it acted in bad faith").

---

[25] *See, e.g., Ridley v. National Union Fire Ins. Co. of Pittsburgh*, Docket No. 3:11-CV-1713-WWE, 2014 U.S. Dist. LEXIS 99246 (D. Conn., July 22, 2014) (granting summary judgment as to plaintiff's bad faith count based upon finding that insurer had not breached insurance policy); *Chorches v. Stewart Title Guaranty Co*., 48 F. Supp. 3d 151, 157 (D. Conn. 2014) ("[b]ecause plaintiff's contract claim fails, so too does his claim of bad faith denial of coverage"); *McCarthy v. Travelers Indemnity Company*, Docket No. CV 970345443, 2000 Conn. Super. LEXIS 823 at \*25-30 (Conn. Super. Ct. March 29, 2000) (noting that numerous trial courts have held that a plaintiff must show that she is entitled to recover under an insurance policy before the insurer can be found to have acted in bad faith).

## IV.    THE HALLORANS' CUTPA/CUIPA CLAIM (COUNT 55) FAILS TO STATE A CLAIM AGAINST THE TRAVELERS DEFENDANTS

In Count 55, the Hallorans allege that "Travelers" violated CUTPA/CUIPA in that "the Defendants have a general business practice of failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies in violation of Conn. Gen. Stat. § 38a-816(6)(B)." (TAC ¶ 980.) This count should also be dismissed because the Connecticut Supreme Court has squarely held that insureds cannot recover under CUTPA/CUIPA on a claim arising from an insurer's denial of coverage where the insurer's interpretation of the policy is determined to be correct. In *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367 (2008), the court explained that "[b]ecause we have concluded that the defendant's interpretation of the policy's coverage limitation was correct," the insured could not demonstrate that "the application of that interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct." *Id.* at 378.

As Judge Underhill explained in *Alexander*, "[b]ecause the coverage claim fails . . . the statutory claims, CUTPA/CUIPA, also fail" because "[q]uite simply, without coverage there can't be bad faith or a violation of either of those consumer statutes." *Alexander*, tr. at 24; *see also Jemiola*, 2017 Conn. Super. LEXIS 473, at *34; *Rancourt v. Allstate Ins. Co.*, 2008 Conn. Super. LEXIS 3024, *7 (Conn. Super. Ct. December 1, 2008) ("[S]ince the defendant [insurer] had no obligation to pay under the policy, the defendant could not have violated CUIPA or CUTPA."); *Wright v. State Farm Mutual Automobile Ins. Co.*, 1997 Conn. Super. LEXIS 3122, *10 (Conn. Super. Ct. Nov. 18, 1997) ("Having no obligation to pay under the policy, State Farm could not have violated CUIPA or CUTPA.").

# V.  PLAINTIFFS' CLAIMS AGAINST THE TRAVELERS COMPANIES, INC. ALSO FAIL FOR LACK OF STANDING

The claims against The Travelers Companies, Inc. ("Travelers Companies") fail, as a matter of law, for an additional reason: plaintiffs lack standing to sue Travelers Companies. "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). In a putative class action, the standing requirement means that "for every named defendant there must be at least one named plaintiff who can assert a claim *directly* against that defendant…." *NECA-IBEW Health & Welfare Fund*, 693 F.3d 145, 159 (2d Cir. 2012) (emphasis added).[26]

*Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012) is directly on point. In that case, the plaintiff sought to pursue putative class claims against an insurance company that had issued a title insurance policy to her, and other entities that were corporate affiliates of the title insurer. *Id.* at 60-61. The district court dismissed the claims against the affiliates for lack of standing. The Second Circuit affirmed, explaining that the fact that the case was brought as a putative class action could not allow the plaintiff to sue entities that did not allegedly injure her because "[a] federal rule cannot alter a constitutional requirement." *Id.* at 64. Here, as in *Mahon*, Plaintiffs have no standing to sue Travelers Companies, which is a holding company that is not an insurance company and does not issue insurance policies or adjust insurance claims. (Declaration of Peter Schwartz, ¶ 2 (Ex. 18).[27]) There is no allegation that Travelers Companies issued any insurance policy to or adjusted any insurance claim made by any of the named Plaintiffs, or

---

[26] In addition, as the Supreme Court recently explained, it would violate the Rules Enabling Act to "giv[e] plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016).

[27] Because this part of the motion to dismiss is brought under Rule 12(b)(1) for lack of standing, which is an issue of subject matter jurisdiction, the Court may consider evidence beyond the allegations in the Substituted Third Amended Complaint. *See Carter*, 822 F.3d at 56-57.

otherwise caused injury to any of the named Plaintiffs. In fact, Travelers Companies did not

engage in any such activities. (*Id.*, ¶¶ 2-3.) All claims alleged against Travelers Companies

therefore must be dismissed. *Catalano v. BMW of N. Am., LLC*, 2016 U.S. Dist. LEXIS 25622,

*27 (S.D.N.Y. 2016) ("There are no allegations tying BMW MC to any of Catalano's personal

claims or the injuries that he suffered. . . . Because the only named plaintiff does not have a

direct claim against BMW MC, BMW MC must be dismissed on Article III standing grounds.").

## <u>CONCLUSION</u>

Plaintiffs' claims against the Travelers Defendants fail as a matter of law, for the reasons

set forth above and in the joint motion to dismiss the claims asserted against all Defendants, in

which the Travelers Defendants have joined. All of the claims alleged against the Travelers

Defendants should therefore be dismissed, in their entirety, and with prejudice.

DEFENDANTS THE TRAVELERS HOME
AND MARINE INSURANCE COMPANY,
THE STANDARD FIRE INSURANCE
COMPANY, THE TRAVELERS
INDEMNITY COMPANY OF AMERICA,
THE AUTOMOBILE INSURANCE
COMPANY OF HARTFORD,
CONNECTICUT, FIDELITY AND
GUARANTY INSURANCE COMPANY,
AND THE TRAVELERS COMPANIES,
INC.

By: /s/ Wystan M. Ackerman
    Stephen E. Goldman (ct06224)
    E-mail: sgoldman@rc.com
    Wystan M. Ackerman (ct24090)
    E-mail: wackerman@rc.com
    Jessica A.R. Hamilton (ct29702)
    E-mail: jhamilton@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2017, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Wystan M. Ackerman