**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL HALLORAN, et al., | : | DOCKET NO. 3:16-CV-00133-VAB |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| HARLEYSVILLE PREFERRED | : | |
| INSURANCE CO., et al., | : | |
| | : | |
| Defendants. | : | APRIL 6, 2018 |

<u>**APPENDIX OF UNREPORTED AUTHORITIES CITED IN SUPPORT OF**</u>
<u>**TRUMBULL INSURANCE COMPANY'S MOTION TO DISMISS**</u>

Respectfully submitted by:

Thomas O. Farrish (ct26917)
John W. Cerreta (ct28919)
Daniel J. Raccuia (ct29535)
Jennifer L. Shukla (ct30204)
Day Pitney LLP
242 Trumbull Street
Hartford, CT  06103

Michael P. Mullins (ct29746)
Day Pitney LLP
One International Place
Boston, MA 02110

Attorneys for the Defendant,
Trumbull Insurance Company

**Case**                                                                      **Tab**

*130 Slade Condo. Ass'n, Inc. v. Millers Capital Ins. Co.*,
   No. CIV.A. CCB-07-1779, 2008 WL 2331048 (D. Md. June 2, 2008).....................................1

*Alexander v. General Insurance Co. of America*,
   Tr. of July 7, 2016 Hrg., No. 3:16-cv-00059 (SRU) (D. Conn. July 7, 2016).........................2

*Alexander v. General Insurance Co. of America*,
   No. 3:16-cv-00059 (SRU), 2017 WL 188134 (D. Conn. Jan. 17, 2017).................................3

*Chernosky v. Amica Mut. Ins. Co.*,
   No. 3:17-cv-01047 (VLB), 2018 WL 529956 (D. Conn. Jan. 24, 2018)...............................4

*Cyr v. CSAA Fire & Cas. Ins. Co.*,
   No. 3:16-cv-00085 (DJS), slip op. (D. Conn. Jan. 29, 2018) ....................................5

*England v. Amica Mut. Ins. Co.*,
   No. 3:16-cv-01951 (MPS), 2017 WL 3996394 (D. Conn. Sept. 11, 2017)............................6

*Hurlburt v. Massachusetts Homeland Insurance Co.*,
   No. 3:17-cv-00503 (VAB), 2018 WL 1035810 (D. Conn. Feb. 23, 2018) ............................7

*Jemiola v. Hartford Cas. Ins. Co.*, No. TTD-CV15-6008837-S,
   2017 WL 1258778 (Conn. Super. Ct. Mar. 2, 2017) ............................................8

*Kowalshyn v. Excelsior Ins. Co.*,
   No. 3:16-cv-00148 (JAM), 2018 WL 888724 (D. Conn. Feb. 13, 2018) ..............................9

*Liston-Smith v. CSAA Fire & Cas. Ins. Co.*,
   No. 3:16-cv-00510 (JCH), 2017 WL 6459552 (D. Conn. Dec. 15, 2017) ............................10

*Makufka v. CSAA Fire & Cas. Ins. Co.*,
   No. 3:16-cv-00567 (VLB), 2018 WL 465775 (D. Conn. Jan. 18, 2018)...............................11

*Miller v. First Liberty Ins. Corp.*,
   No. 07-1338, 2008 U.S. Dist. LEXIS 47550 (E.D. Pa. June 17, 2008)..................................12

*Musgrave v. State Farm Fire & Cas. Co.*,
   No. TTD-CV15-6009840-S, 2017 Conn. Super. LEXIS 5209 (Aug. 10, 2017) ...................13

*Perracchio v. Homesite Insurance Co.*,
   No. TTD-CV16-6010324-S, slip op. (Conn. Super. Ct. Mar. 6, 2018) .................................14

*Toomey v. Central Mutual Insurance Co.*, No. TTD-CV15-6009841-S,
   2017 WL 4159820 (Conn. Super. Ct. Aug. 3, 2017) .............................................15

*In re Trilegiant Corp.*, No. 3:12-cv-00396 (VLB),
   2014 U.S. Dist. LEXIS 42570 (D. Conn. Mar. 28, 2014).........................................16

*XL Spec. Ins. Co. v. Otto Naumann, Ltd.*, No. 12-cv-8224 (DAB),
   2015 U.S. Dist. LEXIS 45028 (S.D.N.Y. Mar. 31, 2015) .......................................................17

*Zamichiei v. CSAA Fire & Cas. Co.*,
   No. 3:16-cv-00739 (VAB), 2018 WL 950116 (D. Conn. Feb. 20, 2016)...............................18

130 Slade Condominium Ass'n, Inc. v. Millers Capital Ins. Co., Not Reported in...

Case 3:16-cv-00133-VAB Document 500-1 Filed 04/06/18 Page 4 of 190

2008 WL 2331048
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

130 SLADE CONDOMINIUM ASSOCIATION, INC.
v.
MILLERS CAPITAL INSURANCE COMPANY.

Civil Action No. CCB–07–1779.
|
June 2, 2008.

**Attorneys and Law Firms**

Vicki L. Dexter, Irwin Green and Dexter LLP, Towson, MD, for 130 Slade Condominium Association, Inc.

Mark T. Mixter, The Law Offices of Mark T. Mixter, Baltimore, MD, for Millers Capital Insurance Company.

**Opinion**

### MEMORANDUM

CATHERINE C. BLAKE, District Judge.

**\*1** Defendant Millers Capital Insurance Company ("Millers") filed a motion for summary judgment against plaintiff 130 Slade Condominium Association, Inc. ("130 Slade") on the grounds that its property insurance policy (the "Policy") does not cover the damage to plaintiff's building. 130 Slade responded by filing a cross motion for partial summary judgment on the Policy coverage issue.[1] The issues in this case have been fully briefed and a hearing was held on May 23, 2008. Because 130 Slade has satisfied the Policy coverage provisions concerning building "collapse," Millers' motion for summary judgment will be denied and 130 Slade's cross motion will be granted.

[1] Because 130 Slade's cross motion concerns only the issue of Policy coverage and not determination of damages, the motion will be construed as one for partial summary judgment.

### BACKGROUND

In October 2006, Jeannette Nesmith, a resident at 130 Slade, was in her condominium unit when she heard a loud noise sounding "like a truck had hit the building." (Pl.'s Opp. Mem. at Nesmith Aff., ¶ 3.) The next morning, Nesmith "noticed that the ceiling of [the] master bedroom had separated from the wall over the bed and there was a large crack in the wall." (*Id.* at ¶ 5.) Nesmith contacted management at 130 Slade, and Kevin Merriman, a professional engineer, was asked to inspect the property.

On October 23, 2006, Merriman visited the six story 130 Slade condominium property, and upon inspection discovered that four corner columns supporting the building "appeared to be significantly deteriorated due to rust. The northwest corner column [had] failed in compression and [had] locally buckled approximately three inches down and three inches to the south. The column movement [had] resulted in cracking of the exterior brick at the corner, and cracking of the interior finishes within the corner units above the portico." (Pl.'s Opp. Mem. at Merriman Aff., ¶ 4 .) Merriman added that to a "reasonable degree of probability" in his field, the building "was in danger of further collapse and had to be evacuated immediately." (*Id.* at ¶ 5.) According to 130 Slade, no one was allowed back into the building for two to three days until adequate shoring of the portico columns was installed and inspected by a structural engineer.

Well prior to this event, 130 Slade had entered into a commercial "Businessowners Policy" with Millers on October 6, 1999. The Policy generally provided that Millers would "pay for direct physical loss of or damage to Covered Property at the premises ... caused by or resulting from any Covered Cause of Loss." (Def.'s Reply Mem. at Policy, § IA.) To analyze the provisions at issue here, it is important to clarify the structure of this somewhat confusing Policy. Section IA generally discusses the "Coverage" of the Policy, while Section IB deals with specific "Exclusions." Section IA ¶ 5 provides for "Additional Coverages," which includes "Collapse." More specifically, the relevant Policy provisions include:

*IA ¶ 3 Covered Causes of Loss*

Risks of direct physical loss unless the loss is:

**\*2** A. Excluded in Paragraph B. "Exclusions in Section I"; or

B. Limited in Paragraph 4. "Limitations in Section I."

*IA ¶ 5 § d Additional Coverages—Collapse*

130 Slade Condominium Ass'n, Inc. v. Millers Capital Ins. Co., Not Reported in...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 5 of 190

(1) With respect to buildings:

(a) Collapse means an abrupt falling down *or* caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

(b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

(c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

(d) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, setting, shrinkage, or expansion.

(2) We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this policy, if the collapse is caused by one or more of the following:

(b) Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**IB Exclusions**

2. We will not pay for loss or damage caused by or resulting from any of the following:

**(i) Collapse**

Collapse, except as provided in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by the Covered Cause of Loss.

**(l) Other Types of Loss**

(1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

Believing its property had "collapsed" as defined by the Policy, 130 Slade promptly filed a claim with Millers. On December 18, 2006, Millers sent a letter to 130 Slade denying the claim and stating that "our investigation determined that your building has not collapsed and your damages resulted from wear and tear, rust, corrosion and deterioration. Therefore, your claim is not a covered loss and the above exclusions apply." (Pl.'s Opp. Mem. at 7.) 130 Slade subsequently filed this lawsuit.

Millers acknowledges that in insurance policies where the meaning of the term "collapse" is ambiguous, Maryland has adopted the minority rule in finding that "any serious impairment of structural integrity is a collapse within [ ] policy coverage." *Kay v. United Pacific Ins. Co.,* 902 F.Supp. 656, 659 (D.Md.1995) (citing *Government Employees Ins. Co. v. DeJames,* 256 Md. 717, 261 A.2d 747, 751 (Md.1970)). Millers argues, however, that Maryland case law does not preclude an insurance policy from explicitly defining and qualifying "collapse," whereby a structure must completely fall down or be reduced to rubble before triggering coverage. Millers then states that the Policy in question specifically defines "collapse" to require "an abrupt falling down **by** [sic] caving in of a building or any party of a building with the result that the building or part of the building can be occupied for its intended purpose." (Def.'s Mem. at 9 (emphasis added).) Critically, Millers appears to consistently misquote the Policy throughout its briefs in that the word emphasized above—"by"—is actually the word "or" in the Policy. Millers' counsel did not acknowledge this error found in both the initial motion and reply brief until specifically questioned by the court despite significant reference to the misquoting in 130 Slade's opposition brief. (*See* Pl.'s Opp. Mem. at 9.)

**\*3** Nevertheless, Millers further argues that the Policy excludes a building "... that is standing or any part of a building that is standing [as it is] not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, setting, shrinkage, or expansion." (Def.'s Mem. at 9.) Millers then points to one of the exclusion paragraphs under section IB, which disclaims loss attributable to "rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in [the] property that causes it to damage or destroy itself." (*Id.* at 10, 261 A.2d 747.) Finally, Millers asserts that because the building has continued to be occupied for its

intended use, albeit with supports, it has not collapsed under the terms of the Policy.

In addition to identifying Millers misquoting of the Policy, 130 Slade notes that the definition of "collapse" in the Policy includes both "falling down *or* caving in." 130 Slade thus contends that the building did in fact "cave in." According to 130 Slade, hidden decay caused the building to "collapse," the collapse was sudden and accidental, and the building was immediately evacuated and remained uninhabitable until after adequate shoring of the columns had been completed. (Pl.'s Opp. Mem. at 11.) 130 Slade further argues that some of the qualifications and exceptions relied upon by Millers are inapplicable to the additional coverage "collapse" provision.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine

issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### ANALYSIS

**\*4** The plain language of the Policy in question here appears to provide coverage for the "collapse" event 130 Slade suffered in October 2006. Moreover, a survey of Maryland law concerning "collapse" provisions in insurance policies reveals that while insurance companies may be able to qualify or limit collapse coverage in a policy, any remaining ambiguity will be construed against the insurer by not requiring that a building be reduced to rubble before an insured party can invoke coverage. Therefore, even if the "collapse" provision in the Policy here were ambiguous, 130 Slade would still be entitled to partial summary judgment on the coverage issue.

#### A. Maryland Law

As a threshold matter, under Maryland law, courts determine the meaning of contract language by adhering "to the principle of the objective interpretation of contracts." *ABC Imaging of Washington, Inc. v. The Travelers Indemnity Co. of America,* 150 Md.App. 390, 820 A.2d 628, 632 (Md.Ct.Spec.App.2003). Because "[a]n insurance policy is a contract between the insurer and the insured," "where the language employed ... is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Id.* at 632–33. Where, however, the language of an insurance contract is ambiguous, "construction is for the jury ... and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured." *DeJames,* 261 A.2d at 749.

130 Slade Condominium Ass'n, Inc. v. Millers Capital Ins. Co., Not Reported in...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 7 of 190

In the context of ambiguous "collapse" provisions in insurance policies, the Maryland Court of Appeals adopted the liberal minority view by rejecting a complete "falling down" definition and finding that "ambiguity [in a policy] is resolved in favor of the insured by holding that any serious impairment of structural integrity is a collapse within the policy coverage." [2] *Id.* at 751; *see also Kay,* 902 F.Supp. at 659. Millers points out, though, that *DeJames* quotes language from *Travelers Fire Ins. Co. v. Whaley,* 272 F.2d 288 (10th Cir.1959), which indicated an insurance company could expressly define or qualify what constitutes a "collapse" event. *Id.* at 752. The Millers' Policy, however, does not define "collapse" to mean "reduced to rubble," as counsel attempts to suggest. As noted, "collapse" is defined, in part, as an "abrupt falling down or caving in of a building." The meaning of this provision is discussed below.

[2]   This liberal definition of "collapse" is both logical and practical. If a "collapse" provision does not provide coverage until a building has been reduced to rubble, then the insured has a perverse incentive to await such an outcome. Of course, the insured may have a duty to mitigate damages upon finding a defect that could result in a complete collapse, which would then severely limit the likelihood that an insured could ever recover under the insurance policy. *See DeJames,* 261 A.2d at 750.

*B. The Policy*

*1. Coverage Provision*

The plain language of the Policy in question appears to provide coverage for the "collapse" event experienced by 130 Slade. Section IA paragraph 5 provides for specific additional coverages of the Policy. Subparagraph 'd' covers "Collapse," and as noted above, includes four elements that contribute to define the term. When read together, the elements appear to require an actual, abrupt, and major event that renders the building structure unusable.

**\*5**   The first element provides that a "collapse" means "[a]n abrupt falling down *or* caving in" event, which causes the building not to be occupied for its intended purpose. The ordinary meaning of "falling down" is clear, however, the Policy does not further define "caving in." Here, 130 Slade did not fall down, [3] but instead appears to have

"caved in," under its ordinary meaning, when the steel supporting column *"buckled* approximately *three inches down and three inches to the south."* (Pl.'s Opp. Mem. at Merriman Aff., ¶ 4 (emphasis added).) Indeed, even counsel representing Millers noted in his own handwriting in the margin of a copy of the Policy submitted to the court that "arguably, [130 Slade] did cave in." (Def.'s Mem. at Policy, at 4.) [4] To the extent that the "caving in" language is ambiguous, even when informed by the remaining three elements of the subsection, the court adopts the "any serious impairment of structural integrity" definition of "caving in" as used to define "collapse." *See DeJames,* 261 A.2d at 751. A building that buckles three inches down and three inches to the south during an abrupt event, which renders the building unsafe and subject to evacuation, certainly suffers a serious impairment to its structural integrity. (*See* Pl.'s Opp. Mem. at Merriman Aff., ¶ 4.)

[3]   During the hearing, Millers' counsel did not discuss the "caving in" language of the Policy provision, but rather continued to argue that 130 Slade did not "fall down." Had Millers intended to limit policy coverage to situations where a building falls down into rubble, it could have done so.

[4]   When questioned on this point at the hearing, Millers' counsel did not attempt to explain the significance of his observation.

The second and fourth elements [5] used to define "collapse" in the Policy provide that a building does not collapse if it is only "in danger of falling down or caving in," or if it shows "evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." While these provisions could be seen as narrowing a "collapse" event to when a building actually falls down into rubble, that interpretation would render the "caving in" language meaningless. Instead, when read with the first element, these elements contribute to the interpretation that "caving in" requires an actual, abrupt, and major event that renders the structure unusable for its intended purpose. This interpretation is consistent with both the Policy language and the liberal definition Maryland law attaches to arguably ambiguous "collapse" provisions. *See DeJames,* 261 A.2d at 751 (finding a "collapse" provision with similar exclusionary language to be ambiguous); *see also Weiner v. Selective Way Ins. Co.,* 793 A.2d 434, 444 (Del.Super.Ct.2002) (adopting a "serious impairment of structural integrity that connotes

130 Slade Condominium Ass'n, Inc. v. Millers Capital Ins. Co., Not Reported in...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 8 of 190

imminent collapse" definition of collapse, and noting that the plaintiffs "could not reasonably have expected the Policy to cover mere impairment of structural integrity," but also that it "would be illogical to force the Plaintiffs to wait for the actual falling down of the Property before they could make a claim").

5        The third element provides that "[a] part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building." While this element may limit the extent of damages, it does not contribute materially to the application of the "collapse" provision for the purposes of granting summary judgment on the coverage issue.

In any event, the 130 Slade building was not just in danger of collapse or merely showing evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion. Instead, when Jeannette Nesmith heard a loud noise sounding "like a truck had hit the building," the building indeed abruptly "caved in." Therefore, under either the plain language of the Policy or the definition applied by Maryland courts to otherwise ambiguous "collapse" provisions, 130 Slade is entitled to coverage under the Policy.

 **6** Immediately following the four-element definition of "collapse," the Policy states that Millers will pay for direct loss or damage caused by a building collapse when that collapse is caused by "[d]ecay that is hidden from view." Here, the rust and deterioration to the columns that caused the structural deficiency appear to have been hidden from view by cosmetic architectural finishes. (*See* Pl.'s Opp. Mem. at Merriman Aff., ¶ 4.) Millers incredibly suggests that rust is not contained within the definition of decay. Decay has been defined as "[w]asting or wearing away, disintegration; dilapidation, ruinous condition." *Norfolk & Dedham Mut. Fire Ins. Co. v. DeMarta,* 799 F.Supp. 33, 35 (E.D.Pa.1992) (quoting IV *Oxford English Dictionary,* 332 (Clarendon Press, 2d Ed.1989)). Merriman's affidavit notes that "[a]ll four columns appeared to be significantly deteriorated due to rust." (Pl.'s Opp. Mem. at Merriman Aff., ¶ 4.) It strains reason to suggest that the Policy's "hidden decay" language does not cover this damage. Indeed, little other than rust could cause decay to steel columns.

*2. Exclusion Provisions*

Millers further argues that subparagraphs 'k' and 'l' in the IB—Exclusions section of the Policy preclude coverage. Those sections exclude damage caused by "neglect" or by wear and tear, rust, corrosion, fungus, decay, deterioration, and hidden or latent defect. [6]

6        Although the parties dispute the issue, under Maryland law "the burden rests on an insurer to establish the applicability of a particular exclusion from coverage." *Warfield–Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Illinois,* 66 F.Supp.2d 681, 689 (D.Md.1999).

The exclusions Millers points to, however, do not appear to qualify the "collapse" coverage offered by the Policy. First, subparagraph 'i' of section IB excludes "collapse" from coverage, "except as provided in the Additional Coverage for Collapse" section. Thus, this subparagraph indicates that the additional collapse coverage is not modified or qualified by any of the other listed exclusions that apply instead to the general coverage provisions. Second, it would make no sense for subparagraph 'l' to modify the collapse coverage, because then the collapse coverage would include "hidden decay," while the exclusion section excludes "decay" or a "hidden defect." Millers effectively conceded at the hearing that the exclusions do not modify the "collapse" coverage when counsel indicated that had 130 Slade completely fallen into rubble, because of the column rust, the Policy's "collapse" provision would have provided coverage. [7] Therefore, the exclusion provisions relied upon by Millers do not modify the additional "collapse" coverage provided by the Policy.

7        Somehow, however, Millers continued to maintain that the exclusion did apply to 130 Slade, because the building did not completely fall down into rubble.

For the foregoing reasons, the court finds that the 130 Slade building suffered a "collapse" under both the plain language of the Policy and the liberal definition Maryland law applies to ambiguous "collapse" provisions. 130 Slade is therefore entitled to partial summary judgment on the issue of coverage.

A separate order follows.

***ORDER***

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. the defendant's motion for summary judgment (docket entry no. 31) is **DENIED;** and

**\*7**  2. the plaintiff's cross motion for partial summary judgment (docket entry no. 32) is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2331048

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - - - x
 3   APRIL M. ALEXANDER, ET AL      :   No. 3:16-cv-00059(SRU)
                                    :   915 Lafayette Boulevard
 4                    Plaintiffs    :   Bridgeport, Connecticut
                                    :
 5            vs.                   :
     GENERAL INSURANCE COMPANY OF   :   July 7, 2016
 6   AMERICA                        :
                                    :
 7                    Defendant     :
      - - - - - - - - - - - - - - - x
 8

 9                      MOTION HEARING

10   B E F O R E:

11       THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

12   A P P E A R A N C E S:

13       FOR THE PLAINTIFFS:

14           LAW OFFICE OF MICHAEL D. PARKER
                 One Monarch Place
15               Suite 2200
                 Springfield, Massachusetts  01144-2220
16           BY:  JEFFREY R. LINDEQUIST, ESQ.

17       FOR THE DEFENDANT:

18           HOWD & LUDORF, LLC
                 65 Wethersfield Avenue
19               Hartford, Connecticut  06114-1190
             BY:  KIERAN W. LEARY, ESQ.
20

21

22

23               Sharon L. Masse, RMR, CRR
                 Official Court Reporter
24               915 Lafayette Boulevard
               Bridgeport, Connecticut  06604
25                 Tel: (860)937-4177
```

```
 1                    (Whereupon, the following proceedings commenced
 2    at 11:14 a.m.)
 3                    THE COURT:  Good morning.  We're here in the
 4    matter of Alexander vs. General Insurance Company of
 5    America.  Could I have appearances, please.
 6                    MR. LINDEQUIST:  Jeff Lindequist here on behalf
 7    of the plaintiffs, Ms. Alexander and Mr. Walker.
 8                    MR. LEARY:  Kieran Leary on behalf of General
 9    Insurance Company of America.
10                    THE COURT:  All right, very good.  And we're
11    here on the motion to dismiss the complaint.
12                    So let's start with the question of what the
13    policy defines as a collapse.  Mr. Lindequist, how has the
14    complaint alleged a collapse within the meaning of the
15    applicable policy?
16                    MR. LINDEQUIST:  Well, Your Honor, we've alleged
17    that the loss has occurred, that it's covered by the
18    policy, and that there's been a breach.  I have more
19    thoughts on the matter, and I could certainly add
20    allegations to the complaint.  We've addressed this issue
21    recently more often as more insurance companies have
22    adopted this definition of collapse or similar definitions
23    of collapse.  In fact, I just submitted an opposition on a
24    summary judgment on Tuesday dealing with the definition of
25    collapse.
```

1            And where this particular Mottes concrete

2    problem, which is sweeping the state by storm, where I

3    think it fits into the collapse language is in this way.

4    So the base -- where we start with the definition of

5    collapse is a falling down or caving in.

6            THE COURT:  Well, abrupt falling down or caving

7    in.

8            MR. LINDEQUIST:  Right, and so I guess first

9    falling down or caving in.  Now, a caving in has to be

10   something other than a falling down or it would be

11   superfluous, and one of the conditions that is very common

12   in these cases is bulging and bowing of walls, which our

13   engineer has opined suggests it's a failure mechanism that

14   suggests that the wall has yielded or has submitted to the

15   lateral pressure of the earth.  The term "caving in" has

16   been defined by a number of dictionaries to mean yielding

17   or submitting to pressure, and that's exactly what has

18   happened --

19            THE COURT:  But --

20            MR. LINDEQUIST:  -- in a number of these homes.

21            THE COURT:  Okay, but with respect to this

22   policy and this definition and this complaint, you have an

23   exclusion from the definition of collapse for cracking,

24   bulging as you just mentioned, bending, leaning.

25            MR. LINDEQUIST:  But if the -- if the exclusion

1    is contrary to the term "caving in" in its ordinary

2    meaning, then I would say that the policy is ambiguous and

3    needs to be construed against the insurer and in favor of

4    coverage.

5              THE COURT:  Okay, but how is bulging

6    inconsistent with an abrupt caving in?

7              MR. LINDEQUIST:  Well, first off, as far as

8    abrupt goes, well, I suppose I could -- if "caving in"

9    means submitting to pressure, and the only way that a wall

10   can submit to pressure is by bulging, then it is

11   inconsistent and superfluous.

12             THE COURT:  Well, no, it's a question of

13   temporal.  In other words, the bulging wall may eventually

14   cave in.

15             MR. LINDEQUIST:  Or it has caved in if "caving

16   in" means, as it is defined to mean, submitting to

17   pressure, which is what has happened.

18             THE COURT:  Okay.  The problem is, it hasn't

19   fully submited to pressure such that the building or part

20   of the building cannot be occupied for its intended

21   purpose.

22             MR. LINDEQUIST:  Well, that's a different

23   question, Your Honor.  Now --

24             THE COURT:  Well, it's not because that's part

25   of the definition of collapse.

```
 1              MR. LINDEQUIST:  Certainly.  Now, we've alleged
 2    that the walls are not behaving as they were designed and
 3    intended --
 4              THE COURT:  Right.
 5              MR. LINDEQUIST:  -- and that the property cannot
 6    be occupied for its intended purpose.  And that's not just
 7    a conclusory allegation as was asserted by the defense.
 8    That's based on our experience with this condition.  A
 9    number of these homes have been condemned.  A number of
10    these homes have --
11              THE COURT:  Okay, but --
12              MR. LINDEQUIST:  -- required shoring to remain
13    occupied, which is what happened in both the Malbco
14    case --
15              THE COURT:  But we're not talking about a number
16    of these homes.
17              MR. LINDEQUIST:  Sure.
18              THE COURT:  We're talking about the plaintiffs'
19    home.
20              MR. LINDEQUIST:  Well, it may be that they're
21    subject to condemnation; the building officials just
22    haven't been there.
23              THE COURT:  Well, but does that help you?  Until
24    it's condemned, does it help you?
25              MR. LINDEQUIST:  I mean, it either is fit or
```

1    unfit for human habitation.  The fact that an inspector

2    hasn't made it to the property doesn't change the

3    condition.  There's been no analysis of the structural

4    integrity by the defense.

5           THE COURT:  Okay.  So why shouldn't this

6    complaint be dismissed without prejudice to refiling if

7    and when the walls fall in?

8           MR. LINDEQUIST:  Well, that's another

9    interesting question, and I haven't briefed this issue,

10   but I -- I have a number of these cases with a number of

11   different insurers, and I was speaking with -- and this is

12   somewhat of a tangent and I apologize for that -- I was

13   speaking with a representative from the Hanover Insurance

14   Company, and they're in the process of analyzing coverage,

15   and they brought to my attention something that I was not

16   aware of, and that is that the Insurance Department has

17   ordered that no carrier can drop the insureds because of

18   this Mottes condition.  And so if Safeco -- General

19   Insurance Company, which is a Safeco brand, can't drop

20   them, then I suppose we could certainly wait for the walls

21   to fall in, but what does that benefit?  I mean, that goes

22   back to the *Beach* analysis where the Supreme Court said

23   why would we want to let a house fall down?  Why not find

24   coverage without putting homes and lives in peril?

25           And so if Safeco can't drop them, and to the

1    extent that I think there's a valid argument that I could

2    perhaps with additional allegations set forth that a

3    caving in is -- that a collapse as defined by the policy

4    has occurred due to various ambiguities, that the abrupt

5    nature, the temporal quality can't be attributed to hidden

6    decay, which I've cited a case for that proposition, but

7    also I've since found a Second Circuit opinion which

8    suggests that where there's decay as a peril, the loss

9    can't be sudden or else it's inconsistent.  And so why

10   wait for that to happen?  Why not allow them to preserve

11   their home and prevent the loss of property and potential

12   danger to the occupants when it's either caved in or will

13   cave in in the near future?

14        THE COURT:  Well, okay, but what you're making

15   is basically a policy argument for the insurance company

16   to resolve the situation.

17        MR. LINDEQUIST:  That's always my hope.

18        THE COURT:  Sure.  Well, what I'm dealing with,

19   though, is a motion to dismiss saying that the allegations

20   of the complaint don't state a claim because the policy,

21   which is referred to in the complaint, doesn't cover the

22   situation alleged.

23        MR. LINDEQUIST:  And perhaps that was inartful

24   pleading, Your Honor.  I think that I, if given -- if it

25   would please the Court, I'm happy to resubmit with some of

1    the additional factual elements that I'm familiar with in

2    these cases, such as the bulging and the ambiguity between

3    the falling down or caving in that would better fit the

4    situation.

5             THE COURT:  Well, a quick survey of the cases

6    suggests that this definition has been found not to bar

7    coverage only when there's been some event, a shifting, a

8    breaking, and that isn't what you're alleging here.

9             MR. LINDEQUIST:  Well, in the *Malbco* case it was

10   more of a gradual loss.  I believe it was due to rot or at

11   least that was a contributing factor, unless I'm -- unless

12   I'm thinking of a different case that I read and didn't

13   cite.  I mean, there are other -- there are other opinions

14   other than the four that we cited, those are just the

15   earliest, but since there have been dozens of other cases

16   applying the --

17            THE COURT:  Right.

18            MR. LINDEQUIST:  -- definition to other factual

19   scenarios.

20            THE COURT:  *Malbco*, M-a-l-b-c-o says:  "If parts

21   of a building abruptly fall or cave in to any degree such

22   that they cannot be occupied for their intended purposes

23   under subsection (a), then a collapse has occurred."

24            MR. LINDEQUIST:  And it may be that I'm just

25   thinking of the factual scenario earlier on, and I

1    apologize if I misremembered it, but I believe it was

2    trusses that had -- roof trusses that had decayed.

3              THE COURT:  That had broken.

4              MR. LINDEQUIST:  Due to decay.

5              THE COURT:  And portions of the building fell a

6    few inches.

7              MR. LINDEQUIST:  Well, I mean, to an extent a

8    bulge is a movement that has occurred in a wall, which may

9    very well, I believe, constitute a caving in, if it is --

10   if caving in is to be found to mean the submission to a

11   pressure or yielding.

12             THE COURT:  Yes.  Well, in *Malbco* the trusses

13   broke --

14             MR. LINDEQUIST:  Okay.

15             THE COURT:  -- and there was a shifting, in

16   effect.  It was just a few inches, but it was a shifting.

17             MR. LINDEQUIST:  Right.

18             THE COURT:  Well, here --

19             MR. LINDEQUIST:  Well, as the walls bulge, they

20   break apart.  I mean, that's the --

21             THE COURT:  But they haven't yet.

22             MR. LINDEQUIST:  No, they have.  In this -- in

23   this instance, as they shift, the cracks expand.  In the

24   Mottes cases in general -- and this case involves more

25   severe cracking -- there is a breaking apart of the

1    concrete.  It's just -- it's just consistent with the

2    cracking lines, and as the movement occurs and the

3    shifting, those cracks are exacerbated.  I mean, the

4    concrete is in a very real sense broken in all planes, not

5    just what you can see on the surface but running

6    vertically within the walls we found as they removed core

7    samples.  I mean, the concrete is, at the end of the day,

8    broken.

9              THE COURT:  Right.  But how has a collapse

10    occurred under the definition of the policy?

11              MR. LINDEQUIST:  By that inward movement,

12    manifesting as a bulge.

13              THE COURT:  But bulging, again, is expressly

14    excluded from the definition.

15              MR. LINDEQUIST:  Well, yes, and I think that

16    was -- the more overarching part of that analysis that

17    *Malbco* and those other cases point to, they said, Listen,

18    you have a four-part definition, and in some cases that

19    also includes sagging, bulging as being excluded, but if

20    there's been a caving in as defined at the beginning, even

21    if it manifests as bulging and sagging, it's inconsistent

22    internally.  I mean, correct me if I'm wrong, but I

23    believe the holding in *Malbco* was that the abrupt falling

24    down or caving in is the definition of collapse and that

25    those prongs refine the definition, and to the extent that

1    they don't match up with what is a condition constituting

2    a falling down or caving in, it's internally inconsistent

3    and has to be applied against the drafter of the policy.

4              So if a caving in is found to be the submission

5    or yielding of a wall to lateral pressure, if that's a

6    bulging, well, that just makes the definitions

7    inconsistent --

8              THE COURT:  No, but --

9              MR. LINDEQUIST:  -- and ambiguous.

10             THE COURT:  Okay, some cavings in, within your

11   broad definition, are bulging.  Bulging is excluded.  But

12   the fact that bulging is excluded doesn't exclude all

13   cavings in.

14             MR. LINDEQUIST:  Right.

15             THE COURT:  So what they're covering is the

16   cavings in that are not bulging, and you haven't brought

17   yourself within the scope of that.

18             MR. LINDEQUIST:  But what could -- what, in a

19   concrete wall, could constitute a caving in that isn't a

20   bulge?  Otherwise, it would have to fall to the ground.

21             THE COURT:  No.  There could have been a bulge.

22   If the bulge eventually falls in, caves in, it doesn't

23   matter that the caving in used to be a bulge.  But you

24   don't have a falling down of the wall; you have a bulging

25   of the wall.  And until it falls down, you don't have an

1    abrupt collapse.

2            MR. LINDEQUIST:  I guess -- I guess that's where

3    I find the terms "falling down" in contrast to "caving in"

4    to be --

5            THE COURT:  Well, it's not a contrast.  It's an

6    abrupt falling down or caving in.

7            MR. LINDEQUIST:  Right, but a concrete wall will

8    either fall to the ground or bulge or sag, so --

9            THE COURT:  Okay.  Once it falls in, there's

10   coverage.

11           MR. LINDEQUIST:  Okay, but then that potentially

12   would render the term "caving in" ambiguous.

13           THE COURT:  How?

14           MR. LINDEQUIST:  Well, caving in has to be

15   something other than or less than a falling down.

16           THE COURT:  Why?

17           MR. LINDEQUIST:  Otherwise, it wouldn't --

18           THE COURT:  It can be both a falling down and a

19   caving in.

20           MR. LINDEQUIST:  Right, but the policy doesn't

21   say "and caving in;" it says "or caving in."

22           THE COURT:  Right, either one.  Either one can

23   be a collapse.

24           MR. LINDEQUIST:  Sure, but I guess -- I guess

25   where I think the ambiguity lies is that if you define a

```
 1   falling down -- a caving in as completely falling in, then
 2   how is that different from a falling down?
 3              THE COURT:  It doesn't have to be different.  It
 4   can be either one.  It's "or."
 5              MR. LINDEQUIST:  Yes, but --
 6              THE COURT:  So you get coverage if it either
 7   falls down or it caves in.
 8              MR. LINDEQUIST:  Okay, but I guess --
 9              THE COURT:  Abruptly.
10              MR. LINDEQUIST:  Abruptly.  But I would submit
11   unless it's caused by decay, because decay cannot occur
12   abruptly.
13              THE COURT:  But decay isn't -- you're not
14   getting coverage for decay.  You're getting coverage for
15   collapse.
16              MR. LINDEQUIST:  But the collapse has to be
17   caused by one of the enumerated perils, one of which is
18   the cave that is hidden from view.  Another is use of
19   improper materials, insect damage.
20              THE COURT:  So here we go.  Let's use insect
21   damage.  There's termites in the house.  No collapse.
22   They're eating away; every day they're eating away.  No
23   collapse.  They keep eating away.  Finally, they eat
24   enough that the beam fails.
25              MR. LINDEQUIST:  Right.
```

1          THE COURT:  Now there's coverage.  Now you have

2    a collapse or falling in.  The fact that it was caused by

3    termites and it was a slow process doesn't mean you didn't

4    have an abrupt collapse.  You did, when the beam failed

5    and there was literally a falling of the beam, a failure

6    of the beam.

7          MR. LINDEQUIST:  But what if when that beam

8    becomes substantially compromised and it begins to shift

9    and move --

10          THE COURT:  No coverage.

11          MR. LINDEQUIST:  -- is that a caving in, though?

12          THE COURT:  No, it's not.

13          MR. LINDEQUIST:  Okay.  I mean, I just -- if

14    "caving in" is to mean the same thing as "falling down,"

15    doesn't that just render the terms superfluous?

16          THE COURT:  They don't mean the same thing, and

17    if they did, it's of no help to you.

18          MR. LINDEQUIST:  Unless the caving in has

19    occurred.

20          THE COURT:  If an abrupt caving in has occurred

21    that is something other than a bulging, sagging, bending,

22    leaning, settling, shrinkage, cracking or expansion,

23    you're in good shape.  We don't have that allegation here.

24          MR. LINDEQUIST:  Well, I believe I can make that

25    allegation in good faith based on the ambiguity of the

1    policy language.

2              THE COURT:  But you haven't told me that

3    anything has happened to the concrete wall other than a

4    bulging.

5              MR. LINDEQUIST:  They've broken apart, they've

6    cracked, they've shifted.

7              THE COURT:  Right.  Cracking is not good.

8    Bulging is not good.  Sagging is not good.

9              MR. LINDEQUIST:  They're not really --

10             THE COURT:  Settling is not good.

11             MR. LINDEQUIST:  Well, they haven't settled.  I

12   mean, it's the opposite of settling.  They've grown.

13   And --

14             THE COURT:  Okay, they've bulged.  They've

15   expanded.  That's no good.  You're premature.  When the

16   basement collapses, caves in, falls down, you've got

17   coverage, but they wrote it out of the policy, presumably

18   knowing about this issue.

19             MR. LINDEQUIST:  I think that's exactly why they

20   wrote it --

21             THE COURT:  Right.

22             MR. LINDEQUIST:  -- out of the policy.

23             THE COURT:  Right.  So what I haven't heard is

24   how you're going to amend the complaint to allege either a

25   falling down -- an abrupt falling down or an abrupt caving

1    in.

2              MR. LINDEQUIST:  Well, I mean, I think that I

3    can -- I mean I think that, as I said, yielding fits under

4    the definition of a caving in.  I believe there's case law

5    to support that, and perhaps I could submit a brief brief

6    on that point.

7              THE COURT:  We've looked at a lot of cases, and

8    there really is -- with this definition, it's not really

9    ambiguous.  That's the problem.

10             MR. LINDEQUIST:  Well, the cases have found it

11   ambiguous and internally inconsistent.  I mean --

12             THE COURT:  Few have found it ambiguous.  Most

13   have found it to be clear.  And it certainly is not

14   ambiguous when there hasn't been any arguably abrupt

15   falling in or caving -- falling down or caving in.  So

16   there isn't a beam that's fallen.  There isn't a wall

17   that's fallen.  There isn't a section that's caved in.

18   What you're telling me is the wall isn't a good wall

19   anymore.

20             MR. LINDEQUIST:  That's certainly true.

21             THE COURT:  It's bulging, it's cracking, it's

22   decaying.

23             MR. LINDEQUIST:  It has failed.

24             THE COURT:  It is failing.

25             MR. LINDEQUIST:  Well, no, I mean the

1    engineering opinion is that where there has been a

2    bulge --

3              THE COURT:  Right.

4              MR. LINDEQUIST:  -- or a yielding, that it has

5    failed --

6              THE COURT:  Well, okay --

7              MR. LINDEQUIST:  -- as opposed to failing, and

8    that's why I believe that it should be construed into the

9    term "caving in."  It's been a movement that has caused a

10   failure of the wall.  It's not a falling down, but they're

11   contrasting terms.

12             THE COURT:  Okay.  I'm not hearing you say that

13   there are facts in this case that come within this

14   definition of collapse.  Are you going to be able to say

15   the basement wall fell down?

16             MR. LINDEQUIST:  No, it hasn't fallen down.

17             THE COURT:  Caved in?

18             MR. LINDEQUIST:  Well, I believe it's caved in.

19             THE COURT:  One day they came downstairs, and

20   there was rubble all over the basement?

21             MR. LINDEQUIST:  No, that I can't say.  I

22   believe that it fits the definition of "caving in" in that

23   it has yielded and submitted to lateral pressure.

24             THE COURT:  Constituting bulging, which is

25   excluded.

```
 1              MR. LINDEQUIST:  Bowing is another way of
 2   describing it.
 3              THE COURT:  Did this happen abruptly?  Was it a
 4   perfect wall on Thursday and a bulged-out wall on Friday?
 5              MR. LINDEQUIST:  That's difficult to say.
 6              THE COURT:  Right, you haven't said it.
 7              MR. LINDEQUIST:  No, that's difficult to say.
 8              THE COURT:  Right.
 9              MR. LINDEQUIST:  I mean, I think as a wall
10   submits to pressure, I think there's at least some
11   conceptual way of saying that it was a number of small,
12   smaller definite instances.  I mean, the wall doesn't give
13   completely at once but probably by degrees as it manifests
14   the bulge.
15              THE COURT:  Yes, right.  It wasn't -- but it
16   doesn't sound like an abrupt bulge.  This is not a bulge
17   that occurred overnight.  One night --
18              MR. LINDEQUIST:  Well, I don't believe so,
19   knowing what I know about the condition, but, I mean, it's
20   certainly not the case that they've observed it happening
21   over time.  They found it and it was, to their knowledge,
22   not there before.  But --
23              THE COURT:  Well, okay.  All right.  Let me hear
24   briefly from Mr. Leary.
25              MR. LEARY:  Yes, Your Honor.
```

  1            THE COURT:  What's your position on all of this?

  2            MR. LEARY:  Right, my position is that an abrupt

  3    event has not occurred, it hasn't fallen or caved in, and

  4    even if Attorney Lindequist's claims could state that,

  5    they can't say that it cannot be occupied for its intended

  6    purpose.  It's currently occupied by the plaintiffs.  The

  7    public policy argument about the plaintiffs shouldn't be

  8    placed in a position where they have to wait for a life

  9    endangerment type of event to occur was briefed and

 10    rejected in the *Rector St.* opinion that I cited where they

 11    said it was unpersuasive that public policy should, you

 12    know, promote safety by not encouraging the policy owners

 13    to risk death or injury.

 14            I'd also note that if a bulge -- excuse me, if a

 15    falling in or a caving in hasn't occurred yet, the

 16    plaintiffs have duties under their policy to protect the

 17    property from further damage.  They have neglect

 18    provisions in the policy which would similarly void

 19    coverage.  So if we're at a point where an abrupt falling

 20    down or caving in hasn't occurred, the plaintiffs or

 21    policyholders are required under the policy to take

 22    affirmative steps now that they know of the supposed

 23    condition to protect the property from incurring any

 24    further damage or from a collapse occurring.

 25            It's our stance, as we said, this lawsuit is

1   premature, and I think not only is it premature at best,

2   but when you read the allegations, this is a progressive

3   loss scenario which will never fit the definition of an

4   abrupt event.

5           THE COURT:  All right.  Mr. Lindequist, anything

6   else?

7           MR. LINDEQUIST:  Yes, if I may be heard briefly

8   on the neglect provisions.  I think the argument is

9   somewhat dubious.  They could potentially salvage through

10  wooden shoring the upper portion of the house, but the

11  policy requires the insured to use reasonable means to

12  protect the property.  There's no means, reasonable or

13  unreasonable, to save these walls, and that's part of the

14  reason why I think why wait?  I mean, the *Rector St.*

15  opinion may have said it's a dubious policy argument, but

16  the Connecticut Supreme Court has put its weight behind

17  the idea that we shouldn't let houses fall down.

18          THE COURT:  Well, fair enough, but I've got a

19  motion to dismiss that says this is outside the coverage,

20  and what you're saying is it would be really great if

21  insurance companies would cover noncovered losses to

22  minimize the extent of the eventual loss.  I don't know

23  that I can do that.  I don't know that I can impose a

24  requirement to cover a loss outside the coverage of the

25  policy.

1          MR. LINDEQUIST:  It will ultimately be covered.

2    I mean, that's the -- there will be an abrupt falling down

3    at some point in time.  There's no way to stop this

4    condition.

5          THE COURT:  Right.

6          MR. LINDEQUIST:  And --

7          THE COURT:  And at that point, if you've got an

8    insurance policy, you'll have a collapse.

9          MR. LINDEQUIST:  I just, as I say, I see that

10   it's wasteful to wait.

11         THE COURT:  Well, that's, again, a policy

12   argument.  It's not one that I can take up really.

13         Okay.  Well, do either of you have further

14   argument?

15         MR. LINDEQUIST:  Unless there are other

16   questions about other portions of the comments that I

17   made, I would rest on the papers.

18         THE COURT:  Okay.  Do you dispute that if the

19   breach of contract claim fails, the CUTPA/CUIPA claims

20   fail?

21         MR. LINDEQUIST:  Not strenuously.  I mean, I

22   think there may be some limited scope of bad faith in the

23   manner in which they were treated by the insurance

24   company, but I understand it's a tough road to follow.

25         THE COURT:  Okay.

1          MR. LEARY:  Just with regard to bad faith, Your

2    Honor, the Connecticut Supreme Court in *Capstone* said that

3    absent coverage there could be no bad faith, so I dispute

4    that last point; but other than that, I rely on the papers

5    and what's been argued previously today.

6          THE COURT:  All right.

7          Okay, I'm going to go ahead and rule at this

8    time.  I'm going to grant the motion to dismiss in its

9    entirety.  The coverage issue I think is the one that's

10   taken up the bulk of the argument today, and that's, I

11   think, clearly barred; that is, coverage is barred by the

12   terms of the collapse provision in the policy, which

13   requires, defines "collapse" to mean an abrupt falling

14   down or caving in of a building or any part of a building

15   with the result that the building or part of the building

16   cannot be occupied for its intended purpose, and then

17   there are three little subparts, the first of which says

18   that a building or a part of a building in danger of

19   falling down or caving in is not considered to be in a

20   state of collapse.  The second doesn't really apply.  And

21   the third says:  A building or any part of a building that

22   is standing is not considered to be in a state of collapse

23   even if it shows evidence of cracking, bulging, sagging,

24   bending, leaning, settling, shrinkage or expansion.

25          So there's several problems for the plaintiff

1    given the allegations in the complaint here.  The first is

2    that there has been no abrupt falling down or caving in of

3    a building or any part of a building for which coverage

4    applies, and there's not been a clear allegation that any

5    building or part of a building cannot be occupied for its

6    intended purpose.

7              Even if that had been met, what we have here is

8    a building that is in danger of falling down, and that is

9    expressly excluded from collapse coverage; and, similarly,

10   there has been cracking, bulging, etc.  Those situations

11   are also excluded by the third provision of, that is,

12   11(a)(3).  And so I just don't see any room -- any wiggle

13   room here.  In other cases with different policy language

14   I have found the term "collapse" to be ambiguous, but here

15   the term has been expressly defined in a way that

16   eliminates coverage under the allegations of the

17   complaint, both because there's not any allegation of any

18   abrupt situation that occurred, there's not an allegation

19   that the home or a part of the home has either fallen down

20   or caved in, there is an allegation that it's in danger of

21   falling down or caving in, and there's allegations, in

22   effect, of cracking and bulging.  So there really is not

23   any ambiguity in the definition, at least as it applies to

24   the allegations of this complaint, and coverage does not

25   exist under the express terms of the policy.

1          Because the coverage claim fails, the claims for

2    breach of implied covenant of good faith and fair dealing

3    and the statutory claims, CUTPA/CUIPA, also fail.  Quite

4    simply, without coverage there can't be bad faith or a

5    violation of either of those consumer statutes.

6          So it's really the failure of the allegations in

7    the complaint to come within the express unambiguous

8    definition in the policy of the term "collapse" that

9    prevents coverage and prevents the other claims from

10   stating a cause of action.

11         Accordingly, the complaint is dismissed, and the

12   file will be closed.  I don't see a reason to permit a

13   repleading here because I haven't been advised that there

14   are allegations that were not made that could have been

15   made that would have brought the plaintiff's claims within

16   the scope of the collapse coverage of the policy, and

17   accordingly, any effort to amend the complaint would be

18   futile.

19         I do not intend to write on this case, but I am

20   happy to try to clarify or expand upon that ruling if

21   either of you would like me to do so at this time.

22         MR. LINDEQUIST:  No, no thank you, Your Honor.

23         MR. LEARY:  No thank you, Your Honor.

24         THE COURT:  All right.  Well, best of luck to

25   all of you.  We'll stand in recess.

1              (Whereupon, the above matter was adjourned at

2   11:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.


               July 19, 2016


               /S/ Sharon L. Masse
          Sharon L. Masse, RMR, CRR
            Official Court Reporter
            915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
              Tel: (860)937-4177

2017 WL 188134
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

April Alexander and Joseph Walker, Plaintiffs,
v.
General Insurance Company of America, Defendant.

No. 3:16-cv-59 (SRU)
|
Signed 01/17/2017

**Attorneys and Law Firms**

Michael D. Parker, Jeffrey R. Lindequist, Law Office of
Michael D. Parker, Springfield, MA, for Plaintiffs.

Kieran W. Leary, Philip T. Newbury, Jr., Howd & Ludorf,
LLC, Hartford, CT, for Defendant.

**Opinion**

## ORDER

Stefan R. Underhill, United States District Judge

*1 On January 14, 2016, April Alexander and Joseph
Walker ("plaintiffs") filed an action against their
homeowner's insurance company, General Insurance
Company of America ("General Insurance"), alleging
various state law claims arising out of an insurance
coverage dispute between the parties. Plaintiffs'
allegations stem from the fact that General Insurance
failed to provide coverage for the deterioration of the
basement walls of plaintiffs' home. On July 7, 2016, I
granted General Insurance's motion to dismiss (doc. # 21),
and plaintiffs filed a motion for reconsideration (doc. #
23) on July 21, 2016.

For the reasons set forth below, I deny the motion for
reconsideration.

## I. Background

April M. Alexander and Joseph Walker own and occupy
the residential property at 23 Muddy Brook Road,
Ellington, Connecticut. The residence was constructed in
1984 and has been insured by General Insurance since
Alexander purchased the property in July 2013.

In May of 2015, plaintiffs discovered—through their
realtor—a series of horizontal and vertical cracks in
their basement walls. Upon further inquiry, plaintiffs
discovered that the form of "pattern cracking" found in
the basement walls of their home was caused by a chemical
compound found in walls constructed in the late 1980s
and the early 1990s with concrete most likely from the J.J.
Mottes Concrete Company. The result of the condition
is that the home's walls are in danger of falling in, which
would then cause the entire home to fall into the basement.

In June 2015, plaintiffs notified General Insurance of
the defect in their basement walls and made a claim for
coverage in accordance with the terms of their insurance
policy. That same month, General Insurance denied
plaintiffs' claim for coverage.

The parties agree that the policy would only cover the
condition if it put the home in a state of "collapse," as
defined by the policy. Under the policy's definition, a
"collapse" is "an abrupt falling down or caving in of a
building or any part of a building...." Exhibit A at 14 (doc.
# 1-1). Furthermore, the policy states that a "building or
any part of a building that is standing is not considered
to be in a state of collapse even if it shows evidence
of cracking, bulging, sagging, bending, leaning, settling,
shrinkage or expansion." *Id.*

On July 7, 2016, I granted General Insurance's motion
to dismiss on the ground that the policy's language
expressly excludes coverage for cracking in the basement
walls. I held that the policy's definition of "collapse"
was unambiguous and expressly did not cover the alleged
"cracking" and/or "bulging" of the plaintiffs' basement
walls. On July 21, 2016, plaintiffs' filed a motion for
reconsideration in which they set forth substantially the
same arguments they raised at oral argument on the
motion to dismiss.

## II. Standard of Review

The standard for granting motions for reconsideration
is strict; motions for reconsideration "will generally be
denied unless the moving party can point to controlling
decisions or data that the court overlooked—matters, in
other words, that might reasonably be expected to alter
the conclusion reached by the court." *Shrader v. CSX
Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Motions
for reconsideration will not be granted where the party

merely seeks to relitigate an issue that has already been decided. *Id.* The three major grounds for granting a motion for reconsideration in the Second Circuit are: (1) an intervening change of controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice. *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478).

**\*2** The primary function of a motion for reconsideration "is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence." *LoSacco v. City of Middletown*, 822 F. Supp. 870, 876 (D. Conn. 1993), *aff'd*, 33 F.3d 50 (2d Cir. 1994). A court is permitted to reconsider its ruling if such ruling overlooked controlling data or law that, had it been considered, would have altered the court's conclusion. *Shrader*, 70 F.3d at 257.

### III. Discussion

Plaintiffs have failed to meet the high bar that would justify reconsideration of my prior ruling. Plaintiffs have not identified any controlling decision that I overlooked, any new evidence that would affect my prior ruling, or any clear error or manifest injustice in need of correction. Rather, plaintiffs' motion merely attempts to relitigate arguments that were considered and rejected on oral argument on the motion to dismiss. To the extent that plaintiffs raise new arguments, such arguments are without merit and not supported by controlling authority. Accordingly, the motion for reconsideration must be denied.

Plaintiffs' motion for reconsideration raises four issues. For the purposes of the motion for reconsideration, however, I will only address the first issue: whether a "collapse," as defined by the policy, occurred. I need not address plaintiffs' additional arguments because they do not alter the conclusion—which I decline to reconsider —that General Insurance is not bound to cover the alleged damage to plaintiffs' home because no "collapse" occurred.

Plaintiffs seek to have me reconsider my ruling that the policy's definition of "collapse" is ambiguous. In support of their argument, plaintiffs cite noncontrolling case law —most of which I have already considered and rejected as

either not on point or unpersuasive. *See* 7/7/2016 Motion Hr'g Tr. ("Tr") at 8-10, 16 (doc. # 22).

Plaintiffs' additional cited cases do not point to controlling authority nor do they identify any cause for me to reconsider my prior ruling because they do not add to plaintiffs' arguments I considered at oral argument. Tr. at 11-18. At oral argument, plaintiffs' attempted to argue that the disjunctive use of the terms "falling down" and "caving in" established that there must be something less than a complete falling down. Tr. at 3. I noted that I did not disagree with that proposition. *Id.* Rather, I held that plaintiffs' failed to allege that either a falling down *or* caving in had occurred. Tr. at 17-18. At one point, plaintiffs' counsel even admitted that the policy had been written to expressly exclude what had occurred. Tr. at 15.

Plaintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are "cracking" or—alleged at oral argument— that they are "bulging." Both conditions are expressly excluded under the definition of the policy and it is clear that no collapse has occurred. *See Sports Domain, LLC v. Max Specialty Ins. Co.*, 2011 WL 6989864, at *2 (Conn. Super. Ct. Dec. 19, 2011) (sagging roof not "collapse" because "sagging" was explicitly excluded in definition of collapse); *Squairs v. Safeco Nat. Ins. Co.*, 136 A.D.3d 1393, 1394 (N.Y. App. Div.), *leave to appeal denied*, 27 N.Y.3d 907 (2016) (no collapse occurred if no abrupt falling down or caving in occurred; state of "imminent collapse" is not "collapse"); *Miller v. First Liberty Ins. Corp.*, 2008 WL 2468605, at *4 (E.D. Pa. June 17, 2008) (no collapse when "no evidence of a sudden and entire falling down or caving in of a building or any part of a building"); *Rector St. Food Enterprises, Ltd. v. Fire & Cas. Ins. Co. of Connecticut*, 35 A.D.3d 177, 178 (2006) ("two-to three-inch-wide cracks in its facade ... sinking, out of plumb, and leaning" do not constitute "abrupt collapse"). Plaintiffs' have not cited to controlling authority or additional evidence that would cause met to reconsider such ruling.

### IV. Conclusion

**\*3** In sum, plaintiffs have not presented any evidence or controlling case law that would cause me to reconsider my prior decision, nor have they identified manifest injustice in need of correcting. For the foregoing reasons, plaintiffs' motion for reconsideration (doc. # 23) is denied.

So ordered.

**All Citations**

Slip Copy, 2017 WL 188134

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2018 WL 529956
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Gail M. CHERNOSKY, Plaintiff,
v.
AMICA MUTUAL INS. CO., Defendant.

3:17-CV-01047 (VLB)
|
Signed 01/24/2018

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiff.

Anthony J. Antonellis, Brendan L. Labbe, John McCormack, Sloane and Walsh, LLP, Boston, MA, Michael S. Antonellis, Sloane & Walsh, LLP, Vernon, CT, for Defendant.

**Opinion**

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION TO DISMISS**

Hon. Vanessa L. Bryant, United States District Judge

I. Introduction

**\*1** Before the Court is Defendant Amica Mutual Insurance Company's (Defendant) Motion to Dismiss Plaintiff's Complaint. [Dkt. 12 (Motion).] Plaintiff Gail Chernosky (Plaintiff) has opposed the Motion. [Dkt. 15 (Opposition).] For the reasons discussed below, Defendant's Motion is GRANTED.

II. Factual Background

The facts alleged in the Amended Complaint [Dkt. 1 (Complaint) ] are taken as true and construed in the light most favorable to Plaintiff for the purpose of a motion to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Plaintiff owns and resides at 372 Bebbington Road, Ashford, Connecticut (the Property). Complaint at ¶ 1. Defendant is incorporated and has a primary place of business in Rhode Island. *Id.* at ¶ 2. Plaintiff made all required payments for a homeowner's insurance policy covering the Property from 2006 forward (the Policy). *Id.* at ¶¶ 3-4.

Plaintiff first observed visible cracking patterns in the Property's concrete on an unspecified date, and had her basement inspected by a structural engineer on January 6, 2016. *Id.* at ¶¶ 5-6. The engineer indicated a chemical reaction was occurring within the concrete which would cause the structure to eventually fall. *Id.* at ¶ 7. Plaintiff submitted a claim for coverage under the Policy on an unspecified date. *Id.* at ¶ 9. Plaintiff asserts the Policy covers the Property's concrete condition under the provision covering "collapse," since losses due to chemical reactions are not listed among Policy exclusions. *Id.* at ¶¶ 10-11. The iterations of the Policy in effect from September 6, 2012 through September 6, 2017 contain the following language: [1]

SECTION I—PROPERTY COVERAGES

E. Additional Coverages...

   8. Collapse...

   b. Collapse applies only to an abrupt collapse.

   c. For the purpose of this Additional Coverage— Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

   d. This Additional Coverage—Collapse does not apply to:

     (1) A building or any part of a building that is in danger of falling down or caving in;

     (2) A part of a building that is standing, even if it has separated from another part of the building;

     **\*2** (3) A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

   e. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against;

(2) Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

(3) Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

(4) Weight of contents, equipment, animals or people;

(5) Weight of rain which collects on a roof; or

(6) Use of defective materials or methods in construction, remodeling or renovation.

f. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under e.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

...

SECTION I—PERILS INSURED AGAINST

A. Coverage A—Dwelling And Coverage B—Other Structures

1. We insure against direct physical loss [2] to property described in Coverages A and B.

2. We do not insure, however, for loss...

b. Involving collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above; except as provided in E.8 ... or

c. Caused by...

(6) Any of the following:

(a) Wear and tear, marring, deterioration;

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;...

(f) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings...

[*See, e.g.,* Dkt. 12-13 (September 2016—September 2017 Policy) at forms HO 00 03 05 11 and HO 01 06 01 13.]

[1]  Defendant attaches to its Motion copies of all iterations of the Policy from 2006 through 2017. The Court may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted). As the Policy is integral to and incorporated by reference into the Complaint, the Court considers it here. *See, e.g., England v. Amica Mut. Ins. Co.*, 3:16-cv-1951, 2017 WL 3996394, at *4 (D. Conn. Sept. 11, 2017) (considering insurance policies on motion to dismiss).

[2]  Plaintiff notes that the iterations of the Policy in effect prior to 2012 included the phrase "risk of" prior to "direct physical loss." However, the provisions relevant to this case are consistent across iterations: the language excluding coverage for collapse other than as defined in Section E8, the definition of collapse under Section E8, and the language excluding coverage for the list of events listed in Section A(2)(c), including deterioration, latent defect, and cracking. *See Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 2017 WL 6459552, at *6 (D. Conn. Dec. 15, 2017) (rejecting an argument that the inclusion of the term "risk" before "direct physical loss" expanded the scope of the policy in a relevant way in another case involving cracked concrete when exclusions existed for "settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations.")

**\*3** Defendant denied Plaintiff's claim for coverage on March 21, 2017. *Id.* at ¶ 13. Plaintiff also alleges Defendant participates with the Insurance Services Office, Incorporated (ISO), an organization that collects data regarding claims shared by most, if not all insurance companies. *Id.* at ¶ 20. Through that participation, Defendant, "upon information and belief, has knowledge of the numerous claims and lawsuits that have arisen in this section of Connecticut ... for issues concerning deteriorating concrete." *Id.* at ¶ 22. Plaintiff asserts Defendant regularly denies claims like Plaintiff's "in similar manners or on similar grounds or other grounds," even though those claims warranted coverage, "based on the aforementioned information received via ISO." *Id.* at ¶¶ 23, 25.

Plaintiff brought the instant suit alleging breach of contract, breach of the covenant of good faith and fair dealing, and violation of Connecticut's Unfair Trade Practices Act (CUTPA) and Connecticut Unfair Insurance Practices Act (CUIPA). Plaintiff seeks money damages, interest, attorney's fees and costs and other costs of the suit, and punitive damages.

### III. Legal Standard

To survive a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiff" when deciding a motion to dismiss *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). A court may, however, "choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

### IV. Discussion

Defendants move to dismiss counts one, two and, three of Plaintiff's Complaint for failure to state a claim for which relief can be granted under Federal Rule of Civil

Procedure 12(b)(6). [Dkt. No. 14 at 1-2.] The Court addresses each count in turn below.

#### a. Count One: Breach of Contract

Defendant asserts the Complaint fails to state a claim for breach of contract because the Complaint does not state the Property's collapse was "abrupt" or the Property "cannot be occupied for its intended purpose" as a result of the claimed damage. Motion at 14.

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction.").

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent.... The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

**\*4** Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not

clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so.... If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

The Policy is explicit in its definition of collapse: it is an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Policy at 29-31. Other courts which have evaluated policies with such a definition have found them to unambiguously deny coverage for mere cracking of concrete. *See, e.g., Lynne Liston-Smith v. CSAA Fire & Casualty Ins. Co.*, 3:16-cv-510 (JCH) (Dec. 15, 2017) (unpublished); *Alexander v. Gen. Ins. Co. of Am.*, No. 3:16-cv-059 at Dkt. 22 (transcript of ruling from the bench). In each of those cases, the insured structure had cracked concrete due to a chemical reaction but was still standing, and in each instance the court found the policy excluded coverage.

While the Court is sensitive to Plaintiff's argument that the Premises is structurally unsound, that allegation is insufficient given the explicit definition of "collapse" in the Policy, which excludes from the definition any structure "that is in danger of falling down or caving in." Judge Underhill's explanation is particularly illustrative: "Let's use insect damage. There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam falls.... Now there's collapse. Now you have a collapse or falling in." *Alexander*, No. 3:16-cv-059, Dkt. 22 at 14.

Plaintiff's assertion that the Policy's definition of "collapse" is ambiguous is unavailing, as the precedent Plaintiffs cite in support is readily distinguishable. In *Dalton v. Harleysville Worcester Mutual*, 557 F.3d 88, 93 (2d Cir. 2009), the policy at issue covered "direct physical loss involving collapse of a building or any part of a building caused ... by ... hidden decay" but noted that "settling, cracking, shrinkage, bulging or expansion" did not constitute "collapse." *Id.* at 90. The Second Circuit found the policy ambiguous as to whether collapse required "total or near total destruction" of

the building or whether "substantial impairment of the structural integrity" was sufficient. *Id.* However, the *Dalton* Court explicitly stated the policy would not have been ambiguous if it had "contained express definitional terms ... for example, that a collapse was 'an abrupt falling down or caving in' and that 'a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking.' " *Id.* at n.1.

Here, "collapse" requires "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." The Complaint states the Premises is still standing and lived in by Plaintiff and does not allege that it has abruptly fallen down or caved in. Accordingly, the Complaint has not alleged that the Policy covered Plaintiff's loss.

**\*5** Plaintiff also argues her loss warrants coverage because loss due to chemical reactions is not explicitly listed among the Policy's exclusions.

Judge Shea recently rejected Plaintiffs' argument, stating it "does not matter whether the originating event behind the cracking and deterioration was a chemical reaction; the exclusions in the Polic[y] make no exception for losses for which the cause is itself a product of a chemical reaction." *England v. Amica Mut. Ins. Co.*, 3:16-cv-1951, 2017 WL 3996394 (D. Conn. 2017); *see also Agosti v. Merrimack Mut. Fire Ins. Co.*, 3:16-cv-1686, 2017 WL 3710786 (D. Conn. 2017) (stating claimants' "loss ... clearly consists of settling, cracking, shrinking, bulging, or expansion of ... foundations [or] walls ... [and the] technical source of the cracking or bulging is irrelevant").

In *England*, as here, the plaintiff's insurance policy excluded losses "involving collapse" caused by, among other things, "deterioration ... latent defect, ... any quality in property that caused it to damage or destroy itself, [and] bulging or expansion, including resultant cracking." 2017 WL 3996394 at \*2-3. The Court rejected the theory that a chemical reaction itself is covered as a loss "independent of any of its manifestations," because "loss ... unambiguously require[s] some change to the detriment of the insured, and a chemical reaction—without any physical manifestations—does not fit that bill." *Id.* The only "loss" suffered was the deterioration and cracking of the basement walls, which were specifically excluded under the policy. *Id.* at \*8.

Here, the only loss about which Plaintiff has offered evidence is the cracking of their concrete (due to a chemical reaction). That loss is explicitly excluded from coverage under the Policy.

Lastly, Plaintiff argues for coverage under the "reasonable repairs" provision of the Policy, which states Defendant "will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." The District of Connecticut recently rejected this argument in *Liston-Smith v. CSAA Fire & Casualty Insurance Company*, 2017 WL 6459552, at *6 (D. Conn. Dec. 15, 2017). In *Liston-Smith*, Attorney Danforth advanced the same argument against a policy which was also found not to provide coverage. *Id.* The court reasoned that because the current condition of the Premises was not covered under the Policy, the coverage for reasonable repairs did not apply. *Id.* As in *Liston-Smith*, Plaintiff has not established that the Premises "is damaged by a Peril Insured Against," and accordingly the "reasonable repairs" section does not apply.

a. Counts Two and Three: Bad Faith and CUTPA

In light of the dismissal of Plaintiffs' breach of contract claim, the Motion to Dismiss is also granted as to Plaintiffs' bad faith and CUTPA claims, which are not viable absent a breach of the underlying contract. *See Capstone Building Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013) (explaining that a claim for "bad faith is not actionable apart from a wrongful denial of a benefit under the [insurance] policy"); *Roberts v. Liberty Mut. Fire Ins. Co.*, 2017 WL 3710062, at *14 (D. Conn. Aug. 28, 2017) (finding that, as with a claim for breach of the implied covenant of good faith and fair dealing, "a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract").

V. Conclusion

**\*6** For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED. The Clerk's Office is directed to close this file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 529956

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JUSTYN CYR and
SHEILA CYR,                              :
     Plaintiffs,                        :
                                :
v.                                        :          No. 3:16cv85 (DJS)
                                :
CSAA FIRE & CASUALTY                      :
INSURANCE COMPANY,                        :
     Defendant.                         :

MEMORANDUM OF DECISION

     The plaintiffs, Justyn Cyr and Sheila Cyr, brought this action against the defendant,

CSAA Fire & Casualty Insurance Company ("CSAA"), in the Connecticut Superior Court

alleging breach of contract, breach of the duty of good faith and fair dealing, and violation of the

Connecticut Unfair Trade Practices Act ("CUTPA") and Connecticut Unfair Insurance Practices

Act ("CUIPA"). CSAA removed the case to this Court on the basis of diversity of citizenship.

Pending before the Court is the defendant's motion for summary judgment. For the reasons stated

below, the motion for summary judgment is granted.

I.  FACTS

     Before reciting the facts which the Court finds to be undisputed, the Court wishes to

address an issue concerning the plaintiffs' filings in opposition to the defendant's motion. The

Rules of the United States District Court for the District of Connecticut contain specific

requirements pertaining to papers filed in opposition to a motion for summary judgment. Those

papers must include a "'Local Rule 56(a)2 Statement,' which states in separately numbered

paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs

contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted

by the moving party is admitted or denied." L. Civ. R. 56(a)2.

In the Local Rule 56(a)2 Statement, each denial of a fact asserted by the moving party "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . The 'specific citation' obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits . . . and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." L. Civ. R. 56(a)3. Failure to provide these specific citations "may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id.*

In their Local Rule 56(a)2 Statement, the plaintiffs admit the majority of the factual allegations set forth in the defendant's Local Rule 56(a)1 Statement. As to the factual allegations the plaintiffs deny, their Rule 56(a)2 Statement is not fully compliant with the requirements of Local Rule 56. Paragraphs 29 and 34 of the defendant's Rule 56(a)1 Statement cite to specific pages of deposition testimony. The plaintiffs' denials of those paragraphs simply state, "Denied, though admitted a statement was made to that effect." (Doc. # 44-1, at 9-10). Similarly, the plaintiffs' denial of paragraph 36, which the defendant supported with a cite to an affidavit, states, "Denied insofar as the Plaintiffs simply have no way of knowing this other than the Defendant's statement." (*Id*. at 11).

The Local Rules clearly state that "each denial in an opponent's Local Rule 56(a)2 Statement must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or evidence that would be admissible at trial." L. Civ. R. 56(a)3. "Counsel and pro se parties are hereby notified that failure to provide specific citations to

-2-

evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id*. To the extent that the defendant's factual assertions are properly supported by the evidence and the plaintiffs' denials fail to provide specific citations to evidence that supports those denials, the Court will deem those assertions admitted.

The plaintiffs' Local Rule 56(a)2 Statement includes several references to objections raised by the defendant to disclosure and production requests the plaintiffs had made during the course of discovery, and the plaintiffs attached the defendant's discovery responses to their Rule 56(a)2 Statement. The discovery period in this case ended on December 1, 2016. Although there may have been cause for the plaintiffs to file a motion to compel disclosure under the Federal and Local Rules of Civil Procedure, they did not do so, and the defendant's objections to the plaintiffs' discovery requests do not constitute an "affidavit of a witness competent to testify as to the facts at trial . . . or . . . evidence that would be admissible at trial" as required by Local Rule 56(a)3. The defendant's objections to discovery requests do not provide any proper support for positions asserted by the plaintiffs in their Local Rule 56(a)2 Statement.

The plaintiffs own and occupy residential property located at 35 Old Kent Road South, Tolland, Connecticut ("the plaintiffs' residence" or "the residence"). Beginning in or about 2003 the plaintiffs observed visible cracking patterns in the basement walls of their residence. Prior to 2005 the plaintiffs observed a change in the crack in the front wall of their basement, which prompted them to look further into the situation. Sheila Cyr, who was a real estate agent, initially believed the cracking was normal settling. When she observed that the crack in the foundation wall was getting bigger, she knew that was unusual and that they needed to do something about

-3-

it.

The plaintiffs subsequently opened up the front wall of the basement and observed that "there were puzzle pieces," the wall was bowing in, and there was "[c]racking everywhere." (Doc. # 37-7, at 17, p. 16:2, and at 19, p. 18:15). In September 2005 the plaintiffs replaced the concrete foundation in the front of the house and three-quarters of the south side of the house due to the cracking and bowing of the foundation. The repairs made in 2005 to address the cracking concrete cost over $25,000.00. The plaintiffs contacted their insurance agent but were told there was no coverage under their homeowner's policy, which had been issued by Allstate, for the cracking foundation. Justyn Cyr knew in 2005 that the right wall of the basement and the back section of the left wall of the basement also needed to be replaced but the plaintiffs did not have the money at that time to proceed with that additional work.

The cracks present prior to and in 2005 were the type of cracks associated with defective concrete and were sufficient to create an impairment of the structural integrity of the house. The concrete deterioration and cracking were caused by a chemical reaction in the concrete, resulting from improper materials used in the concrete, that will continue to progressively deteriorate the basement walls rendering the structure unstable.

The defendant CSAA issued a homeowners insurance policy covering the plaintiff's residence ("the Policy") in September 2014. The Policy was renewed for the period from September 11, 2015 to September 11, 2016. On or about October 12, 2015, the plaintiffs made a formal claim to CSAA for damage caused by the deterioration of the concrete in the basement walls. A CSAA employee visited the plaintiff's residence on or about October 14, 2015, inspected the exterior of the residence, and took photographs of the exterior. The plaintiffs were

-4-

unaware that a CSAA employee had come to their residence to investigate the claim. On October 23, 2015, CSAA denied coverage for the plaintiffs' claim.

The plaintiffs' residence is still standing and the plaintiffs are still living there. The residence has not abruptly fallen down or caved in. At his deposition, Justyn Cyr testified that the plaintiffs have not experienced any damage of a sudden nature.

In October 2016 CSAA's expert inspected the plaintiff's residence and reported that: (1) the cause of the cracking foundation is defective concrete; (2) the cracks are an ongoing process that began prior to 2005; (3) the cracking was visible, in part, for years before being reported in 2015; and (4) the foundation functioned as intended and was not at that time at imminent risk of falling down or caving in.

## STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (internal quotation marks omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* The Court must view all inferences and ambiguities in a light most favorable to the

nonmoving party. See *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Only when

reasonable minds could not differ as to the import of the evidence is summary judgment proper."

*Id.*

DISCUSSION

A. BREACH OF CONTRACT

"Because this is a diversity suit based on a state law contract action, the court must apply

Connecticut substantive law." *Roberts v. Amica Mutual Insurance Co.*, No. 3:14-cv-1589 (SRU),

2015 WL 7458510, at *3 (D. Conn. Nov. 24, 2015). The standard of review with respect

to insurance contracts is well settled in Connecticut:

> It is the function of the Court to construe the provisions
> of the contract of insurance. The interpretation of an
> insurance policy, like the interpretation of other written
> contracts, involves a determination of the intent of the
> parties as expressed by the language of the policy. The
> determinative question is the intent of the parties, that is,
> what coverage the . . . [insured] expected to receive and
> what the [insurer] was to provide, as disclosed by the
> provisions of the policy . . . . It is axiomatic that a
> contract of insurance must be viewed in its entirety,
> and the intent of the parties for entering it derived from
> the four corners of the policy . . . . The policy words must
> be accorded their natural and ordinary meaning . . . [and]
> any ambiguity in the terms of an insurance policy must be
> construed in favor of the insured because the insurance
> company drafted the policy.

*Springdale Donuts, Inc. v. Aetna Casualty & Surety Co. of Illinois,* 247 Conn. 801, 805-806

(1999) (internal quotation marks and citations omitted).

The defendant maintains that the plaintiffs' claim under the Policy was barred by virtue of

-6-

unambiguous provisions of the Policy that limit the types of claims covered under the Policy. The

plaintiffs argue that coverage of their claim was provided by various sections of the Policy. The

Court will proceed to address these breach of contract issues.

1. Policy Provisions

a. Provisions Pertaining to Claims for Collapse

The Policy provides in part as follows:

> E. Additional Coverages
> * * * *
> 8. Collapse
> a. This Additional Coverage applies to property covered under Coverages A and B.[1] With respect to this Additional Coverage:
> (1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
> (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
> (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
> (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
>
> ` b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:
> (1) The Perils Insured Against under Coverages A and B;
> (2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;
> (3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

---

[1]Coverage A concerns a "Dwelling," and Coverage B concerns "Other Structures." (Doc. # 37-3, at 8).

(4) Weight of contents, equipment, animals or people;
(5) Weight of rain which collects on a roof; or
(6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

c. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under b. (2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

d. This coverage does not increase the limit of liability that applies to the damaged covered property.

(Doc. # 37-3, at 10, 12).

The defendant argues that the undisputed facts clearly demonstrate the Policy's additional coverage for collapse does not apply in this case. The plaintiffs respond that a claim for collapse is warranted because "the walls are cracking, are essentially caving in," and the "structural integrity of the building certainly is in a state of collapse . . . ." (Doc. # 44, at 8, 9).

In support of their position, the plaintiffs rely in part on a decision issued by the district court in Oregon in 2009, *Malbco Holdings, LLC v. AMCO Insurance Co.*, 629 F. Supp. 2d 1185 (D. Or. 2009). In *Malbco*, the insurance policy provisions pertaining to coverage for a collapse were nearly identical to the provisions in the Policy issued to the plaintiffs by CSAA. The court in *Malbco* determined that the phrase "abrupt falling down or caving in" in the policy's definition of the term "collapse" was ambiguous in that it was "subject to more than one plausible interpretation." *Id.* at 1195, 1196. That court further noted, however, that the policy's collapse coverage "also requires that at least part of the structure cannot be occupied for its intended purpose." *Id.*

-8-

The definition of "collapse" in the Policy at issue in this case is identical to that in the policy considered in *Malbco*. Quite apart from the interpretation of the phrase "abrupt falling down or caving in," the facts before this Court demonstrate that the requirement that "the building or part of the building cannot be occupied for its intended purpose" was not satisfied in this instance. It is undisputed that the plaintiffs are still able to use their residence for its intended purpose and are still living there. This fact in and of itself distinguishes this case from *Malbco*. Likewise, in *130 Slade Condominium Association, Inc. v. Millers Capital Insurance Co.*, Civil Action No. CCB-07-1779, 2008 U.S. Dist. LEXIS 44182 (D. Md. June 2, 2008), another case relied upon by the plaintiffs, the subject property "was in danger of further collapse and had to be evacuated immediately." *Id.* (internal quotation marks omitted). The other cases cited by the plaintiffs in support of their claim for collapse did not address the interpretation of the term "collapse" as defined in a governing insurance policy. Here, the plaintiffs' own expert "acknowledges that the structure is still standing, there has been no abrupt falling down, there has been no abrupt caving in, and the home can be used for its intended purpose." (Doc. # 44, at 5).

The defendant directs the Court's attention to a ruling by Judge Underhill granting a motion to dismiss a complaint based on an insurance policy's definition of "collapse" identical to that in the instant case. In his ruling from the bench, Judge Underhill noted that "what we have here is a building that is in danger of falling down, and that is expressly excluded from collapse coverage; and, similarly, there has been cracking, bulging, etc. Those situations are also excluded by the [policy]." *Alexander v. General Insurance Co. of America*, No. 3:16-cv-00059 (SRU), Transcript of Motion Hearing, July 7, 2016, Doc. # 22, at 23. In explaining his reasons for granting the defendant's motion to dismiss, Judge Underhill also noted that "there's not been a

clear allegation that any building or part of a building cannot be occupied for its intended purpose." *Id.* A more recent Connecticut Superior Court decision tracked a virtually identical definition of "collapse" and agreed with Judge Underhill's ruling:

> The court agrees with the Connecticut Federal District Court in *Alexander* . . . .
> * * * *
> The damage to the plaintiff's basement walls is due to defective material in the concrete that is causing it to deteriorate over time. The basement walls will, according to the plaintiff's expert, eventually give way, causing the house to fall into the basement. However, this has not happened yet. . . . Thus, at this point in time, the plaintiff's home and or basement walls are only in danger of falling down or caving in and her home remains standing. Under these circumstances, the plaintiff cannot meet the "abrupt falling down and caving in" portion of the definition. . . . Furthermore, the plaintiff's home can still be occupied "for its intended current purposes," pursuant to the definition.

*Jemiola v. Hartford Casualty Insurance Co.*, Docket No. CV-15-6008837-S, 2017 WL 1258778, at *10, *11 (Conn. Super. Ct. March 2, 2017).

This Court agrees with the reasoning expressed in *Alexander* and *Jemiola* and, for the reasons stated in those cases, concludes that CSAA is entitled to summary judgment as to the plaintiffs' claim based on the "collapse" provisions of the Policy.

b. Provisions Relating to Perils Insured Against

The plaintiffs contend that coverage of their claim was provided under the "Perils Insured Against" section of the Policy, which states, in part, that, "We insure against risk of direct physical loss to property described in Coverages A, B and C."[2] (Doc. # 37-3, at 15). The plaintiffs argue further that the coverage provided by this section did not exclude chemical reactions. The defendant responds that the "Perils Insured Against" section includes additional

_____

[2]Coverage C pertains to "Personal Property." (Doc. # 37-3, at 8).

language that excludes the plaintiffs' claim. The "Perils Insured Against" section of the Policy

includes the following pertinent provisions:

> We insure against risk of direct physical loss to property described
> in Coverages A, B and C.
> We do not insure, however, for loss:
> A. Under Coverages A, B and C:
>     * * *
> 2. Caused by:
>     * * *
> e. Any of the following:
> (1) Wear and tear, marring, deterioration;
> (2) Mechanical breakdown, latent defect, inherent vice, or any quality in
> property that causes it to damage or destroy itself;
>     * * *
> (6) Settling, shrinking, bulging or expansion, including resultant
> cracking, of bulkheads, pavements, patios, footings, foundations, walls,
> floors, roofs or ceilings . . . .

(Doc. # 37-3, at 15-16).

The plaintiffs' claims arise out of the deterioration of the concrete in the basement walls

of their residence. This deterioration is caused by a chemical reaction in the concrete and will

continue to progressively deteriorate the basement walls. The plaintiffs' expert testified at his

deposition that the deterioration of the concrete in the basement walls is a "[d]efect, it's a result

of improper materials being used to make the concrete" at the time the concrete was installed.

(Doc. # 37-8, at 25, p. 95:24-25).

"In determining whether the terms of an insurance policy are clear and unambiguous, a

court will not torture words to import ambiguity where the ordinary meaning leaves no room for

ambiguity." *Lexington Insurance Co. v. Lexington Healthcare Group, Inc.*, 311 Conn. 29, 38

(2014) (internal quotation marks and alterations omitted). The terms of the "Perils Insured

Against" section of the Policy are clear and unambiguous as they relate to the plaintiffs' claim.

-11-

The deterioration of the concrete in the basement walls of the plaintiffs' residence has been caused by "latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself." (Doc. # 37-3, at 16). The Court notes further that coverage under the "Perils Insured Against" section expressly excludes "cracking of . . . foundations [or] walls . . . ." (*Id.*). The Court concludes that CSAA is entitled to summary judgment as to the plaintiffs' claim based on the "Perils Insured Against" section of the Policy.

c. Provisions Pertaining to Costs Incurred to Protect Covered Property

The plaintiffs contend that coverage for their claim was also provided under the provision in the "Additional Coverage" section of the Policy that stated "[w]e will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." (Doc. # 37-3, at 11). According to the plaintiffs, "since chemical reactions are covered perils, as well as the risks associated with the chemical reaction to the concrete, the cost to repair the concrete is covered pursuant to the terms of the policy, particularly to protect the property from 'further damage.'" (Doc. # 44, at 12).

The Court has already concluded that the deterioration of the concrete in the basement walls of the plaintiffs' residence resulting from the chemical reaction in the concrete is not a "Peril Insured Against." Consequently, costs incurred by the plaintiffs as a result of the deterioration of the concrete are not cost incurred by them "to protect property that is damaged by a Peril Insured Against . . . ." The Court concludes that CSAA is entitled to summary judgment as to the plaintiffs' claim based on the "costs incurred to protect covered property" provision in the Policy.

-12-

d. Provisions Pertaining to Ensuing Loss

The plaintiffs maintain that "coverage exists for the condition of the Plaintiffs property" under the "ensuing loss" provision in the Policy. (Doc. # 44, at 12). The particular section of the Policy relied upon by the plaintiffs provides in pertinent part as follows:

> We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.
> * * *
> 3. Faulty, inadequate or defective:
> * * *
> b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> c. Materials used in repair, construction, renovation or remodeling . . . .

(Doc. # 37-3, at 18).

Thus the Policy specifically excluded loss to property caused by faulty or defective materials used in construction, as well as faulty or defective workmanship or construction. Despite this clear language, and despite the fact that, according to the plaintiffs' own expert, deterioration of the concrete in the basement walls of the plaintiffs' residence is the result of defective material, i.e., the concrete, having been used in the construction of the residence, the plaintiffs contend that this section of the Policy provided coverage for the losses resulting from the deterioration of the concrete. Their argument on this point focuses solely on the "ensuing loss" language in the Policy. They appear to be arguing that the "ensuing loss to property" language that follows the specific exclusions listed in this section of the Policy somehow negates those same specific exclusions.

-13-

The word "ensuing" means "happening after or following something else."[3] In this instance, the term refers to property loss that: (1) happens *after* a loss excluded by the terms of this section; and (2) is not otherwise excluded under the Policy. The claim submitted to the defendant by the plaintiffs did not concern property loss that happened after an excluded loss, but concerned property loss that *was* a loss excluded by the express terms of this section. "[A] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Lexington Insurance Co.*, 311 Conn. at 38 (internal quotation marks omitted). The plaintiffs' argument based on the "ensuing loss" provision in the Policy does not comport with the natural and ordinary meaning of the language contained in the Policy and would not lead to a result that is reasonable under the express terms of the Policy. The Court concludes that CSAA is entitled to summary judgment as to the plaintiffs' claim based on the "ensuing loss" provision in the Policy.

Having considered the various aspects of the plaintiffs' breach of contract claims, the Court concludes that summary judgment should enter in favor of the defendant CSAA as to those claims.

## B. CONTRACTUAL LIMITATION PERIOD

In a section entitled "Suit Against Us," the Policy states that "[n]o action can be brought against us unless . . . the action is started within two years after the date of loss." (Doc. # 37-3, at 20). "Such a provision in a contract of insurance is valid and binding upon the parties." *Bocchino v. Nationwide Mutual Fire Insurance Co.*, 246 Conn. 378, 383 (1998) (internal quotation marks omitted). The defendant contends that the plaintiffs' action is barred by virtue of the two-year

---

[3]https://dictionary.cambridge.org/us/dictionary/english/ensuing.

limitation period specified within the Policy. The plaintiffs counter with the argument that the two-year limitation period did not start to run until September 16, 2015, when they were "realistically apprised of the seriousness of the condition to [sic] their home." (Doc. # 44, at 8).

Because the Court previously determined that the defendant is entitled to summary judgment as to the plaintiffs' breach of contract claims, it is not necessary to rule on the contractual limitation period issue. The Court does note in this regard that while there is no controlling Connecticut case on point, the prevailing view appears to be that an insurance policy's limitation period begins to run only when an insured learns, or should have learned, that an event that is believed to be covered under the governing policy has occurred. In cases involving the deterioration of basement walls resulting from defective concrete, courts have indicated that it is an insured's awareness of the severity of cracking damage, rather than simply an awareness of cracks, that triggers the start of an insurance contract's limitation period. *See Belz v. Peerless Insurance Co.*, 204 F. Supp. 3d 457, 465-66 (D. Conn. 2016); *Parker v. Worcester Insurance Co.*, 247 F.3d 1, 5 (1st Cir. 2001). Even when the facts are undisputed in such cases, courts may find that "a reasonable factfinder could draw varying conclusions as to whether a reasonable person should have known from these facts that a substantial structural flaw was present or at least likely. . . . [I]t is one of those conclusions that most courts leave to juries where, as here, reasonable juries could differ." *Parker*, 247 F.3d at 5.

## C. BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

The plaintiffs claim that CSAA breached its duty of good faith and fair dealing by unreasonably failing to provide coverage under the Policy for damages relating to the deterioration of the concrete in the basement walls of the plaintiffs' residence. The defendant

responds that it is entitled to summary judgment as to this claim because the plaintiffs were not deprived of a benefit they were entitled to under the Policy.

In the context of an insurance contract, a viable claim for the breach of the duty of good faith and fair dealing cannot be sustained absent the denial of a benefit the plaintiffs were entitled to under the insurance policy. "A bad faith cause of action not tied to duties under the insurance policy must therefore fail as a matter of law." *Capstone Building Corp. v. American Motorists Insurance Co.*, 308 Conn. 760, 797 (2013). Because the Court previously concluded that CSAA did not deny a benefit to which the plaintiffs were entitled under the terms of the Policy, the plaintiffs' claim for the breach of the duty of good faith and fair dealing fails as a matter of law and CSAA is entitled to summary judgment as to that claim.

## D. CUTPA/CUIPA CLAIM

The plaintiffs also claim that CSAA violated CUTPA and CUIPA by "[b]y failing to effectively evaluate and effectuate a fair solution to the Plaintiffs' claim pursuant to its policy, . . . [and thereby engaging] in a business practice intended to put the Plaintiffs at a disadvantage . . . ." (Doc. # 1-1, at 7, ¶ 25). The defendant maintains that this claim fails because the plaintiffs have failed to provide any evidence that CSAA engaged in any unfair claims practice specified in the CUIPA statute, Conn. Gen. Stat. § 38a-816.[4]

"Section 38a-816 specifically enumerates, in its twenty-two subdivisions, those practices that are defined as unfair insurance practices in this state." *State v. Acordia, Inc*. 310 Conn. 1, 26 (2013). The plaintiffs do not specify which of the twenty-two subdivisions relates to their CUIPA

---

[4]"[C]onduct by an . . . insurance company that is related to the business of providing insurance can violate CUTPA only if it violates CUIPA . . . ." *State v. Acordia, Inc.*, 310 Conn. 1, 27 (2013).

claim, but allege in their Complaint that "[b]y failing to effectively evaluate and effectuate a fair

solution to the Plaintiffs' claim pursuant to its policy, [CSAA] has conducted itself in a business

practice intended to put the Plaintiffs at a disadvantage in violation of Conn. Gen. Stat. § 38a-

816." (Doc. # 1-1, at 7, ¶ 25). Presumably the plaintiffs' claim relates to Conn. Gen. Stat. § 38a-

816 (6), "Unfair claim settlement practices."

    The facts alleged in the Complaint pertaining to the CUIPA claim are that CSAA

"participates with the Insurance Services Office, Inc. ('ISO'), an organization that collects data

regarding claims shared by most, if not all, insurance companies," that "[t]he use of ISO was not

made known to the Plaintiffs," and that "[b]ased on . . . information [about other claims and

lawsuits concerning deteriorating concrete] received via ISO, the Defendant has attempted to

deny coverage for claims such as the Plaintiffs' based on other purported conclusions despite

provisions within the policy that provide coverage for the chemical reaction that occurred and

collapse." (Doc. # 1-1, at 6, ¶¶ 19, 20, 22).

The plaintiffs' CUIPA claim rests on the contention that CSAA improperly denied

coverage under the terms of the Policy. The Court's previous determination that CSAA did not

deny a benefit to which the plaintiffs were entitled under the terms of the Policy undermines the

plaintiffs' CUIPA claim. See *Alexander v. General Insurance Co. of America*, No. 3:16-cv-

00059 (SRU), Transcript of Motion Hearing, July 7, 2016, Doc. # 22, at 24) ("Because the

coverage claim fails, the claims for breach of implied covenant of good faith and fair dealing and

the statutory claims, CUTPA/CUIPA, also fail. Quite simply, without coverage there can't be bad

faith or a violation of either of those consumer statutes.").

The Court also notes that the defendant's Local Rule 56(a)1 Statement asserts that

"CSAA did not rely on or consider information from the Insurance Services Office, Inc. (the 'ISO') in reaching its coverage determination." (Doc. # 37, at 11, ¶ 37). CSAA provided an affidavit from the CSAA employee who issued the coverage denial letter to the plaintiffs in support of that assertion. The plaintiffs' response to that assertion in their Local Rule 56(a)2 Statement is as follows: "Admitted that statement was made [in the CSAA employee's affidavit], but denied insofar as Defendant simply objected to a request made for disclosure and production as to this issue." (Doc. # 44-1, at 11, ¶ 37). The plaintiffs' denial is followed by a reference to objections to certain requests for production served upon the defendant during the discovery period. It has already been noted that objections to discovery requests do not constitute an "affidavit of a witness competent to testify as to the facts at trial . . . or . . . evidence that would be admissible at trial" as required by Local Rule 56(a)3 and do not provide any proper support for positions asserted by the plaintiffs in their Local Rule 56(a)2 Statement. Consequently, the factual assertion that CSAA did not rely on any information from ISO in reaching its coverage determination is deemed admitted. See L. Civ. R. 556(a)3.

The defendant also argues that the plaintiffs have failed to produce any evidence of CSAA's denials of claims other than their own, and that the denial of a single claim is insufficient to support a claim of an unfair business practice. *See Lees v. Middlesex Insurance Co.*, 229 Conn. 842, 849 (1994) ("the defendant's alleged improper conduct in the handling of a single insurance claim, without any evidence of misconduct by the defendant in the processing of any other claim, does not rise to the level of a 'general business practice' as required by § 38a-816 (6)"). The plaintiffs responded to the defendant's argument with the statement that "[a]s of this time, the Plaintiffs have nothing further to provide this Court with other than the allegations

that they are of the belief that coverage is warranted and information may have been shared

through ISO . . . ." (Doc. # 44, at 14-15). The plaintiffs then refer again to information not

provided to them by the defendant in response to discovery requests.

A conclusory statement that the plaintiffs "are of the belief that coverage is warranted and

information may have been shared" is insufficient to defeat a motion for summary judgment.

"The non-moving party must present specific evidence demonstrating a genuine dispute, rather

than mere conclusory allegations or some metaphysical doubt as to the material facts." *Gannon v.*

*UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (internal quotation marks and citation omitted). Also,

as was previously discussed, the plaintiffs' reliance on a discovery issue that was not raised with

the Court during the discovery period is of no avail to the plaintiffs' position. For these

additional reasons the plaintiffs' CUIPA claim fails and  CSAA is entitled to summary judgment

as to that claim.

<div align="center">CONCLUSION</div>

For the reasons stated above, the defendant CSAA's motion for summary judgment (**doc.**

**# 35**) is **GRANTED**.

The Clerk shall enter Judgment in favor of the defendant CSAA and close this case.


SO ORDERED this     29th        day of January,  2018.



_____
/s/ DJS
Dominic J. Squatrito
United States District Judge

<div align="center">-19-</div>

2017 WL 3996394
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Cecily I. ENGLAND, Plaintiff,
v.
AMICA MUTUAL INS. CO., Defendant.

No. 3:16-cv-1951 (MPS)
|
Signed 09/11/2017

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiff.

Anthony J. Antonellis, John McCormack, Brendan L. Labbe, John Anthony Donovan, III, Sloane and Walsh, LLP, Boston, MA, Michael S. Antonellis, Sloane & Walsh, LLP, Vernon, CT, for Defendant.

**Opinion**

**RULING ON MOTION TO DISMISS**

Michael P. Shea, U.S.D.J.

**\*1** Plaintiff Cecily I. England filed this action in state court against her homeowner's insurance provider, Amica Mutual Insurance Company ("Amica"), seeking damages for its failure to provide coverage for damage to the basement walls of a residence she owns. (ECF No. 1-1.) Amica removed the case to this court on November 29, 2016. (ECF No. 1.) On December 6, 2016, Amica moved to dismiss the case, arguing that the alleged loss was not covered by any of the policies issued to Ms. England and that Ms. England's claim was untimely. (ECF No. 10.) For the reasons set forth below, the motion is GRANTED.

**I. Factual Allegations**

According to the allegations in the complaint, Ms. England owns a property located at 1 Fernwood Drive, Bolton, Connecticut ("the Property"). (ECF No. 1-1 ¶ 1.) Amica has insured the Property at all relevant times. (*Id.* ¶ 3.) Ms. England has made all required insurance payments. (*Id.* ¶ 4.)

"While moving items" on an unspecified date, Ms. England "observed visible cracking patterns in the basement walls" of the Property. (*Id.* ¶ 5.) On October 30, 2014, a structural engineer inspected the basement of the Property. (*Id.* ¶ 6.) In a report dated November 3, 2014, the engineer concluded that "the concrete deterioration and cracking was caused by a chemical reaction occurring in the concrete," and recommended that the basement walls be replaced (*Id.* ¶ 7.) At the time Ms. England filed the complaint, the cost of repair was expected to be approximately $60,000. (ECF No. 1-1 ¶ 7.) [1]

---

[1]    Although neither party contests that the amount in controversy in this action exceeds $75,000, the Court has its own obligation to determine whether it has diversity jurisdiction. "A party invoking the jurisdiction of the federal court [on the basis of diversity] has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (internal quotations omitted). The Second Circuit recognizes a "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Id.* (internal quotations omitted). Here, Ms. England alleges that the cost of replacement of her concrete basement walls is estimated to be $60,000. (ECF No. 1-1 ¶ 7.) The complaint does not explicitly claim other monetary damages. However, as Amica notes in its Notice of Removal, the complaint suggests that "Plaintiff also seeks damages for 'damage to the structure of the dwelling itself.' " (ECF No. 1 ¶ 6 (citing ECF No. 1-1 ¶ 7).) Amica also notes that "if Plaintiff is successful in demonstrating that coverage is owed under the terms of the Policy ... she may also be entitled to damages for additional living expenses under the terms of the policy." (ECF No. 1 ¶ 6.) There is thus a reasonable probability that, in addition to damages resulting from the cost of replacement of Ms. England's basement walls, damage to the structure of the Property and any living expenses potentially covered by the Policy would result in damages exceeding $15,000, bringing the total amount in controversy in excess of $75,000.

**\*2** At an unspecified date, Ms. England made a claim for coverage under her homeowner's policy. (*Id.* ¶ 8.) At the time Ms. England filed the complaint, Amica had not made a decision on her claim. (*Id.* ¶ 12.) In her opposition brief, Ms. England represented that she still had not received a decision from Amica. (ECF No. 20

at 1-2.)[2] Ms. England alleges that the concrete in her home "continues to deteriorate," causing damage to the basement walls. (ECF No. 1-1 ¶ 14.)

[2]    There is no issue of ripeness here, as the Court may construe Ms. England's complaint, which seeks, among other things, a demand for "[s]uch other relief ... the Court deem[s] equitable" (ECF No. 1-1 at 6.), as one seeking a declaratory judgment as to whether the damage to the Property is covered by an Amica policy. *See* Fed. R. Civ. P. 54(c). Courts in this District have recognized that "Connecticut law has made clear that there is no question that a declaratory judgment action is a suitable vehicle to test the rights and liabilities under an insurance policy." *Allstate Ins. Co. v. Martinez*, No. 3:11-cv-574 (VLB), 2012 WL 6115094, at *5 (D. Conn. Dec. 10, 2012) (quoting *Vermont Mut. Ins. Co. v. Ciccone*, No. 3:09-cv-445 (CSH), 2012 WL 5199688, at *3 (D. Conn. Oct. 22, 2012)).

Ms. England alleges in the complaint that under "Section I, 'Perils Insured Against,' " the homeowner's policy covers " 'direct physical loss to the property'; in this case, the chemical reaction that occurred in the concrete." (*Id.* ¶ 9.) Ms. England further alleges that under the policy, "losses due to chemical reaction are not excluded from policy coverage." (*Id.* ¶ 10.) Ms. England also alleges that "under Section I, 'Property Coverage'," the policy covers " 'Collapse' of the basement walls consistent with the progressive deterioration of the concrete caused by the chemical reaction." (*Id.* ¶ 11.) Ms. England did not attach to her complaint the policy she relies on.

Amica attached to its motion to dismiss five policies issued to insure the Property, one for each year dating from April 7, 2010, through April 7, 2015 (collectively, "the Policies").[3] Each of the Policies includes a section titled "Section I—Property Coverages," which contains portions titled "Coverage A—Dwelling," "Coverage B—Other Structures," "Coverage C—Personal Property," "Coverage D—Loss of Use," and "Additional Coverages." (*See* ECF Nos. 10-2–10-6.)

[3]    Although Ms. England's homeowner's policy is not attached to the complaint or formally incorporated by reference, as discussed below, "the court may nevertheless consider [a document] where the complaint relies heavily upon its terms and effect, which renders the document integral to the

complaint." *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations omitted). The Policies attached to Amica's motion to dismiss were effective from April 7, 2010, through April 7, 2015. (ECF Nos. 10-2–10-6.) Ms. England does not contest that one or more of these Policies apply.

In the policies dating from April 7, 2012, through April 7, 2015 (collectively, "the 2012–2015 Policies"), the portion titled "Additional Coverages," as amended by an endorsement titled "Special Provisions—Connecticut," specifies:

    8. Collapse

    ...

    b. The coverage provided under this Additional Coverage—Collapse applies only to an abrupt collapse.

    c. For the purpose of this Additional Coverage—Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purposes.

    **\*3** d. This Additional Coverage—Collapse does not apply to:

    (1) A building or any part of a building that is in danger of falling down or caving in;

    (2) A part of a building that is standing, even if it has separated from another part of the building; or

    (3) A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

    e. We insure for direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following:

    (1) The Perils Insured Against;

    (2) Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    ...

(6) Use of defective material or methods in construction, remodeling or renovation.

f. Loss to a[ ] ... foundation ... is not included under e. (2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

(*See, e.g.*, ECF No. 10-6 at 42-43.)

Under "Section I—Perils Insured Against," the 2012–2015 Policies specify with respect to "Coverage A—Dwelling And Coverage B—Other Structures":

1. We insure against direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

a. Excluded under Section I—Exclusions;

b. Involving collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above;

except as provided in E.8 Collapse under Section I—Property Coverages; or

c. Caused by:

...

(6) Any of the following:

(a) Wear and tear, marring, deterioration;

(b) Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

(c) Smog, rust or other corrosion, or dry rot;

...

(f) Settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations, walls, floors, roofs or ceilings....

(*See, e.g.*, *id.* at 23-24.)

Under "Section I—Exclusions," the 2012–2015 Policies state:

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

...

3. Faulty, inadequate or defective:

...

c. Materials used in repair, construction, renovation or remodeling ...

of part or all of any property whether on or off the residence premises.

(*See, e.g.*, *id.* at 27.)[4]

[4]  The language in "Additional Coverages" and "Section I—Perils Insured Against" varies in minor ways from the 2010–2012 Policies to the 2012–2015 Policies. (*Compare, e.g.*, ECF No. 10-2 at 42-43, *with* ECF No. 10-6 at 42-43.) The variations do not affect the interpretation of the Policies for the purpose of Amica's motion to dismiss, and neither party relies on the variations. I will refer to the language in the 2012–2015 Policies in this decision.

**II. Legal Standards**

 **\*4**  On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), I take the plaintiff's factual allegations in the complaint "to be true and [draw] all reasonable inferences in" her favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, I may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted).

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008) (citation and quotation marks omitted).

> If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning.... When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result.... As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.

*Id.* at 5-6 (citations, quotation marks, and alterations omitted).

## III. Discussion

### A. Applicable Policies

Amica argues that Ms. England has not sufficiently alleged that she was covered by an Amica homeowner's policy during the relevant time period. (ECF No. 10 at 22-23.) Ms. England does allege, however, that "[a]t all times relevant herein, the Defendant provided homeowner's insurance coverage to the Plaintiff" for the Property, and that "[o]n or about October 30, 2014, the Plaintiff had her basement inspected by a professional structural engineer" after "observ[ing] visible cracking patterns in the basement walls." (ECF No. 1-1 ¶¶ 3, 5-6.) Ms. England also alleges that Amica itself sent an engineer to inspect the Property in December 2014. (*Id.* ¶ 13.) Drawing reasonable inferences in Ms. England's favor, I find that Ms. England has sufficiently alleged that she was covered by an Amica homeowner's policy at the time the alleged loss occurred. As noted above (*see* note 4, *supra*), it makes no difference which Amica policy governs the alleged loss, and I will analyze the complaint under the language in the 2012–2015 Policies.

### B. "Collapse" Coverage

Ms. England claims that she is entitled to coverage under the collapse provision located under "Section I, 'Property Coverage' " of the Policies. (ECF No. 1-1 ¶ 11.) The 2012–2015 Policies specify in this section, under "Additional Coverages," that collapse coverage "applies only to an abrupt collapse." (ECF No. 10-6 at 42.) The 2012–2015 Policies further state that, "[f]or the purpose of this Additional Coverage—Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*Id.*) Thus, under the Policies, Ms. England's alleged loss must have resulted from an abrupt event in order for collapse coverage to apply.

**\*5** Ms. England argues that the term "collapse" is "ambiguous in light of the qualifiers made by the provisions in the policy," relying on *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 93 (2d Cir. 2009). (ECF No. 20 at 5.) Ms. England's reliance on *Dalton* is misplaced. In that case, the policy at issue did not define "collapse" to have any temporally abrupt quality, and the Court had to look to unsettled New York law to determine the meaning of "collapse." *See id.* at 90-91. By contrast, the Policies here clearly define "abrupt collapse" as an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended

purpose." (*See, e.g.*, ECF No. 10-6 at 42.)[5] The Policies therefore unambiguously require an abrupt event for collapse coverage to apply.

5    Further, the Policies in this case include language substantially identical to language the *Dalton* Court suggested would unambiguously resolve the issue of coverage. *Compare Dalton*, 557 F.3d at 93 ("We also note that other insurers in New York used forms that speak much more directly to the dispute involved here. *E.g.*, [*Rector St. Food Enter., Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 827 N.Y.S.2d 18, 18 (App. Div. 2006) ] (construing policy language that a 'building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion').") *with* ECF No. 10-6 at 42 (stating that collapse coverage does not apply to "a building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning settling, shrinkage or expansion").

Ms. England does not argue, and I do not find, that the term "abrupt" is ambiguous. The term must therefore be "accorded its natural and ordinary meaning." *Connecticut Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008.) "To ascertain the commonly approved usage of a word in an insurance policy, it is appropriate to look to the dictionary definition of the term." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 42 n.8 (2014) (internal citation and alteration omitted). The ordinary meaning of the word "abrupt" is "characterized by or involving action or change without preparation or warning." *Merriam Webster's Collegiate Dictionary* (10th ed. 1994).

Even when the allegations are construed in the light most favorable to Ms. England, Ms. England does not allege that any collapse occurred abruptly, or that any change occurred to the Property without preparation or warning. Indeed, Ms. England does not even argue in her opposition brief that any damage to the Property occurred abruptly. Rather, Ms. England alleges that a chemical reaction caused "concrete deterioration and cracking." (ECF No. 1-1 ¶ 7.) Elsewhere in the complaint, Ms. England characterizes the damage as "progressive deterioration of the concrete caused by the chemical reaction" (*Id.* ¶ 11) and as "continual deterioration." (*Id.* ¶ 15.) These allegations that the damage has occurred progressively and continuously are at odds with any claim that the damage occurred abruptly.

Courts have ruled in favor of insurance companies in concrete decay cases where insurance policies require "abrupt" events for collapse coverage to apply. *See, e.g.*, *Alexander v. General Ins. Co. of America*, No. 3:16-cv-59 (SRU), transcript of oral ruling, ECF No. 22 at 23 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "abrupt falling down or caving in"); *Jemiola v. Hartford Cas. Ins. Co.*, No. CV-15-6008837-S, 2017 WL 1258778, at *1 (Conn. Super. Ct. Mar. 2, 2017) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in"); *Toomey v. Central Mut. Ins. Co.*, No. CV-15-6009841-S (Conn. Super. Ct. Aug. 3, 2017) (unpublished) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in").

**\*6** Further, as noted (*see* note 5, *supra*), the 2012–2015 Policies specify that collapse coverage does not apply to "[a] building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." (ECF No. 10-6 at 42.) Thus, collapse coverage does not apply where a building is standing but shows evidence of cracking. In addition to alleging that the basement walls of the Property are progressively deteriorating (which falls outside the definition of "collapse" for the reasons discussed above), Ms. England alleges that the Property displayed "visible cracking patterns." (ECF No. 1-1 ¶¶ 5-6.) Ms. England does not allege that the Property is no longer standing, but rather that the concrete "continues to deteriorate, which is causing damage to the basement walls." (*Id.* ¶ 14.) The cracking Ms. England alleges to have occurred falls squarely within the Policies' language excluding collapse coverage for buildings that show evidence of cracking but are still standing. As a result, Ms. England has not alleged that she is entitled to coverage under the Policies' collapse provisions.[6]

6    Ms. England also does not sufficiently allege "that the building or part of the building cannot be occupied for its intended purpose." (ECF No. 10-6 at 42.) Ms. England has not alleged any facts suggesting that the Property cannot be occupied as a "residence," which is the only description of its intended purpose in the complaint. (ECF No. 1-1 ¶¶ 3, 6).

### C. Coverage for "Chemical Reactions"

Alternatively, Ms. England apparently seeks coverage under provisions of the Policies independent of the "collapse" coverage.[7] She argues that she is entitled to coverage because the loss allegedly sustained was due to a "chemical reaction," which, she contends, is not expressly excluded by the Policies. (ECF No. 20 at 3 ("Plaintiff has Stated a Sufficient Cause of Action under the Policy due to Its Failure to Exclude *Losses from a Chemical Reaction* ") (emphasis added); ECF No. 1-1 ¶ 10 ("[L]osses due to chemical reaction are not excluded from policy coverage.").) At the same time, Ms. England argues that she has alleged that "the chemical reaction *is the 'direct physical loss'* " necessary to trigger coverage. (ECF No. 20 at 3 (emphasis added)); (ECF No. 1-1 ¶ 9 ("Plaintiff[ ] [is] covered for 'direct physical loss to the property'; in this case, the chemical reaction that occurred in the concrete.").) I note at the outset that this is internally inconsistent: Ms. England cannot plausibly allege that the "loss" was the chemical reaction itself while at the same time alleging that the "loss" consists of "*damages caused by a chemical reaction.*" (ECF No. 20 at 4 (emphasis added).) Because a party may plead alternative and inconsistent theories, Fed. R. Civ. P. 8(d)(2), (3), however, I consider whether Ms. England states a claim under either theory.

7    This is not entirely clear from Ms. England's brief. To the extent that she is arguing that she is entitled to coverage for "collapse" caused by a chemical reaction, however, that argument fails because, as already discussed, Ms. England has not alleged facts that plausibly suggest a "collapse" that would be covered by the Policies.

Ms. England's first alternate theory is that the chemical reaction itself is covered as a "direct physical loss," independent of any of its manifestations. This is not a plausible reading of the Policies, because the terms "direct physical loss" and "loss," as used in the Policies, unambiguously require some change to the detriment of the insured, and a chemical reaction—without any physical manifestations—does not fit that bill.

The Policies themselves do not define the terms "direct physical loss" or "loss." However, the use of these terms in the Policies provides insight as to how I should construe them. *See Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 38 (2014) (acknowledging the well-settled principle that courts must look at a contract as a whole and consider all relevant portions together

when interpreting an insurance policy); *see also Johnson & Johnson v. Guidant Corp.*, No. 06-cv-7685 (RJS), 2014 WL 3728598, at *15 (S.D.N.Y. July 22, 2014) ("The general rule of contract construction presumes that words have the same meaning throughout the contract." (internal citations omitted)) In the Policies' exclusions, for example, the term "loss" is used to describe the result of various excluded processes or events:

> **\*7**  Section I—Perils Insured Against
>
> A. Coverage A—Dwelling and Coverage B—Other Structures
>
> ...
>
> 2. We do not insure, however, for *loss*:
>
> ...
>
> c. *Caused by*:
>
> ...
>
> (a) Wear and tear, marring, deterioration;
>
> (b) ... [L]atent defect, inherent vice or any quality in property that causes it to damage or destroy itself ...
>
> (f) Settling, shrinking, bulging or expansion, including resultant cracking ... of ... foundations, walls....

(ECF No. 10-6 at 23-24 (emphasis added).) In other words, the "loss" is the damage or the detrimental change to the insured that is the product of these excluded processes and events. So understood, a "loss" can be the result of an originating chemical reaction but it cannot be the originating chemical reaction itself absent any physical manifestation.

The Policies use "loss" similarly in other provisions. For example, the provision titled "Suit Against Us" states, "No action can be brought against us unless ... the action is started within two years after *the date of loss.*" (ECF No. 10-6 at 29 (emphasis added).) This provision suggests that the term "loss" must be accorded a meaning that is limited to observable, tangible effects: if the term "loss" were interpreted to include the occurrence of an imperceptible chemical process, before that process were to result in any observable effect, no policyholder could determine a date

of loss for the purpose of establishing the timeliness of the policyholder's suit.

The usage of "loss" in the Policies is consistent with its ordinary meaning. Black's Law Dictionary defines "loss" in the context of insurance as "[t]he amount of financial detriment caused by ... an insured property's damage, for which the insurer becomes liable." *Black's Law Dictionary* (9th ed. 2014). "Loss" is more generally defined as "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way." *Id.* "Direct loss" is defined as "[a] loss that results immediately and proximately from an event." *Id.* All of these definitions suggest that the term "loss" includes perceptible harms that manifest as a consequence of triggering events—but does not include the triggering events themselves. That the Policies specify that Amica provides coverage only for "direct physical losses" further underscores that a covered loss is treated separately from its cause for the purposes of coverage, and must be in the form of a perceptible harm for a policyholder to claim coverage.

Connecticut case law reflects a similar understanding of the difference between a loss and its cause. Specifically, courts interpreting insurance policies to determine the scope of insurance coverage have distinguished between loss or damage, on the one hand, and processes that could—but have yet to—cause loss or damage, on the other, ruling that the latter do not fall within the scope of coverage where the policies require physical loss or damage to trigger coverage. In *Capstone Building Corp. v. American Motorists Insurance Company*, the Connecticut Supreme Court held that "the escape of carbon monoxide, without more, is not property damage," and therefore did not constitute "physical injury to tangible property, including all resulting loss of use of that property" as required to trigger coverage under a commercial general liability policy. *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 782 (2013) (alteration omitted). The *Capstone* Court found persuasive reasoning in a recent New Hampshire Supreme Court case, in which that court ruled that the "seepage of odorless carbon monoxide from defectively installed chimneys was not 'property damage,' reasoning that the gas 'caused no physical, tangible alteration to any property' or any physical injury to the homeowners." *Id.* at 782-83 (quoting *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.*, 160 N.H. 690, 694 (2010)).

**\*8** In line with the Connecticut Supreme Court's reasoning, other courts have interpreted the term "direct physical loss or damage" to "strongly impl[y] that there was an initial satisfactory state that was changed into an unsatisfactory state." *City of Burlington v. Indemnity Ins. Co. of N. Am.*, 332 F.3d 38, 44 (2d Cir. 2003) (collecting cases interpreting Louisiana, Virginia, Washington, and Texas law for the purpose of interpreting Vermont law) (internal quotations and alterations omitted). Using this interpretation, the Second Circuit reasoned that "while the failure of a defective part qualifies as direct physical loss or damage, the defect itself, assuming the item has not yet failed, does not." *Id.*

All of this confirms that, to the extent she is seeking coverage for a chemical reaction alone as a "direct physical loss," Ms. England's claim fails. While the resultant cracking within Ms. England's walls likely qualifies as "direct physical loss to the Property," and "loss" as used in the Policies embraces the financial consequences thereof (although losses from cracking are excluded from coverage by other provisions), the chemical reaction itself, absent any physical manifestation in the Property marking a change to an unsatisfactory state, is not a "direct physical loss" or other "loss" under the Policy.

Using the ordinary meaning of the term "loss"—an undesirable outcome or financial detriment—I find that the only loss Ms. England sufficiently alleges to have occurred is the deterioration and cracking of the basement walls and the related financial harm. (ECF No. 1-1 ¶¶ 6-7, 11, 14, 16.) [8] And that loss is specifically excluded by the Policies.

8     Ms. England's complaint also refers to "damage to the structure of the dwelling itself," but provides no allegations regarding the nature or extent of this alleged damage. (ECF No. 1-1 ¶ 6.) This allegation does not provide sufficient facts to support a claim for relief independent of Ms. England's allegations regarding concrete deterioration, cracking, and the resultant expected costs of replacing her basement walls. *See Ashcroft v. Iqbal*, 559 U.S. 662, 678 (2009).

Ms. England's second alternate theory is that she is entitled to coverage because she has suffered a "direct physical loss" as a result of a chemical reaction, and coverage for losses due to chemical reactions are not

excluded under the Policies, as the term "chemical reaction" is not specifically listed among the exclusions in the Policies. (ECF No. 20 at 3.) A reading of the Policies as a whole, however, makes clear that this second alternate theory fares no better than the first.

As noted above, the only "direct physical loss" identified in the complaint—that is, the only "physical, tangible alteration to any property," *Capstone Bldg. Corp.*, 308 Conn. at 782-83 (internal quotation omitted)—is the cracking and deterioration of the basement walls, and the financial "loss" therefrom, which is expressly excluded. Indeed, such a loss is excluded twice—when it "involv[es] a collapse" and when it does not. (*See* ECF No. 10-6 at 23 (excluding loss "[i]nvolving collapse, including ... (1) [a]n abrupt falling down or caving in; (2) [l]oss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or (3) [a]ny cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above[,]" except when such loss otherwise qualifies for collapse coverage); *id.* at 23-24 (excluding loss caused by "deterioration ... [s]ettling, shrinking, bulging or expansion, including resultant cracking, of ... foundations, walls").) [9] It does not matter whether the originating event behind the cracking and deterioration was a chemical reaction; the exclusions in the Policies make no exception for losses for which the cause is itself a product of a chemical reaction. Indeed, many of the loss-producing causes listed in the exclusions either are the product of chemical reactions or are broad enough to include chemical reactions. (*See id.* at 23-24 (excluding loss caused

by "rust or other corrosion, or dry rot" or "latent defect, inherent vice or any quality in property that causes it to damage or destroy itself").) Ms. England's argument that the Policies cover loss from cracking and deterioration when the cracking and deterioration are caused by a chemical reaction is therefore implausible. [10]

| | |
|---|---|
| 9 | As discussed above, Ms. England's complaint consistently characterizes the damage allegedly sustained as "deterioration" of the concrete. (ECF No. 1-1 ¶¶ 7, 11, 14-16.) Ms. England's argument that what is occurring on the Property should be distinguished from "the normal deterioration" or "the normal wear and tear" that occurs in a home fails to sidestep the Policies' exclusion, which does not limit the exclusion for losses caused by deterioration. (*See* ECF No. 20 at 3.) |
| 10 | Amica also argues that Ms. England's suit is untimely based on the "Suit Against Us" provision in the Policies. Because Ms. England's claim otherwise fails, I need not and do not consider this argument. |

**IV. Conclusion**

**\*9**  For the reasons stated above, Amica's Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 3996394

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1035810
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Mark R. HURLBURT and
Melanie Hurlburt, Plaintiffs,

v.

MASSACHUSETTS HOMELAND
INSURANCE COMPANY, Defendant.

No. 3:17-cv-503 (VAB)
|
Signed 02/23/2018

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiffs.

Wystan M. Ackerman, Robinson & Cole, LLP, Hartford, CT, for Defendant.

**Opinion**

### RULING AND ORDER ON MOTION TO DISMISS

VICTOR A. BOLDEN, UNITED STATES DISTRICT JUDGE

**\*1** Mark Hurlburt and Melanie Hurlburt (the "Hurlburts") sued Massachusetts Homeland Insurance Company ("Mass. Ins." or "Defendant") after Mass. Ins. denied coverage for visible cracking in concrete in their basement allegedly caused by a chemical reaction. Specifically, they allege breach of contract and the covenant of good faith and fair dealing and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42–100a *et seq.*; and the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a–815 *et. seq.*

Defendant now moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 11.

For the following reasons, the motion is **GRANTED.**

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Factual Allegations

#### 1. Terms of the Insurance Policy

The Hurlburts live at 119 Pinney Street, Ellington, Connecticut. Compl. ¶ 1, ECF No. 1-1. The Hurlburts allege that they maintain a homeowner's insurance policy with Defendant.[1] Compl. ¶ 3. The Hurlburt's Insurance Policy ("Policy") provides:

E. Additional Coverages

* * *

8. Collapse

a. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or any part of the building cannot be occupied for its current purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. We insure for sudden and accidental direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against named under Coverage C;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

Policy at 40, ECF No. 12-7.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

SECTION I: PERILS INSURED AGAINST

A.	COVERAGE	A—DWELLING	AND
COVERAGE B—OTHER STRUCTURES

1. We insure against risk of direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

a. Excluded under Section 1—Exclusions;

* * *

c. Caused by:

* * *

(6)Any of the following:

(a) Wear and tear, marring, deterioration;

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes to damage or destroy itself;

* * *

(f) Settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations, [and] walls....

*Id.* at 42.

E. Additional Coverages

* * *

2. Reasonable Repairs

a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

**\*2** *Id.* at 39.

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

* * *

3. Faulty, inadequate, or defective:

c. Materials used in repair, construction....

*Id.* at 1.

1	Paragraph three of the Complaint states that "Defendant Merrimack" provided homeowner's insurance to Plaintiffs. Compl. ¶ 3.Any reference to a defendant or party named "Merrimack" is noticeably absent from the remainder of the Complaint. The Court acknowledges this discrepancy and treats it as a scrivener's error.

**2. The Hurlburts' Claim**

On August 7, 2015, after the Hurlburts allegedly noticed visible cracking patterns in the concrete foundation of their home, Compl. ¶ 5, contacted William F. Neal, PE ("Mr. Neal"), "for the specific purpose of conducting a visual examination of the concrete foundation [at Plaintiffs' home]." Opp. Mot. to Dismiss at Exhibit A, at 2, ECF No. 17-1. After Mr. Neal inspected the unfinished basement, he wrote the Hurlburts a letter dated the same day as inspection. *Id.* In relevant part, the letter stated:

Most of the visible concrete foundation, both exterior and interior, and the garage floor have numerous spider-web cracks. Some of these cracks are as much as ¾" wide and the foundation walls in several locations are bowing inward by as much as 1. "Heavy efflorescence (a white powdery from the concrete) is present in many areas of the basement, especially in more heavily cracked areas.... There is no way to arrest the process and there is no way to repair the existing damage. The basement walls at this time are structurally unsound and corrective action is necessary.... It is my recommendation that the basement walls be replaced. It is not possible to predict how quickly the foundation will deteriorate to the point it is structurally dangerous. I therefore urge you to develop a corrective plan with a licensed contractor as soon as possible.

*Id.*

In September 2015, the Complaint alleges that the Hurlburts made a formal claim for coverage under their homeowner's insurance policy. Compl. ¶ 9. Despite allegedly making all required payments for coverage, *id.* ¶

4, Defendant allegedly denied the Hurlburts claim by letter dated September 30, 2015. *Id.* ¶ 12.

**B. Procedural History**

On February 23, 2017, the Hurlburts sued Defendant in Connecticut Superior Court, Judicial District of Tolland at Rockville. *See generally* Compl. The Complaint includes three counts: (1) breach of contract; (2) breach of duty of good faith and fair dealing; and (3) violation of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act. *See id.* ¶¶ 13, 15, and 26. The Hurlburts seek money damages; pre- and post-judgment interest under Conn. Gen. Stat. § 37-3a; costs of suit; attorney's fees and costs under Conn. Gen. Stat. § 42-110g; and punitive damages under Conn. Gen. Stat. § 42-110g. *Id.*

**\*3** Defendant removed the case to this Court on March 28, 2017.

Defendant now moves to dismiss the Complaint for failure to state a claim. Mot. to Dismiss, ECF No. 11.

On February 21, 2018, the Court heard oral argument on the motion. ECF No. 24.

**II. STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Court will dismiss any claim that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), the Court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the Complaint must contain

"factual amplification ... to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

All of the factual allegations in the complaint will be taken as true. *Iqbal*, 556 U.S. at 678. The factual allegations will also be viewed in the light most favorable to the plaintiff, and all inferences will be drawn in favor of the plaintiff. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

Courts considering motions to dismiss under Rule 12(b)(6) generally limit its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005). Accordingly, the court may review the homeowner's insurance contract attached in this record by Defendant.

**III. DISCUSSION**

This case, like a number of other recent decisions in the District of Connecticut, requires the Court to examine the provisions of an insurance policy, after homeowners have discovered that the concrete supporting the walls of their home are deteriorating. *See, e.g., Zamichie, v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-CV-739 (VAB), 2018 WL 950116 (D. Conn. Feb. 20, 2018); *Cyr v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-85 (DJS), slip op. (D. Conn. Jan. 29, 2018); *Makufka v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-00567 (VLB), 2018 WL 465775 (D. Conn. Jan. 18, 2018); *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2017 WL 6731713 (D. Conn. Dec. 29, 2017); *Allstate Ins. Co. v. Swaminathan*, No. 3:16-cv-1708 (VAB), 2017 WL 6614092 (D. Conn. Dec. 27, 2017); *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, No.

3:16-cv-510 (JCH), 2017 WL 6459552, (D. Conn. Dec. 15, 2017); *Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050 (VAB), 2017 WL 5906613 (D. Conn. Nov. 30, 2017); *Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS), 2017 WL 3821791 (D. Conn. Aug. 31, 2017); *Adams v. Allstate Ins. Co.*, 276 F. Supp. 3d 1 (D. Conn. 2017); *Clough v. Allstate Ins. Co. et al.*, No. 3:17-cv-140 (JBA) (D. Conn. Aug. 29, 2017); *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-1686 (SRU), 2017 WL 3710786 (D. Conn. Aug. 28, 2017); *Valls v. Allstate Ins. Co.*, No. 3:16-cv-1310 (VAB), 2017 WL 4286301 (D. Conn. Sept. 27, 2017); *Metsack v. Liberty Mut. Fire Ins. Co.*, 3:14-cv-1150 (VLB), 2017 WL 706599 (D. Conn. Feb. 21, 2017).

**\*4** The critical issue at the pleading stage is whether, taking all facts as true and construing them in favor of the Hurlburts, the Hurlburts have plead a plausible claim under their homeowners insurance policy. Because the Hurlburts' policy covers only "an abrupt falling down or caving in of a building," Homeowners Insurance Policy ("Policy") at 40, Def.'s Br. Exs. C-1, C-2 ECF Nos. 12-3, 12-4, which cannot reasonably be read to embrace the gradual deterioration of property over time, the Complaint must be dismissed.

## A. BREACH OF CONTRACT

Under Connecticut law, "the terms of an insurance policy are to be construed according to the general rules of contract construction"; that is, the Court must discern the intent of the parties as articulated in the provisions of the policy. *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 290 Conn. 767, 795 (2009). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.* at 796. Instead, a court must read the words of the policy with "their natural and ordinary meaning," and resolve any ambiguity in favor of the insured. *Wentland v. Am. Equity Ins. Co.*, 267 Conn. 592, 600-01 (2004). "The court must conclude that the language should be construed in favor of the insured unless it has 'a high degree of certainty' that the policy language clearly and unambiguously excludes the claim." *Id.* (quoting *Kelly v. Figueiredo*, 610 A.2d 1296, 1299 (Conn. 1992)).

### 1. Policy Coverage for Sudden and Accidental Direct Physical Loss

The Hurlburts allege that "the concrete deterioration and cracking were caused by a chemical reaction in the concrete ... [this] condition substantially impairs the structural integrity of the building." Compl at ¶¶ 7–8. Defendants argue that the Hurlburts' loss is gradual and will occur over time and is therefore not a "sudden and accidental direct physical loss." *See* Def.'s Mem. in Supp. of Mot. to Dismiss at 7. The Court agrees.

The insurance policy covers "sudden and accidental direct physical loss to covered property involving collapse of a building or any part of a building...." Policy at 40. Over fifteen years ago, the Connecticut Supreme Court interpreted the clause "sudden and accidental" in a pollution context. The court in *Buell Industries, Inc. v. Greater New York Mutual Insurance*, 791 A.2d 489 (Conn. 2002), interpreted the meaning and applicability of the "sudden and accidental" exception to the pollution exclusion contained in the defendants' insurance policies. *Id.* at 29. The *Buell* court rejected the plaintiff's argument that "sudden" meant "only unexpected" and concluded "the term 'sudden' requires that the release [of pollutants] in question occurs abruptly or within a short amount of time." *Id.* at 541.

Numerous courts in this District have applied *Buell* when interpreting insurance policies that allegedly cover losses due to crumbling or cracking concrete ailing Connecticut homeowners. *See, e.g., Valls*, 2017 WL 4286301 (D. Conn. Sept. 27, 2017) (applying *Buell* and dismissing all claims, including breach of contract); *Adams v. Allstate Ins. Co.*, 276 F. Supp. 3d 1 (D. Conn. 2017) (same); *Clough*, 2017 WL 3763841 (same); *Miller v. Allstate Ins. Co.*, No. 3:16-cv-2059 (JBA), 2017 WL 3763425 (D. Conn. 2017) (same); *see also, e.g., Metsack v. Liberty Mut. Fire Ins. Co.*, 3:14-cv-1150 (VLB), 2017 WL 706599, at \*8 (D. Conn. Feb. 21, 2017) (concluding that "sudden" unambiguously excluded coverage for long-term deterioration of concrete; *Cyr v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-85 (DJS), slip op. (D. Conn. Jan. 29, 2018); *Makufka v. CSAA Fire 7 Cas. Ins. Co.*, 3:16-cv-00567, 2018 WL 465775 (D. Conn. Jan. 18, 2018).

**\*5** "The fact that the parties advocate different meanings of the [ ] clause does not necessitate a conclusion that

the language is ambiguous." *Kelly*, 610 A.2d at 1299 (internal quotation marks omitted). Here, the contract language is unambiguous; the limiting term "sudden" requires a temporal quality. *See Manseau*, 2017 WL 3821791, at *5 ("[T]he term 'sudden,' used in the context of the phrase 'sudden and accidental' is unambiguous, and must be accorded a temporal quality."); *Clough*, 2017 WL 3763841, at *3 (finding that the plaintiffs had alleged "progressive deterioration that may in the future be punctuated with sudden breaks or collapses," but that "[w]ithout any allegation of suddenness, and with allegations that explicitly contradict the possibility that any sudden loss has already occurred, Plaintiff's claim is not plausibly covered by the plain language of the policy unless it falls under the limited exception for certain kinds of collapses"). The Hurlburts have not alleged a "sudden" loss. *See, e.g.*, Compl. ¶ 5 ("Over time, the Plaintiffs observed visible cracking patterns in the concrete of their home.").

The lack of ambiguity in the policy language and the overwhelming body of case law make clear that the Hurlburts have failed to state a claim upon which the Court may provide relief.

## 2. Policy Coverage for Collapse

The Hurlburts allege that the concrete in their basement is deteriorating and cracking due to a chemical reaction in it, "and that this chemical reaction would continue to progressively deteriorate the basement walls, rendering the structure unstable[.]"[2] Compl. ¶ 7. The Hurlburts therefore argue that the Policy covers such a loss. Defendants contend that "Plaintiffs have not alleged that their home has fallen down or caved in, or that it has done so abruptly, or that the home cannot be occupied for its intended purpose." Mot. to Dismiss at 2–3. The Court agrees.

[2]   The Hurlburts allege in their opposition to the motion to dismiss that "one of the after effects of the ongoing chemical reaction to the home is that it is collapsing. In this case, the Hurlburts argue that the walls are cracking, have given way and [are] essentially caving in." Even if true, however, Plaintiffs have not alleged that the home is no longer habitable nor have they alleged that they do not live at the residence.

The limiting language "abrupt" renders "collapse" unambiguous. The term "abrupt" must be "accorded its natural and ordinary meaning." *Connecticut Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (Conn. 2008). "To ascertain the commonly approved usage of a word in an insurance policy, it is appropriate to look to the dictionary definition of the term." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1176 n.8 (Conn. 2014) (internal citation and alteration omitted). "The ordinary meaning of the word 'abrupt' is 'characterized by or involving action or change without preparation or warning.' " *England v. Amica Mut. Ins. Co.*, No. 3:16-cv-1951 (MPS), 2017 WL 3996394, at *5 (D. Conn. Sept. 11, 2017) (quoting *Merriam Webster's Collegiate Dictionary* (10th ed. 1994)).

The contract covers only "abrupt" collapse. By alleging that the concrete in their basement is deteriorating, which may or may not lead to a collapse, the Hurlburts have not alleged an "abrupt collapse."

### i. "Collapse" is Unambiguous

The Hurlburts argue that the term "collapse" is ambiguous due to the qualifying provision that collapse due to "decay" is covered. Opp'n. Mot. to Dismiss at 6. Plaintiff contends that *Dalton v. Harleysville Worcester Mutual*, 557 F.3d 88 (2d Cir. 2009), supports this position. *Id.* at 93 (finding an ambiguity in the contract language between a sudden occurrence and a slow process where a policy defines collapse as caused by "hidden decay"). The Court sees in *Harleysville* no parallel with this case.

"*Harleysville* addressed the slightly different question of whether, as a matter of New York law, collapse must be sudden when a policy does not place any temporal restrictions on the definition of collapse." *Adams*, 2017 WL 3763837, at *4.

**\*6** The present case is inapposite to *Harleysville*. Here, the contract expressly states that a "[c]ollapse means an abrupt falling down or caving in of a building ... [and a] sudden and accidental direct physical loss[.]" Policy at 40. Although "collapse" by itself may be ambiguous,[3] the inclusion of "decay" as a possible cause of "collapse" does not render the term ambiguous by subverting the qualifying language in the contract. Decay is but one possible way in which a "collapse" may occur; offering

decay as a possible cause does not create ambiguity in otherwise unambiguous contractual language.

3    If "collapse" was by itself ambiguous, Connecticut's definition of "substantial impairment" would apply. *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 253 (1987). Courts in this District have, on numerous occasions, allowed concrete claims to proceed to summary judgment when the term 'collapse' has been without qualification in the policy. *See, e.g., Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016 (D. Conn. Sept. 30, 2015); *Gabriel v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5684063 (D. Conn. Sept. 28, 2015); *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157 (D. Conn. 2014); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110 (D. Conn. 2014); *accord Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-01686 (SRU), 2017 WL 3710786, at *4 (D. Conn. Aug. 28, 2017) ("For the reasons stated by the Connecticut Supreme Court in *Beach v. Middlesex Mutual Assurance Co.*, and subsequently followed by many judges of this court, I conclude that the term 'collapse,' standing alone, 'is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building.' ") (quoting *Beach*, 205 Conn. at 252). Here, however, qualifying language supplements "collapse" and is not ambiguous. Accordingly, the Court need not address the applicability of *Beach*.

The Hurlburts also cite to *130 Slade Condominium Association, Inc. v. Millers Capital Insurance Co.*, No. CIV.A. CCB-07-1779, 2008 WL 2331048 (D. Md. June 2, 2008). But there the court's conclusion did not turn on whether the policy language was ambiguous. Instead, the court found that the property had "caved in ... when the steel supporting column buckled approximately three inches down and three inches to the south." *Id.* at *5. *130 Slade Condominium Association, Inc.* therefore did not concern facts analogous to those at issue here.

Additionally, *Malbco Holding, LLC v. Amco Insurance Co.*, 629 F. Supp. 2d 1185 (D. Or. 2009), another decision cited by the Hurlburts, is similarly distinguishable. In a similar case, Judge Underhill distinguished the *Malbco* decision in *Alexander v. Gen. Ins. Co. of Am.*, No. 3:16-cv-59 (SRU), Trans. of Mot. Hearing, July 7, 2016, (D. Conn. July 7, 2016), noting that in *Malbco* portions of the insured building had fallen a few inches and the trusses broke. *Id.* at 9. Moreover, the structural damage was so severe that parts of the building could not be occupied.

*Malbco Holding, LLC*, 629 F. Supp. 2d at 1191. Here, by contrast, the Complaint fails to allege an abrupt falling down or caving in, nor have the Hurlburt's alleged that they cannot use their home for its intended purpose.

Consequently, the Hurlburts' Complaint fails to plausibly allege that their home or any portion thereof has collapsed within the meaning of the policy.

### ii. Deterioration as a "State of Collapse"

The Hurlburts do not allege a "falling down or caving in of a building." Policy at 40. Instead, they allege "that th[e] chemical reaction would continue to progressively deteriorate the basement walls, rendering the structure unstable[.]" Compl. at ¶ 7. Defendant asserts that the Hurlburts have failed to allege an "abrupt falling down or caving in. Def.'s Br. at 14. The Court agrees.

 **\*7**  The Policy expressly states that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse." Policy at 40. The collapse provision therefore does not insure the Hurlburts' putative loss until such time as the property "abrupt[ly] fall[s] down or cav[es] in." *Id.*; *see, e.g., Liston-*Smith, 2016 WL 6246300, at *8 (finding that a CSAA policy requiring "an abrupt falling down or caving in" did not cover plaintiffs' home because "the walls were deteriorating as a result of a progressive condition, remained upright, and the home was still inhabitable for its intended purpose").

Furthermore, the Policy states that "[c]ollapse means an abrupt falling down or caving in of a building ... with the result that the building ... cannot be occupied for its current intended purpose." *Id.* Currently, the Hurlburts reside in their home and have not alleged that they cannot or do not use it for its "current intended purpose." Compl. at ¶ 1; *see, e.g., Liston-Smith*, 2016 WL 6246300, at *8 (finding that the home was still inhabitable even though the walls were deteriorating).

The Hurlburts' Complaint insufficiently pleads a claim for relief under the Policy's collapse provision.

### 3. Policy Coverage for a Chemical Reaction

Alternatively, the Hurlburts assert that the policy insures against chemical reactions. The Hurlburts argue that by omitting a "chemical reaction" from the coverage exceptions, Defendant insures against chemical reactions. Compl. ¶ 10. Defendant maintains that, regardless of the involvement of a chemical reaction, the Hurlburts cannot obtain coverage without pleading facts that, if proven, would establish "an abrupt falling down or caving in ... the result that the building or part of the building cannot be occupied for its current intended purpose," which they have not. Policy at 40. The Court agrees.

The Hurlburts gloss over several coverage exclusions. For example, the Policy expressly states that it does not cover the cracking of foundations or walls, deterioration, or latent defect. *Id.*; *see, e.g., Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-01686 (SRU), 2017 WL 3710786, at *3 (D. Conn. Aug. 28, 2017) (finding that plaintiffs' loss was excluded even though the "insurance policy does not exclude by name losses that are caused by chemical reactions," but "expressly exclude 'loss consisting of or caused by ... settling, cracking, shrinking, bulging or expansion of ... foundations [or] walls.' "). The Complaint attributes the cracking to deterioration or latent defect. *See* Opp. Mot. to Dismiss, Ex. A at 2 ("[ASR] typically causes this type of distress to be visible 15 to 20 years after the foundation is poured. The ASR will continue to deteriorate the concrete and the basement walls will continue to bulge inward until they structurally fail.").

Moreover, the Hurlburts maintain that a chemical reaction is a "sudden and accidental direct physical loss." Opp'n. Mot. to Dismiss at 4. Other courts in this District have heard and rejected this and similar arguments. For example, *Agosti* rejected the argument, stating that "loss—if not considered an imminent collapse—clearly 'consist[s] of ... settling, cracking, shrinking, bulging or expansion of ... foundations [or] walls.' The technical cause of the cracking or bulging is irrelevant." 2017 WL 3710786, at *3 (internal citations omitted); *see also England*, 2017 WL 3996394, at *6 (" '[D]irect physical loss' and 'loss,' as used in the Polic[y], unambiguously require some change to the detriment of the insured, and a chemical reaction—without any physical manifestations —does not fit that bill."). The Court sees no reason to disagree with the reasoning in *Agosti*.

**\*8** Because the Hurlburts have not plausibly allege that cracking concrete constitutes a "sudden and accidental"

collapse, the Hurlburts' have not plead a claim upon which the Court may grant relief.

### 4. Policy Coverage for Reasonable Repairs

Plaintiffs argue that the "Additional Coverages" portion of the policy, which states that the insurer will pay the cost of "Reasonable Repairs," should cover the deterioration because such repairs will preemptively prevent a collapse that will then be covered under the policy. Opp'n. Mot. to Dismiss at 7. Defendants contend the terms of the contract preclude coverage because the Hurlburts have failed to allege an abrupt collapse or sudden and accidental loss. The Court agrees.

The policy provides: "We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." Policy at 39. The term "Peril Insured Against" is defined as "sudden and accidental direct physical loss to property described in Coverages A [dwelling] and B [personal property] ... [w]e do not insure, however, for loss: ... [i]nvolving collapse, except as provided in E.8. Collapse...." Policy at 42. Further, the scope of "Peril[s] Insured Against" expressly excludes "deterioration ... latent defect ... other corrosion ... [or] cracking...." *Id.*

Because the Hurlburts have not alleged "a sudden and accidental direct physical loss" as set out above, even taking the facts as true and construing them in favor of the Hurlburts, the Additional Coverage provision cannot be reasonably read to include the loss alleged here. *See, e.g., Adams*, 2017 WL 3763837, at *4 (finding that plaintiffs had failed to allege a sudden collapse); *Manseau*, 2017 WL 3821791, at *5 ("Regardless of whether the loss is characterized as a collapse or a chemical reaction, Plaintiffs fail to allege that any loss occurred suddenly, that is, temporally abruptly, as required for coverage to apply.").

Additionally, the Hurlburts' loss falls within several losses expressly excluded as a "Peril Insured Against." *See, e.g.*, Policy at 42. The Policy excludes "deterioration ... latent defect ... other corrosion ... [or] cracking...." *Id.* The Hurlburts have plead that the foundation in their home is cracking. Compl. at ¶ 7. Absent a collapse, this is precisely the type of loss the Policy specifically excludes.

*See, e.g., Clough*, 2017 WL 3763841, at *5 (finding that although the deterioration may at some point cause the house to collapse, a plaintiff must wait until that time to seek coverage).

Accordingly, Plaintiffs failed to state a plausible claim for relief on the grounds that the "Reasonable Repairs" provision covered their loss.

### 5. Policy Coverage for Ensuing Loss

The Hurlburts also argue that the "ensuing loss" provision applies. Opp'n. Mot. to Dismiss at 7. The Court disagrees.

The "ensuing loss" provision expressly provides that: "We do not insure for loss to property described in Coverages A and B cause by any of the following." Under a subsection, the Policy excludes "[f]aulty, inadequate or defective ... [m]aterials used in ... construction." *Id.* Because the concrete was used in the construction of their home, the Hurlburts have not raised a plausible claim under the "ensuring loss" provision of the policy.

**\*9** Moreover, the Policy provides: "[A]ny ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered." Policy at 1. As discussed above, both the Policy's "Collapse" and the "Perils Insured Against" provisions expressly preempt, as plead, the Hurlburt's ability to rely on the "ensuing loss" provision.

For the reasons stated above, the Hurlburts have failed as a matter of law to state a claim upon which the Court may grant relief. [4]

[4]     At oral argument, Counsel for the Hurlburts conceded that further factual development would not substantively change the allegations in the Complaint as currently pled.

### B. THE COVENANT OF GOOD FAITH AND FAIR DEALING

The Hurlburts contend that Defendant's "unreasonably and in bad faith, [ ] interpreted policy provisions in a manner [and] for the purpose of denying benefits despite the aforementioned provisions of the policy conferring benefits." Compl. ¶ 15. Defendant contends that, absent a

viable breach of contract, there can be no such claim. The Court agrees.

While each contract imposes a duty of good faith and fair dealing on the parties, Connecticut law requires a breach of contract in order to plead bad faith. *Valls*, 2017 WL 4286301, at *5; *see also Capstone Bldg. Corp. v. Am. Motorists Ins.* Co., 67 A.3d 961, 988 (Conn. 2013) (concluding that "bad faith is not actionable apart from a wrongful denial of a benefit under [an insurance] policy.").

Because Plaintiffs, as a matter of law, have not plead a plausible claim for breach of contract, their claim for breach of the implied covenant of good faith and fair dealing also fails. *Valls*, 2017 WL 4286301, at *4; *see also, Manseau*, 2017 WL 3821791, at *5 (dismissing breach of implied covenant claim in concrete case after court dismissed breach of contract claim); *Agosti*, 2017 WL 3710786, at *8 (same). Accordingly, the Hurlburts fail to state a claim on the basis of the covenant of good faith and fair dealing.

### C. CONNECTICUT UNFAIR TRADE PRACTICES ACT AND CONNECTICUT UNFAIR INSURANCE PRACTICES ACT

Finally, the Hurlburts argue that Defendant's participation in the Insurance Services Office, Inc. ("ISO") demonstrate Defendant's participation in an industry-wide scheme to deny claims by homeowners in Connecticut. Opp'n. Mot. to Dismiss at 11. Defendant contends that absent a viable breach of contract claim, the Hurlburts cannot plead a violation of the CUTPA or the CUIPA. The Court agrees.

"A plaintiff may assert a private cause of action based on a substantive violation of CUIPA through CUTPA's enforcement provision." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 117 (D. Conn. 2014). "To succeed on such a CUTPA claim, a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165 (D. Conn. 2014).

As discussed above, because the Hurlburts have failed to plead a plausible breach of contract claim, no CUTPA or CUIPA claim can follow. *See Alexander*, 2017 WL 188134, Trans. of Mot. Hearing, July 7, 2016, at 24 ("Because the coverage claim fails, the claims [under]

CUTPA and CUIPA, also fail. Quite simply, without coverage there can't be ... a violation of either of those consumer statutes."); *see also Cyr*, No. 3:16-cv-85, (DJS) slip op. at 17 (agreeing with *Alexander* and granting the insurer summary judgment on the same grounds); *Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 416 (D. Conn. 2017) ("[A] claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract.").

 **\*10** The Complaint fails to allege on its face a claim under the CUTPA or the CUIPA. These statutory claims therefore must be dismissed.

## IV. CONCLUSION

Plaintiffs have failed to plead a claim upon which this Court can provide relief.

For the reasons discussed above, the motion to dismiss is **GRANTED**.

The Court instructs the Clerk of the Court to enter judgment for Defendant and close this case.

SO ORDERED at Bridgeport, Connecticut, this 23rd day of February, 2018.

**All Citations**

Slip Copy, 2018 WL 1035810

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1258778
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
JUDICIAL DISTRICT OF TOLLAND.

Edith R. JEMIOLA, Trustee of
the Edith R. Jemiola Living Trust
v.
HARTFORD CASUALTY INSURANCE COMPANY

DOCKET NO. CV–15–6008837–S
|
MARCH 2, 2017

**Opinion**

## MEMORANDUM OF DECISION: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (# 141)

Cobb, J.

**\*1** This is one of many cases in Tolland County involving claims of extensive pattern cracking to basement walls caused by a chemical compound in the concrete provided by the J.J. Mottes Concrete Company (JJ Mottes) that was used to construct the basement walls of numerous homes, including the plaintiff's. In this case, the plaintiff, Edith R. Jemiola, Trustee of the Edith R. Jemiola Living Trust, claims that the defendant, Hartford Casualty Insurance Company, breached the homeowner's policy when it denied coverage for the "collapse" of the basement walls of her home and that this breach also constituted a violation of the implied covenant of good faith and fair dealing as well as the Connecticut Unfair Trade Practice Act and the Connecticut Unfair Insurance Practices Act (CUTPA/CUIPA). The defendant moves for summary judgment on all counts of the complaint, which the plaintiff has opposed. Both parties have thoroughly briefed the issues in this case and the court has heard lengthy arguments. Having considered the parties' arguments and submissions, [1] the court concludes that the defendant is entitled to judgment on all of the plaintiff's claims.

1     The defendant filed a motion to strike certain exhibits submitted by the plaintiff in opposition to summary judgment (# 156), which the plaintiff opposed (# 157). The court granted the motion to strike in part and denied it in part. In particular, the court struck the deposition excerpts of the plaintiff's expert taken in other similar cases, as this practice is not permitted under the Practice Book and there was no agreement by the parties as to the use of depositions taken in other cases in the present case.

## UNDISPUTED MATERIAL FACTS

The plaintiff's home is located at 54 Hall Hill Road in Willington. She purchased the home with her former spouse in 1986 shortly after it was constructed. The plaintiff was divorced in 2001 and since then has owned the home individually or as the beneficiary of the trust. The plaintiff placed the home in a living trust in September 2002. The plaintiff's home has been insured by the defendant since 1986. [2] The plaintiff has paid all of the premiums and her policy has been renewed by the defendant, or one of its related subsidiaries, each year since 1986.

2     The plaintiff's house was insured by the defendant after it had been constructed and subsequently purchased.

At all times from 1986 to March 2014, the plaintiff's homeowner's policy with the defendant provided coverage for "collapse." However, from 1986 to March 2005, the policies did not define the term "collapse." In March 2005, the defendant amended the policy to define "collapse" as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." This definition of "collapse" has been contained in the plaintiff's policies from March 2005 through 2014, when she made her coverage claim in this case.

The plaintiff was employed by The Harford for forty-one years in the property-casualty insurance department. The plaintiff read her insurance policies, understood her duty as the insured to timely report claims, and the timing limitations for filing a coverage lawsuit.

**\*2** The plaintiff first observed damage to her home when a crack in the drywall appeared in the southeast side of

the master bedroom in the late 1990s, which was repaired and repainted. Around the 2005 to 2006 timeframe, the plaintiff noticed that several nails in her kitchen had popped out. Several years later, in 2009 and 2010, the plaintiff further noticed that more nails had come out around the windows in the upper portion of her home.

In the fall of 2006, the plaintiff observed cracks in her basement walls that ran in vertical and horizontal directions along the south side of the house and at least one crack split the wall so that the plaintiff could observe light outside through the crack. Consequently, the plaintiff consulted a contractor, Viking Masonry of Manchester, who told the plaintiff that the cracks were normal. The plaintiff then hired Viking Masonry to repair the basement cracks in October 2006. The repairs included excavation around the outside of the house to reinforce the foundation in seven places with 14-inch rebar and expoxy, repairing the outside of the foundation, and waterproofing the plaster. Viking Masonry also filled in the cracks on the inside of the basement walls and installed a support post underneath one of the beams in the plaintiff's home. The post came loose several times and had to be adjusted twice a year.

The plaintiff believed that the cracking in her basement walls was normal, and, thus, the repairs constituted routine home maintenance. As a result, she did not notify the defendant of the cracking condition in 2006 and did not make a claim under her policy.

In 2009, the plaintiff hired Hillcrest Builders to repair chimney damage that she now believes was connected to the shifting of her basement walls. Hillcrest told her that the cracks were "very unusual" and "not normal." The plaintiff did not make an insurance claim after this event.

In 2014, the plaintiff noticed that the same area in her basement that had cracking in 2006, had again begun to crack. The plaintiff was referred to Dean Soucy, a contractor who was experienced with the cracking problem the plaintiff faced. Soucy viewed the basement walls and told the plaintiff that the cracks were related to faulty concrete supplied by the JJ Mottes. The plaintiff believed that Soucy's explanation shed light on the other continuing conditions she had been experiencing in her home.

On June 3, 2014, one day after Soucy informed her of what he believed were significant structural issues with her home, the plaintiff made a claim to the defendant under her policy. The defendant investigated the claim and engaged an engineer to inspect the condition of the plaintiff's home. The defendant then denied the plaintiff's claim and, in its July 22, 2014 denial letter, explained that its engineer determined that "the foundation was cracking due [to] faulty workmanship and the type of materials used in the foundation, however the structural integrity of the foundation walls is not compromised. It was also determined ... that the cracking and nails popping was due to settling of the Lally columns and not related to the foundation damage."

The defendant's denial letter relied on the policy with effective dates of July 10, 2013, to July 10, 2014, and explained that the policy "provides coverage for direct physical loss to your property on an all risk basis. Unfortunately, faulty workmanship and materials as well as settling of walls and foundations are excluded from coverage under the policy." The letter then cited specific provisions in the policy that excluded coverage, including "bulging or expansion, including resultant cracking, of ... foundations [or] walls," or "loss ... caused by ... [f]aulty, inadequate or defective ... [m]aterials used in ... construction."

**\*3** Soucy's Opinion was confirmed by David Grandpré, the plaintiff's expert witness, after he inspected the plaintiff's home on September 4, 2015. Grandpré has opined that the pattern or map cracking condition in the plaintiff's basement is caused by the use of aggregate material, which most likely contains a reactive chemical compound, in the composition of the concrete used to form the basement walls of the plaintiff's home. He believes that the damage is either caused by a ferrous sulfide reaction or an alkali-silica reaction. In the case of iron sulfide reaction, there is an iron mineral such as pyrrhoitite in the concrete which expands in the presence of water, of such small amount as humidity in the air. This internal expansion of the chemical reaction causes the concrete to fracture internally, which results in the cracking or general deterioration of the concrete. The other possible cause, alkali-silica reaction, has a similar expansive mechanism and resulting damage. Grandpré opines that eventually, this condition will lead to the decomposition of the concrete in the basement walls of the plaintiff's home. Once this happens, the walls of the

basement will be unable to support the structure above and the home will fall to the ground. Grandpré has not provided a date or period of time that he believes the home will fall to the ground.

In Grandpré's opinion, the structural integrity of the plaintiff's basement walls is "substantially impaired." He believes that because the aggregate containing the reactive chemical agent was used in the mixing of the concrete, the decomposition and deterioration of the concrete began immediately and was assured the moment it was mixed and poured. Grandpré believes that although the home was "doomed" from the outset, the substantial impairment of the structural integrity of the plaintiff's home occurred after the expansive reaction took place, causing the fracturing and cracking of the concrete to the point that it is no longer a solid mass that it was intended to be. In other words, the substantial impairment occurs when there is some outward manifestation of cracking, which occurs due to the expansive reaction occurring within the walls.

The plaintiff has continuously resided in the home since 1986 and still lives in the home, which remains standing. The plaintiff continues to use her basement for a playroom, storage, and for recreational purposes.

## DISCUSSION

The plaintiff's complaint is in three counts; breach of contract, breach of the covenant of good faith and fair dealing, and violation of CUTPA/CUIPA. In count one, the breach of contract claim, the plaintiff asserts that the defendant violated the homeowner's insurance policies, in place since 1986, when it denied her claim in this case.[3] In count two, the plaintiff asserts that the defendant violated the implied covenant of good faith and fair dealing when it unilaterally, without notice and disclosure, changed the terms of the policy. In count three (incorrectly identified in the complaint as IV), the plaintiff claims that the defendant violated CUTPA/CUIPA by engaging in a general business practice to deny coverage for similar concrete decay claims.

[3]     In her breach of contract count, the plaintiff asserts that the defendant made a unilateral change in her policy in 2005 when it included a definition of collapse without notice or adequate disclosure to the plaintiff.

As a result, the plaintiff alleges that the original provisions of the policy, prior to the institution of the new definition of "collapse," remained in place and apply to this claim. The plaintiff's brief does not address this claim. When asked at argument if the plaintiff was pursuing it in relation to her breach of contract claim, plaintiff's counsel said, "not really." Thus, this court does not address this issue.

The defendant has denied the essential allegations of the plaintiff's complaint and asserted eighteen special defenses. The defendant moves for summary judgment on all three counts of the complaint. As to count one, the defendant argues that the plaintiff's losses are not covered under any of the policies and that the action is barred due to the plaintiff's failure to bring it in a timely manner under the limitation of suit provision, after she first noticed the cracks in the basement in 2006. The defendant asserts that if the court grants summary judgment on the breach of contract count and finds that it correctly denied coverage, then the plaintiff's remaining counts, which depend on a finding of breach, cannot survive.

**\*4** The plaintiff opposes the defendant's motion for summary judgment and asserts that as to the breach of contract claim, there is a genuine issue of material fact as to when the plaintiff's loss occurred—prior to, or after, the defendant amended the policy to include the definition of "collapse." The plaintiff contends that the pre–2005 policies are applicable and under those policies, the court must apply the common law definition of "collapse" that requires a finding of any substantial impairment to structural integrity of the plaintiff's home, and that as to this issue, there is a genuine issue of material fact. If the post–2005 policies are applied, which include a definition of collapse, the plaintiff argues that the definition is ambiguous, thereby triggering the common law definition of collapse applicable to the pre–2005 policies, which would similarly create a genuine issue of material fact.

### A. Summary Judgment Standards

The standards for considering motions for summary judgment are well established. Practice Book § 17–49 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Our Supreme Court has recently set forth the burden on each party: "In seeking summary judgment, it is the movant that has the burden of

showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. ... When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. ... Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [§ 17–45] ...." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co. v. Tully*, 322 Conn. 566, 573, 142 A.3d 1079 (2016); see *Stuart v. Freiberg*, 316 Conn. 809, 820–21, 116 A.3d 1195 (2015).

"[S]ummary judgment is appropriate only if a fair and reasonable person could conclude only one way. ... [A] summary disposition ... should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party. ... [A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Dugan v. Mobile Medical Testing Services, Inc.*, 265 Conn. 791, 815, 830 A.2d 752 (2003); see *Farrell v. Twenty–First Century Ins. Co.*, 301 Conn. 657, 662, 21 A.3d 816 (2011).

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. ... Because [l]itigants have a constitutional right to have factual issues resolved by the jury ... motion[s] for summary judgment [are] designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted; internal quotation marks omitted.) *Maltas v. Maltas*, 298 Conn. 354, 365–66, 2 A.3d 902 (2010); see *Grenier v. Commissioner of Transportation*, 306 Conn. 523, 534–35, 51 A.3d 367 (2012).

### B. Count One—Breach of Contract

**\*5** "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Keller v. Beckenstein*, 117 Conn. App. 550, 558, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009). There is no dispute that the parties entered into contracts—homeowner's insurance policies—from 1986 to 2014, and that the plaintiff paid all of her annual premiums over that period of time. The plaintiff's claim in this case is that the defendant breached these policies by denying her claim for the damage to her basement walls, which she claims constitutes a "collapse." Because the definition of collapse changed substantially in March 2005, from an undefined term to a defined term, the first question the court must determine is whether there is a genuine issue of material fact as to when the plaintiff's loss occurred. If so, then the parties agree that the issue of when the loss occurred must be decided by the jury.

### 1. When the Loss Occurred

This case involves two sets of policies, which require application of two very different definitions of "collapse:" (1) the pre–March 2005 policies provide coverage for "collapse," but do not define the term, leaving the court to apply the more liberal common law definition of "collapse" to determine if the defendant breached the contract; and (2) the post–March 2005 policies which contain a more narrow and limited definition of the term "collapse." If there is a genuine issue of material fact as to whether the loss occurred prior to March 2005, then the issue of whether there had been a "collapse" would be guided by the 1986 decision of our Supreme Court that held that the undefined word "collapse" in a similar homeowner's insurance policy was ambiguous and then defined it to mean "any substantial impairment of the structural integrity of a building." *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246,

532 A.2d 1297 (1987). If the *Beach* definition applies in this case, then the issue of whether there was any substantial impairment of the structural integrity of the plaintiff's home would be a question of fact for the jury to decide based on the competing opinions of the parties' experts. See *Roy v. Liberty Mutual Fire Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV–15–6009410–S (February 22, 2017, *Cobb, J.*) (applying the definition of "collapse" as outlined by *Beach* to deny summary judgment because there was a genuine issue of material fact as to whether the plaintiff's house had suffered any substantial impairment of its structural integrity).

If, however, the undisputed material facts establish that the loss occurred after March 2005, then the court must undertake a two part analysis to determine whether there has been a "collapse," as defined by all of the post March 2005 polices as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." The court must first determine whether this definition of "collapse" is ambiguous, and, second, whether there is a genuine issue of material fact that the policy provides coverage for the plaintiff's loss.

At a minimum to prevail under any policy, and in particular the pre–2005 policies where there is no policy definition, to establish that her house has suffered a "collapse" the plaintiff agrees that she must establish that her home suffered a substantial impairment to the structural its integrity, pursuant to the common law definition of "collapse."

The plaintiff claims that she has presented sufficient evidence to establish a genuine issue of material fact that the loss occurred prior to March 2005, and in particular, that it can reasonably be inferred from the evidence presented that the substantial impairment existed prior to March 2005 in the early 2000s. The defendant disagrees and argues that such an inference cannot be drawn from the facts presented, but rather, would require a jury to resort to speculation and surmise. The court agrees with the defendant and finds that the plaintiff has not produced sufficient evidence to establish a genuine issue of material fact from which the court, or a jury, could find or infer that the loss occurred prior to March 2005.

**\*6** The plaintiff testified at her deposition that the first time she observed horizontal and vertical cracks on the

walls on the south side of her basement was in the fall of 2006. In October 2006, the plaintiff hired a contractor to repair the cracks. The plaintiff presented no evidence that anyone observed any cracks to the plaintiff's basement walls prior to October 2006. The plaintiff further testified that she had issues with her furnace, and, therefore, she was very diligent about checking her basement. Therefore, there is no eyewitness evidence of cracking to the plaintiff's basement walls prior to October 2006.

The plaintiff conceded at argument that the determination of whether there was a substantial impairment of the structural integrity of her home requires expert testimony. [4] The plaintiff's expert witness stated in his deposition, that the plaintiff's basement walls have been impaired since 1986 when the concrete was poured because the chemical reaction in the concrete was inevitable. However, he did not provide an opinion, and it is not the plaintiff's position, that the substantial impairment of the structural integrity of the plaintiff's home occurred in 1986, when the concrete was first poured. [5] Instead, it is the plaintiff's position in this case, supported by her expert witness, that the substantial impairment of the structural integrity of the plaintiff's home, that is, the loss, occurred when outward manifestations of horizontal and vertical cracking appeared and were visible in the basement walls. [6] The plaintiff's expert opines that October 2006 was "latest point in time" that a substantial impairment occurred, that is, when the plaintiff observed the cracks. The plaintiff's expert did not offer an opinion that it could be reasonably inferred that the substantial impairment existed nineteen months earlier, prior to March 2005, based on the fact that the cracks were visible in October

4    Expert testimony is generally required where the question involved goes beyond the field of ordinary knowledge and expertise of judges or jurors. *Franchey v. Hannes*, 155 Conn. 663, 666, 237 A.2d 364 (1967); *State v. Padua*, 273 Conn. 138, 149, 869 A.2d 192 (2005).

5    Even if this argument was made, it fails because the defendant did not insure the home when it was first poured; rather, the home at issue was constructed and purchased before it was subject to any homeowner's policy.

6    At oral argument, plaintiff's counsel clarified this point, stating that "substantial impairment" requires some evidence of cracking, "when the concrete itself is broken apart and fractured."

Despite the lack of direct eyewitness or expert evidence, the plaintiff claims that the jury could make a reasonable inference that there was a substantial impairment to her home prior to March 2005 because (1) there was visible cracking in the basement in October 2006 and her expert opined that the deterioration began immediately in 1986, and (2) she observed cracking in the drywall and the popping of nails in the upstairs living portion of her home as early as the late 1990s and "around the 2005–2006 time frame." [7] The court disagrees that such an inference could be made based upon this evidence because no one observed any visible signs of cracking prior to October 2006, despite the plaintiff's diligence in checking her basement, and her expert offered no opinion in this case that based on the existence of extensive cracking in plaintiff's basement walls in October 2006, it could be reasonably inferred that visible cracking was present prior to March 2005. Similarly, the plaintiff's expert did not opine that the substantial impairment to her basement walls occurred, or was at all related to, the outward manifestations occurring in the upper portion of the home. There was nothing in the plaintiff's expert's deposition that could permit either inference, and no affidavit of the plaintiff's expert was submitted in this case. [8] "Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion ... a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. ... A party opposing a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Ecourse v. 100 Taylor Avenue, LLC*, 150 Conn. App. 819, 829–30, 92 A.3d 1025 (2014); see *Buell Industries v. Greater N. Y. Mutual Ins. Co.*, 259 Conn. 527, 558, 791 A.2d 489 (2002); see also *Paige v. St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 33–34, 734 A.2d 85 (1999) ("[d]rawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable they must rest

upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess" [Internal quotation marks omitted] ).

7    The plaintiff urges the court to follow another nonbinding Superior Court's decision in this district denying summary judgment in a similar case finding that when the loss occurred was a genuine issue of material fact. See *Boucher v. Amica Mutual Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV–12–6004826S (February 1, 2013, *Sferrazza, J.*). The court declines to apply this decision because the facts are distinguishable and the decision is a single sentence containing no analysis.

8    At oral argument, the court pressed plaintiff's counsel on this important point—that is, whether the plaintiff's expert had offered or could offer an opinion that based on the visible cracking in the plaintiff's basement walls in October 2006, it could be reasonably inferred that such visible cracking, and thus, a substantial impairment of the structural integrity of the plaintiff's home, existed in March 2005 or earlier. The plaintiff conceded that the expert has not rendered such an opinion. The court invited the plaintiff to provide the court with a supplemental affidavit from the expert on this crucial issue, but such an affidavit was not submitted in this case.

**\*7**  Thus, the court concludes that the undisputed material facts establish that the loss in this case can be traced to October 2006, when the plaintiff observed the cracking of her basement walls. The plaintiff has failed to produce admissible counter-evidence to establish a genuine issue of material fact that the loss occurred prior to March 2005.

## 2. Coverage Under Post–2005 Policies

Having determined that the undisputed evidence establishes that the loss occurred after the defendant changed the policies to include an amendment for the term "collapse," in March 2005, the court turns to the issue of whether the defendant breached the post–March 2005 policies by finding that the loss did not constitute a "collapse," and denying the plaintiff's claim. Because all of the relevant provisions contained within the post–March 2005 policies are the same, the court does not have to decide the exact date of the loss or which specific annual policy applies here.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

The defendant asserts that it is entitled to summary judgment on the plaintiff's breach of contract claim because the undisputed material facts establish that it did not breach the policy in denying coverage for this claim. In particular, the defendant claims that the definition of "collapse" in the post March 2005 policies is unambiguous, requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." The defendants argues that the claim is not covered under the policy and it is therefore entitled to summary judgment because the undisputed facts establish that the house has not "abruptly" "fallen down" or "caved in," rather, it is still standing and the plaintiff remains living in the home. The plaintiff disputes the defendant's claims and argues that the policy definition of collapse is internally inconsistent and ambiguous. In particular, the plaintiff argues that the word "abrupt" is ambiguous and it should be construed to mean "unexpected." The plaintiff also argues that the terms "falling down," "caving in," and "occupied for its current intended purpose," are ambiguous. If the policy definition is ambiguous, then the more liberal common law definition of collapse annunciated in *Beach* would apply, rendering the issue one for the jury to decide. Having reviewed the policy, the relevant cases and the parties' arguments, the court concludes that as applied to this case, the policy definition of collapse is unambiguous and does not provide coverage for the plaintiff's loss.

The standards governing interpretation of insurance policies are well established. "[A]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." (Internal quotation marks omitted.) *Shenkman–Tyler v. Central Mutual Ins. Co.*, 126 Conn. App 733, 742, 12 A.3d 613 (2011); see *Connecticut Ins. Guaranty Assn. v. Fontaine*, 278 Conn. 779, 784–85, 902 A.2d 18 (2006). "[P]rovisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." (Internal quotation marks omitted.) *Vermont Mutual Ins. Co. v. Walukiewicz*, 290 Conn. 582, 592, 966 A.2d 672 (2009). Where policy terms are unambiguous, they should be accorded their natural and ordinary

meaning and "the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (Internal quotation marks omitted.) *Jacaruso v. Lebski*, 118 Conn. App. 216, 233, 983 A.2d 45 (2009). "Contract language is unambiguous when it has a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion." (Internal quotation marks omitted.) *Isham v. Isham*, 292 Conn. 170, 181, 972 A.2d 228 (2009).

**\*8** Where a policy term is susceptible to more than one meaning, the term should be construed against the insurance company. See *New London County Mutual Ins. Co. v. Zachem*, 145 Conn. App. 160, 165, 74 A.3d 525 (2013). Ambiguous policy terms are construed in favor of coverage. See *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.* 311 Conn. 29, 66, 84 A.3d 1167 (2014); *Johnson v. Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 642, 31 A.3d 1004 (2011). Where an insurance policy is ambiguous, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact. *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.*, 284 Conn. 744, 762–63, 936 A.2d 224 (2007).

Before examining the specific policy language at issue, the court sets forth some relevant legal history. In 1986, the Connecticut Supreme Court considered an insurance coverage dispute in which the issue was whether the undefined word "collapse" in the homeowners' policy was ambiguous. *Beach v. Middlesex Mutual Assurance Co.*, supra, 205 Conn. 246. In *Beach*, the defendant insurance company denied the homeowners' claim and argued that the word "collapse" in the policy unambiguously connoted a sudden and complete catastrophe of a cataclysmic nature. The court disagreed and found that the word "collapse" in the policy was ambiguous. It then adopted the majority view of courts that had similarly considered policies that did not define the term, and determined that collapse meant "any substantial impairment of the structural integrity of a building." Id., 252. In its decision, the Court invited the defendant insurance company to define the term "collapse" stating: "If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it has the opportunity expressly to define the term to provide for the limited usage it now claims to have intended." Id., 251.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

As discussed, from 1986 to March 2005, the plaintiff's policies provided coverage for collapse, but they did not define the term, thereby rendering the common law provision applicable. See *Roy v. Liberty Mutual Fire Ins. Co.*, supra, Superior Court, Docket No. CV–15–6009410–S. However in March 2005, the defendant amended the policy to include a more narrow and limited definition of "collapse." Since March 2005, all of the plaintiff's policies have included this definition.[9]

[9]   It is the court understanding that all or most of the defendant's homeowners' policies now include the definition of "collapse" at issue here.

In particular, the policies from March 2005 forward provide "Additional Coverage" for "collapse," and provide in relevant part:

b. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion.

 **\*9**  c. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against named under Coverage C;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to the "insured" prior to collapse;

(4) Weight of contents, equipment, animals or people.

(5) Weight of rain which collects on a roof; or

(6) Use of defective material or methods in construction, remodeling or renovation....

By using the phrase "abrupt falling down or caving in of a building or part of a building" this language appears to be a response to the *Beach* Court's suggestion that the defendant insurance company define the term "collapse," in that it clarifies that a "collapse" requires a sudden and catastrophic type event.

No other Connecticut state court has had occasion to interpret this "collapse" definition in a case JJ Mottes concrete case.[10] However, a Connecticut Federal District Court has recently reviewed the same collapse definition in a similar case, involving defective concrete from JJ Mottes, and granted the defendant's motion to dismiss finding that coverage was barred based on this definition which it found to be unambiguous. *Alexander v. General Ins. Co. of America*, United States District Court, Docket No. 3:16–CV–59 (SRU) (D. Conn. July 7, 2016). In the court's oral decision, it stated:

So there are several problems for the plaintiff given the allegations of the complaint here. The first is that there has been no abrupt falling down or caving in of a building or any part of a building for which coverage applies, and there has not been a clear allegation that any building or part of a building cannot be occupied for its intended purpose.

Even if that had been met, what we have here is a building that is in danger of falling down, and that is expressly excluded from collapse coverage; and, similarly, there has been cracking, building, etc. Those situations are also excluded....

[10]   There is a Connecticut Superior Court case that found in a different context this policy definition of collapse not to be ambiguous. *The Shorts Domain, LLC v. Max Specialty Ins. Co.*, Superior Court,

judicial district of New Haven, Docket No. CV–09–5025291–S (December 19, 2011, *Hadden J.T.R.*).

On reconsideration, the District Court reaffirmed its decision, stating: "Plaintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are cracking or ... they are bulging. Both conditions are expressly excluded under the definition of the policy and it is clear that no collapse has occurred." *Alexander v. General Ins. Co. of America*, United States District Court, Docket No. 3:16–CV–59 (SRU) (D. Conn. January 17, 2017).

Courts around the country have examined this same policy definition of the word "collapse," and also determined that the definition is unambiguous, and applied it to sustain the denial of coverage claims. See *Squairs v. Safeco National Ins. Co.*, 25 N.Y.S.3d 502, 136 A.D.3d 1393, appeal denied, 27 N.Y.3d 907, 56 N.E.3d 900, 36 N.Y.S.3d 620 (2016) (determining that the collapse provision is unambiguous and finding there had not been a collapse because the building was still standing); *Rector St. Food Enterprises, Ltd. v. Fire & Casualty Ins. Co. of Connecticut*, 827 N.Y.S.2d 18, 35 A.D.3d 177 (2006) (rejecting the plaintiff's public policy arguments and determining the collapse provision is unambiguous); *Residential Management, Inc. v. Federal Ins. Co.*, 884 F. Supp. 2d 3 (E.D.N.Y. 2012) (following New York precedent and determining that the four section definition of collapse in the policy is clear enough to clarify any potential ambiguity); *Mount Zion Baptist Church v. Guideone Elite Ins. Co.*, 808 F. Supp. 2d 1322 (N.D.G.A. 2011) (determining that the collapse provision was unambiguous because of the specific definition included within the policy); *Miller v. First Liberty Ins. Co.*, United States District Court, Docket No. 07–1338 (TNO) (E.D.P.A. June 17, 2008) (concluding that the collapse provision, including the four part definition of collapse, is unambiguous).

**\*10** The court agrees with the Connecticut Federal District Court in *Alexander* and the other courts around the country that have held that the definition of collapse in the policy is unambiguous as applied to circumstances similar to this case.

The plaintiff relies on a number of out-of-state decisions that have interpreted the definition of "collapse," under the circumstances presented in those cases, and found

the definition to be ambiguous. [11] See *Landmark Realty, Inc. v. Great American Ins. Co.*, United States District Court, Docket No. 10–278 (JKS), 2010 WL 5055805 (D. Md. December 3, 2010) (determining that the application of the collapse provision to the building at issue yields conflicting results and, thus, creates an ambiguity); *Ken Johnson Properties, LLC v. Harleysville Worcester Ins. Co.*, United States District Court, Docket No. 12–1582 (JRT/FLN) (D. Minn. September 30, 2013) (determining that the collapse provision is ambiguous because "of the conflicting nature of the four subsections defining collapse"); *Malbco Holdings, LLC, v. Amco Insurance Company*, 629 F. Supp. 2d 1185 (D. Or. 2009) (finding that the collapse provision is ambiguous because the entire definition, with the exception of "abrupt," is subject to more than one plausible interpretation); *Scorpio v. Underwriters at Llyod's London*, United States District Court, Docket No. 10–325 (ML) (D. R.I. June 5, 2012) (finding that the collapse provision at issue would provide coverage under one section, but preclude coverage under other sections, resulting in an ambiguity); *Kings Ridge Community Assn., Inc. v. Sagamore Ins. Co.*, 98 So. 3d 74 (Fla. Dist. Ct. App. 2012) (recognizing the factual similarities of *Malbco, 130 Slade*, and *Landmark*, and holding that the collapse provision "is susceptible to more than one reasonable interpretation, one providing coverage, and the other limiting coverage").

[11]   In addition to the preceding cases, the plaintiff also contends that the court in *130 Slade Condominium Assn., Inc., v. Millers Capital Ins. Co.*, United States District Court, Docket No. 07–1779 (CCB) (D. Md. June 2, 2008), found the collapse provision ambiguous; however, the court disagrees. The *130 Slade* decision cannot be read to decide whether the collapse provision is ambiguous or unambiguous because the court did not resolve that issue. Instead, the court found that the policy affords coverage whether it found that the collapse provision was ambiguous or unambiguous.

The court does not find these cases cited by the plaintiff to be persuasive because they found the definition of collapse to be ambiguous based upon its application to the particular building and facts at issue in those cases, which are distinguishable from this case. For example, in certain cases, the buildings were uninhabitable; see e.g., *Ken Johnson Properties, LLC v. Harleysville Worcester Ins. Co.*, supra, United States District Court, Docket No. 12–1582 (JRT/FLN) (the building was suffering from a

sagging roof, broken joists, a hole in the roof, and at least one apartment in the building was condemned); *Landmark Realty, Inc. v. Great American Ins. Co.*, supra, United States District Court, Docket No. 10–278 (JKS) (the building was evacuated and the property was condemned as "unfit for human habitation" due to the sagging of the floor); *Malbco Holdings, LLC, v. Amco Insurance Company*, supra, 629 F. Supp. 2d 1185 (the building was in a dangerous physical condition due to a sagging floor and the city was prepared to shut down the entire building, but for an emergency shoring). Also, in other cases, the building experienced a sudden occurrence in which the building, or a part of it, fell down or caved in; see e.g., *Scorpio v. Underwriters at Llyod's London*, supra, United States District Court, Docket No. 10–325 (ML) (after a rain storm, the roof fractured and "permanently deflected"); *Kings Ridge Community Assn., Inc. v. Sagamore Ins. Co.*, supra, 98 So. 3d 74 (one morning, the building began to shake resulting in the significant deflection of the flat roof and ceiling).

 **\*11** In interpreting contracts, "[t]he ambiguous language must render the policy ambiguous as to the relevant issue." *Connecticut Medical Ins. Co., v. Kulikowski*, 286 Conn. 1, 15, 942 A.2d 334 (2008). In addition to the plaintiff's cited cases being distinguishable, the ambiguities found by the courts in those cases were premised on the certain facts when applied to the definition that made the definition ambiguous.

Applying the unambiguous "collapse" provision to the plaintiff's home, there is no genuine issue of material fact that the plaintiff's loss is not covered because there has been no sudden or abrupt falling down or caving in, pursuant to subsection b (1). Subsection b (1), of the Additional Coverage section, provides the primary definition of "collapse" and the following subparts, (2), (3), and (4), provide additional clarification of that definition. The definition utilizes plain and ordinary language understandable to a layman. "Abrupt" is generally understood to mean "characterized by or involving action or change without preparation or warning." Miriam–Webster's Collegiate Dictionary (11th Ed. 2003). Abrupt is also defined as "unexpectedly sudden." American Heritage College Dictionary (5th Ed. 2011). "Sudden" has recently been found to mean "a rapid or otherwise abrupt manner." See *Buell v. Greater New York Mutual Ins. Co.*, supra, 259 Conn. 527 (concluding that the term "sudden," as used in

an insurance policy's "pollution exclusion," to be clear and unambiguous, and expressly rejecting the plaintiff's argument that the "sudden" should be construed to mean "unexpected"). "Unexpected" is generally defined to mean "occurring without warning; unforeseen"; American Heritage College Dictionary (5th Ed. 2011); and is generally considered a synonym for "abrupt" or "sudden." [12] The word "abrupt" is unambiguous and the damage to the plaintiff's basement walls was not "abrupt," but rather is happening over time.

12      The plaintiff urges the court to find the word "abrupt" ambiguous, because the falling down or caving in in this case is not unexpected as it is taking place over time. Even if the court were to adopt this argument, the plaintiff could not prevail under the other unambiguous requirements of the definition as discussed.

The damage to the plaintiff's basement walls is due to defective material in the concrete that is causing it to deteriorate over time. The basement walls will, according to the plaintiff's expert, eventually give way, causing the house to fall into the basement. However, this has not happened yet. The plaintiff's expert offers no opinion as to when this event will occur. Thus, at this point in time, the plaintiff's home and or basement walls are only in danger of falling down or caving in and her home remains standing. Under these circumstances, the plaintiff cannot meet the "abrupt falling down and caving in" portion of the definition. Additionally, under these circumstances, the plaintiff's loss is excluded under subpart b(2) of the definition, which clarifies that a "collapse" does not include a building that "is in danger" of falling down or caving in.

Furthermore, the plaintiff's home can still be occupied "for its intended current purposes," pursuant to the definition. It is undisputed that the plaintiff has lived in the home continuously since 1986 and still lives there today. In addition to living in her home, the plaintiff continues to use her basement. The home is still standing and has not been condemned and she has not been forced to move out of it due to any imminent risk that the basement walls will give way. Also, under these circumstances, the plaintiff's loss is excluded under subpart b(4) of the definition which clarifies that a building is not in a state of "collapse" if "it is standing ... even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion."

**\*12**  Thus, the court concludes that the policy definition of "collapse," when applied to the circumstances of this case, is unambiguous. Applying that unambiguous definition here, the court finds that the defendant did not breach the policies in place from 2005 forward, when it denied the plaintiff's insurance claim. Accordingly, the defendant is entitled to summary judgment on count one, the plaintiff's breach of contract count. [13]

13    Because the court has found that the policy did not cover the plaintiff's loss, it is unnecessary for the court to decide the defendant's suit limitation claim.

*C. Other Claims*

Because the court has found no improper denial of coverage under the policy, the plaintiff cannot prevail on count two, her claim of breach of the covenant of good faith and fair dealing. See *Capstone Building Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 796, 67 A.3d 961 (2013) (concluding that "bad faith is not actionable apart from a wrongful denial of a benefit under the policy"). Thus the defendant is entitled to judgment as to count two.

As to her CUTPA/CUIPA claim, that too must fail in view of the court's finding that there was not coverage under the policy, and, consequently, the plaintiff has not sustained an injury. See *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306, 692 A.2d 709 (1997) ("in order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act *and* that, 'as a result of' this act, the plaintiff suffered an injury" [Emphasis original] )

CONCLUSION

For all of the foregoing reasons, the defendant's motion for summary judgment is granted as to all counts of the complaint.

So ordered.

**All Citations**

Not Reported in A.3d, 2017 WL 1258778

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2908951...

Case 3:16-cv-00132-VAB Document 500-1 Filed 04/06/18 Page 91 of 190

2017 WL 2908951 (D.Conn.) (Trial Motion, Memorandum and Affidavit)
United States District Court, D. Connecticut.

Justyn CYR, et al., Plaintiffs,

v.

CSAA FIRE & CASUALTY INSURANCE COMPANY, Defendant.

No. 3:16-CV-00085 (VLB).
March 31, 2017.

**Memorandum of Law in Support of Motion for Summary Judgment**

Daniel P. Scapellati, Federal Bar No. ct03855, Carl R. Ficks, Jr., Federal Bar No. ct03342, Halloran & Sage LLP, 225 Asylum Street, Hartford, CT 06103, Telephone: (860) 522-6103, scapellati@halloransage.com, ficks@halloransage.com, for the defendant, CSAA Fire & Casualty Insurance Company.

I. *INTRODUCTION*

Defendant CSAA Fire & Casualty Insurance Company ("CSAA") respectfully submits this memorandum of law in support of its Motion for Summary Judgment as to the Plaintiffs' Complaint dated December 14, 2015. By way of their Complaint, the Plaintiffs seek to recover insurance proceeds under their homeowners' insurance policy with CSAA due to the cracking of their concrete foundation and basement walls. The Plaintiffs' claims are not only untimely but based on the undisputed factual record, are barred as a matter of law under numerous unambiguous provisions of the policy.

First, coverage is barred because the alleged loss occurred outside of the policy period. Indeed, many years before the Plaintiffs secured homeowners insurance with CSAA, they were aware of the cracking of their foundation and as a result, undertook significant repairs in 2005 to replace nearly one-half of the foundation. Consequently, because the loss occurred prior to inception of the CSAA policy, there is no coverage. Moreover, the Plaintiffs failed to commence this suit against CSAA within two years of the date of loss. Accordingly, the Plaintiffs' suit is barred by the policy's two-year suit limitation provision.

Second, the Plaintiffs' policy does not cover the loss at issue because the loss does not constitute a "Collapse" as defined by the policy. Specifically, because the Premises is still standing, has not sustained an abrupt falling down or caving in and is still being used for its intended purpose, the Premises has not "collapsed" as contractually defined. Therefore, coverage for the loss based upon the policy's Additional Coverage - Collapse is barred.

Third, coverage for the alleged loss is barred as a matter of law because the policy provides coverage for accidental, fortuitous losses only. Here, there is no genuine issue of material fact that the Plaintiffs' loss was not an accidental, fortuitous loss. Consequently, there is no coverage.

Fourth, coverage for the alleged loss is barred upon several unambiguous exclusions in the subject policy. Specifically, the policy excludes coverage for damage that results from wear, tear, marring, deterioration, inherent vice, latent defect and/or mechanical breakdown. Because the Plaintiff's alleged loss or damage is the result of wear and tear, marring, deterioration, inherent vice and/or latent defect, there is no coverage for the claim. The loss is further excluded as it is the result of defective materials and/or workmanship in construction and because the loss consists of and/or was caused by cracking.

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY I..., 2017 WL 2958591...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 92 of 190

Finally, as argued below, there is no genuine issue of material fact that CSAA did not handle the Plaintiffs' claim in bad faith. Nor did CSAA violate Connecticut's Unfair Trade Practices Act. As such, CSAA is entitled to summary judgment on these extracontractual claims as well.

Based upon the foregoing, judgment as a matter of law should enter on all counts in CSAA's favor.

## II. *UNDISPUTED FACTS*

### A. *The Plaintiffs' Claims*

By way of Complaint dated December 14, 2015 Plaintiffs Justyn Cyr and Sheila Cyr (the "Plaintiffs") instituted this action seeking insurance proceeds allegedly due to the cracking of the concrete foundation of the Plaintiffs' house located at 35 Old Kent Road South, Tolland, Connecticut (the "Premises"). *See* Local R. 56(a)1 Statement at ¶1. The Plaintiffs served CSAA with the instant lawsuit on December 21, 2015. *Id.* at ¶38.

The undisputed facts establish that the cracking condition of the concrete foundation of the Premises is a gradual and ongoing condition which the Plaintiffs first became aware of in 2003, many years before the Plaintiffs obtained homeowners insurance from CSAA. Further, there is no genuine issue of material fact that the Plaintiffs have known for more than 10 years that the cracks in the foundation were a significant issue and that they undertook extensive repairs of the foundation in 2005. *Id.* at ¶¶8-15.

Beginning in or about 2003, the Plaintiffs observed visible cracking patterns in the basement walls of the Premises. *Id.* at ¶8. Over the course of at least one winter prior to 2005, the Plaintiffs observed the crack in the front wall change, prompting them to look into it further. *Id.* at ¶9. Because Plaintiff Sheila Cyr was a real estate agent, she had been involved in inspections and initially believed the cracking was normal settling. *Id.* at ¶10. When Mrs. Cyr observed that the crack in the foundation wall was getting bigger, she knew that it was unusual and knew that they had to do something. *Id.* at ¶11. After noticing the crack in the exterior of the front wall of the Premises, the Plaintiffs opened up the front wall in the basement to investigate. *Id.* at ¶12. Once the front wall was opened up, the Plaintiffs observed that "there were puzzle pieces," the wall was bowing in and there was "cracking everywhere." *Id.* at ¶13.

In September 2005 the Plaintiffs undertook the replacement of the concrete foundation in the front of the house and three quarters of the south side of the house due to cracking and bowing of the foundation. *Id.* at ¶14. The Plaintiffs took extensive photographs of the repairs to the concrete foundation which shows the cracks in the concrete. *Id.* at ¶15. The cracks that were present prior to and at the time of the repairs in 2005 were the type of cracks associated with defective concrete and were sufficient to create impairment of structural integrity. *Id.* at ¶16. The repairs sought to address cracking concrete that was not normal and cost over $25,000, including excavation, disconnection of utilities, removal of front steps, removal of part of the old concrete, re-pouring the front and left side concrete walls, back fill, reinstallation of utilities, landscaping, front steps and rebuilding an existing finished basement. *Id.* at ¶¶17 and 18.

In 2005, when the repairs were undertaken, Justyn Cyr knew that the right wall and the back section of the left wall also needed to be replaced but the Plaintiffs did not have the money to do it. *Id.* at ¶19. The Plaintiffs contacted their homeowner's insurer at the time, Allstate, but were told there was no coverage for the cracking foundation. *Id.* at ¶20.

The concrete deterioration and cracking were caused by a chemical reaction in the concrete and this reaction will progressively deteriorate the basement walls rendering the structure unstable. *Id.* at ¶21. The cracking is caused by an inherent defect in the form of improper materials used in the concrete that have been essentially lying in wait since the concrete was poured. *Id.* at 22.

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2909597...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 93 of 190

On October 12, 2015, just over ten years after undertaking these repairs, the Plaintiffs made a formal claim to CSAA for damages caused by the chemical reaction. *Id.* at ¶23. The Plaintiffs seek coverage under the Policy's Additional Coverage - Collapse provision. *Id.* at ¶24. They seek to recover for the progressive deterioration of the concrete caused by the chemical reaction. *Id.* at ¶25.

On or about October 14, 2015, CSAA employee Michael Fantozzi visited the Premises. Although no one was present, Fantozzi took photographs of the exterior. *Id.* at ¶36. After conducting an efficient investigation, CSAA denied coverage for the Plaintiffs' claim by way of correspondence dated October 23, 2015. *Id.* at ¶26. CSAA did not rely on or consider information from the Insurance Services Office, Inc. (the "ISO") in reaching its coverage determination. *Id.* at ¶37.

The Premises is still standing and the Plaintiffs are using it for its intended purpose. *Id.* at ¶27. The Premises has not abruptly fallen down or caved in. *Id.* at ¶28. The Plaintiffs have not experienced any damage of a sudden nature. *Id.* at ¶29. They are still living at the Premises, which is being used for its intended purpose. *Id.* at ¶30.

Because the Plaintiffs were unaware that CSAA came to the Premises to investigate the claim, the Plaintiffs question the investigation conducted by CSAA and opine that CSAA denied the claim without viewing the Premises. *Id.* at ¶¶31-32. CSAA has not done anything misleading or immoral. *Id.* at ¶33. The Plaintiffs admittedly have not been misled by CSAA. *Id.* at ¶34. The Plaintiffs are, however, disappointed that the claim was denied. *Id.* at ¶35.

Based upon the foregoing, the Plaintiffs claim that CSAA breached the Policy. In Count Two, the Plaintiffs assert a claim for breach of the duty of good faith and fair dealing. It is alleged that CSAA, in its discretion, unreasonably and in bad faith sought out other policy provisions and interpreted these and other provisions in a manner for the purpose of denying benefits despite the aforementioned provisions conferring benefits. *Id.* at ¶1 (Compl. at ¶16). By failing to provide coverage and/or failing to address and/or provide coverage afforded by the terms of the policy, the Plaintiffs claim injury for allegedly not receiving the benefit to which they were entitled. *Id.*

In Count Three, the Plaintiffs allege that CSAA violated the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act ("CUTPA/CUIPA") as follows: CSAA allegedly participates with the ISO, an organization that collects data regarding claims shared by most, if not all, insurance companies. *Id.* at ¶19. The use of ISO was not made known to the Plaintiffs at any time while insured by CSAA. It is further alleged that CSAA has knowledge from ISO of numerous claims and lawsuits that have arisen in this geographic section of Connecticut for deteriorating concrete. *Id.* at ¶21. From the information received from ISO, CSAA has allegedly attempted to deny claims such as the Plaintiffs' based on other purported exclusions, despite provisions within the policy that provide coverage for the chemical reaction and collapse. Despite this knowledge, CSAA allegedly provided a false and misleading denial that was contrary to other sections of the policy such as collapse and that nowhere in the policy does it exclude coverage for chemical reaction losses. *Id.* at ¶23. The Plaintiffs further allege that CSAA regularly denied claims in a similar manner or on similar grounds or other grounds, including other matters handled by the Plaintiffs' attorney. *Id.* at ¶24. By failing to effectively evaluate and effectuate a fair solution to the Plaintiffs' claims, CSAA has allegedly conducted itself in a business practice intended to put the Plaintiffs at a disadvantage in violation of CUTPA/CUIPA. *Id.* at ¶25-26.

### B. *The Policy*

CSAA issued a policy of homeowners insurance to the Plaintiffs bearing policy number H05-003823949 with effective dates of 9/11/15 - 9/11/16 (the "Policy"). [1]  Local R. 56(a)1 Statement at ¶3. The Policy provides, in pertinent part, as follows:

Footnotes

## SECTION I - PERILS INSURED AGAINST

We insure against risk of direct physical loss to property described in Coverages A, B and C.

We do not insure, however, for loss:
A. Under Coverages A, B and C:

1. Excluded under Section I - Exclusions;

2. Caused by:

e. Any of the following:

(1) Wear and tear, marring, deterioration;

(2) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

(6) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings.

*Id.* at ¶4.

The Policy further provides as follows:
SECTION I - EXCLUSIONS

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

3. Water Damage

Water Damage means:

a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

b. Water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment;

c. Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure, caused by or resulting from human or animal forces or any act of nature.

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

1. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in A. above to produce the loss.

2. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

3. Faulty, inadequate or defective:

a. Planning, zoning, development, surveying, siting;

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;....

*ld*. at ¶5.

The Policy further provides:
E. Additional Coverages

8. Collapse

a. This Additional Coverage applies to property covered under Coverages A and B. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against under Coverages A and B;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

(4) Weight of contents, equipment, animals or people;

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY I..., 2017 WL 2908591...

Case 3:16-cv-00132-VAB   Document 500-1   Filed 04/06/18   Page 96 of 190

(5) Weight of rain which collects on a roof; or

(6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

c. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under b.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

d. This coverage does not increase the limit of liability that applies to the damaged covered property.

*Id.* at ¶6.

The Policy further provides:
SECTION I - CONDITIONS

* * *

G. Suit Against Us

No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss.

* * *

P. Policy Period.

This policy applies only to loss which occurs during the policy period.

*Id.* at ¶7.

### III. *LEGAL STANDARD*

#### A. *Legal Standard for Summary Judgment*

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The moving party has the burden of showing that no genuine issue of material fact exists, and all reasonable inferences must be drawn in favor of the nonmoving party. *Jacobs Vehicle Sys., Inc. v. Pac. Diesel Brake Co.*, 424 F. Supp. 2d 388, 391 (D. Conn. 2006) (citation omitted).

Once the moving party has demonstrated the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and point to evidence in the record showing that there is a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The nonmoving party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. *Id.* (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). While the nonmoving party's evidence must be accepted as true, and the nonmoving party

must be given the benefit of all reasonable inferences, if the evidence in the record, viewed in this manner, would be insufficient to support a jury verdict for the nonmoving party, summary judgment may be granted to save the parties and the public the expense of an unwarranted trial. *Knox v. City of New Haven*, 357 F. Supp. 2d 449, 451-52 (D. Conn. 2005) (citations omitted); *see also Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 252 (1986) (stating that the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant).

### B. *Legal Standard for Interpretation of Insurance Contracts*

Interpretation of an insurance policy presents a question of law. *Wentland v. Am. Equity Ins. Co.*, 267 Conn. 592, 600, 840 A.2d 1158 (2004). Under Connecticut law, the terms of an insurance contract are construed according to the general rules of contract construction. *Heyman Assocs. No. 1 v. lns. Co. of the State of Pa.*, 231 Conn. 756, 769-770, 653 A.2d 122 (1995).

> If the words in the [insurance] policy are plain and unambiguous, the established rules for the construction of contracts apply. The language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.

*Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583, 573 A.2d 699 (1990). Ambiguous terms are generally read in favor of coverage, but this approach "applies only when the terms are, without violence, susceptible of two equally reasonable interpretations. The fact that the parties advocate different meanings of the insurance policy does not necessitate a conclusion that the language is ambiguous." *Misiti, LLC v. Travelers Prop. Cas. Co. of Am.*, 308 Conn. 146, 155, 61 A.3d 485 (2013) (internal quotation marks, citations, and alterations omitted). Since a party's "subjective perception of the terms" does not bear on the court's interpretation of the policy provisions, *see Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 373, 949 A.2d 1084 (2008), it follows that "[u]nder Connecticut law, the insured is charged with knowledge of the terms and conditions of the policy." *Am. Home Assurance Co. v. Abrams*, 69 F. Supp. 2d 339, 351-52 (D. Conn. 1999).

### IV. *LAW & ARGUMENT*

#### A. *Suit Against CSAA Is Barred By The Policy's Suit Limitation Provision*

The Policy contains a suit limitation provision which directs that any action must be brought "within two years after the date of loss." Local R. 56(a)1 Statement at ¶ 7. [2] Because there is no genuine issue of material fact that the loss or damage complained of occurred more than two years before the Plaintiffs initiated this action, and because the undisputed facts establish that the Plaintiffs knew of the loss more than two years before they initiated suit, the Plaintiffs' lawsuit is barred. Accordingly, entry of summary judgment is appropriate.

---

[1]    The Plaintiffs' Policy incepted on 9/11/14 and subsequently was renewed for the policy period 9/11/15 to 9/11/16. Local R. 56(a)1 Statement at ¶3.

It is well-established in Connecticut that a provision in an insurance policy or contract requiring suit to be brought within a specified time is a valid contractual obligation. *See Monteiro v. Am. Home Assurance Co.*, 177 Conn. 281, 283, 416 A.2d 1189 (1979) (upholding trial court's grant of summary judgment where the plaintiff failed to bring suit within one year of the alleged loss as required by the contracts of insurance); *see also Bocchino v. Nationwide Mut. Fire Ins. Co.*, 246 Conn. 378, 383, 716 A.2d 883 (1998) (holding that the policy provision requiring that an action be brought within twelve

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 296897...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 98 of 190

months of the date of loss is both binding and valid); *Chichester v. New Hampshire Fire Ins. Co.*, 74 Conn. 510, 51 A. 545 (1902) (stating that "[a suit limitation] provision in a contract of insurance is valid and binding upon the parties"). The provision in the policy (or language that is substantively identical) has been interpreted and applied by numerous courts, and its meaning is not open to any reasonable dispute. To comply with this provision, the Plaintiffs must have commenced litigation within two years after they learned or should have learned of the *loss* - not the date their claim was made or denied. *See Roberts v. Arnica Mut. Ins. Co.*, 2015 WL 7458510, at *3 (D. Conn. Nov. 24, 2015) (Underhill, J.). *Perez v. State Farm Fire & Cas. Co.*, No. DBDCV136012334S, 2015 WL 1588382, at *6 (Conn. Super. Ct. Mar. 13, 2015) (interpreting identical provision); *see also Knapp v. New London County Mut. Ins. Co.*, 2015 WL 3974384, at *6 (Conn. Super. Ct. June 1, 2015) (substantively identical clause "plainly required the commencement of litigation within the stated period"); *Riggs v. Standard Fire Ins. Co.*, 2006 WL 416201, at *2 (Conn. Super. Ct. Feb. 7, 2006) (same); *Collins v. Peerless Ins. Co.*, 2004 WL 114490, at *3 (Conn. Super. Ct. Jan. 6, 2004) (same).

For example, in *Roberts*, the District Court applied a contractual limitations provision under decidedly similar facts to bar the plaintiffs' suit for a crumbling concrete claim. The court held that the policy's limitations period began running on the date the plaintiffs "learned or should have learned of the cracking in their basement walls." *Id.* at *3. Because the plaintiffs did not serve the insurer until after expiration of the suit limitations period, the complaint was dismissed as untimely. Id. at *5. Numerous other state and federal courts in Connecticut have applied contractual limitations periods to grant summary judgment in favor of insurers. *See, e.g., Craig v. Colonial Penn Ins. Co.*, 335 F. Supp. 2d 296 (D. Conn. 2004) (granting insurer's summary judgment motion where insurer did not file suit within one-year suit limitation provision); *Lee v Safeco Ins. Co. of Am.*, 2008 WL 2745944 (Conn. Super. Ct. June 16, 2008) (granting insurer's summary judgment motion where insurer was served nearly two years after the date of loss); *Browning v. Peerless Ins. Co.*, 2007 WL 1247226 (Conn. Super. Ct. Apr. 13, 2007) (granting insurer's summary judgment motion where loss due to frozen pipes occurred on January 19, 2004, and suit was not served on insurer until May 11, 2005.); *Kenneth v. One Beacon Ins.*, 2005 WL 3047226 (Conn. Super. Ct. Oct. 25, 2005) (granting insurer's summary judgment motion where loss due to fire occurred on January 4, 2003, and suit was not served on insurer until January 8, 2004).

In the case at bar, the undisputed facts establish that the cracks in the Plaintiffs' basement walls and foundation - that is the loss - occurred more than ten (10) years before the Plaintiffs initiated suit. Both Plaintiffs admitted as much when they testified, under oath, that they discovered the cracking in the front basement wall in 2003. Local R. 56(a)1 Statement at ¶8. Over the course of at least one winter prior to 2005, the Plaintiffs observed the cracks change, prompting them to look into it further. *Id.* at ¶9. The Plaintiffs removed the finished wall and found "puzzle pieces," a bowing front wall and "cracking everywhere." *Id.* at ¶¶10-13. The Plaintiffs then undertook an extensive repair of the defective foundation, replacing almost half of the concrete foundation walls. Indeed, the Plaintiffs expended approximately $25,000 and took extensive photographs of the repair which clearly show the cracks in the concrete. Id. at ¶¶14-17. The Plaintiffs took these remedial steps in an attempt to repair the cracking in the fall of 2005 - steps that conclusively establish their knowledge of both the cracks and the significance of the issue. *Id.* at ¶¶15-17. In fact, Mr. Cyr testified that all of the walls needed to be replaced but he did not have the money to undertake all of the necessary repair. *Id.* at ¶19.

The Plaintiffs served CSAA on December 21, 2015, meaning that to be timely, the loss must have occurred on or after December 21, 2013. *Id.* at ¶38. However, the clear and indisputable facts demonstrate that the loss has existed at least since 2003. Because the Plaintiffs did not bring this action within two years of when they "learned or should have learned of the cracking in their basement walls," their suit must be dismissed as untimely. *Roberts*, 2015 WL 7458510, at *3. Accordingly, judgment as a matter of law should enter in favor of CSAA.

### B. *Suit Against CSAA Is Barred Because The Property Damage Occurred Outside Of The Policy Period*

The Plaintiffs' claim is further barred because the property damage for which the Plaintiffs seek recovery occurred outside of the policy period and prior to the inception of coverage. In fact, the undisputed facts establish that the damage for

which the Plaintiffs seek to recover existed prior to the inception of coverage. Accordingly, judgment as a matter of law should enter in CSAA's favor.

The Policy's Conditions provide, in pertinent part, as follows:
P. Policy Period.

This policy applies only to loss which occurs during the policy period.

Local R. 56(a)1 Statement at ¶7.

The Plaintiffs' testimony, as well as photographs taken at the time significant repairs were undertaken in 2005, establishes that the damage complained of, or the extensive cracking in the concrete, existed prior to the inception of coverage with CSAA. *Id.* at ¶¶8-20. Mr. Cyr testified that the Plaintiffs discovered the cracking in 2003 and knew that it was a significant issue. Id. The Plaintiffs' knowledge of these cracks and the extensive repairs undertaken in 2005 establishes unequivocally that the damage existed prior to the inception of coverage. Mr. Cyr testified that prior to conducting the repairs in 2005, the crack that first made them aware of the significance of the issue was at least two inches wide and ten feet long, allowing daylight to shine through the concrete and into the basement. *Id.* at ¶11. Thus, the Plaintiffs' testimony confirms that the cracking for which the Plaintiffs now seek recovery was present and visible before the CSAA policy incepted. This is further confirmed by the photographs taken in 2005 depicting the repairs undertaken. *Id.* at ¶15. These photographs clearly depict the pattern cracking at issue here. In fact, the Plaintiffs' own expert confirms as much. *Id.* at ¶¶15-16. By the Plaintiffs' own allegations and expert testimony, the concrete is itself defective and had impaired the structural integrity of the Premises since at least 2005. *Id.* at ¶¶15-16. Because the visible cracking and damage was present prior to the inception of coverage with CSAA, there is no coverage for the Plaintiffs' claim. Accordingly, judgment as a matter of law should enter in CSAA's favor.

### C. *The Policy's Additional Coverage for Collapse Is Not Triggered Given The Undisputed Facts*

From the allegations of the Complaint, the Plaintiffs seek coverage under the Policy's Additional Coverage for Collapse. Compl. Count One, ¶11. In *Alexander v. General Ins. Co. of Am.*, No. 3:16-cv-00059 (SRU), Judge Underhill issued a ruling from the bench dismissing almost identical claims under the same policy language. See Exhibit 2, pp. 20-25. In *Alexander*, Judge Underhill found that "coverage is barred by the terms of the collapse provision in the policy which ... defines 'collapse' to mean an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose, and then there are three little subparts...." *Id.* at p. 22. Applying the policy language, Judge Underhill went on to find that "there has been no abrupt falling down or caving in of a building or any part of a building for which coverage applies, and there's not been a clear allegation that any building or part of a building cannot be occupied for its intended purpose." Furthermore, "[e]ven if that had been met, what we have here is a building that is in danger of falling down, and that is expressly excluded from collapse coverage; and, similarly, there has been cracking, bulging, etc.," which are also excluded. *Id.* at p. 23. Finally, the Court noted that "[i]n other cases with different policy language I have found the term 'collapse' to be ambiguous, but here the term has been expressly defined in a way that eliminates coverage under the allegations of the complaint, both because there's not any allegation of any abrupt situation that occurred, there's not an allegation that the home or a part of the home has either fallen down or caved in, there is an allegation that it's in danger of falling down or caving in, and there's allegations, in effect, of cracking and bulging." On this basis, the policy language was deemed clear and unambiguous. *Id.*

The Defendant anticipates that the Plaintiffs will rely upon a readily distinguishable decision, which found the undefined and unqualified term "collapse" to be "sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 252 (1987). However, unlike the Middlesex Mutual policy that was at issue in *Beach*, the CSAA Policy clearly and unambiguously defines "collapse" as

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2559557...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 100 of 190

"an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." *See* Local R. 56(a)1 at ¶6; *see also Alexander v. General Ins. Co. of Am.*, No. 3:16-cv-00059 (SRU), Motion Hearing Transcript, pp. 20-25 (July 7, 2016) (Underhill, J.) (Exhibit 2) (dismissing all counts, finding that collapse provision was unambiguous and did not provide coverage absent an abrupt falling down or caving in). This collapse provision has been found to be clear and unambiguous in this jurisdiction and beyond. *Id.*; *see also Squairs v. Safeco Nat. Ins. Co.*, 136 A.D.3d 1393, 25 N.Y.S. 3d 502 (2016) (finding definition of "collapse" was unambiguous); *Miller v. First Liberty Ins. Co.*, 2008 WL 2468605, *4 (E.D.Pa. June 17, 2008) (entering judgment in favor of insurer based upon unambiguous "collapse" provision); *Residential Management (N.Y.) v. Fed. Ins. Co.*, 2012 WL 3288671, *9 (E.D.N.Y. Aug. 10, 2012) (finding policy contains a "clear definition of 'collapse' to clarify any potential ambiguity"); *Rector St. Food v. Fire & Cas. Ins. Co. of Ct.*, 35 A.D.3d 177, 827 N.Y.S.2d 18 (2006).

Here, by the Plaintiffs' own allegations, testimony and the expert opinions, the Premises has not sustained a "collapse" as defined by the Policy. There has been no abrupt falling down or cave in. Local R. 56(a)1 Statement at ¶27-30, 40. Instead, the Plaintiffs maintain that the concrete deterioration and cracking were caused by a chemical reaction in the concrete and that this reaction will continue to progressively deteriorate the basement walls rendering the structure unstable. *Id.* at ¶21. Notably, the Plaintiffs have acknowledged that the Premises is still standing and being used for its intended purpose. *Id.* at ¶27. Even if, as the Plaintiffs claim, the Premises is *in danger* of falling down and/or has sustained cracking or bulging of the basement walls, this is not sufficient to satisfy the Additional Coverage - Collapse language. *Id.*; *see also* Motion Hearing Transcript, pp. 20-25 (same).

Based upon the foregoing, there is no genuine issue of material fact that the state of the Premises' foundation and basement walls is the result of a progressive condition, as opposed to an abrupt falling down or caving in. The Premises remains standing and is being used for its intended purpose. Local R. 56(a)1 Statement at ¶27. Further, like the insureds in *Alexander*, the Plaintiffs improperly seek to recover for bulging and/or cracking under the Additional Coverage - Collapse. For all the foregoing reasons, there is no coverage for the Plaintiffs' claim and, therefore, judgment as a matter of law should enter in CSAA's favor.

### D. *The Undisputed Facts Establish That Coverage Is Barred Because The Plaintiffs' Loss Is Not An Accidental, Fortuitous Loss*

There is no genuine issue of material fact that the Plaintiffs seek insurance proceeds for the cracking foundation and basement walls of the Premises which resulted from an internal chemical reaction in the concrete used to construct the foundation and basement walls. This damage was inevitable and unavoidable from the date the concrete foundation was poured. Local R. 56(a)1 Statement at ¶¶22. Because the policy provides coverage only for accidental, fortuitous losses, there is no coverage for the Plaintiffs' claim.

The Plaintiffs' Policy is an "all-risk" policy as to property damage. However, "all-risk" does not mean "all-loss." *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 47 (2d Cir. 2003). "Even in an 'all risk' policy, there must be a fortuitous event - a casualty - to give rise to any liability for insurance." *Id.*; *see also* Conn. Ins. Law, § 5-1, p. 136 (2011) ("Stated simply, all-risk policies cover losses that are caused by 'fortuitous and extraneous' events where there is no express provision excluding coverage."). A loss that is inevitable is not a covered risk. *City of Burlington*, 332 F.3d at 47.

For decades, courts have held that "losses that resulted from an inherent quality or defect in the thing insured" are "non-fortuitous - and therefore outside the scope of coverage." *Id.* at 47; *Glassner v. Detroit Fire & Marine Ins. Co.*, 127 N.W.2d 761, 764 (Wis. 1964) ("An 'all-risk' policy... is not a promise to pay for loss or damage which is almost certain to happen because of the nature and inherent qualities of the property insured."). Even in the absence of an express exclusion, "[d]amage which is certain and inevitable and which either (1) proceeds from an inherent vice or infirmity present at the time that the policy was issued as a veritable time-bomb, already set and ticking ... or (2) is the natural, expected result of normal wear and tear or deterioration... is not the result of a casualty and cannot be covered." *Standard Structural*

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2365567...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 101 of 190

*Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 191 (D. Conn. 1984) (citations omitted). Thus, "an all risk policy covers only losses caused by 'fortuitous and extraneous' events." *Id.* (citations omitted).

Under Connecticut law, "the insured bears the burden of showing that insurance coverage covers the loss, but the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim." *MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) (recognizing that New York and Connecticut law were identical in this respect). In order to satisfy its burden of proof, "the all risk insured has generally met his burden of proof by establishing ... 'a fortuitous loss within comprehensive coverage though not proving exactly what caused it'." *Standard Structural*, 597 F. Supp. at 192 (citations omitted). This showing has been articulated to require proof that (1) a fortuitous loss took place (2) not arising from an inherent defect in the subject matter but occurring as a result of an extraneous or external cause (3) that there was no fraud or intentional misconduct and (4) that the insured risk was a lawful one. Id.

Here the facts, as supported by the testimony and reports of the experts, demonstrate that the damage to the foundation and basement walls was the result of non-fortuitous events - it arose from an inherent defect in the concrete and was not the result of an extraneous or external cause. Local R. 56(a)1 Statement at ¶22. In fact, the Plaintiffs' own expert testified that the cracking was caused by an inherent defect in the form of improper materials used in the concrete that have been essentially lying in wait since the concrete was poured. *Id.* CSAA's expert likewise has opined that cause of the Plaintiffs' cracking concrete is defective concrete, that the cracks were an ongoing process that began prior to 2005, and that the cracking was visible, in part, for years before being reported in 2015. Id. at 40. Put simply, the cracking of the concrete was due to an ongoing chemical reaction that will progressively deteriorate the basement walls. *Id.* at ¶21. Because the material used to construct the concrete foundation at the time the house was constructed was defective, so was the concrete foundation from the time it was poured, thereby rendering the cracking inevitable. For these reasons, the Plaintiffs' loss is not an accidental, fortuitous loss and as such, there is no coverage.

### E. *The Undisputed Facts Establish That Coverage Is Unambiguously Barred By Numerous Exclusions*

Beyond the Additional Coverage-Collapse, there is no coverage because the damage was caused by an inevitable internal chemical reaction in the concrete and is therefore barred by unambiguous exclusions. Specifically, the policy expressly excludes coverage caused by, wear, tear, marring, deterioration, inherent vice, latent defect or mechanical breakdown. *See* Local R. 56(a)1 Statement at ¶4. It further provides that there is no coverage for losses caused by faulty, inadequate or defective materials used in repair, construction, renovation or remodeling. Because the loss was not fortuitous and instead was the result of inherent vice, latent defect, and/or defective and inadequate materials used in construction, repair, renovation or remodeling and/or workmanship, these exclusions unambiguously bar coverage under the undisputed facts. Finally, because the Plaintiffs seek to recover for loss or damage caused by and/or consisting of settling, shrinking, bulging or expansion of foundation, walls and/or floors, coverage is barred.

### 1. *The Plaintiffs' Damage Is The Result Of Wear And Tear. Marring. Deterioration, Latent Defect Inherent Vice Or Any Quality In Property That Causes It To Damage Or Destroy Itself*

While Connecticut courts have had only limited occasion to consider this exclusionary language, it is beyond dispute that the Plaintiffs' claimed loss was caused by deterioration, latent defect, inherent vice or a quality in the concrete that causes it to damage or destroy itself and therefore is excluded from coverage. *Ehsan v. Ericson Agency*, 2003 WL 21716345 (Conn. Super. Ct. July 3, 2003), ("[g]iven the context of the word in this policy, adjacent to the terms 'wear and tear' and 'deterioration,' the term is meant to include that marring of appearance caused by wear and tear or deterioration resulting from the reasonable and normal use of an object over time"); *Waldron v. Richardson*, 1992 WL 361501, *6 (Conn. Super. Ct. Nov. 25, 1992) (finding " '[r]easonable wear,' 'ordinary wear and tear' and similar phrases apply more naturally to the gradual deterioration resulting from use, lapse of time and to a certain extent to the operation of the elements, but do not cover destruction in whole or in part of a structure by a sudden catastrophe"); *Brodkin v. State*

*Farm Fire & Cas. Co.*, 265 Cal. Rptr. 710, 714 (Cal. Ct. App. 1989) ("The plain meaning of the exclusion is the insurer will not cover slow-moving disintegration or corrosion of the concrete foundation because of external forces.").

Beyond Connecticut, in *Garson Management Co., LLC v. Travelers Indemnity Co. of Illinois*, 752 N.Y.S.2d 696 (N.Y. App. Div. 2d Dep't 2002), the New York Appellate Division addressed the issue whether there was coverage for corroded structural steel beams that were only discovered when a chunk of concrete fell from a portion of the insured garage. The court concluded that there was no coverage and summary judgment was appropriate because "the plain meaning of the [deterioration] exclusion was to relieve the insurer of liability when its insured sought reimbursement for costs incurred in correcting corrosion and deterioration...." *Id.* at 697.

Here, the chemical reaction which the Plaintiffs identify as the cause of the cracking to their foundation and basement walls is precisely the type of deterioration, marring, inherent vice and/or latent defect that the Policy excludes from coverage. Local R. 56(a)1 Statement at ¶¶8-19, 21. The Plaintiffs' expert opined that the crumbling concrete is the result of an inherent defect present at the time the concrete was poured. *Id.* at ¶21-22. This aligns with the opinion of CSAA's expert. Id. at 40. The defective material has been lying in wait since the concrete was poured. Based upon the foregoing, the cracking condition, which resulted from an inherent defect in the concrete that caused a chemical reaction, is the result of wear, tear, marring, deterioration and/or inherent vice. Accordingly, the Policy does not afford coverage for the Plaintiffs' loss and judgment as a matter of law should enter in favor of CSAA.

### 2. *The Cracking And Bulging Foundation And Basement Walls Are The Result Of Faulty, Inadequate Or Defective Construction And/or Materials Used in Repair, Construction, Renovation Or Remodeling*

Furthermore, coverage is also precluded because the compromised foundation of the Premises consists of faulty, inadequate or defective construction and/or material used in repair, construction, renovation or remodeling. Indisputably, the chemical reaction which the Plaintiffs have identified as the cause of the cracking is the result of faulty, inadequate or defective materials and/or workmanship in the pouring of the concrete foundation. Accordingly, coverage is barred by the unambiguous exclusion for defective "material used in repair, construction, renovation or remodeling." Local R. 56(a)1 Statement at 115.

This unambiguous exclusion has been routinely applied to bar coverage for property damage caused by defective and/or inadequate materials used in construction. *see also Rhoden v. State Farm Fire & Cas. Co.*, 32 F. Supp. 2d 907, 914 (S.D. Miss. 1998) (noting that an identical exclusion "specifically states" that a loss resulting from the allegedly defective construction work is not covered under a homeowner's policy), *aff'd sub nom. Rhoden v. State Farm Fire*, 200 F.3d 815 (5th Cir. 1999); *Bloom v. W. Nat. Mut. Ins. Co.*, No. A05-2093, 2006 WL 1806415, at *3 (Minn. Ct. App. July 3, 2006) (applying exclusion which provided, in pertinent part, that no coverage would be provided for "defect, weakness, the inadequacy, fault, or unsoundness in materials used in construction or repair of the home"); *Padgett v. State Farm Fire & Cas. Co.*, 714 So. 2d 302, 304 (Ala. Civ. App. 1997) (affirming a trial court's grant of summary judgment finding that an insured's claim was precluded from coverage due to an exclusion for "defect in materials used in construction or repair"); *George v. State Farm Lloyds*, 2014 WL 2481894, at *3 (Tex. Ct. App. May 19, 2014) (finding an identical exclusion to be unambiguous).

Courts in this jurisdiction and beyond have also found this exclusion to unambiguously bar coverage for loss or damage caused by faulty workmanship. *See Edmond v. Hartford Ins. Com.*, 2008 WL 616092 (D. Conn. Mar. 3, 2008) (granting homeowners insurer's motion for summary judgment as there was no evidence that property damage was caused by anything but faulty workmanship); *see also Alwart v. State Farm Fire & Cas. Co.*, 508 S.E.2d 531, 534 (N.C. 2008) (granting summary judgment in favor of the defendant insurer and finding that faulty workmanship exclusion was unambiguous); *see also Rhoden*, 32 F. Supp. 2d at 913-14 (granting summary judgment in favor of the defendant insurer after finding that the faulty "workmanship" exclusion applied so as to preclude coverage for damages the plaintiffs sustained as a result of cracking in the foundation of their residence); *Smith v. State Farm Fire & Cas. Co.*, 425 S.E.2d 719,

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2908007...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 103 of 190

720 (N.C. Ct. App. 1993) (noting that an identical faulty workmanship exclusion was not ambiguous); *Myers v. State Farm Fire & Cas. Co.*, No. C8-02-62, 2002 WL 1547673, at *6 (Minn. Ct. App. July 16, 2002) (upholding a trial court's grant of summary judgment in favor of the defendant insurer and noting that an exclusion for "defective or inadequate design, workmanship, construction, grading, and compaction" applied to bar coverage for claimed losses); Bergeron *v. State Farm Fire & Cas. Co.*, 766 A.2d 256, 260 (N.H. 2000) (quoting an identical exclusion as standing for the principle that "not every loss resulting from a defect in design or construction is covered; only those losses that are not themselves excluded by the policy are covered"); *Murray v. State Farm Fire & Cas. Co.*, 268 Cal. Rptr. 33 (Ct. App. 4th Dist. 1990) (finding that the faulty workmanship exclusion applied to preclude coverage and opining "one might similarly argue that the predominating cause of the loss was the negligence of the individual or company who installed the [product]....The ... policy, however, specifically excludes coverage for any 'defect, weakness, inadequacy, fault or unsoundness in ... design, specifications, workmanship, construction [or] materials used in construction ... of any property.'"); *Waldsmith v. State Farm Fire & Cas., Co.*, 283 Cal. Rptr. 607, 608-09 (Ct. App. 1991) (noting that a plaintiffs policy "contains the same language and commands the same result" as *Murray*" *(supra)*); *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1005-06 (Wash. 1992) (upholding a trial court's granting of summary judgment and applying "faulty workmanship and materials exclusion" to find that losses "consisting of... defect, weakness, inadequacy, fault or unsoundness in design, specifications, workmanship, construction, grading, compaction" were excluded under the policy).

By the Plaintiffs' own testimony, allegations and expert testimony, the cracking foundation is the result of defective materials contained in the concrete that was used to construct their foundation and basement walls. Local R. 56(a)1 Statement at ¶¶21-22. In this respect, it is beyond dispute that the spider web cracks were the result of defective, weak, inadequate, faulty and/or unsound workmanship, construction and/or materials used in construction of the Premises. Id. In fact, the Plaintiffs own expert testified that offending materials within the concrete were present from day one, lying in wait. *Id.* at ¶22. Furthermore, if it is found that the Plaintiffs' damage was instead caused, in whole or in part, by defective workmanship, the result is the same. In either case, the Plaintiffs' claims are unambiguously barred by this exclusionary language.

### 3. *The Cracking Basement Walls Are Subject To the "Cracking" Exclusion*

Finally, it is beyond dispute that the Plaintiffs seek to recover for loss or damage caused by settling, shrinking, bulging or expansion cracking of their foundation and/or basement walls. Because the CSAA policy expressly excludes coverage for such settling, shrinking, bulging or expansion and resulting cracking, there is no coverage for the Plaintiffs' claim.

The cracking exclusion is "unambiguous." *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1006 (Wash. 1992). By their plain terms, similar cracking exclusions have been found to apply to cracks in basement or foundation walls. See Rhoden, 32 F. Supp. 2d at 913 ("find[ing] that the 'settling/cracking' exclusion applies to bar coverage for damage to Plaintiff's claim as a result of the cracking of the foundation of the residence"; granting summary judgment for State Farm); *Montee v. State Farm Fire & Cas.*, 782 P.2d 435, 436 (Or. Ct. App. 1989) (finding cause of loss had no bearing on whether it consisted of excluded damage); *Brodkin*, 265 Cal. Rptr. at 713-14; *Indiana Ins. Co. v. Liaskos*, 697 N.E.2d 398, 406 (Ill. App. Ct. 1998) (applying "the explicit language of the policy which excludes loss caused by 'settling, cracking, shrinking, bulging or expansion of foundations, walls, floors....' ").

Over the course of at least one winter prior to 2005 the Plaintiffs observed changes in a crack in their front wall, prompting them to investigate further. Local R. 56(a)1 Statement at ¶9. They opened the wall and found cracks in the form of "puzzle pieces" in the concrete, bowing walls and "cracking everywhere." *Id.* at ¶¶8-13. It is beyond dispute that the Plaintiffs seek to recover for cracks and bulging of their foundation and/or walls. For this reason as well, coverage is excluded under the unambiguous terms of the policy.

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2903221...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 104 of 190

### F. *CSAA Is Entitled To Judgment As A Matter Of Law On Count Two Claiming Breach Of The Covenant Of Good Faith And Fair Dealing*

### 1. Because There Is No Coverage For The Plaintiffs' Insurance Claim, CSAA Has Not Deprived The Plaintiffs Of A Benefit They Reasonably Expected To Receive

"To constitute a breach of [the covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Alexandru v. Strong*, 81 Conn. App. 68, 80-81 (2004). Proof of bad faith thus requires proof that the insurer has denied coverage without a reasonable basis and has acted with a "dishonest purpose." *De La Concha v. Aetna Life Ins.*, 269 Conn. 424, 433 (2004). The reasonable denial of coverage constitutes a complete defense to a bad faith claim. *Kim v. State Farm Fire and Cas. Co.*, 2015 WL 6675532 (D.Conn. Oct. 30, 2015) (Bryant, J.) (dismissing bad faith claim where insurer's denial letter contained at least facially plausible policy provisions, explained how the provisions applied to the case and was not misleading as was therefore evidence of a mere coverage dispute); *Craig v. Colonial Penn Ins. Co.*, 335 F. Supp. 2d 296, 306 (D.Conn. 2004) (Arterton, J.) (holding that the bad faith claim was unavailing because plaintiffs failed to provide evidence that insurer "breached its duty to the insured by acting unreasonably or contrary to the policy provisions, or that plaintiffs could reasonably expect to receive approval of their claim"); *R.E.O., Inc. v. Travelers Cos.*, 1998 WL 285836, at *42 (Conn. Super. Ct. May 20, 1998) (Silbert, J.) (finding that first element of bad faith claim is not met if there was a reasonable basis for denying the claim); *Springdale Donuts, Inc. v. Aetna Cas. & Surety Ins. Co. of Illinois*, 1997 WL 688759, *5 (Conn. Super. Ct. Oct. 28, 1997) (holding that the plaintiff failed to demonstrate that the defendant-insurers breached the covenant of good faith and fair dealing "as the three policies do not provide coverage as claimed by the plaintiff").

In *Capstone Building Corporation v. American Motorists Insurance Company*, 308 Conn. 760, 798 (2013), the Connecticut Supreme Court held that "bad faith is not actionable apart from a wrongful denial of a benefit under the policy...." In *Capstone*, the certified question was "[c]an an insurer's bad faith conduct in investigating an insurance claim provide a basis for a cause of action for bad faith under Connecticut law?" Id. at 79 (emphasis added). "Under our precedent, a bad faith action must allege denial of the receipt of an express benefit under the policy." (emphasis added) (citing *Renaissance Management Co. v. Conn. Housing Fin. Auth.*, 281 Conn. 227, 240 (2007) (housing authority's refusal to accept mortgage prepayments did not violate covenant of good faith and fair dealing when agency was not contractually obligated to accept prepayments). The Court went on to recognize that "[b]ecause bad faith actions require the denial of benefits under the policy, we must analyze the plaintiffs' proposed cause of action based on the actual terms of the insuring agreement. Unless the alleged failure to investigate led to the denial of a contractually mandated benefit in this case, the plaintiffs have not raised a viable bad faith claim." *Id.* at 796 (emphasis added; citations omitted). Based upon the foregoing, the Court held that "[a]lthough we recognize that a discretionary investigation is often necessary to assess the duty to defend or indemnify under the policy, a bad faith action is properly addressed to the insurer's conduct depriving the insured of these contractual benefits, rather than the precedent, investigatory step." *Id.* at 797 (citations omitted). In this way, "[a] bad faith cause of action not tied to duties under the insurance policy must therefore fail as a matter of law." *Id.* (emphasis added). As a result, "bad faith is *not actionable apart* from a wrongful *denial* of a benefit under the policy...." *Id.* at 798 (emphasis added).

Here, the Plaintiffs have not been deprived of a right that they reasonably expected to receive under the Policy. Put simply, as argued above, there is no coverage for the Plaintiffs' loss. Thus, CSAA's purported bad faith in the investigation of the claim did not deprive the Plaintiffs of a contractual benefit because there simply was no coverage available under the Policy. Accordingly, because the Plaintiffs' bad faith claim does not arise out of a wrongful denial of a benefit under the Policy, judgment as a matter of law must enter in CSAA's favor.

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY ..., 2017 WL 2105367...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 105 of 190

### 2. Even If The Plaintiffs Have Been Deprived Of A Benefit They Reasonably Expected To Receive, The Plaintiffs Cannot Establish The Requisite Ill Will Or Evil Motive

"To constitute a breach of [the implied covenant] the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Renaissance Management Co. v. Connecticut Housing Finance Authority*. 281 Conn. 227, 240 (2007). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon*, 224 Conn. 231, 237-38 (1992) (citations omitted); *see also Buckman v. People's Express, Inc.*, 205 Conn. 166, 171 (1987); *De La Concha*, 269 Conn. at 433 ("[b]ad faith means more than mere negligence; it involves a dishonest purpose"). Thus, bad faith requires conduct "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.*; *Anacona v. EchoStar Satellite Corp.*, 2005 WL 1331818 (May 5, 2005) (Burke, J.) (granting motion for summary judgment because "the record is devoid of any evidence that would support a conclusion that [the insurer] acted with a dishonest purpose in conducting an investigation before advising the plaintiff of his claim's final status"); *Liguore v. Assurance Co. of American*, 2002 WL 521334, at *2-*3 (Conn. Super. Ct. Mar. 19, 2002) (holding that allegations that insurer failed to act with reasonable promptness, failed to cover the claim, and failed to defend and indemnify the plaintiff were "simply claims that the defendant denied the plaintiff's claim for benefits under the policy," not claims for breach of covenant of good faith and fair dealing).

Here, the Plaintiffs can bring forth no evidence of ill will or sinister motive sufficient to support their bad faith claims. The Plaintiffs admittedly have not been misled by CSAA. Local R. 56(a)1 Statement at ¶34. In the Plaintiffs' opinion, CSAA has not done anything misleading or immoral. *Id.* at ¶33. When questioned regarding the substance of their bad faith claim, the Plaintiffs testified that they are disappointed with the denial of the claim. *Id.* at ¶ 35. This, however, is evidence of a legitimate coverage dispute and not the basis for a bad faith claim. Furthermore, beyond a straightforward disagreement regarding coverage, the Plaintiffs' only issue with CSAA's conduct is that the Plaintiffs believe that CSAA denied the claim without visiting the Premises. *Id.* at ¶33. However, CSAA did send a representative to the Premises prior to issuing its denial. *Id.* at 36. Furthermore, even if CSAA did deny the claim without viewing the Premises, this cannot form the basis for the Plaintiffs' bad faith claim. *Capstone*, 308 Conn. at 798. Accordingly, for this reason as well, judgment must enter in CSAA's favor as to Count Two.

### G. Judgment Should Enter In CSAA's Favor As The Plaintiffs' CUTPA/CUIPA Claim

#### 1. *Count Three Should Be Dismissed As The Plaintiffs Fail To Allege That CSAA Engaged In Any Unfair Claims Practice Enumerated In § 38a-816*

The Plaintiffs allege that CSAA, unbeknownst to the Plaintiffs, was a member of ISO and had access to information regarding other deteriorating concrete claims which it used to deny coverage for claims such as the Plaintiffs' based upon inapplicable exclusions. *See* Complaint, ¶¶20-22. Despite this claimed knowledge of denial of other claims, CSAA allegedly provided a false and misleading denial of coverage that was contrary to other sections of the policy, and in particular, the additional collapse coverage. *Id.* at ¶23. In doing so, the Plaintiffs' claim must fail if, as discussed above, CSAA properly denied the insurance claim. Furthermore, contrary to the Plaintiffs' claims, CSAA's involvement with ISO is insufficient to establish a violation of CUIPA in what otherwise amounts to nothing more than a coverage dispute.

In the absence of a CUIPA violation, a CUTPA claim cannot be sustained in the insurance industry. *See State v. Acordia*, 310 Conn. 1, 26 (2013). Section 38a-816 specifically enumerates those practices that are defined as unfair insurance practices in Connecticut. *Id.*; *see also Acordia*, 310 Conn. at 26. Here, the Plaintiffs allege, in conclusory fashion, that CSAA violated § 38a-816 but fail to identify the subsection allegedly violated. Nor do they provide any factual allegations to support such a claim. Otherwise, the Plaintiffs allegations are contradictory and confusing. First, the Plaintiffs allege

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2590507...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 106 of 190

that, unbeknownst to them, CSAA was a member of ISO. There is nothing improper about membership in ISO, "an association of approximately 1400 domestic property and casualty insurers [which]... is the almost exclusive source of support services in this country for... insurance. [ISO] develops standard policy forms and files or lodges them with each [s]tate's insurance regulators; most... insurance written in the United States is written on these forms." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, n. 6 (2013) (citations omitted). In this way, there is nothing inherently wrong with CSAA's alleged ISO membership, a resource widely used by insurers. Furthermore, the Plaintiffs have offered no evidence to suggest that there is anything inherently wrong with CSAA's participation in ISO. To the contrary, CSAA did not rely on or consider information from ISO in reaching its coverage determination. See Local R. 56(a)1 Statement at ¶37.

The Plaintiffs contend that despite CSAA's knowledge of other deteriorating concrete claims, CSAA provided a false and misleading denial of coverage that was contrary to other sections of the policy, and in particular, the additional collapse coverage. *See*. Complaint at ¶23. Again, this claim requires a finding that the denial letter was false and misleading, something the Plaintiffs' themselves dispute. See Local Rule 52(a)1 Statement at ¶33. Furthermore, as set forth above, CSAA's denial of the Plaintiffs' claim for insurance proceeds was appropriate. That is so because the Plaintiffs' loss occurred outside of the policy period and before coverage incepted. In addition, CSAA's denial of the Plaintiffs' claim was appropriate because the Premises has not sustained a "collapse" under the Policy's Additional Coverages and, as a result, is otherwise excluded under the terms of the Policy. Because the denial of coverage was appropriate and was not misleading, the Plaintiffs cannot establish that CSAA violated CUIPA.

### 2. *Even If The Plaintiffs Are Able To Create An Issue Of Fact As To Conduct By CSAA In Violation Of CUIPA. Judgment Should Enter On Count Three For Lack Of A General Business Practice*

Count Three also fails because the Plaintiffs, at most, can establish nothing more than a single instance of insurer misconduct. The Plaintiffs can provide no evidence to establish that CSAA has engaged in unfair insurance practices of the kind in the handling of other claims. Instead, the Plaintiffs vaguely allege that CSAA "on information and belief, has regularly denied claims in similar manners or on similar grounds or other grounds, including other matters handled by the unregulated with [CSAA]." Local R. 56(a)1 Statement at ¶1 (Compl. at ¶24). In essence, the Plaintiffs allege that CSAA has denied other claims, whether in a similar or unrelated manner, without any evidence beyond that which is purportedly publically available. This is simply not sufficient to establish a general business practice. For this reason as well, judgement should enter in CSAA's favor as to Count Three.

While CUIPA does not itself provide a private right of action, it is possible to bring a CUIPA claim through the private right of action conferred by CUTPA. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 119 (2d Cir. 2001); *Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn 760 (2013); *Mead v. Burns*, 199 Conn. 651, 663 (1986). To sustain a claim for violation of CUIPA, the plaintiff must demonstrate that the defendant has engaged in unfair claim settlement practices with such frequency as to indicate a general business practice. Conn. Gen. Stat. § 38a-816(6) (2015); *Lees*, 229 Conn. at 849; *Mead*, 199 Conn. at 663-666; *Kim*, 2015 WL 6675532, *5 (finding the plaintiff "still must plead enough facts to permit for the reasonable inference that 'unfair insurance practice occurred with enough frequency for it to be deemed a 'general business' ' " (citations omitted)); *McCulloch v. Hartford Life and Accident Ins. Co.*, 363 F.Supp.2d 169, 182 (D.Conn.2005) (stating "alleged improper conduct in the handling of a single insurance claim, without any evidence of misconduct in processing any other claim, does not rise to the level of a general business practice").

In instituting the "general business practice" requirement, "the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct." *Lees*, 229 Conn. at 849 (citations omitted). Taking guidance from the dictionary definition, courts have recognized that " 'General' is defined as 'prevalent, usual [or] widespread'... and 'practice' means [p]erformance or application habitually engaged in ... [or] repeated or customary action.' " *Id.* at 849, n.8. Thus, "alleged improper conduct in the handling of a single insurance claim, without any

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2383847...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 107 of 190

evidence of misconduct by the defendant in the processing of any other claim, does not rise to the level of a 'general business practice' as required by § 38a-816(6)." Id. at 849.

Here, with respect to a general business practice, the Plaintiffs vaguely allege "upon information and belief, CSAA has regularly denied claims in similar manners or on similar grounds or other grounds, including other matters handled by undersigned with [CSAA]." Local R. 56(a)1 Statement at ¶1 (citing Compl. at ¶24). First, as discussed above, CSAA properly denied the Plaintiffs' claim for insurance coverage. Furthermore, the denial of coverage based upon policy exclusions, even if later determined to be wrong, is nothing more than a coverage dispute and does not violate CUIPA. *See Trans-Clean Corp. v. Evanston Ins.*, 2010 WL 4276754 (Conn. Super. Ct. Sept. 23, 2010) (Dooley, J.): *see also Squairs*, 2016 WL 534016.

The Plaintiffs have been unable to come forth with any evidence to support their claims of other instances of insurer misconduct. First, the Plaintiffs' only support for their vague allegation that CSAA relied upon information from ISO to deny the Plaintiffs is from "[i]nformation publically available through both State and Federal judicial website." Local R. 56(a)1 Statement at ¶39. This claim is insufficient on its face. The Plaintiffs reference to publically available legal filings discredits their claim that CSAA relied on information from ISO, and instead suggests that CSAA obtained information from publically available legal filings, which is entirely proper.

Furthermore, the Complaint's unsupported and conclusory claim that CSAA regularly denies other claims, whether similar or completely unrelated, is irrelevant. *See Martin v. American Equity Ins. Co.*, 185 F.Supp.2d 162, 167 (D.Conn. 2002) (dismissing CUTPA/CUIPA claim that failed to allege facts supporting claim of CUIPA violation); *see also Pettengill*, 2013 WL 4054635, *2 (finding plaintiff alleged only a single instance of claims mishandling which is insufficient to survive a motion to dismiss); *Emmeimann*, 2006 WL 861015, *3 (dismissing CUTPA/CUIPA claim for lack of a general business practice). Bald assertions and conclusions of law such as these cannot survive a motion to dismiss. *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). This is particular true where, as here, the Plaintiffs purportedly have access to information as to other denials and elect not come forth with any evidence of such denials. *See* Local R. 56(a)1 Statement at ¶39. Accordingly, because the Plaintiffs have not and cannot come forth with evidence to establish that CSAA has engaged in such conduct with sufficient frequency to indicate a general business practice, judgment must enter in CSAA's favor.

### 3. *In The Absence Of A Viable CUIPA Claim. Count Three Must Be Dismissed Because It Improperly Asserts A Stand-Alone Claim Under CUTPA*

If the Plaintiffs' CUIPA claim fails, judgement must also enter as to Count Three of the Plaintiffs' Complaint because it improperly asserts a stand-alone cause of action for insurance-related conduct. It is well established in Connecticut that, for insurance-related conduct to constitute a violation of CUTPA, it must also constitute a violation of CUIPA. *Acordia*, 310 Conn. at 37-38; *see also Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 850 (1991); *Mead v. Burns*, 199 Conn. 651, 663-66 (1986); Conn. Gen. Stat. § 38a-816(6) (2015). Simply stated, a stand-alone CUTPA claim cannot be maintained for insurance-related practices. *See Acordia*, 310 Conn. 37-38. For this reason as well, Count Three of the Plaintiffs' Complaint must be dismissed.

### V. *CONCLUSION*

Based upon the foregoing, the Defendant CSAA respectfully moves for the entry of judgment as a matter of law as to all counts of the Plaintiffs' Complaint.

THE DEFENDANT, CSAA FIRE & CASUALTY INSURANCE COMPANY

*/s/ Daniel P. Scapellati*

Justyn CYR, et al., Plaintiffs, v. CSAA FIRE & CASUALTY..., 2017 WL 2806597...

Case 3:16-cv-00133-VAB   Document 500-1   Filed 04/06/18   Page 108 of 190

Daniel P. Scapellati

Federal Bar No. ct03855

Carl R. Ficks, Jr.

Federal Bar No. ct03342

Halloran & Sage LLP

225 Asylum Street

Hartford, CT 06103

Telephone: (860) 522-6103

*scapellati@halloransage.com*

*ficks@halloransage.com*

---

2    This language tracks Connecticut's statutory form fire insurance policy. The current form policy requires suits to be commenced within two years, see Conn. Gen. Stat. § 38a-307. This provision became "[e]ffective [on] October 1, 2014, and [is] applicable to policies *issued or renewed on or after said date."* 2014 Conn. Legis. Serv. P.A. 14-175, § 3 (H.B. 5502) (emphasis added).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 888724
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Shawn M. KOWALYSHYN, et al., Plaintiffs,
v.
EXCELSIOR INSURANCE
COMPANY, et al., Defendants.

No. 3:16-cv-00148 (JAM)
|
Signed 02/13/2018

**Attorneys and Law Firms**

Jeffrey R. Lindequist, Michael D. Parker, Law Office of
Michael D. Parker, Springfield, MA, for Plaintiffs.

Daniel P. Scapellati, Carl R. Ficks, Jr., Halloran & Sage,
Kieran W. Leary, Howd & Ludorf, LLC, Hartford, CT,
for Defendants.

**Opinion**

**RULING ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

Jeffrey Alker Meyer, United States District Judge

 **\*1**  This case is brought by plaintiff homeowners, Shawn
and Kim Kowalyshyn, against their homeowner insurance
providers, Peerless Insurance Company and Kemper
Independence Insurance Company. Plaintiffs allege that
their insurers failed to pay for damages to the basement
walls of their home caused by cracking and deteriorating
concrete. Plaintiffs allege that this constitutes a breach
of contract, a breach of the implied covenant of good faith
and fair dealing, and unfair practices in violation of the
Connecticut Unfair Trade Practices Act (CUTPA) and
the Connecticut Unfair Insurance Practices Act (CUIPA).
Both insurers have moved for summary judgment on all
of plaintiffs' claims. For the reasons described below, I
will grant Peerless's motion for summary judgment in its
entirety, and grant in part and deny in part Kemper's
motion for summary judgment.

**BACKGROUND**

Plaintiffs purchased a home in Willington, Connecticut
in July of 2007. Doc. #51 at 2. The home has a concrete
foundation, as well as a second concrete foundation wall
covering the original foundation. Doc. #62-3 at 6. In
connection with this purchase, plaintiffs commissioned
a home inspection report. *Id.* at 4. The report did not
note cracking in the foundation, but did note the presence
of the second concrete foundation wall. Doc. #69-1 at
20. The home inspector wrote that it appeared that the
second wall had been poured as a result of damage caused
by backfilling. *Id.* Plaintiffs were aware that a second
foundation wall had been poured but did not believe this
reflected that the home was structurally unsound. Docs.
#62-3 at 6, #62-4 at 5.

Plaintiff Shawn Kowalyshyn was aware of minor, hairline
cracks in the exterior foundation at the time he purchased
the house in 2007. Doc. #62-3 at 6. Plaintiffs purchased
a homeowners' insurance policy from Peerless for the
period of July 2007-July 2008. [1] Doc. #51 at 2. Plaintiffs
later purchased a homeowners' insurance policy from
Kemper that began in November 2007 and continues to
the present. *Id.* at 11.

[1]     Peerless maintains for the first time in its reply brief
        that it insured the property for only four months in
        2007. Doc. #77 at 2. I assume for the purposes of
        this ruling that the policy applied from July 2007-July
        2008, although my ruling in this case would be the
        same regardless.

Plaintiffs first noticed extensive cracking in the basement
walls of their home in August 2015 after they learned
from news reports about widespread problems of defective
concrete used to build homes in Connecticut. Doc. #51
at 2. An investigation of the cracking revealed that the
basement was constructed with defective concrete that
likely originated from J.J. Mottes Concrete Company. *Id.*
at 3. This concrete includes a high level of pyrrhotite,
which causes swelling and cracking in the concrete when
exposed to oxygen and water. The basement walls will
continue to deteriorate and eventually crumble as a result
of the faulty concrete. *Ibid.*

Plaintiffs' expert evaluated the home on April 12, 2016.
*Ibid.* The only way to salvage the home would be to replace
the foundation, which is projected to cost approximately
$200,000. *Id.* at 5.

**\*2** Plaintiffs notified Peerless of the condition on September 23, 2015. *Id.* at 4. Peerless's policy covers "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: ... (b) Hidden decay; ... (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." Doc. #51-1 at 10. On September 25, 2015, Peerless denied coverage for the claim. Doc. #51-2. The denial letter noted that Peerless only covered the home for the year of 2007-2008 and that Peerless could no longer inspect the damage that had occurred as of that time. *Id.* at 2. The letter also cited a series of exclusions under the policy, but did not clarify or explain which exemptions Peerless believed applied or why.

Plaintiffs notified Kemper of the condition on September 22, 2015. Doc. #51 at 12. Kemper's policy also covered collapse in its "Additional Coverages" section, although the definition of collapse was amended during the course of coverage in 2011. One definition of "collapse" applied for 2007-2011, and an updated definition applies from 2011 forward.[2] Kemper's old policy from 2007-2011 covered collapse that caused "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: ... (b) Hidden decay; ... (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." Doc. #51-3 at 15. The policy clarified that collapse did not include "settling, cracking, shrinking, bulging or expansion." *Ibid.* In a section entitled "Perils Insured Against," the policy covered all "risks of direct loss" to covered property with specific enumerated exclusions. Doc. #51-3 at 17. The exclusions included loss caused by "inherent vice, latent defect" or "settling, shrinking, bulging or expansion, including resultant cracking" of "foundations, walls, floors." *Id.* at 18. In another section entitled "Exclusions," the policy excluded coverage for "faulty, inadequate or defective ... materials used in ... construction." *Id.* at 21.

[2]    It is not clear from the record precisely when this change in definition took place. The term of the original Kemper policy was November 2007-November 2008. Doc. #51-3 at 2. And Kemper states that the term for the 2015-2016 policy was from June 2015-June 2016. Doc. #61 at 8. Given that these

policies both began mid-year, it appears that the 2011 policy change probably applied mid-year as well.

Kemper's new policy from 2011 and onward altered the definition of "collapse" to be "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Doc. #61-2 at 3. The policy stated that "collapse" did not extend to a structure that is merely "in danger of falling down or caving in" or one that "shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Ibid.*

Kemper conducted an investigation of plaintiffs' claim, including an inspection of the home on September 28, 2015. Doc. #51-4 at 2. Kemper denied coverage for the claim on January 14, 2016. Doc. #51-4. Kemper's denial letter cited multiple reasons as the basis for denial and explained why Kemper believed that the claim was not covered under its policy. *Id.* at 7-8.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### Peerless Insurance Company

**\*3** Peerless argues that even if plaintiffs' loss would otherwise be covered under the policy, there is no dispute of material fact that the loss did not occur during the very limited period of time that its policy was in effect for plaintiffs. Peerless's policy includes a provision

limiting coverage for "property damage" that "occurs" during the policy period. Doc. #51-1 at 21. The relevant loss in this case is the collapse of plaintiffs' home. I assume for purposes of this argument that "collapse" in the Peerless policy includes "substantial impairment of the structural integrity" of the home. *See Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 252 (1987); *see also Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 409 (D. Conn. 2017) (discussing widespread adoption of *Beach* standard and "in the absence of a contrary policy definition—a building has 'collapsed' by suffering a substantial impairment of structural integrity if it would have caved in had the plaintiffs not acted to repair the damage") (internal quotation marks and brackets omitted). I further assume that the extensive map cracking in plaintiffs' foundation constitutes substantial impairment of the structural integrity of plaintiffs' home. Nevertheless, I agree with Peerless that there is no dispute of material fact that any collapse can be proved to have occurred during the narrow time frame in which Peerless insured plaintiffs' home.

Plaintiffs do not know precisely when the substantial cracking in their basement concrete took place. Plaintiffs' expert indicated that he had previously testified that a foundation with this type of defective concrete would be substantially impaired after 10 to 14 years, which would place the map cracking during the years of 1999-2003. Doc. #62-5 at 8-9. Plaintiffs' expert further testified that, given his experience with this concrete condition, he believed that the map cracking would have been present in plaintiffs' foundation walls by 2007. *Id.* at 10. But he also noted that the 2007 home inspector report did not mention the cracking, which he believes the inspector would have noted had the cracking been present at the time. *Id.* at 12. Additionally, plaintiff Shawn Kowalyshyn testified that he only noticed minor spider cracking in the walls in 2007. Doc. #62-3 at 6. The expert further testified that he determined "with a high degree of engineering certainty" that the condition occurred at least five years prior to his 2016 inspection of plaintiffs' home. Doc. #62-5 at 27. He therefore concluded that the substantial cracking must have occurred at some point between the time of the 2007 home inspection report and 2011. *Id.* at 28.

Even construing all of the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the substantial impairment occurred between July 2007-July 2008. Accepting the expert's testimony as true

that there was no unusual cracking in 2007 and that the map cracking was present by 2011, a jury would have no basis other than guesswork to conclude that the substantial impairment had occurred by July 2008. Plaintiffs' expert did not place the substantial impairment in this narrower time frame, and plaintiffs have provided no further evidence that would allow a jury to reach such a conclusion.

To avoid this problem, plaintiffs argue that I should apply a "multiple injury trigger" analysis which would allow for coverage under any policies in effect "where there has been an exposure to a cause of injury, an injury in fact, or when an injury manifests." Doc. #68 at 11 (citing *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 697 n.12 (2003)). Because the concrete has been deteriorating since the foundation was originally poured, plaintiffs argue that they were "exposed" to the cause of the injury for that entire period, including for Peerless's policy period.

I don't agree. It is true that Connecticut courts have applied an "exposure" trigger in cases involving "progressive, long latency diseases such as asbestosis and mesothelioma." *R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 171 Conn. App. 61, 158 (2017) (explaining that the continuous trigger theory applies to the distinct problem of "long-tail toxic tort claims"). Such diseases "continually reinjure the body for decades after initial exposure, and because those injuries are considered to be indivisible—their progression and magnitude during any particular policy period are impossible to quantify." *Ibid.*

**\*4** But unlike cases involving gradual environmental contamination or gradual progression of a disease, coverage for defective concrete foundation cases is not triggered until there is a "collapse"—that is, until the point when the structure of the home became substantially impaired. The "collapse" itself did not occur innumerable times over the years, unlike the injuries or losses in environmental or disease cases. *See also Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 627 (2d Cir. 1994) (noting the difficulty of importing "concepts of bodily injury ... into the property damage context" and distinguishing installation of asbestos building products with other "types of property damage—such as the gradual contamination of earth and groundwater by leaking landfills—[that] may be analogous to the slow

progression of diseases such as asbestosis and cancer"). I conclude that the Peerless policy was not triggered merely by the fact that plaintiffs were "exposed" to injury because their foundations were built with defective concrete. [3]

[3]   Not to the contrary is *Roberts v. Liberty Mut. Fire Ins. Co.*, in which Judge Underhill cited and applied the "continuous trigger theory" to a defective concrete claim, but only by way of concluding that "the concrete deterioration 'became manifest' in 2012, within the period of Liberty Mutual's coverage," 264 F. Supp. 3d at 401 n.3, without more broadly suggesting—as plaintiffs argue here—that coverage is triggered by mere "exposure" to the cause of injury from the fact that defective concrete was used in the first place and continued to be in the foundation while the Peerless policy was in effect. Plaintiffs here have not otherwise established a genuine fact issue to show that the substantial impairment was manifest during the limited Peerless policy period.

Because no reasonable jury could find that the collapse occurred during the policy period, Peerless was not obligated to plaintiffs. And because Peerless did not breach its policy contract, plaintiffs' other claims against Peerless necessarily fail. "In the absence of a breach of an express duty under the insurance policy, ... there is no independent cause of action for the breach of the implied covenant of good faith and fair dealing." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014) (citing *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 801 (2013)). Similarly, "a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract." *Roberts*, 264 F. Supp. 3d at 416. Because I conclude that no reasonable jury could find that Peerless breached its contract, plaintiffs' claims that Peerless violated the implied covenant of good faith and fair dealing and CUTPA/CUIPA also fail. Accordingly, I will grant Peerless's motion for summary judgment in its entirety.

### Kemper Independence Insurance Company

Plaintiffs allege that the structural integrity of their home has been substantially impaired, that this occurred during the years of 2007-2011, and that such substantial impairment constitutes collapse with the meaning of Kemper's 2007-2011 policies. Kemper does not dispute that the extensive cracking in the foundation of plaintiffs' home would constitute substantial impairment of the structural integrity of plaintiffs' home. But Kemper argues

that no reasonable jury could conclude that the substantial impairment occurred during the 2007-2011 period when its pre-amended definition of "collapse" applied. Kemper further argues that its updated collapse definition of the 2011-2016 policy applies, which indisputedly bars coverage for substantial impairment. In addition, Kemper claims that even if the older definition of collapse applies, its policy contains several exclusions that operate to bar coverage for plaintiffs' loss.

### Timing of the substantial impairment

As I explained above, construing all of the evidence in the light most favorable to plaintiffs, there is at least a material dispute of fact as to whether the extensive cracking in the foundation occurred prior to 2007, between 2007-2011, or after 2011. Although Kemper emphasizes the expert's testimony in other cases that the cracking would have occurred 10-14 years after the concrete was poured, there is other evidence in this case from which a reasonable jury could conclude that the cracking occurred later. *See Metsack v. Liberty Mut. Fire Ins. Co.*, 2017 WL 706599, at *6 (D. Conn. 2017) (denying summary judgment where defendant argued that there was no dispute because plaintiffs' expert—the same as in this case—testified in other cases about the 10-14 year period and holding that there was enough other evidence, including plaintiff's testimony that she did not notice the cracks in her home until later, to create a dispute of material fact as to timing). As such, I find that a reasonable jury could conclude that the substantial impairment occurred during the several years that elapsed from 2007-2011 at which time the older version of the Kemper policy and its pre-amended definition of "collapse" was in force.

### Cracking Exclusion

**\*5**   Kemper argues that plaintiffs' home did not "collapse" within the meaning of its policy because the policy excludes "settling, cracking, shrinking, bulging or expansion" from the definition of collapse. Doc. #51-3 at 15.I reject this argument on the ground that this exclusion is ambiguous for the reasons stated by Judge Underhill when he considered the same exclusion in *Agosti v. Merrimack Mut. Fire Ins. Co.*, 2017 WL 3710786, at *4-5 (D. Conn. 2017) (noting in part that "the language of the 'cracking' exclusion is fairly susceptible to being interpreted as not including mere settling or cracking, but including settling or cracking that results in substantial

impairment of a home's structural integrity") (internal quotation marks omitted).

*Fortuitous Loss Limit*
Kemper next argues that its insurance policy is an "all-risk" policy as to property damage that only covers fortuitous and extraneous events and that plaintiffs' loss is not a fortuitous loss. But Kemper's policy as it relates to its collapse coverage is not an all-risk policy. An all-risk policy is one that "insure[s] against all risks unless explicitly excluded." *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 41 (2d Cir. 2003). While it is true that some of the coverage provided under the policy, including Coverages A and B, are all-risk, the "collapse" provision under "Additional Coverages" is clearly not. The collapse provision states that the policy covers "direct physical loss to covered property involving collapse ... caused only by one or more of the following," then lists six causal agents that trigger coverage, including hidden decay. This is "named-perils" coverage rather than "all-risk" coverage. *See Fabozzi v. Lexington Ins. Co.*, 639 Fed.Appx. 758, 760 (2d Cir. 2016) (distinguishing between "all-risk" and "named-perils" coverage and explaining that an identical "collapse" provision in a policy with an identical structure was properly characterized as named-perils coverage rather than all-risk coverage). Therefore, whether plaintiffs' claim is covered depends on whether a "collapse" occurred and whether it was caused by one of the enumerated covered triggers. Kemper's argument about fortuitous or accidental loss under all-risk policies is inapposite.

Notably, this case is distinguishable from defective concrete cases holding that coverage was barred where the insurance policy included specific language requiring that the collapse be "sudden and accidental." *See, e.g.*, *Metsack*, 2017 WL 706599, at *7 (holding that policy language defining collapse as "sudden and accidental" precluded coverage in a defective concrete case and noting that "while *Beach* and the numerous JJ Mottes concrete cases that have been heard in this district have held that a collapse need not be 'sudden' to be covered, none of the policies evaluated included the word 'sudden' within their 'collapse' provisions."). Kemper has not pointed to any provision in its 2007-11 policy with similar language.

*Suit Against Us Limitation*

Kemper further argues that plaintiffs' claim is barred by the policy's "Suit Against Us" limitation provision which requires that any action be brought "within one year after the date of loss." Doc. #51-3 at 23. Kemper argues that there is no dispute that the loss occurred and that plaintiffs knew of the loss more than one year before plaintiffs initiated the instant suit in February of 2016. Courts in this district have "determined on multiple occasions that the 'date of loss' for purposes of an insurance policy's 'Suit Against Us' provision is the date on which the insured learned or should have learned of the covered loss." *Belz v. Peerless Ins. Co.*, 204 F. Supp. 3d 457, 465-66 n.2 (D. Conn. 2016) (citing cases).

**\*6** Construing the evidence in the light most favorable to plaintiffs, I conclude that a reasonable jury could find that plaintiffs only learned or should have learned of the collapse of their home in August 2015, which was less than one year before they filed this suit. Contrary to Kemper's assertions, neither their knowledge of a double pour foundation wall nor their knowledge of minor, hairline cracking establishes that plaintiffs knew or should have known that the structural integrity of their home was substantially impaired. Plaintiffs testified that they only learned of the extensive cracking in 2015, when they checked their home after hearing about the concrete problem in the news. Plaintiffs' position is further supported by the fact that the original foundation wall was largely hidden from view, suggesting that a reasonable person would not have known of this problem earlier. *See Belz*, 204 F. Supp. 3d at 466 n.2 (denying summary judgment where "the fact that the cracks were obscured from view ... combined with the early engineer's reports that the cracks did not threaten the structural integrity of the home, suggest that the [plaintiffs] could not have known of the 'collapse' any sooner than 2013"). Accordingly, there is at least a dispute of material fact as to whether plaintiffs should have known of the collapse prior to the summer of 2015 such that the "Suit Against Us" limitation would bar coverage for their claim.

*Latent Defect/Faulty Materials Exclusions*
Kemper further argues that plaintiffs' loss is excluded under policy exclusions for damage caused by "wear and tear, marring, deterioration" or "inherent vice, latent defect." Doc. #51-3 at 18. These exceptions are found in "Section I—Perils Insured Against" of the policy. *Id.* at 17. This section opens by stating, "We ensure against risks of direct loss to property described in Coverages A and

B only if that loss is a physical loss to property; however, we do not insure loss:" and proceeds to list enumerated exclusions. This section is a prototypical "all-risk" policy that covers all risks to the property described in Coverages A and B but for the specific risks excluded by this section. The policy clarifies for these exclusions that "any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered." *Id.* at 18.

Kemper also argues that the exclusion for "faulty, inadequate, or defective ... construction" applies. This exclusion appears in provision 2.c. of "Section I—Exclusions." Doc. #51-3 at 20-21. This provision opens by stating, "We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered." *Id.* at 20.

The clear reading of these sections is that the exclusions therein do not apply to limit coverage granted in the "Additional Coverage" section. The "Additional Coverage" section serves as "a coverage-restoring exception to Coverage A's exclusions." *Fabozzi v. Lexington Ins. Co.*, 23 F. Supp. 3d 120, 125 (E.D.N.Y. 2014) (describing a collapse provision in an "Additional Coverages" section). Both the "inherent vice, latent defect" and "faulty materials" exceptions limit coverages granted in Coverages A and B, but do not refer to the separate "Additional Coverages" section. *See also Sirois v. USAA Cas. Ins. Co.*, 2017 WL 3726468, at *5 (D. Conn. 2017) (similar policy exclusions did not clearly apply to "collapse" coverage granted in an "Additional Coverages" section).

Furthermore, the "ensuing loss" provisions of the exclusions mean that a loss that results from a covered event that "ensues" from one of the exclusions is covered under the policy. In *Beach*, the Connecticut Supreme Court interpreted a similar "ensuing loss" provision and held that the provision could "reasonably be understood to have contemplated coverage for a 'collapse' that follows consequentially from excluded activity." *Beach*, 205 Conn. at 252; *see also Roberts*, 264 F. Supp. 3d at 413. Thus, as commentators have noted, "[w]here a policy provides coverage for 'collapse' caused by otherwise excluded causes of loss, the coverage prevails over the general exclusion in another part of the policy.... In other words, exclusions in the main body of the policy will

generally not apply to eliminate coverage for the extended coverage of collapse." Paula B. Tarr *et al.*, *Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories*, 35 Tort & Ins. L.J. 57, 76 (1999).

**\*7** I conclude that there is at least a material dispute of fact as to whether plaintiffs' loss occurred during Kemper's policy period and whether the policy covers their loss. Accordingly, a reasonable jury could find that Kemper breached its policy by failing to pay plaintiffs' for the collapse of their home. I will therefore deny Kemper's motion for summary judgment as to Count Four (Breach of Contract).

*Implied Covenant of Good Faith and Fair Dealing*
Kemper argues that even if it breached its contract by failing to pay plaintiffs, no reasonable jury could conclude that it did so in bad faith. Because plaintiffs have shown a material dispute regarding whenever they are entitled to an express benefit under Kemper's policy, "the question becomes whether the record supports finding that [the insurer] acted with actual or constructive fraud, a design to mislead, or have acted with neglect or refusal to fulfill its duties." *Metsack*, 2017 WL 706599, at *8 (citation and questions omitted). Absent such indicia, "it is not bad faith for an insurer to fight liability when policy coverage is unclear." *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 271 (2d Cir. 1995).

I find that plaintiffs have not have shown a material dispute of fact that Kemper has engaged in bad faith. Plaintiffs' allegations of bad faith rest principally on "the fact that Kemper denied the instant claim based upon an incomplete coverage analysis and a reliance on a position consistently rejected by the courts in Connecticut." Doc. #68 at 25. Plaintiffs allege that, although Kemper's letter cited the updated collapse provisions that had been in place for five years, its analysis was "incomplete" because it did not fully analyze the applicability of the older collapse definition. Additionally, plaintiffs allege that it was bad faith to cite the "foundation" exception in the letter, "thereby utilizing an interpretation of the term 'foundation' that has been universally rejected by the State and Federal Courts in Connecticut in the context of these concrete decay claims." *Id.* at 24.

Given that the updated definition of collapse had been already operative for several years by the time plaintiffs filed their claim, I do not think a reasonable jury could find

that Kemper acted in bad faith by principally relying on the updated definition. Nor is it bad faith for an insurer to rely on an interpretation of a policy that "has not prevailed so far" in the courts so long as it is not "unreasonable on its face under existing insurance law." *Roberts*, 264 F. Supp. 3d at 415. "Until such time as those arguments are rejected by Connecticut's appellate courts or the Second Circuit, [defendant insurer] is entitled to continue making them." *Ibid.* I will therefore grant Kemper's motion for summary judgment as to Count Five (breach of implied covenant of good faith and fair dealing).

*CUTPA and CUIPA*

In order to sustain a CUTPA/CUIPA claim, a plaintiff must allege that a defendant engaged in conduct prohibited by CUIPA and that the act proximately caused the plaintiff's harm. *See Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165 (D. Conn. 2014). If a plaintiff premises a CUTPA claim on a defendant's unfair claim settlement practices, the plaintiff must "allege that the defendant has committed the alleged proscribed act with sufficient frequency to indicate a general business practice." *Ibid.*

Plaintiffs have failed to show that Kemper's liability under its policy was "reasonably clear." The existence of other nonbinding decisions that the insurer is "potentially liable would not make it 'reasonably clear' that [the insurer] actually was liable, and so could not persuade a reasonable jury to find that [the insurer] violated CUTPA/CUIPA."

*Roberts*, 264 F. Supp. 3d at 416. This is especially true here, where plaintiffs reported the collapse in 2015, and Kemper's policy included an updated "collapse" definition that barred coverage for substantial impairment that had been in effect since 2011. Because plaintiffs have not introduced any other evidence to support their CUTPA/ CUIPA claim, I will grant Kemper's motion for summary judgment with respect to Count Six (CUTPA and CUIPA claim).

## CONCLUSION

**\*8** Defendant Peerless's motion for summary judgment (Doc. #63) as to Counts One, Two, and Three is GRANTED. Defendant Kemper's motion for summary judgment (Doc. #60) is GRANTED in part and DENIED in part. Kemper's motion is DENIED as to Count Four (breach of contract) but GRANTED as to Count Five (Breach of the Implied Covenant of Good Faith) and Count Six (CUTPA and CUIPA). Trial shall proceed solely on Count Four against Kemper.

It is so ordered.

**All Citations**

Slip Copy, 2018 WL 888724

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6459552
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Lynne LISTON–SMITH, et al., Plaintiff,
v.
CSAA FIRE & CASUALTY
INSURANCE COMPANY, Defendant.

CIVIL ACTION NO. 3:16–CV–510 (JCH)
|
Signed 12/15/2017

**Synopsis**

**Background:** Insureds brought action alleging that insurer breached their homeowners' insurance policy, breached implied covenant of good faith and fair dealing, and violated Connecticut Unfair Insurance Practices Act (CUIPA) and Connecticut Unfair Trade Practices Act (CUTPA) when it denied their claim for damages to foundation of their residence. Insurer moved for summary judgment.

**Holdings:** The District Court, Janet C. Hall, J., held that:

[1] insureds' claim did not fall within scope of policy provision providing additional coverage for collapse;

[2] chemical reaction that caused damage did not itself constitute covered "direct physical loss" under policy;

[3] insureds' claim fell within scope of exclusion barring recovery for "settling, shrinking, bulging or expansion, including resultant cracking, of … foundations, walls";

[4] claim did not fall within scope of policy's additional coverage for reasonable repairs;

[5] insurer's denial of coverage did not violate CUIPA and CUTPA; and

[6] insurer's threat to cancel policy if insureds did not repair their basement walls did not violate CUIPA and CUTPA.

Motion granted.

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiff.

Daniel P. Scapellati, Carl R. Ficks, Jr., Halloran & Sage, Hartford, CT, for Defendant.

**Opinion**

**RULING RE: MOTION FOR
SUMMARY JUDGMENT**

Janet C. Hall, United States District Judge

## I. INTRODUCTION

**\*1** The plaintiffs, Lynne Liston–Smith and John Smith (collectively "the plaintiffs"), bring this action against their homeowner's insurance provider, CSAA Fire & Casualty Insurance Company ("CSAA"), for CSAA's failure to pay for damage to their basement walls. The Complaint (Doc. No. 1–1) alleges breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), and violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). On October 25, 2016, the court dismissed Count Two. See Ruling re Mot. to Dismiss (Doc. No. 19).

CSAA has moved for summary judgment (Doc No. 30) as to the two remaining counts. For the reasons that follow, CSAA's Motion for Summary Judgment is granted.

## II. FACTUAL BACKGROUND [1]

[1]     The following facts are undisputed unless otherwise stated.

The plaintiffs have lived at their home in Tolland, Connecticut since 1996. Local Rule 56(a)1 Statement ("L.R. 56(a)1 Stat.") (Doc. No. 32) at ¶¶ 2, 12. Plaintiffs' home is insured by CSAA. Id. at ¶ 3. Around late summer or fall of 2014, John Smith ("Smith") noticed cracks in his basement wall and alerted his wife, Lynne Liston–Smith ("Liston–Smith"). John Smith Depo. (Oct. 14, 2016), Ex. C to L.R. 56(a)1 Stat. (Doc. No. 32–3) at 7. In August of 2015, the plaintiffs hired an engineer, William Neal, to inspect the cracks in the foundation of their home.

Lynne Liston–Smith Depo. (Oct. 14, 2016), Ex. D to L.R. 56(a)1 Stat. (Doc. No. 32–4) at 10. Neal determined that a defect in the concrete, which he later determined to be a chemical reaction, was causing cracks in the walls that would continue to grow until the structure became unstable. William Neal Depo. (Dec. 1, 2016), Ex. E (Doc. No. 32–5) at 12–13.[2] Neal recommended that the concrete foundation be replaced. Id. at 14.

[2]  In their Local Rule 56(a)2 Statement, plaintiffs repeatedly qualify their admissions—including Neal's statement in his deposition—with phrases like "[a]dmitted the statement was made," "[a]dmitted though is amongst other claims," and "[a]dmitted insofar as those statements were made." Plaintiffs' Local Rule 56(a)2 Statement is improper and violates the Local Rules.
District of Connecticut Local Civil Procedure Rule 56(a)2 requires that the party opposing a motion for summary judgment respond to facts in the moving party's Local Rule 56(a)1 Statement by "admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." Rule 56(c) permits objections when "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The caveats plaintiffs place on their admissions frustrate Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists.

On September 2, 2015, the plaintiffs made a claim to CSAA for damages the chemical reaction had caused to their foundation. L.R. 56(a)1 Stat. at ¶ 13. In a letter dated October 12, 2015, CSAA denied plaintiffs coverage under their home insurance policy ("the Policy"). Id. at ¶ 16.

**\*2**  "Coverage A—Dwelling" in the Policy applies to plaintiffs' home. CSAA Pol'y, Ex. B to L.R. 56(a)1 Stat. (Doc. No. 32–2) at 6. In "Section I—Perils Insured Against," the Policy states, in pertinent part:

We insure against risk of direct physical loss to property described in Coverages A, B and C.

We do not insure, however, for loss:

A. Under Coverages A, B and C:

1. Excluded under Section I—Exclusions;

2. Caused by: ...

e. Any of the following:

1. Wear and tear, marring, deterioration;

2. Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself; ...

6. Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings ...

Id. at 13–14.

In "Section I—Exclusions," the policy states, in relevant part:

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered....

3. Faulty, inadequate or defective:

a. Planning, zoning, development, surveying, siting;

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;

of part or all of any property whether on or off the "residence premises".

Id. at 15–16.

In a section called "E. Additional Coverages," the Policy states, in relevant part:

2. Reasonable Repairs

a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage....

8. Collapse

a. This Additional Coverage applies to property covered under Coverages A and B. With respect to this Additional Coverage:

1. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

2. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

3. A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

4. A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

1. The Perils Insured Against under Coverages A and B;

2. Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

3. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

4. Weight of contents, equipment, animals or people;

5. Weight of rain which collects on a roof; or

6. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

**\*3** Id. at 8–10, 28.

In "Section I—Conditions," the Policy states, in relevant part:

G. Suit Against Us

No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss....

H. Policy Period

This policy applies only to loss which occurs during the policy period.

Id. at 18–19.

The plaintiffs filed the instant lawsuit on February 22, 2015, and defendants removed the case to federal court on March 30, 2016. See L.R. 56(a)1 Stat. (Doc. No. 32) at ¶ 1; Notice of Removal (Doc. No. 1).

## III. LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, 106 S.Ct. 2505, and present "such proof as would allow a reasonable juror to return a verdict in [its] favor," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d

1219, 1224 (2d Cir. 1994) ). On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) ).

## IV. DISCUSSION

### A. Count I: Breach of Contract

**[1]** **[2]** **[3]** Under Connecticut law, "construction of a contract of insurance presents a question of law for the court." Lexington Ins. Co. v. Lexington Healthcare Grp., 311 Conn. 29, 37, 84 A.3d 1167 (2014). An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." Zulick v. Patrons Mut. Ins. Co., 287 Conn. 367, 372–73, 949 A.2d 1084 (2008). "A contract must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Murtha v. City of Hartford, 303 Conn. 1, 7, 35 A.3d 177 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355, 999 A.2d 713 (2010) ).

**\*4** **[4]** **[5]** **[6]** Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc., 300 Conn. 254, 260, 14 A.3d 284 (2011) (quoting Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC, 273 Conn. 724, 734–35 (2005) ). Contract language is unambiguous when "its language is clear and conveys a definite and precise intent." Id. To the extent the language of an insurance policy is ambiguous, such language must be construed against the insurance company, who was the drafter of the policy. See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co., 247 Conn. 801, 806, 724 A.2d 1117 (1999).

CSAA argues that the Policy does not cover damage to the plaintiffs' walls for several reasons. First, the loss the plaintiffs identify is not considered a "collapse" under the Policy. See Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Doc. No. 31) at 12–15. Second, the Policy only covers accidental losses, whereas the deterioration of the plaintiffs' walls has been inherent in the concrete since the foundation of the house was laid. See id. at 15–17. Third, coverage for the plaintiffs' claim is barred by several exclusions in the Policy. See id. at

18–24. Fourth, CSAA argues that the plaintiffs' suit is barred by the Policy's two-year suit limitation provision and that the alleged loss from the chemical reaction in the plaintiffs' foundation and basement walls began well before the CSAA Policy period. See id. at 25–28. Because the court agrees with the defendants that the plaintiffs' claim is not covered under the collapse provision and is barred by express exclusions in the Policy, the court does not reach the issue of timeliness.

### 1. Collapse

**[7]** CSAA argues that there is no genuine dispute of material fact that the plaintiffs' home has not collapsed, as defined in the Policy, and is therefore not covered under the Additional Coverage for collapse. See Defs.' Mem. at 15. Plaintiffs argue that the definition of collapse is ambiguous and that coverage under the collapse provision extends to "substantial impairment of the structural integrity of a building." See Pls.' Mem. of Law in Opp'n to the Defs.' Mot. for Summ. J. ("Pls.' Opp'n") (Doc. No. 37) at 6–7.

The court concludes that the Additional Coverage for collapse does not cover the plaintiffs' home because there has been no collapse, as the provision unambiguously requires. Plaintiffs' own expert stated that the walls had not abruptly fallen down or caved in. See William Neal Depo. (Dec. 1, 2016), Ex. E to L.R. 56(a)1 Stat. (Doc No. 32–5) at 14. Rather, he determined that the walls were deteriorating as a result of a progressive condition, remained upright, and the home was still inhabitable for its intended purpose. Id.

Other Connecticut courts that have looked at insurance policies requiring an abrupt collapse have rejected arguments that the provision was ambiguous or could be interpreted as covering a state short of an abrupt collapse, such as a "substantial structural impairment". See, e.g., Carlson v. Allstate Ins. Co., No. 3:15-cv-01045 (MPS), 2017 WL 4285687, at \*6 (D. Conn. Sept. 27, 2017), appeal docketed, No. 17–3501 (2d Cir. Oct. 27, 2017) (finding that the policies unambiguously limited coverage to "sudden and accidental" collapses and therefore the alternative formulation of collapse—a "substantial structural impairment"—did not apply); England v. Amica Mut. Ins. Co., No. 3:16-CV-1951 (MPS), 2017 WL 3996394, at \*5 (D. Conn. Sept. 11, 2017) (finding that the

policies unambiguously required an abrupt collapse for coverage to apply); Manseau v. Allstate Ins. Co., No. 3:16-cv-1231 (MPS), 2017 WL 3821791, at *4 (D. Conn. Aug. 31, 2017) (granting motion to dismiss where policy defined collapse as "a sudden and accidental direct physical loss"); Adams v. Allstate Ins. Co., 276 F.Supp.3d 1, 4 (D. Conn. 2017) (same); Metsack v. Liberty Mut. Fire Ins. Co., No. 3:14-CV-01150 (VLB), 2017 WL 706599, at *8 (D. Conn. Feb. 21, 2017) (granting motion for summary judgment where policy required "a sudden and accidental direct physical loss"); Alexander v. General Ins. Co. of America, No. 3:16–cv–59 (SRU), transcript of oral ruling (Doc. No. 22) at 22–24 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "abrupt falling down or caving in"); Toomey v. Central Mut. Ins. Co., Docket No. CV-15-6009841-S, 2017 WL 4159820, at *7 (Conn. Super. Ct. Jud. Dist. of Tolland Aug. 3, 2017) (unpublished) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in"); Jemiola v. Hartford Cas. Ins. Co., No. CV-15-6008837-S, 2017 WL 1258778, at *1 (Conn. Super. Ct. Jud. Dist. of Tolland Mar. 2, 2017) (unpublished) (same).

**\*5** Plaintiffs cite several cases in support of their contention that their walls are in a state of collapse under the Policy, but none of them concerned facts analogous to the condition of the plaintiffs' home or the terms of the Policy. In Malbco Holding, LLC v. Amco Ins. Co., 629 F.Supp.2d 1185, 1196–97 (D. Or. 2009), the court found the collapse provision ambiguous because it was not clear whether the entire structure had to collapse or a partial collapse was covered. Some sections of a hotel had fallen over three inches and the city was prepared to "red tag" the hotel because of its dangerous physical condition if it was not repaired immediately. Id. at 1191. In contrast, in the instant case, no part of the plaintiffs' home has collapsed, so there is no ambiguity about how extensive a collapse must be to obtain coverage.

Two additional cases cited by the plaintiffs—Dalton v. Harleysville Worcester Mutual, 557 F.3d 88, 92–93 (2d Cir. 2009) and Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246, 250–52, 532 A.2d 1297 (1987)—interpreted collapse provisions as covering a "substantial impairment of the structural integrity" of a building, but only because the policies at issue, unlike the instant Policy, did not require a collapse to be abrupt. Finally, 130 Slade Condo Ass'n, Inc. v. Millers Capital Ins. Co., Civ. A. No.

CCB-07-1779, 2008 WL 2331048, at *5 (D. Md. June 2, 2008), does not support plaintiffs' argument because the 130 Slade court did not decide whether the policy language was ambiguous. Instead, it determined that, under the interpretation of collapse advanced by either party, the plaintiffs were entitled to coverage after a column buckled approximately three inches down and three inches over, the ceiling of the master bedroom separated from the wall, and the building was evacuated for several days until columns were stabilized. Id.

The court concludes, as a matter of law, that plaintiffs are not covered under the Additional Coverage for collapse in the Policy. No part of their home collapsed—abruptly or otherwise—and their entire home can still be occupied for its current intended purpose. Moreover, the Policy expressly excludes from coverage buildings that are in danger of collapse or that remain standing. CSAA Pol'y, Ex. B to L.R. 56(a)1 Stat. (Doc. No. 32–2) at 28. Finally, the Policy specifies that walls that exhibit cracking are not considered to be in a state of collapse. Id. There is no genuine dispute of material fact that the Plaintiffs are not covered for collapse under the Additional Coverage.

## 2. Chemical Reaction

Plaintiffs argue that the chemical reaction itself is a loss that should be covered under the Policy. See Pls.' Opp'n at 8–10. Plaintiffs also argue that the Policy language does not limit claims to accidental events. See id. at 7–8. Further, they contend that the use of the term "risk" in the Policy includes not only the chemical reaction occurring in the concrete, but risks associated with the chemical reaction, such as collapse. See id. at 9.

CSAA argues that plaintiffs' claim is barred under the Policy because only accidental losses are covered under an all-risk insurance policy. See Defs.' Mem. at 15. The chemical reaction that has caused plaintiffs' walls to crack has been inevitable since the concrete used to construct the foundation and basement walls was poured. See id. Moreover, the consequences of the chemical reaction are barred by numerous exclusions. See id. at 18.

**[8]** A chemical reaction does not constitute a "direct physical loss" under the Policy. The court finds the reasoning in England, 2017 WL 3996394 at *6–8, instructive. There, Judge Shea found that the use of

the term "loss" in a substantially similar policy, the ordinary meaning of "loss," and Connecticut case law all distinguish between a loss and its cause. Id. The chemical reaction is a process that can <u>cause</u> tangible, physical property damage; it does not qualify as a compensable <u>loss</u> in and of itself. Id.

 **\*6**  Plaintiffs cite <u>Khuns v. Bay State Ins. Co.</u>, 19 Misc.3d 1129(A), 866 N.Y.S.2d 92, at \*1–\*2 (Sup. Ct. 2008) <u>aff'd</u>, 78 A.D.3d 1496, 910 N.Y.S.2d 822 (2010), in support of their contention that a chemical reaction is not excluded under the Policy, but <u>Khuns</u> bears little resemblance to the instant case. In <u>Khuns</u>, the court determined that an expert's affidavit attributing the cause of a collapsed wall to rotting mortar arguably brought the loss within the policy's coverage for collapse due to decay, and therefore raised a question of fact for the jury. Id. at \*1. Further, the court found that the defendants had not timely asserted certain disclaimers and that, even if they had properly disclaimed coverage on those bases, there were genuine issues of material fact that a collapse occurred and whether the cause of that collapse fell under the exclusion for defective design. Id. at \*1–\*2. None of the analysis in <u>Khuns</u> relates to plaintiffs' argument that a chemical reaction is covered in and of itself.

 **[9]**  **[10]**  Plaintiffs also argue that the use of the term "risk" before "direct physical loss" expands the scope of the Policy. <u>See</u> Pls.' Opp'n at 9. Even if it is assumed that the use of the term "risk" expands the coverage, an exclusion following the coverage for "risk of direct physical loss" bars recovery for "settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations, walls ..." The risk of damage to the plaintiffs' home is posed by bulging in the concrete and resultant cracking. <u>See, e.g.</u>, <u>Manseau</u>, 2017 WL 3821791 at \*4 (determining that cracking plaintiffs alleged fell squarely within the policy language excluding cracking from the definition of collapse); <u>Agosti v. Merrimack Mut. Fire Ins. Co.</u>, 279 F.Supp.3d 370, 374-75 (D. Conn. 2017) (finding that, although the insurance policy did not specify that losses caused by chemical reactions are excluded, the express exclusion for loss consisting of or caused by cracking of foundations or walls barred the plaintiffs' loss under that provision of the policy). In addition, coverage for risk also excludes "[f]aulty ... [m]aterials used in ... construction ..." The concrete that is now cracking was faulty at the time it was used in the construction of the plaintiffs' house. <u>See</u> L.R. 56(a)1 Stat. at ¶¶ 10–11, 26.

These two exclusions distinguish the instant Policy and condition of the covered residence from <u>401 Fourth Street, Inc. v. Investors Ins. Grp.</u>, 823 A.2d 177, 178–79 (Pa. Super. 2003), which plaintiffs cite in support of their position and also involved a policy with language about "risks of direct physical loss." The damage in <u>401 Fourth Street</u>—a parapet wall that was bowed and leaning inward—was not barred by exclusions following the "risk of loss" language, unlike the instant case.

 **[11]**  Finally, plaintiffs argue that their costs for replacing the foundation should be covered under the Additional Coverage for reasonable repairs. <u>See</u> Pls.' Opp'n at 10. However, the Policy only pays for the cost of repairs taken "to protect covered property that is damaged by Perils Insured Against from further damage." Because the "risk" plaintiffs identify is not covered under the Policy, the Additional Coverage for reasonable repairs does not apply. [3]

3      The parties dispute whether the Policy covers inevitable losses. CSAA argues that an all-risk policy is limited to fortuitous events, see Defs.' Mem. at 15, while plaintiffs argue that the Policy is not limited to fortuitous events, see Pls.' Opp'n at 8. Because the plaintiffs' claim is barred by express exclusions, the court does not reach the question whether the all-risk plan would cover an inevitable loss were it not excluded by specific provisions in the Policy.
      The parties also disagree about whether the exclusion for "wear and tear, marring, deterioration, mechanical breakdown, latent defect, inherent vice ..." bars the plaintiffs' claim. Because the court finds the claim barred on other bases, it does not reach the scope of this exclusion.

 **\*7**  The court concludes that plaintiffs have not raised a genuine issue of material fact as to whether CSAA breached the Policy. The court finds the Policy unambiguous and its terms exclude coverage for the damage to the plaintiffs' walls. Therefore, the court grants CSAA's Motion for Summary Judgment on plaintiffs' breach of contract claim.

 B. <u>Count III: CUIPA/CUTPA</u>

CSAA argues that plaintiffs' claim under CUIPA and CUTPA fails as a matter of law because the denial of plaintiffs' insurance claim was proper. <u>See</u> Defs.' Mem. at 29. Further, CSAA argues, plaintiffs have not offered any evidence to suggest that CSAA's allegedly wrongful

conduct was part of a general business practice, as is required to bring a claim under CUIPA. See id. at 30–33. Plaintiffs maintain that CSAA violated CUIPA and CUTPA, but they do not provide facts in support of their claim beyond arguing that CSAA wrongly denied them coverage under the Policy and shared information with other insurance companies through the Insurance Services Office, Inc. ("ISO"). See Pls.' Opp'n at 11–12.

**[12]** CUTPA prohibits the use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42–110b, while CUIPA defines "unfair methods of competition" in the insurance trade, Conn. Gen. Stat. § 38a–815. CUTPA creates a private right of action for "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice ..." Conn. Gen. Stat. § 42–110g(a). Although there is no private right of action under CUIPA, see Bacewicz v. NGM Ins. Co., No. 3:08-CV-1530 (JCH), 2009 WL 1929098, at *2 (D. Conn. June 30, 2009) (citing Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 119 (2d Cir. 2001) ), a "plaintiff may assert a private cause of action based on a substantive violation of CUIPA through CUTPA's enforcement provision," Karas v. Liberty Ins. Corp, 33 F.Supp.3d 110, 117 (D. Conn. 2014).

**[13]** **[14]** When CUTPA and CUIPA claims are premised on denial of coverage under an insurance policy and the insurer's interpretation of the policy is correct, "there can be no genuine issue of material fact as to whether the application of that interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct in violation of the statues." Zulick v. Patrons Mut. Ins. Co., 287 Conn. 367, 378, 949 A.2d 1084 (2008). Because the court concludes that CSAA's denial of coverage was proper, plaintiffs' claim

that CSAA's alleged breach of contract was part of a general unfair business practice fails as a matter of law.

**[15]** Plaintiffs also argue that CSAA's threat to cancel coverage if the plaintiffs did not repair their basement walls presents an issue of fact as to whether CSAA violated CUIPA and CUTPA. See Pls.' Opp'n at 12. In its Ruling re. Mot. to Dismiss, the court dismissed Count Two—breach of the implied covenant of good faith and fair dealing—because, in addition to not alleging facts that would plausibly show bad faith in CSAA's interpretation of the terms of the Policy, plaintiffs did not allege any damages arising from the threatened cancellation, which was later retracted. (Doc. No. 19) at 6. Plaintiffs were given leave to amend the Complaint in accordance with the Ruling, see id. at 6, but did not do so. Without a link between CSAA's threat and any damage to the plaintiffs, the claim under CUTPA and CUIPA lacks proximate cause. See Tucker v. Am. Int'l Grp., Inc., 179 F.Supp.3d 224, 229–30 (D. Conn. 2016) (noting that CUTPA requires a showing "that the prohibited act was the proximate cause of a harm to the plaintiff") (quoting Abrahams v. Young & Rubicam, 240 Conn. 300, 306, 692 A.2d 709 (1997) ). Therefore, the court grants CSAA's Motion for Summary Judgment as to plaintiffs' claim under CUIPA and CUTPA.

## V. CONCLUSION

**\*8** For the foregoing reasons, CSAA's Motion for Summary Judgment is granted.

## SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2017 WL 6459552

---

2018 WL 465775
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Howard & Donna MAKUFKA, Plaintiffs,
v.
CSAA FIRE & CASUALTY INS. CO., Defendant.

3:16-CV-00567 (VLB)
|
Signed 01/18/2018

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiffs.

Daniel P. Scapellati, Carl R. Ficks, Jr., Halloran & Sage, Hartford, CT, for Defendant.

**Opinion**

MEMORANDUM OF DECISION
GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

Hon. Vanessa L. Bryant, United States District Judge

I. Introduction

**\*1** Before the Court is Defendant CSAA Fire & Casualty Insurance Company's ("CSAA" or "Defendant") Motion FOR Summary Judgment as to all counts of the Complaint, which allege breach of contract (Count One), breach of the duty of good faith and fair dealing (Count Two), and violation of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act (Count Three) [Dkt. 34.] Plaintiffs Howard and Donna Makufka ("Plaintiffs") oppose the Motion. [Dkt. No. 39.]. For the reasons discussed below, Defendant's Motion is GRANTED.

II. Factual Background

Plaintiffs purchased a home located at 23 Sandy Beach Road, Ellington, Connecticut (the "Premises") in 1991. [Dkt. 35-6 (D. Makufka Dep. at 8.] The Premises was built in 1985. Id. Defendant provided Plaintiffs a homeowner's insurance policy for the Premises on September 18, 2015 (the "Policy"). [Dkt. 35-4 (Policy) at 1]. The Policy

excludes coverage for losses caused by "wear and tear, marring, deterioration ... [m]echanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself ... settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations [or] walls." Policy at 21-23. The Policy also excludes coverage for "loss to property ... caused by ... [f]aulty, inadequate or defective ... [m]aterials used in ... construction." Id.

In addition, the Policy deletes a section providing coverage for "collapse" and replaces it with language defining collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Id. The Policy explains that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse, [a] part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building, [and a] building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." Id.

The Policy insures for "direct physical loss" caused by certain "perils insured against," including "[d]ecay that is hidden from view, unless the presence of such decay is known to an 'insured' prior to collapse ... or [u]se of defective material or methods [i]n construction." Id. However, loss to a "foundation [due to a peril insured against] is not [covered] unless the loss is a direct result of the collapse of a building or any part of a building." Policy at Ex. B, HW01060210 p.1 of 3.

The Policy also states Defendant will pay the "reasonable cost incurred by [the insured] for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." Id. at 15.

Finally, the Policy "applies only to loss which occurs during the policy period" and an insured may only sue under the policy if "there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss." Id. at 35, 37.

**\*2** Plaintiffs first noticed cracks in the Premises' basement walls around 2000. [Dkt. 35-5 (H. Makufka Dep.) at 26-27; D. Makufka Dep. at 17.] Plaintiff Howard Makufka first noticed the cracks expanding and "thought [they] had an issue" in 2014. H. Makufka Dep. at 34. Before that date, Mr. Makufka thought the "small cracks" were "just normal concrete cracking." *Id.* Mr. Makufka did not realize the cracks posed a "serious issue" until October of 2015 after consulting with a concrete mason. *Id.*

The concrete which forms the basement walls was made with "defective materials" which made the breakdown of the concrete "inevitable." [Dkt. 35-7 (Neal Dep.) at 48-49; Dkt. 35-10 (Centurelli Expert Report) (stating the cracks are the result of a defect in the concrete which has been present since the initial placement of the concrete).] Plaintiffs submitted a claim to Defendant for the damage to their foundation listing the date of loss as October 1, 2015. [Dkt. 35-8 (McMillan Aff.) at 5.]

On December 8, 2015, Defendant denied Plaintiffs' claim, stating "settling or cracking of foundation walls or ceilings is specifically exclude[d] in your policy." *Id.* The letter refers to language in the Policy excluding coverage for "loss caused by settling, shrinking, bulging or expansion, including resultant cracking of ... foundations [or] walls." *Id.* The letter also indicates that Defendant "expects that [Plaintiffs] will undertake all necessary repairs so as to protect the property from future damage." *Id.* Should Plaintiffs fail to do so, the letter warns that Defendant "cannot be held liable for any further damage to the dwelling." *Id.*

On February 22, 2016, William Neal, P.E., a consulting engineer, conducted a "visual examination" of the Premises' concrete foundation. [Dkt. 39-1 (Rule 56(a)(2) Statement), Ex. AA (Neal Letter) at 1.] He noted that the cracks in the concrete had "rapidly worsened in size and number in the last three months" and the foundation walls were "bowing inward" by half an inch. *Id.* Neal opined that "the most likely cause of the foundation distress is a chemical reaction resulting from incompatible materials used in the concrete mix." *Id.* He opined that there is "no way to arrest the process" of deterioration and concluded that the basement walls were "structurally unsound" and needed to be replaced. *Id.*

The Premises is still standing, is not in imminent danger of falling down, and Plaintiffs still live in the home. H. Makufka Dep. at 44-46; Neal Dep. at 37-38 (stating the house is still standing and while he cannot state the current condition of the house since he has not visited the Premises recently, in February 2016 it was not in danger of caving in and was fit for human occupancy). No singular, sudden, or abrupt event caused the cracking. H. Makufka Dep. at 44; Neal Dep. at 36-38.

### III. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

**\*3** "A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at \*1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)). "Summary judgment cannot be defeated by the presentation ... of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## IV. Discussion

### a. Count One: Breach of Contract

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (internal quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent.... The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other

provisions ... and every provision must be given effect if it is possible to do so.... If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

Defendant asserts the Policy does not allow coverage for Plaintiffs' loss, and accordingly argues there is no evidence to support their breach of contract claim. As discussed below, the Court agrees with the Defendant that the Policy's definition of "collapse" does not encompass Plaintiffs' loss. *Id.* at 2. In addition, the Court agrees with Defendant that exclusions in the policy bar the coverage Plaintiffs seek. *Id.*

### i. The Policy's Definition of Collapse

**\*4** The Policy is explicit in its definition of collapse: it is an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Policy at 29-31. Other courts which have evaluated policies with such a definition have found them to unambiguously deny coverage for mere cracking of concrete. *See, e.g., Lynne Liston-Smith v. CSAA Fire & Casualty Ins. Co.*, 3:16-cv-510 (JCH) (Dec. 15, 2017) (unpublished); *Alexander v. Gen. Ins. Co. of Am.*, No. 3:16-cv-059 at Dkt. 22 (transcript of ruling from the bench). In each of those cases, the insured structure had cracked concrete due to a chemical reaction but was still standing, and in each instance the court found the policy excluded coverage.

While the Court is sensitive to Plaintiffs' argument that they have been told their structure is structurally unsound, that allegation is insufficient given the explicit definition of "collapse" in the Policy, which excludes from the definition any structure "that is in danger of falling down or caving in." Policy at 29-31. Judge Underhill's explanation is particularly illustrative: "Let's use insect damage. There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam falls.... Now there's coverage. Now you have a collapse or falling in." *Alexander*, No. 3:16-cv-059, Dkt. 22 at 14.

Plaintiffs' assertion that the Policy's definition of "collapse" is ambiguous is unavailing, as the precedent Plaintiffs cite in support is readily distinguishable. In *Dalton v. Harleysville Worcester Mutual,* 557 F.3d 88, 93 (2d Cir. 2009), the policy at issue covered "direct physical loss involving collapse of a building or any part of a building caused ... by ... hidden decay" but noted that "settling, cracking, shrinkage, bulging or expansion" did not constitute "collapse." *Id.* at 90. The Second Circuit found the policy ambiguous as to whether collapse required "total or near total destruction" of the building or whether "substantial impairment of the structural integrity" was sufficient. *Id.* However, the *Dalton* Court explicitly stated the policy would not have been ambiguous if it had "contained express definitional terms ... for example, that a collapse was 'an abrupt falling down or caving in' and that 'a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking.' " *Id.* at n.1.

Here, "collapse" requires "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." *Id.* There is no question of fact that the Premises is still standing and lived in by Plaintiffs and has not abruptly fallen down or caved in. Accordingly, the Policy does not cover Plaintiffs' loss.

### ii. The Policy's Exclusions

Defendant also asserts Plaintiffs' loss is barred by multiple exclusions within the Policy, including exclusions for damage caused by deterioration, inherent vice, or latent defect; damage caused by faulty, inadequate or defective materials used in construction; and damage caused by and/or consisting of bulging or cracking of a foundation or wall. Motion at 22-23.

Plaintiffs respond that their loss warrants coverage because loss due to chemical reactions is not explicitly listed among the exclusions to that coverage. Opposition at 10.

Judge Shea recently rejected Plaintiffs' argument, stating it "does not matter whether the originating event behind the cracking and deterioration was a chemical reaction; the exclusions in the Polic[y] make no exception for losses for which the cause is itself a product of a chemical reaction."

*England v. Amica Mut. Ins. Co.,* 3:16-cv-1951, 2017 WL 3996394 (D. Conn. 2017); *see also Agosti v. Merrimack Mut. Fire Ins. Co.,* 3:16-cv-1686, 2017 WL 3710786 (D. Conn. 2017) (stating claimants' "loss ... clearly consists of settling, cracking, shrinking, bulging, or expansion of ... foundations [or] walls ... [and the] technical source of the cracking or bulging is irrelevant").

 **\*5** In *England,* as here, the plaintiff's insurance policy enumerated excluded losses such "faulty, inadequate or defective ... materials used in ... construction." 2017 WL 3996394 at \*2-3. The Court rejected the theory that a chemical reaction itself is covered as a loss "independent of any of its manifestations," because "loss," although undefined in the policy, "unambiguously require[s] some change to the detriment of the insured, and a chemical reaction—without any physical manifestations—does not fit that bill." *Id.* The only "loss" suffered was the deterioration and cracking of the basement walls, which were specifically excluded under the policy. *Id.* at \*8.

Here, the only loss about which Plaintiffs have offered evidence is the cracking of their concrete (due to a chemical reaction). That loss is explicitly excluded from coverage under the Policy.

Defendant also raises other arguments in favor of summary judgment, including that Plaintiffs did not timely initiate this suit and that the all-risk Policy precludes coverage for non-fortuitous losses even in the absence of a specific exclusion. Because the previously discussed issues are dispositive, the Court need not address these other arguments. Summary judgment on Plaintiffs' breach of contract claim is granted.

### a. Counts Two and Three: Bad Faith and CUTPA

In light of the dismissal of Plaintiffs' breach of contract claim, summary judgment is also granted as to Plaintiffs' bad faith and CUTPA claims, which are not viable absent a breach of the underlying contract. *See Capstone Building Corp. v. Am. Motorists Ins. Co.,* 308 Conn. 760, 798 (2013) (explaining that a claim for "bad faith is not actionable apart from a wrongful denial of a benefit under the [insurance] policy"); *Roberts v. Liberty Mut. Fire Ins. Co.,* 2017 WL 3710062, at \*14 (D. Conn. Aug. 28, 2017) (finding that, as with a claim for breach of the implied covenant of good faith and fair dealing, "a claim

for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract").

### V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to all claims. This case is dismissed and the clerk is directed to close this file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 465775

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

■ Caution
As of: March 27, 2018 9:03 PM Z

# *Miller v. First Liberty Ins. Corp.*

United States District Court for the Eastern District of Pennsylvania

June 17, 2008, Decided

CIVIL ACTION NO. 07-1338

**Reporter**
2008 U.S. Dist. LEXIS 47550 *; 2008 WL 2468605

JOHN MILLER v. FIRST LIBERTY INSURANCE CORPORATION, d/b/a LIBERTY MUTUAL INSURANCE GROUP

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

*HN1*[🔻] **Entitlement as Matter of Law, Appropriateness**

*Fed. R. Civ. P. 56(c)* provides, in part, that summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Absence of Essential Element

*HN2*[🔻] **Evidentiary Considerations, Absence of Essential Element**

Summary judgment will be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN3*[⤓] **Entitlement as Matter of Law, Genuine Disputes**

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. If the moving party sustains the burden, the non-moving party must set forth facts demonstrating the existence of a genuine issue for trial.

Civil Procedure > ... > Summary Judgment > Opposing Materials > Accompanying Documentation

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

*HN4*[⤓] **Opposing Materials, Accompanying Documentation**

*Fed. R. Civ. P. 56(e)* provides that when a properly supported motion for summary judgment is made, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in R. 56, must set forth specific facts showing that there is a genuine issue for trial. The adverse party must raise more than a mere scintilla of evidence in its favor in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN5*[⤓] **Summary Judgment, Evidentiary Considerations**

The existence of disputed issues of material fact, for summary judgment purposes, should be ascertained by resolving all inferences, doubts, and issues of credibility against the moving party.

Business & Corporate Compliance > ... > Breach > Breach of Contract Actions > Elements of Contract Claims

*HN6*[⤓] **Breach of Contract Actions, Elements of Contract Claims**

To maintain an action for breach of contract under Pennsylvania law, a plaintiff must demonstrate: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Construction Against Insurers

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Coverage Favored

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Entire Contract

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Question of Law

*HN7*[⬇] **Ambiguous Terms, Construction Against Insurers**

The Supreme Court of Pennsylvania has set forth well-established rules of insurance contract interpretation, stating that the task of interpreting an insurance contract is generally performed by a court, rather than by a jury. The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language of the policy is clear and unambiguous, a court is required to give effect to that language. When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage. Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts, in interpreting a contract, do not assume that its language was chosen carelessly. Thus, they will not consider merely individual terms utilized in an insurance contract, but the entire insurance provision, to ascertain the intent of the parties.

Insurance Law > ... > Property Insurance > Coverage > General Overview

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > General Overview

*HN8*[⬇] **Property Insurance, Coverage**

Although not considering the precise meaning of the term "collapse," the Supreme Court of Pennsylvania has noted that historically it considers the term "collapse," as used in an insurance policy, to require the sudden falling together of a structure. The court has reasoned that a policy provision that covered not only loss for a collapse, but also the risk of loss involving a collapse, was ambiguous because it contemplated broader coverage than policy language simply employing the term "collapse." However even in the face of this ambiguity, the court reasoned that to interpret the broad policy language to cover substantial impairment of structural integrity was too distant from the concept contained in existing case law, which requires the falling of a building. The court has warned that such an interpretation would possibly convert the policy into a maintenance agreement, by permitting recovery for damage which, while substantial, does not threaten collapse of the structure.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

Governments > Courts > Judicial Precedent

*HN9*[⬇] **Federal & State Interrelationships, Erie Doctrine**

Where Pennsylvania law governs an action, and a Supreme Court of Pennsylvania decision is instructive, the United States District Court for the Eastern District of Pennsylvania will not adopt the reasoning of courts from other jurisdictions.

Insurance Law > ... > Property Insurance > Coverage > General Overview

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

*HN10*[⬇] **Property Insurance, Coverage**

When a property insurance policy unambiguously defines "collapse" in conformity with the Supreme Court of Pennsylvania's definition of "collapse"-- the sudden and entire falling down or caving in of a building or any part of a building --and states that it insures for direct physical loss to covered property involving the collapse of a building or any part of a building, there is nothing in the policy language to suggest broader coverage for a risk of loss involving a collapse. A policy explicitly prohibits coverage for risk of loss involving collapse when it states that a building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

*HN11*[⬇] **Ambiguous Terms, Unambiguous Terms**

Where an insurance policy is clear and unambiguous, the United States District Court for the Eastern District of Pennsylvania is required to give effect to the policy language.

Insurance Law > ... > Property Insurance > Homeowners Insurance > General Overview

*HN12*[⬇] **Property Insurance, Homeowners Insurance**

Even if a "collapse" provision of a homeowners' insurance policy can be read to cover imminent collapse, it will not provide coverage for a loss where any imminence of collapse results from the voluntary taking down of another part of the structure.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Insurance Law > Liability & Performance Standards > Bad Faith & Extracontractual Liability > Payment Delays & Denials

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Payments

*HN13*[⬇] **Entitlement as Matter of Law, Legal Entitlement**

A bad faith claim against an insurance company is governed by *42 Pa. Cons. Stat. § 8371*. Under Pennsylvania law, bad faith on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith. The insurer must accord the interest of its insured the same faithful consideration it gives its own interest. Bad faith cases are commonly decided at the summary judgment stage, with the court determining, as a matter of law, that the insurer had a reasonable basis for its actions.

Insurance Law > Remedies > Costs & Attorney Fees > Failure to Pay Claims

Insurance Law > Liability & Performance Standards > Bad Faith & Extracontractual Liability > Payment Delays & Denials

Insurance Law > Remedies > Interest Awards

Insurance Law > ... > Damages > Punitive Damages > General Overview

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Payments

**HN14**[🔽] **Costs & Attorney Fees, Failure to Pay Claims**

See *42 Pa. Cons. Stat. § 8371*.

Insurance Law > Liability & Performance Standards > Bad Faith & Extracontractual Liability > Payment Delays & Denials

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Payments

**HN15**[🔽] **Bad Faith & Extracontractual Liability, Payment Delays & Denials**

Mere negligence or bad judgment is not bad faith under *42 Pa. Cons. Stat. § 8371*. Where a plaintiff fails to produce evidence that an insurance company acted with a dishonest purpose or meant to breach a known duty through some motive of self-interest or ill will, the company did not act in bad faith.

**Counsel:  [*1]** For JOHN MILLER, Plaintiff: JOSEPH A. ZENSTEIN, LEAD ATTORNEY, ZENSTEIN GALLANT & PARLOW PC, STEVEN C. FEINSTEIN, ZENSTEIN, GALLANT & PARLOW, P.C., PHILADELPHIA, PA.

FIRST LIBERTY INSURANCE CORPORATION doing business as LIBERTY MUTUAL INSURANCE GROUP, Defendant: WILLIAM C. FOSTER, LEAD ATTORNEY, MARSHALL DENNEHY WARNER COLEMAN & GOGGIN, PHILADELPHIA, PA.

**Judges:** THOMAS N. O'NEILL, JR., J.

**Opinion by:** THOMAS N. O'NEILL, JR.

# Opinion

O'NEILL, J.

MEMORANDUM

On March 8, 2007 plaintiff John Miller filed a complaint in the Pennsylvania Court of Common Pleas of Philadelphia County asserting claims for breach of contract and bad faith against defendant First Liberty Insurance Corporation, d/b/a Liberty Mutual Insurance Group. Defendant removed the matter to this

Court on April 4, 2007 pursuant to *28 U.S.C. §§ 1441* and *1446*. I have jurisdiction pursuant to *28 U.S.C. § 1332*. Presently before me are defendant's motion for summary judgment, plaintiff's response, and defendant's reply.

BACKGROUND

Defendant issued a LibertyGuard Deluxe Homeowners Policy to plaintiff John J. Miller and Frances T. Miller providing coverage for plaintiff's dwelling located at 6 Republic Avenue in Norristown, Pennsylvania for the policy period March 17, **[*2]** 2006 to March 17, 2007.

On April 11, 2006 the Policy for plaintiff's dwelling was in full force and effect. On that date plaintiff was in the process of putting a second floor on top of an existing addition. The addition, which was built in 1984, experienced termite infestation in 1996. Plaintiff addressed the infestation by hiring an exterminator in 1996, but the termites caused structural damage to the walls of the addition that remained hidden until plaintiff's contractors removed the roof in April 2006. Determining that the structural condition of the addition walls would not support a second floor, the contractors decided to tear down the walls as a safety precaution.

On April 11, 2006 plaintiff submitted a claim to defendant for damage to the insured property. The designated loss date for plaintiff's claim was 1996, the year in which the termite infestation was discovered and treated. On April 12, 2006 a property adjuster for defendant investigated plaintiff's alleged loss by taking a recorded statement. Based upon that investigation, defendant determined that plaintiff's claim was not covered by the Policy. In a letter to plaintiff dated April 12, defendant informed plaintiff **[*3]** that an "investigation revealed that the damage to your Dwelling is from termite infestation" and plaintiff's Policy did not provide coverage for the damages caused by the termite damage. Quoting the Policy, the April 12 letter noted that defendant "do[es] not insure . . . for loss . . . [c]aused by . . . [b]irds, vermin, rodents, or insects . . . ."

Plaintiff subsequently referred his claim to a public adjustor at Alliance Adjustment Group, who attempted to have defendant alter the loss date. Defendant refused to change the loss date and restated its conclusion that the Policy did not provide coverage for plaintiff's loss by again quoting the relevant Policy language in a letter to plaintiff and Alliance dated July 17, 2006. The July 17 letter further noted that the Policy did not provide coverage where the insured neglected to use all reasonable means to save and preserve the property during and after the loss, and quoted the Policy language regarding the insured's duties after loss, including the duty to "[g]ive prompt notice to us or our agent."

Plaintiff contends that the Policy provides coverage for his loss based on the "collapse" provision. Under Item 8, the Policy states: "We **[*4]** insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . c. Hidden insect or vermin damage. . . ." The Amendatory Endorsement to the Policy defines "collapse" as follows:

> (1) Collapse means that sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.
> (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
> (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
> (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

STANDARD OF REVIEW

*Rule 56(c) of the Federal Rules of Civil Procedure* HN1[↑] provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions **[*5]** on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. HN2[↑] Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

HN3[↑] The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. *Id. at 322-23*. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See *Anderson, 477 U.S. at 255*. HN4[↑] *Rule 56(e)* provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, **[*6]** by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. The adverse party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*. However, HN5[↑] the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against'" the moving party. *Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978)*, quoting *Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972)*.

DISCUSSION

I. Breach of Contract

HN6[↑] To maintain an action for breach of contract under Pennsylvania law plaintiff must demonstrate: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *Omicron Sys., Inc. v. Weiner, 2004 PA Super 389, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)*, quoting *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 2002 PA Super 39, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)*.

In **[*7]** 401 Fourth Street, Inc. v. Investors Insurance Group, HN7[↑] the Pennsylvania Supreme Court set forth "the well-established rules" of insurance contract interpretation:

The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language of the policy is clear and unambiguous, a court is required to give effect to that language. When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage. Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Finally, [i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a

contract, do not assume that its language was chosen carelessly. Thus, we will not consider merely individual terms utilized in the insurance contract, **[\*8]** but the entire insurance provision to ascertain the intent of the parties.

*583 Pa. 445, 879 A.2d 166, 171 (Pa. 2005)* (citations and quotation marks omitted) (alterations in original).

Though if *HN8*[↑] did not consider the precise meaning of the term "collapse" in 401 Fourth Street, the Pennsylvania Supreme Court noted that "[h]istorically, our Court has considered the policy term 'collapse' to require the sudden falling together of a structure." *Id. at 172 n.2*, citing *Kattelman v. Nat'l Union Fire Ins. Co. of Pittsburgh, 415 Pa. 61, 202 A.2d 66, 67 (Pa. 1964)*; *Skelly v. Fid. & Cas. Co. of New York, 313 Pa. 202, 169 A. 78, 79 (Pa. 1933)*; *Dominick v. Statesman Ins. Co., 692 A.2d 188, 190-91 (Pa. Super. Ct. 1997)*.

Analyzing the language of the insurance policy in 401 Fourth Street the Pennsylvania Supreme Court found ambiguity where the defendant stated, "We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse." *Id. at 174*. As the policy covered "not only loss for a collapse, but also the *risk* of loss *involving* a collapse," the Court reasoned that the provision was ambiguous because it contemplated broader coverage than policy language simply employing the term "collapse." Id. (emphasis **[\*9]** in original). However even in the face of this ambiguity the Court reasoned that "to interpret the broad policy language to cover substantial impairment of structural integrity, we believe to be too distant from the concept contained in our existing case law which requires the falling of a building." Id. The Court warned that such an interpretation "would possibly convert the policy into a maintenance agreement by permitting recovery for damage which, while substantial, does not threaten collapse of the structure." Id. [1]

In this case plaintiff voluntarily removed the roof of the addition to his dwelling and then voluntarily took down the walls to the addition after finding structural damage due to a past incidence **[\*10]** of termite infestation. In response to defendant's motion for summary judgment plaintiff acknowledges that for his breach of contract claim "[t]he only remaining question is whether the voluntary tearing down of the structure is a collapse within the meaning of the law."

I conclude that the collapse provision of the Policy is unambiguous and covers neither the structural damage of plaintiff's walls caused by termite infestation nor the voluntary tearing down of the walls due to such structural damage. In accordance with reasoning of the Pennsylvania Supreme Court in *401 Fourth Street*, I note that construing the Policy to cover voluntary tearing down due substantial impairment of structural integrity would convert the policy into a maintenance agreement in contravention of the clear language of the parties' agreement.

*HN10*[↑] The Policy unambiguously defines collapse in conformity with the Pennsylvania Supreme Court's definition -- the "sudden and entire falling down or caving in of a building or any part of a building" -- and states, "We insure for direct physical loss to covered property involving collapse of a building or any part of a building." Unlike the policy implicated in *401 Fourth* **[\*11]** *Street*, there is nothing in the Policy language at issue in this case to suggest broader coverage for "risk of loss involving collapse." To

---

[1] Though plaintiff urges me to define "collapse" as "any serious impairment of structural integrity" in accordance with cases from other states, see, e.g., *Gov't Employees Ins. Co. v. DeJames, 256 Md. 717, 261 A.2d 747 (Md. 1970)*; *Nationwide Mut. Life Ins. Co. v. Tomlin, 181 Ga. App. 413, 352 S.E.2d 612 (Ga. Ct. App. 1986)*, *HN9*[↑] Pennsylvania law governs this action. I find the Pennsylvania Supreme Court's decision in *401 Fourth Street* instructive and will not adopt the reasoning of courts from other jurisdictions.

the contrary, as noted above, the Amendatory Endorsement to the Policy explicitly prohibits coverage for risk of loss involving collapse: "A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse." [2]

Because plaintiff presents no evidence of a sudden and entire falling down or caving in of a building or any part of a building, I find there was no "collapse" under the clear and unambiguous terms of the Policy. Therefore I will grant summary judgment in favor of defendant with respect to plaintiff's breach of contract claim.

## II. Bad Faith

Plaintiff's _HN13_[⬆] bad faith claim against defendant, an insurance company, is governed by _42 Pa. C.S.A. § 8371_. [3] Under Pennsylvania law "'bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy." _Terletsky v. Prudential Prop. & Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)_, citing Black's Law Dictionary 139 (6th ed. 1990). "For purposes of an action against an insurer for failure to pay **[*14]** a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-

---

[2] Plaintiff further notes that the Court of Appeals, interpreting New Jersey law, determined that the term "collapse" includes a collapse which has not yet occurred but is "imminent." See _Buczek v. Cont'l Cas. Ins. Co., 378 F.3d 284, 290 (3d Cir. 2004)_ ("[T]he definition of collapse must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by.") (citation and internal marks omitted). The Court of Appeals noted three definitions of imminent that might apply: "ready to take place: near at hand"; "likely to occur at any moment: impending"; "likely to happen without delay." _Id. at 291_.

Though the Pennsylvania Supreme Court in 401 **[*12]** Fourth Street briefly addressed whether "collapse" includes "imminent collapse," see _879 A.2d at 173_ (acknowledging that some courts treat imminent collapse as covered under the traditional view of the term "collapse"), it did so in the context of a policy covering "risk of loss involving collapse" and determined not to reconsider the "precise meaning of the term 'collapse,'" see _id. at 172 n.2_.

Additionally, I conclude that the collapse provision of the Amendatory Endorsement to the Policy unambiguously provides that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse." That is, because plaintiff's Policy in unambiguous terms provide no coverage for a building that is in danger of falling down or caving in, the Policy does not provide coverage for the circumstances presented by plaintiff's claim. _HN11_[⬆] Where the policy is clear and unambiguous, I am required to give effect to that language. I again note that construing the Policy to cover substantial impairment of structural integrity would be to convert the collapse provision into a maintenance agreement.

Finally, plaintiff acknowledges that only "once the **[*13]** roof was removed, it was in the best interest of public safety to tear down the walls." Therefore, _HN12_[⬆] even if the collapse provision of the Policy somehow could be read to cover imminent collapse, it still would not provide coverage for plaintiff's loss as any imminence of collapse resulted not from termite infestation but from the voluntary taking down of another part of the structure: a circumstance not covered by the Policy.

[3] The statute provides:

_HN14_[⬆] ] In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

_42 Pa. C.S.A. § 8371_.

interest or ill will; mere negligence or bad judgment is not bad faith." Id., citing Black's Law Dictionary 139. "[T]he insurer must accord the interest of its insured the same faithful consideration it gives its own interest." *Cowden v. Aetna Cas. & Sur. Co., 389 Pa. 459, 134 A.2d 223, 228 (Pa. 1957)*. "Bad faith cases are commonly decided at the summary judgment stage, with the court determining, as a matter of law, that the insurer had a reasonable basis for its actions." *Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 581 n.3 (E.D. Pa. 1998)*.

Plaintiff presents no evidence to  [*15] support his conclusory allegation that "[i]t is abundantly clear that Defendant had a mindset of denial from the inception of this claim and was not going to waiver on its pre-conceived desire to deny the claim." Contrary to plaintiff's contention, the record reflects that defendant had multiple reasonable bases to deny the claim.

First from the record I conclude defendant reasonably determined that the loss date of plaintiff's claim was 1996 and reasonably used that loss date as one basis for denying coverage as the Policy required plaintiff to give prompt notice of loss. The conversation among defendant's claims adjustor, plaintiff and plaintiff's contractor revealed that the addition walls were taken down voluntarily due to structural damage from termite infestation. Plaintiff explained that the addition experienced termite infestation in 1996 and further declared that no termites were present on the premises between treatment in July 1996 and start of construction in April 2006. Further, in response to the question "When did you start noticing this damage?" plaintiff responded, "I don't know wh- when it all started with the termites."

Second defendant's claims adjustor reasonably  [*16] discerned no basis for coverage under the Policy where the conversation between defendant's claims adjustor and plaintiff revealed that the walls of the addition were taken down voluntarily as a result of termite damage. Plaintiff's representations indicate no "sudden and entire falling down or caving in of a building or any part of a building" that would implicate the collapse provision of the Policy.

Finally to the extent that defendant neglected the possibility of collapse defendant was at most negligent or demonstrated bad judgment, and it is well-established that **HN15**[⬆] mere negligence or bad judgment is not bad faith. Because plaintiff fails to produce evidence that defendant acted with a dishonest purpose or meant to a breach of a known duty through some motive of self-interest or ill will, I conclude defendant did not act in bad faith. Therefore I will grant summary judgment in favor of defendant with respect to plaintiff's bad faith claim.

An appropriate Order follows.

ORDER

AND NOW, this 17th day of June 2008, upon consideration of defendant's motion for summary judgment, plaintiff's response and defendant's reply, it is ORDERED that defendant's motion is GRANTED. Judgment is entered  [*17] against plaintiff and in favor of defendant with respect to all claims.

/s/ Thomas N. O'Neill, Jr.

THOMAS N. O'NEILL, JR., J.

**End of Document**

No *Shepard's* Signal™
As of: March 27, 2018 9:04 PM Z

## *Musgrave v. State Farm Fire & Cas. Co.*

Superior Court of Connecticut, Judicial District of Tolland At Rockville

August 10, 2017, Decided

DOCKET NO: TTDCV156009840S

**Reporter**
2017 Conn. Super. LEXIS 5209 *

MUSGRAVE, RICHARD E. Et Al v. STATE FARM FIRE AND CASUALTY COMPANY Et Al

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Judges:  [*1]** SUSAN QUINN COBB, Judge.

**Opinion by:** SUSAN QUINN COBB

# Opinion

ORDER

ORDER REGARDING:

01/17/2017 146.00 MOTION FOR SUMMARY JUDGMENT

The foregoing, having been considered by the Court, is hereby:

ORDER:

This is one of the many cases in this district involving claims by homeowners against their insurance companies for failure to provide insurance coverage for damage to their homes resulting from faulty concrete used to construct their foundations supplied by the now defunct company J.J. Mottes. The defendants, Twin City Fire Insurance Company ("Twin City") and Property & Casualty Insurance Company of Hartford ("Property & Casualty") are both underwriting companies of the The Hartford Financial Services Group, Inc. ("The Hartford"). The plaintiffs' claims against Twin City are contained in counts three, four, five, and six of the second amended complaint and involve policies issued to the plaintiffs from 2004 to 2009, alleging breach of contract, bad faith, declaratory judgment seeking coverage under Twin Cities' policies, and violation of CUTPA/CUIPA respectively. The plaintiffs' claims against Property & Casualty are contained in counts seven and eight and involve policies issued to the plaintiffs from 2009 to **[*2]**  the present and allege breach of contract and violations of CUTPA/ CUIPA. The Hartford moves on behalf of both of the defendants for summary judgment as to counts three through eight of the plaintiffs' second amended complaint. The court incorporates the undisputed material facts set forth in its decision in this case pertaining to the defendant's, State Farm Fire & Casualty Co., motion for summary judgment. The Hartford's motion is GRANTED in part and DENIED in part.

2017 Conn. Super. LEXIS 5209, *2

The court grants summary judgment as to counts seven and eight of the second amended complaint against Property & Casualty for the reason that the plaintiffs' loss is not covered under the policies which define collapse as requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." This court has had occasion to consider these claims in a case involving similar facts and policy language and granted summary judgment in *Jemiola v. Hartford Casualty Ins. Co., Superior Court, judicial district of Tolland, Docket No. CV-15 6008837-S, 2017 Conn. Super. LEXIS 1661 (March 2, 2017, Cobb, J.)*. The court adopts and applies **[*3]** its decision in Jemiola and for the same reasons, the court grants summary judgment for Property & Casualty on counts seven and eight, breach of contract and CUTPA/CUIPA.

As to counts three and six, the breach of contact and declaratory judgment counts against Twin City, the court denies summary judgment. The court finds that genuine issues of material fact exist and therefore, summary judgment is inappropriate. In particular, the court finds that the disputed material facts exist as to when the plaintiffs' discovered the loss and whether the loss occurred during the policy period covered by the Twin City policy. The court notes that although no Connecticut appellate court has done so in a property casualty case, The Hartford urges the court to consider various "trigger" theories, which it argues all result in the plaintiffs' claim not being covered by the policies. See *Security Ins. Co. of Hartford v. Lumbermens Mutual Casualty Co., 264 Conn. 688, 697 n.12, 826 A.2d 107 (2003)* (outlining various trigger theories). The court declines to do so because it finds that regardless of the trigger theory that is applied, there is a question of fact as to whether and when the "loss" under the policies.

The court finds that genuine issues of material fact exist as to whether the plaintiffs suffered a **[*4]** covered loss under the 2004-2006 policies. Those policies provided coverage for collapse but did not define the term. This court has recently had occasion to review and consider cases involving the same policy language and similar facts. See *Roy v. Liberty Mutual Fire Ins. Co., Superior Court, judicial district of Tolland, Docket No. CV-15-6009410-S, 2017 Conn. Super. LEXIS 2032 (February 22, 2017, Cobb, J.)*; see also *Celentano v. Liberty Mutual Fire Insurance Company, Superior Court, judicial district of Tolland, Docket No. CV-15-6009018-S, 2017 Conn. Super. LEXIS 5212 (July 27, 2017, Cobb, J.)*. In the Roy case, the court applied the Supreme Court's decision in *Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 532 A.2d 1297 (1987)*, and held that where the insurance policy does not define the word collapse, it means any "substantial impairment of the structural integrity." In this case, there is a genuine issue of material fact as to whether the plaintiffs' basement suffered a substantial impairment to its structural integrity during the period of 2004-2006. As to the other coverage issues asserted, the court also analyzed those and other similar coverage issues in Roy and determined that the policy language was ambiguous. The court adopts and applies its analysis in its decision in Roy, and denies summary judgment **[*5]** for the same reasons as to Twin City.

As to count four against Twin City, the bad faith claim, the court agrees that the defendant is entitled to summary judgment. This count is premised on the plaintiffs' claim that The Hartford acted in violation of the covenant of good faith and fair dealing by amending language in the 2006 policy to define collapse, which resulted in lessoning coverage, when they were in a long-term insurance relationship. The court finds that Twin City has met its burden on summary judgment as to this claim both as a matter of fact and law, and that the plaintiffs have not met their burden in response. It is well established that: "A policy of insurance is a contract between the parties; a renewal of the original policy is a separate and distinct contract providing coverage for a specific term or period." *Kane v. American Ins. Co., 52 Conn. App. 497, 501, 725 A.2d 1000 (1999)*, aff'd, *252 Conn. 113, 743 A.2d 612 (2000)*. The Supreme Court has held that the duty of good faith and fair dealing applies to the performance of an existing contract not to the formation of a new contract. *Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 638, 804*

*A.2d 180 (2002)*. The undisputed material facts establish that the plaintiffs' claim here applies to the formation of the annual renewal policies and the amendments to policies and not to the defendant's **[*6]** performance of the policies, and therefore Twin City is entitled to summary judgment on count four.

As to the CUTPA/CUIPA count against Twin City, the court has denied summary judgment on the coverage and timing issues, and thus arguments relating to a lack of coverage are unavailing. The court finds that the defendant has not met its burden on summary judgment and that issues of fact exist as to this claim. "In seeking summary judgment, it is the movant that has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion **[*7]** for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co. v. Tully, 322 Conn. 566, 573, 142 A.3d 1079 (2016)*; see *Stuart v. Freiberg, 316 Conn. 809, 820-21, 116 A.3d 1195 (2015)*.

The court is not convinced by the nonbinding precedents provided in Twin City's memoranda, particularly as applied to the circumstances of this case. Whether the plaintiffs can prove their case at trial is a different issue than whether the defendant is entitled to summary judgment, where the movant has the initial strict burden and the evidence must be viewed in the light most favorable to the nonmovant, here the plaintiffs. *Dugan v. Mobile Medical Testing Services, Inc., 265 Conn. 791, 815, 830 A.2d 752 (2003)*; see *Farrell v. Twenty-First Century Ins. Co., 301 Conn. 657, 662, 21 A.3d 816 (2011)*. Thus, the court denies summary judgment as to count five.

For the foregoing reasons, summary judgment is denied as to counts three, five, and six and granted as to counts four, seven, and eight.

Copy of order mailed to all parties of record.

431193

Judge: SUSAN QUINN COBB

---

End of Document

DOCKET NO. CV-16-6010324-S      : SUPERIOR COURT

VINCENT PERRACCHIO, ET AL      : JUDICIAL DISTRICT

VS.      : OF TOLLAND

HOMESITE INSURANCE COMPANY      : MARCH 6, 2018

## MEMORANDUM OF DECISION

      In this insurance dispute involving crumbling concrete basement walls at the home of the

plaintiffs, Vincent and Margaret Ann Perracchio, the defendant, Homesite Insurance Company

("Homesite"), has moved for summary judgment on all three counts of the plaintiffs' complaint.

The first count alleges breach of contract based on Homesite's denial of coverage for the damage

to the plaintiffs' basement.  The second count alleges Homesite breached the duty of good faith

and fair dealing implicit in the insurance contract by misinterpreting and misapplying the terms

of the policy in order to justify its denial of coverage.  The third count alleges a claim under the

Connecticut Unfair Trade Practices Act ("CUTPA") based on an alleged general business

practice of unreasonably denying coverage for this and similar claims in violation of the

Connecticut Unfair Insurance Practices Act ("CUIPA").  Homesite, which provided homeowners

insurance coverage to the plaintiffs for only one year (December 16, 2014 to December 16,

2015), maintains that its policy does not provide coverage for the claimed loss and that the loss

occurred prior to the inception of its policy period.  Based on that, Homesite asserts further that

the plaintiffs have no viable claims for bad faith and for violation of CUTPA/CUIPA. For the

reasons set forth below, Homesite's motion is granted and judgment shall enter in its favor on all

three counts.

MEMORANDUM OF DECISION WAS MAILED 3/6/18 To:
TOUSANO & DANFORTH LLC
ATTY STEPHEN R KLAFFKY
MURPHY KARPIE CONNELLY & SICKINGER LLC
REPORTER OF JUDICIAL DECISIONS
SMB

## FACTS

The material facts are undisputed.  The plaintiffs' home in Willington, Connecticut was built in 1988.  They purchased the home in November 1991.  Over time, the plaintiffs noticed visible cracking patterns in the basement walls of the home.  They first noticed them in late Fall 2014.  In 2015, they retained William Neal, a professional engineer, to conduct an inspection of their home.  Mr. Neal inspected the home on October 5, 2015 and observed that the basement walls had "numerous spider web cracks," they showed "heavy efflorescence," the corners had significant movement distorting the framing above, the walls were bowing inward and the "expanding" concrete had pushed at least one beam above its supporting columns.  The chimney was leaning away from the house.  In Mr. Neal's opinion there was an Alkalai-Silica-Reaction (ASR) taking place, a chemical reaction within the concrete causing the damage.  He opined that the house was unstable and structurally unsound, that the ASR would continue and there is no way to stop the deterioration of the basement walls.  He advised that the house may suffer a catastrophic failure at any time.  He recommended that the basement walls be replaced and urged the plaintiffs to vacate the premises until that was done.  It is undisputed, however, that the plaintiffs have not replaced the basement walls and they still occupy the house.

After receiving Mr. Neal's report in October 2015, the plaintiffs made a claim for coverage under their policy with Homesite.  The Homesite policy[1] covers "risk of direct loss to property…if that loss is a physical loss to property."  This broad extension of coverage in "Section I – Perils Insured Against" is subject to a number of limitations.  Of significance here are just a few of those.  First, Section I of the policy does not cover loss "involving collapse,

---

[1] The court only makes reference to the policy provisions cited by the parties in their briefs and restricts its review to those provisions and the parties' arguments associated with them.

other than as provided in Additional Coverage 8." Section I also does not cover loss "2. Caused

by:... e. Any of the following: (1) Wear and tear, marring, deterioration; (2) Inherent vice, latent

defect, mechanical breakdown; (3) Smog, rust or other corrosion, mold, wet or dry rot;... (6)

Settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios,

foundations, walls, floors, roofs or ceilings..." This section of the policy also states, however,

that any "ensuing loss" that results from a condition specified in the limitations on coverage is

covered unless it is "excluded or excepted in this policy." Section I – Perils Insured Against is

also subject to a number of exclusions,[2] including an exclusion for loss "2. caused by... c.

Faulty, inadequate or defective: (2) Design, specifications, workmanship, repair, construction,

renovation, remodeling, grading, compaction; (3) Materials used in repair, construction,

renovation or remodeling; or (4) Maintenance; of all or part of any property." This exclusion is

also qualified by an exception for "ensuing loss" not otherwise excepted or excluded.

As referenced above, the policy does provide coverage for collapse under Section I's

"Additional Coverages." As modified by endorsement, the plaintiffs' policy "insure[s] for direct

physical loss to covered property involving abrupt collapse of a building or any part of a building

if such collapse was caused by... "Decay of a building or any part of a building that is hidden

from view, unless the presence of such decay is known to an 'insured' prior to collapse;... or (6)

Use of defective material or methods in construction, remodeling or renovation." The policy

includes a definition of "collapse" with respect to this coverage.

> (1) Abrupt collapse means an abrupt falling down or caving in of a
> building or any part of a building with the result that the building or
> part of the building cannot be occupied for its intended purpose.

---

[2] Unaddressed in the parties' briefs is the question of who bears the burden of proof on Section I's limitations, as opposed to its "exclusions," but resolving that issue is not necessary to decide Homesite's motion.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

The policy also provides coverage for "reasonable repairs" as an "Additional Coverage." That provision states in pertinent part, "[i]n the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage."

In their complaint the plaintiffs claim coverage under both "Section I – Perils Insured Against" and under the "Additional Coverage" for collapse. In count one they allege a breach of contract based on Homesite's denial of coverage. They assert coverage exists under the additional coverage for collapse, not mentioned in Homesite's written denial of coverage, and also assert coverage for the "chemical reaction" underlying the progressive deterioration of their basement walls, a subject also not addressed in Homesite's written denial of coverage. Homesite denied coverage on October 16, 2005, citing the limitations on coverage under "Section I – Perils Insured Against" for "(1) wear and tear, marring, deterioration... [and] (6) Settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs or ceilings…." Homesite also cited the Section I exclusion for faulty design and materials quoted fully above. In its written denial of coverage, Homesite did not address the additional coverage for collapse, ensuing loss, or the idea that a chemical reaction might be

4

covered under Section I – Perils Insured Against. Homesite did "reserve the right to raise additional policy terms, conditions, exclusions and defenses…" in its letter.

Following Homesite's denial of coverage, the plaintiffs commenced this lawsuit on February 16, 2016.  In addition to alleging breach of contract in count one, in count two the plaintiffs allege Homesite breached the implicit duty of good faith and fair dealing in the insurance contract, depriving them of the benefits of their insurance, claiming that Homesite "unreasonably and in bad faith, sought out other policy provisions [other than those the plaintiffs argue afford coverage] and interpreted these and other policy provisions in a manner for the purpose of denying benefits despite the aforementioned provisions of the policy conferring benefits."  In count three, the plaintiffs assert a CUTPA/CUIPA claim reiterating the same misinterpretation and misapplication of relevant policy provisions by Homesite in providing a "false and misleading denial of coverage" and alleging that Homesite "has regularly denied claims in similar manners or on similar grounds or other grounds."  This count also appears to allege that Homesite is engaged in a scheme, plan, or conspiracy to indiscriminately deny all collapse claims associated with the crumbling basement walls phenomenon in eastern Connecticut, carried out through the Insurance Services Organization ("ISO").

## THE PARTIES' CLAIMS ON SUMMARY JUDGMENT

Homesite has moved for summary judgment on several grounds. First, Homesite maintains there is no genuine issue of material fact on the threshold question of whether the loss suffered by the plaintiffs occurred during the Homesite policy period. Homesite further claims there is no coverage under Section I – Perils Insured Against due to the limitations on the scope of coverage in that section, including the limitation for loss caused by "deterioration" and for loss caused by "bulging or expansion, including resultant cracking, of foundations [or] walls."

5

Further under that section, Homesite relies upon the exclusion for loss caused directly or indirectly by "Faulty, inadequate or defective . . . materials used in construction." Homesite also argues that the additional coverage for collapse is inapplicable because the undisputed facts establish that the condition of the plaintiffs' basement walls falls outside the definition of "abrupt collapse" for which coverage is afforded. Homesite goes on to argue that the common law bad faith count and the CUTPA/CUIPA counts must fail because there is no coverage under the policy and, even if coverage is found, because its denial was made in good faith as demonstrated by the judicial decisions that have upheld its interpretation of the policy provisions.

In response to Homesite's motion, the plaintiffs argue they have a "potential claim" that their loss is covered under the Additional Coverage for collapse because the restrictive definition of "collapse" is ambiguous. They also argue that coverage is afforded under Section I – Perils Insured Against, despite the limitations and exclusions relied upon by Homesite, because coverage is sought for the chemical reaction taking place inside the basement walls, something not explicitly addressed in the policy and, therefore, within the scope of coverage for "the risk of direct loss to property . . . if that loss is a physical loss to property." The plaintiffs also argue that the use of the phrase "risk of" prefacing the grant of coverage for "direct loss to property" expands the scope of coverage such that the coverage "contemplates not only the chemical reaction itself, but risks associated with the occurrence of the chemical reaction such as a total collapse of the structure." Because coverage is provided for the chemical reaction, the plaintiffs argue, the limitations and exclusions cited by Homesite are inapplicable because the cracking, deterioration, and defective materials "are simply the result of the chemical reaction" for which coverage is allegedly afforded. The plaintiffs further claim the "risk of" language triggers

coverage under the reasonable repairs provision of the policy.[3] Because the chemical reaction is

a covered peril, according to the plaintiffs, as are the risks associated with the chemical reaction,

the cost to repair the concrete is covered, "particularly to protect the property from 'further

damage.'" Finally, the plaintiffs claim, without elaboration, that their loss is an "ensuing loss"

resulting from conditions specified in the limitations of coverage.

In response to Homesite's argument that the loss did not occur during the policy period,

the plaintiffs argue that they "filed a timely claim" with Homesite "as there is an issue of fact as

to precisely when the issue arose with this type of issue." Homesite has not asserted a timeliness

issue with respect to either notice or the commencement of suit. The plaintiffs appear to be

suggesting, however, that there is a question of fact as to when the loss occurred.[4]

As to the bad faith count, the plaintiffs argue the claims must stand because the Homesite

policy "provides for reasonable repairs and collapse, neither of which were mentioned in the

denial letter." As the court understands this claim, the plaintiffs argue that if there is coverage

under either of those policy provisions, it was bad faith on the part of Homesite not to address

those issues in its denial letter. Regarding the CUTPA/CUIPA count, the plaintiffs recite

boilerplate law on those claims and state "the [p]laintiffs have nothing further to provide this

---

[3] This claim, as well as the ensuing loss claim referenced below, is not among those asserted in the plaintiffs' complaint, which otherwise makes reference to the policy terms pursuant to which they claim coverage.

[4] Neither party has adequately briefed the trigger of coverage issue. Based on its argument, it is apparent that Homesite takes either a manifestation position or an injury in fact position, whereas the plaintiffs fail to articulate any discernible position. No law is cited by either party on the subject. This court has previously applied a manifestation trigger to a similar first party property claim involving a very similar progressive loss. *Musgrave* v. *Twin City Fire Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-15-6009840-S (November 7, 2017) (Transcript of Proceedings); see also *Prudential-LMI Commercial Ins.* v. *Superior Court*, 51 Cal.3d 674, 798 P.2d 1230 (1990); *Mangerchine* v. *Reaves*, 63 So.3d 1049 (La.App. 1 Cir., 2011), rehearing denied; C. Lantz, "Triggering Coverage of Progressive Property Loss: Preserving the Distinctions Between First-And Third-Party Insurance Policies," 35 Wm. & Mary L. Rev. 1801 (1994); D. Grand, "Nailing Down Occurrence Triggers for Property Damage in the Wake of Redevelopment--Why a Distinction Should Be Made Between First and Third Party Policies," 68 La. L. Rev. 605 (2008). Because the parties have not adequately briefed the trigger issue, and its resolution is not required to decide Homesite's motion, the court does not reach the question of whether the plaintiffs' loss occurred during the Homesite policy period.

[c]ourt with other than the allegations that they are of the belief that coverage is warranted and information may have been shared through ISO, as is common practice amongst most insurance companies." No evidence of any ISO related activity has been submitted.

In their reply, Homesite addresses the plaintiffs' "chemical reaction" argument, their interpretation of the "risk of" language in the policy, and the ensuing loss argument, as well as further advancing its arguments on collapse and the extra-contractual claims. Homesite does not address the "reasonable repairs" argument.

The court heard the parties at oral argument on October 23, 2017. Based on the written submissions and the arguments of the parties, the court concludes that there is no genuine issue of material fact concerning the plaintiffs' claims for coverage under either the Additional Coverage for collapse or Section I – Perils Insured Against.  For that and other reasons, the court also finds that the plaintiffs' extra-contractual claims are not viable, and judgment shall enter on all counts in favor of Homesite.

## SUMMARY JUDGMENT STANDARDS

"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Stuart* v. *Freiberg*, 316 Conn. 809, 820-21, 116 A.3d 1195 (2015). "The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . A

material fact . . . [is] a fact which will make a difference in the result of the case." (Internal

quotation marks omitted.) Id., 821.

"To satisfy his burden the movant must make a showing that it is quite clear what the

truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact.

. . . When documents submitted in support of a motion for summary judgment fail to establish

that there is no genuine issue of material fact, the nonmoving party has no obligation to submit

documents establishing the existence of such an issue. . . . Once the moving party has met its

burden, however, the opposing party must present evidence that demonstrates the existence of

some disputed factual issue." (Internal quotation marks omitted.) *Ferri* v. *Powell-Ferri*, 317

Conn. 223, 228, 116 A.3d 297 (2015).

## INSURANCE POLICY INTERPRETATION

An insurance contract is interpreted by the court according to "the same general rules that

govern the construction of any written contract." (Internal quotation marks omitted.) *Johnson* v.

*Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 643, 31 A.3d 1004 (2011). Thus, "[t]he

determinative question is the intent of the parties, that is, what coverage the . . . insured expected

to receive and what the insurer was to provide, as disclosed by the provisions of the policy."

(Internal quotation marks omitted.) Id. If the policy's terms are "clear and unambiguous," then

that language "must be accorded its natural and ordinary meaning." (Internal quotation marks

omitted.) Id. If the terms of the insurance policy are "ambiguous," however, meaning

"reasonably susceptible to more than one reading," then ambiguity "must be construed in favor

of the insured because the insurance company drafted the policy." (Internal quotation marks

omitted.) Id. "The court must conclude that the language should be construed in favor of the

insured unless it has 'a high degree of certainty' that the policy language clearly and

unambiguously excludes the claim." *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 796, 967 A.2d 1 (2009), citing *Kelly* v. *Figueiredo*, 223 Conn. 31, 37, 610 A.2d 1296 (1992).

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group*, 311 Conn. 29, 37-38, 84 A.3d 1167 (2014), quoting *Johnson* v. *Connecticut Ins. Guaranty Assn.*, supra, 302 Conn. 643. "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, supra, 290 Conn. 796. Nevertheless, "[c]ontext is often central to the way in which policy language is applied; the same language may be found both ambiguous and unambiguous as applied to different facts. . . . Language in an insurance contract, therefore, must be construed in the circumstances of a particular case, and cannot be found to be ambiguous or unambiguous in the abstract. . . . In sum, the same policy provision may shift between clarity and ambiguity with changes in the event at hand . . . and one court's determination that a term . . . was unambiguous, in the specific context of the case that was before it, is not dispositive of whether the term is clear in the context of a wholly different matter." (Citations omitted; emphasis omitted; internal quotation marks omitted*.) Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 41-42.

## **BREACH OF CONTRACT**

A.    Additional Coverage for Collapse

Homesite argues there is no genuine issue of material fact that the plaintiffs' home has not experienced a "collapse" as defined in the policy and their claimed loss, therefore, is not covered under the Additional Coverage for collapse. It is undisputed that there is a progressive deterioration of the basement walls in the plaintiffs' home and there is evidence to suggest that this will continue until the basement walls crumble and the house above then falls to the ground. Nevertheless, the house has not fallen down or caved in "with the result that the building or part of the building cannot be occupied for its intended purpose." The plaintiffs have continued to occupy the house from 2015, when they reported the loss, until the present time. The house may be "in danger of falling down or caving in" sometime in the future, as Mr. Neal suggests, but under the definition of "collapse," a building in that condition "is not considered to be in a state of collapse." The building is still standing and the definition of "collapse" states a building that is still standing "is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."

Despite the effort to clarify what is required to constitute a covered "collapse," the plaintiffs argue that Homesite has fallen short of drafting a clear and unambiguous definition of "collapse" and maintains the court must consequently resort to the default definition set forth in *Beach* v. *Middlesex Mutual Ins. Co.*, 205 Conn. 246, 252-53, 532 A.2d 1297 (1987) (in absence of definition of "collapse" coverage will be found when there has been "substantial impairment of structural integrity.") The plaintiffs argue that paragraphs (2), (3), and (4) of the definition of collapse are "qualifiers" that render the definition ambiguous when juxtaposed with the principal definition set forth in paragraph (1). They do not explain why these paragraphs render the entire

11

definition ambiguous, but they cite *Malbco Holdings, LLC* v. *AMCO Ins. Co.*, 629 F. Supp. 2d 1185 (D. Ore. 2009), in support of that proposition.

In *Malbco*, a local building department threatened to "red tag" a hotel because of its dangerous condition caused by a long term water leak that had resulted in twenty broken or damaged trusses holding up the floor and guest rooms above a pool, exercise room, and conference room. The hotel owner sought coverage under a collapse provision identical to the one in Homesite's policy. Before making that claim, it had been discovered that some parts of the hotel had already fallen over three inches, but it was disputed whether that had happened suddenly or over an extended period of time, thus placing the "abruptness" issue into dispute. The insurer sought summary judgment nevertheless because its interpretation of the "collapse" definition required that the building "completely fall to the ground" before coverage would attach. On that question, the court concluded the policy was ambiguous. While the court considered the insurer's interpretation plausible, the insured argued that the definition's requirement that the building or part thereof "cannot be occupied for its intended purpose" meant that something short of a complete falling down would be within the scope of coverage. Otherwise, the occupancy requirement would be surplusage, since "[c]learly one cannot occupy a building if it has completely fallen down or caved in." Id., 1196. The court found that interpretation plausible as well and concluded the policy was ambiguous. The issue and circumstances in this case are different than those involved in *Malbco*. Here there is no dispute over whether the house could not be "occupied for its intended purpose" at the time of the alleged loss. The plaintiffs have continued to live in the house and there is no evidence that any local official has determined otherwise.

*Malbco* does not stand for the proposition for which the plaintiffs have cited it.  In *Malbco*, the court observed that "[o]nly subsection (a) actually defines the term 'collapse.' The other subsections serve merely to clarify other situations in which a building is not in a state of collapse . . . ." Id., 1195. The court found an ambiguity in subsection (a) under the circumstances presented in that case (subsection (1) in this case). Even if the court's analysis in *Malbco* is presumed to be correct, it does not support the plaintiffs' view that there is an ambiguity under the circumstances of this case. *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn. 41-42 (the question of ambiguity is not determined in the abstract). The court did not find that the "qualifiers" in subsections (2), (3) and (4), as the plaintiffs label them, are inherently contradictory or inconsistent with subsection (1) rendering the entire definition ambiguous.  The court did consider those subsections consistent with the insured's interpretation of subsection (1).

As the court stated in *Malbco*, subsections (2), (3) and (4) clarify that certain circumstances do not satisfy the requirements of the principal definition set forth in subsection (1). They do not obscure the definition. Along with subsection (1) they are clearly intended to fill the gap perceived by the Connecticut Supreme Court in *Beach,* and by other courts as well, in earlier policies that lacked a definition of "collapse." Subsection (2) clarifies that just because there is a danger of falling down or caving in does not mean that subsection (1) has been satisfied. Subsection (3) clarifies that mere separation of one part of a building from another does not constitute a collapse if that part of the building is still standing. Subsection (4) clarifies that cracking, bulging, etc. does not satisfy subsection (1) if the building, or the part of the building at issue, is still standing. None of these clarifications, however, indicate that there is no collapse under any circumstance where the building is still standing. Whether that is the case can only be determined based on an interpretation of subsection (1) and the significance of the phrase

13

"cannot be occupied for its intended purpose." That issue is not before this court because it is undisputed that the plaintiffs continued to occupy the home long after the Homesite policy expired.

The plaintiffs also cite *Dalton* v. *Harleysville Worcester Mutual Ins. Co.*, 557 F.3d 88 (2d Cir. 2009), in support of their argument that Homesite's definition of "collapse" is ambiguous. *Dalton*, however, supports the opposite conclusion. In *Dalton*, hidden decay in a wall was so severe that the City of New York issued a notice to vacate. The homeowners claimed the condition constituted a collapse under their insurance policy but the insurer denied the claim. The district court entered summary judgment for the insurer on the basis that a "collapse" under the policy required "a total or near total destruction of the property." The policy, however, did not define "collapse" and the Second Circuit held that the district court had misread New York law on the subject. Finding New York law unsettled and the policy ambiguous in the absence of a definition of "collapse," the court reversed summary judgment. In a footnote, however, the court noted that a policy providing "that a collapse was 'an abrupt falling down or caving in' and that 'a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, or expansion' . . . addresses the ambiguity . . . ." (Citation omitted.) Id., 92 n.1. Thus, if anything, *Dalton* supports Homesite's position, as do a number of other cases that have addressed similar crumbling concrete claims involving the same definition of collapse. *Jemiola* v. *Hartford Casualty Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-15-6008837-S (*Cobb, J.*, March 2, 2017), appeal pending, SC 19978; *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, United States District Court, Docket No. 3:16CV00510 (JCH) (D. Conn. October 25, 2016); *Alexander* v. *General Ins. Co. of America*, United States District Court, Docket No. 3:16CV59 (SRU) (D. Conn. July 7, 2016) (Transcript of Oral Ruling).

14

Aside from the plaintiffs' continued occupancy of the home, the Additional Coverage for collapse covers "abrupt collapse." No attempt has been made by the plaintiffs in this case to argue that "abrupt" is ambiguous either in the abstract or as applied to the circumstances of this case. It is undisputed that the deterioration taking place in the plaintiffs' basement walls is a gradual, progressive process that takes many years to result in a complete falling down of the building. It is a condition whose progress the plaintiffs have had the unfortunate opportunity to witness themselves "over time." Because there is no argument in this case that the word "abrupt" is ambiguous in this context, and because it is a progressive process at issue, the court finds this essential element of the definition of collapse to be unsatisfied in this case. See *Jemiola* v. *Hartford Casualty Ins. Co.*, supra; *England* v. *Amica Mutual Ins. Co.*, United States District Court, Docket No. 3:16CV1951 (MPS) (D. Conn. September 11, 2017).

The court concludes there is no coverage for the plaintiffs' alleged loss under the Additional Coverage for collapse.

B.      Section I – Perils Insured Against

Having concluded there is no coverage for the plaintiffs' alleged loss under the Additional Coverage for collapse, the question remains whether the plaintiffs' loss is covered under the general all risk coverage afforded under "Section I – Perils Insured Against. Under this section, the policy covers the insured for "risk of direct loss to property . . . if that loss is a physical loss to property." That coverage is subject to the limitations and exclusions recited above and discussed below.

1.      Limitations on Coverage

Section I of the Homesite policy limits the scope of "physical loss" to exclude any loss "Caused by e. Any of the following: (1) Wear and tear, marring, deterioration . . . (6) Settling,

15

shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs or ceilings . . . ." Homesite maintains the damage to the plaintiffs' home has been caused by "deterioration" and by "bulging or expansion, including resultant cracking, of foundations [or] walls." The plaintiffs argue, however, the deterioration, bulging, expansion and cracking in their basement walls did not cause their loss – they were caused by the loss. The "loss," they argue is the chemical reaction taking place within the concrete walls. The proposition that the chemical reaction itself constitutes the "physical loss to property" covered in Section I is one several Connecticut federal district courts have recently rejected in crumbling concrete cases. See *England* v. *Amica Mutual Ins. Co.*, supra, United States District Court, Docket No. 3:16CV1951 (MPS).[5]

In *England*, the court first observed that a claim that the chemical reaction itself constitutes the loss is inconsistent with the plaintiffs' alternative claim that the plaintiffs' "loss" was caused by a collapse. The doubt this casts over the argument is not dispositive, however, particularly because the court has already concluded the collapse coverage is not applicable. Conceptually, however, it is an implausible interpretation of the policy, which covers "direct . . . physical loss to property." There are multiple chemical reactions taking place inside every home and even within the concrete walls. Mr. Neal observes one of them when he notes the presence of efflorescence in the plaintiffs' basement. There is no claim that efflorescence is a loss or the cause of a loss. The alkali-silica reaction (ASR) identified by Mr. Neal, however, allegedly

---

[5] See also *Hurlburt* v. *Massachusetts Homeland Ins. Co.*, United States District Court, Docket No. 3:17CV503 (VAB) (D. Conn. February 23, 2018); *Zamichiei* v. *CSAA Fire & Casualty Ins. Co.*, United States District Court, Docket No. 3:16CV739 (VAB) (D. Conn. February 20, 2018); *Mazzarella* v. *Amica Mutual Ins. Co.*, United States District Court, Docket No. 3:17CV598 (SRU) (D. Conn. February 8, 2018); *Chernosky* v. *Amica Mutual Ins. Co.*, United States District Court, Docket No. 3:17CV01047 (VLB) (D. Conn. January 24, 2018); *Makufka* v. *CSAA Fire & Casualty Ins. Co.*, United States District Court, Docket No. 3:16CV00567 (VLB) (D. Conn. January 18, 2018); *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, United States District Court, Docket No. 3:16CV510 (JCH) (D. Conn. December 15, 2017); *Agosti* v. *Merrimack Mutual Fire Ins. Co.*, United States District Court, Docket No. 3:16CV01686 (SRU) (D. Conn. August 28, 2017).

16

results in damage because of the nature of its impact on the concrete. It causes the concrete to

deteriorate, bulge, expand, and crack. It is because of the physical damage to the concrete walls

that the plaintiffs may be considered to have suffered a "loss." As the *England* court points out,

citing *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 782, 67 A.3d

961 (2013), Connecticut law recognizes a "difference between a loss and its cause."

> Specifically, courts interpreting insurance policies to determine the scope of
> insurance coverage have distinguished between loss or damage, on the one hand,
> and processes that could—but have yet to—cause loss or damage, on the other,
> ruling that the latter do not fall within the scope of coverage where the policies
> require physical loss or damage to trigger coverage. In *Capstone Building Corp.*
> v. *American Motorists* [*Ins. Co.*], the Connecticut Supreme Court held that 'the
> escape of carbon monoxide, without more, is not property damage,' and therefore
> did not constitute 'physical injury to tangible property, including all resulting loss
> of use of that property' as required to trigger coverage under a commercial
> general liability policy.
> *England* v. *Amica Mutual Ins. Co.*, supra.

Formulating their argument somewhat differently, the plaintiffs also note that the policy

language limits coverage for loss "*caused* by" deterioration, bulging, cracking and expansion.

(Emphasis added.) In the circumstances of this case, they argue, the deterioration, bulging,

cracking, and expansion are not the cause of the loss, but rather one of the effects of the chemical

reaction, which is the "cause" of the loss. The same argument concerning the same policy

language also fell short in *England*. There the court held that the only "direct physical loss"

claimed "is the cracking and deterioration of the basement walls, and the financial 'loss'

therefrom, which is expressly excluded. . . . It does not matter whether the originating event

behind the cracking and deterioration was a chemical reaction; the exclusions in the [p]olicies

make no exception for losses for which the cause is itself a product of a chemical reaction.

Indeed, many of the loss-producing causes listed in the exclusions either are the product of

chemical reactions or are broad enough to include chemical reactions." (Footnote omitted.) *Id.* In

other words, if the cause of the loss, for example deterioration, is itself preceded by and caused by a chemical reaction, that does not mean that the "loss" was not caused by deterioration. Again, the "loss," as *England* points out, "is the damage or the detrimental change to the insured that is the product of these excluded processes and events." Id.

In support of their arguments, the plaintiffs cite *Khuns* v. *Bay State Ins. Co.,* 866 N.Y.S.2d 92 (Sup. Ct. 2008), aff'd, 910 N.Y.S. 822, 78 A.D.3d 1496 (2010). In *Kuhns,* a claim that a wall collapsed was denied by the insurer, not because there was a dispute as to whether there was a collapse but because the insurer determined the cause of the collapse was not included among the causes covered by the policy. The insurer attributed the cause of collapse to underground water pressure. The plaintiffs' expert, however, attributed the cause of the collapse to deteriorating mortar in the wall and the plaintiff argued that fell within the scope of "hidden decay," a recognized cause of collapse under the policy. The court denied the defendant's motion for summary judgment because of this dispute. How this relates to the plaintiffs' claim that the chemical reaction in their basement walls constitutes the loss is unclear. As best the court can glean, the plaintiffs may analogize the penetrating water in the *Kuhns* case to the chemical reaction in their basement walls, but there was no indication in *Kuhns* that the court considered the penetrating water to be the loss, as opposed to the collapse of the wall.

2.      Exclusion for Faulty, Inadequate or Defective Materials

Section I of the Homesite policy contains an exclusion providing that Homesite does "not insure for loss . . . caused by . . . [f]aulty, inadequate or defective… materials used in repair, construction, renovation or remodeling . . . ." Homesite argues that the plaintiffs' alleged loss "is a claim for loss caused by defective concrete used in construction." The plaintiffs do not directly address the language of this exclusion, but seek to avoid it in the same fashion they attempted to

18

avoid the coverage limitations discussed above. The plaintiffs argue that the defective concrete is not the cause of the loss; rather the chemical reaction is the loss, or the cause of the loss. The same reasoning applied to the plaintiffs' arguments that the coverage limitations are inapplicable disposes of the plaintiffs' claim that this exclusion does not apply.

   3.   Ensuing Loss

Nor does the "ensuing loss" provision that qualifies the limitations and exclusion discussed above change the outcome. Under the ensuing loss provision, even if the loss caused by defective concrete is excluded, "any ensuing loss to property . . . not excluded or excepted in this policy is covered." The plaintiffs claim the benefit of this provision but do not explain why they are entitled to that benefit. The issue, therefore, is inadequately briefed. Still, under the terms of the policy, an "ensuing loss" must be a covered "loss." The plaintiffs do not explain what loss, other than the alleged collapse or the chemical reaction determined above not to be a "loss," has occurred and that should be considered an "ensuing loss." In *Mazzarella* v. *Amica Mutual Ins.Co.*, United States District Court, Docket No. 3:17CV598 (SRU) (D. Conn. February 8, 2018), the court discussed the ensuing loss provision in the context of a crumbling concrete case. The court explained that an ensuing loss must be something distinct from the non-covered event, in this case the deteriorating basement walls, that is itself within and not excluded from coverage. "Further, [w]here a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk." (Internal quotation marks omitted.) Id., quoting *Yale University* v. *Cigna Ins. Co.*, 224 F. Supp. 2d 402 (D. Conn. 2002). That appears to be what the plaintiffs are attempting to do here and, thus, the ensuing loss provision is inapplicable.

4.      "Risk of" Loss

Finally, the plaintiffs offer an interpretation of Section I's extension of coverage that

vastly expands the nature of the coverage offered. The plaintiffs point out that the Homesite

policy does not just state that it insures for direct, physical loss to property; the policy says it

insures "against *risk of* direct loss to property . . . only if that loss is a physical loss to property."

(Emphasis added.) Under the plaintiffs' interpretation of this language, there does not have to be

an actual, direct physical loss. Merely the risk of such a loss is within the scope of the coverage

offered. The plaintiffs do not explain why such a risk is not also the subject of the limitations and

exclusions that follow and were discussed above.[6] See *Liston-Smith* v. *CSAA Fire & Casualty*

*Ins. Co*, supra, United States District Court, Docket No. 3:16CV00510 (JCH).

Moreover, this interpretation is so expansive that the only limits on coverage are the

limits of the imagination concerning what things might go wrong. Further, there is no reliable

way to quantify such a risk of loss, except in the sense that the risk is already quantified in the

premium – something the policyholder is required to pay, not the insurer.

The "risk of" phrase cited by the plaintiffs merely identifies the language that follows as

the description of what is covered under Section I of the policy.  The use of the phrase can be

viewed as somewhat redundant in this context. It does not add any substantive meaning to the

extension of coverage and other policies have dispensed with it. See *Chernosky* v. *Amica Mutual*

*Ins. Co.*, United States District Court, Docket No. 3:17CV01047 (VLB) (D. Conn. January 24,

2018). To the extent one might attempt to extract an ambiguity out of this use of the phrase,

---

[6] The plaintiffs do mention the Additional Coverage for reasonable repairs included in the policy. Conceivably an insurer might agree to cover, for example, the cost of repairs to basement walls in order to prevent the risk of a future collapse. Prerequisite to the Additional Coverage for reasonable repairs in the policy, however, is that the "covered property is damaged by an applicable Peril Insured Against." Once again, the chemical reaction in the concrete is not damage or a loss and, therefore, the reasonable repairs provision is not triggered. See *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, supra, United States District Court, Docket No. 3:16CV00510 (JCH).

however, that effort is unavailing. The court "will not torture words to import ambiguity where

the ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.)

*Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.,* supra, 311 Conn. 37-38. The creative

legal mind dissecting the language of an insurance policy must be tempered by reason. The rule

of construction placing the burden of an ambiguity on an insurer "applies only when the terms

are, without violence, susceptible of two equally reasonable interpretations . . . ." (Internal

quotation marks omitted.) *R.T. Vanderbilt Company, Inc.* v. *Hartford Accident & Indemnity Co.,*

171 Conn. App. 61, 90, 156 A.3d 539, cert. granted, 327 Conn. 923, and cert. granted, 327 Conn.

923, and cert. granted, 327 Conn. 925 (2017), quoting *Misiti, LLC* v. *Travelers Property*

*Casualty Co. of America*, 308 Conn. 146, 155, 61 A.3d 485 (2013). That is not the case here.

The plaintiffs cite *401 Fourth Street, Inc.* v. *Investors Ins. Group*, 823 A.2d 177 (Pa.

Super 2003), aff'd, 583 Pa. 445, 879 A.2d 166 (2005), in support of their expansive

interpretation of the policy. In that case, a parapet wall was bowing, leaning inward, in danger of

completely collapsing and needed immediate repairs. The insured sought coverage for collapse

under a substantially different collapse provision than the one in these plaintiffs' policy. That

provision, however, included similar "risk of" language, providing coverage for "loss or damage

caused by or resulting from risks of direct physical loss involving collapse of a building or any

part of a building . . . ." "Collapse" was not defined by the policy but the policy said it "does not

include settling, cracking, shrinkage, bulging or expansion." The insurer moved for summary

judgment claiming that the collapse coverage did not apply unless the building or a part of it

actually fell. The court disagreed, relying in part on the "risk of" language, holding the words

"clearly broaden the policy's coverage to include something less than a structure completely

falling to the ground." Id., 179. Of course, numerous Connecticut courts have reached the same

conclusion about very similar policy language that does not include the "risk of" language. See *Roberts* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:13CV00435 (SRU) (D. Conn. August 28, 2017), and cases cited therein. The court in *401 Fourth Street* blithely and unpersuasively dismissed the "concern that this interpretation would unfairly subject the insurer to liability based on 'potentially infinitesimal risks' or 'the existence of some small or vague possibility' of collapse." *401 Fourth Street, Inc.* v. *Investors Ins. Group*, supra, 179. More persuasively, the dissent observed, "[a]ll insurance is meant to cover risks. I do not believe that the addition of the term 'risks' to the language of this policy broadens the coverage." Id., 180.

The court concludes there is no coverage for the plaintiffs' alleged loss under Section I – Perils Insured Against.

### BAD FAITH AND CUTPA/CUIPA

Having concluded there is no coverage for the plaintiffs' alleged loss under the Homesite policy, the court must consider in that context the viability of the plaintiffs' common-law bad faith claims and their unfair insurance practice claims under CUTPA/CUIPA. Homesite argues that these claims must fail because there is no coverage under the policy and, even if coverage had been found, because its denial was made in good faith as demonstrated by the judicial decisions that have upheld its interpretation of the policy provisions.[7]

Regarding the common-law bad faith claim, the plaintiffs argue that if there is coverage under the Additional Coverages for collapse or reasonable repairs, it was bad faith on the part of Homesite not to address those issues in its denial letter. Because the court has found there is no coverage under the policy, including those provisions, the common-law bad faith claim must fail in light of the plaintiffs' allegations and their position on summary judgment. "[B]ecause the covenant of good faith and fair dealing only 'requir[es] that neither party [to a contract] do

---

[7] The court does not reach the latter ground because no coverage has been found.

22

anything that will injure the right of the other to receive the benefits of the agreement,' it is not implicated by conduct that does not impair contractual rights." (Internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 794, quoting *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 200, 663 A.2d 1001 (1995). Because the plaintiffs have not been deprived of any benefits under the Homesite policy, there can be no claim for bad faith.

The plaintiffs' CUTPA/CUIPA claim reiterates the allegations set forth in the common-law bad faith claim concerning the misinterpretation and misapplication of relevant policy provisions by Homesite and alleges that Homesite "has regularly denied claims in similar manners or on similar grounds or other grounds." This count also appears to allege that Homesite is engaged in a scheme, plan, or conspiracy to indiscriminately deny all collapse claims associated with the crumbling basement walls phenomenon in this judicial district, carried out through ISO. Whatever communications may have taken place within ISO, the court has concluded that the denial of coverage was not wrongful. "When CUTPA and CUIPA claims are premised on denial of coverage under an insurance policy and the insurer's interpretation of the policy is correct, 'there can be no genuine issue of material fact as to whether the application of that interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct in violation of the statues.'" *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, supra, United States District Court, Docket No. 3:16CV00510 (JCH), quoting *Zulick* v. *Patrons Mutual Ins. Co.*, 287 Conn. 367, 378, 949 A.2d 1084 (2008).

## CONCLUSION

For all of the foregoing reasons, the defendant Homesite's motion for summary judgment is granted as to all counts of the complaint.


Farley, J.

2017 WL 4159820

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Tolland at Rockville.

Sarah TOOMEY, et al.

v.

CENTRAL MUTUAL INSURANCE COMPANY, et al.

CV156009841S
|
August 3, 2017

**Opinion**

Cobb, J.

 *1  This is one of many cases in Tolland County
involving claims of extensive pattern cracking to basement
walls caused by a chemical compound in the concrete
provided by the J.J. Mottes Concrete Company (JJ
Mottes) that was used to construct the basement walls
of numerous homes, including the plaintiffs.' In this case,
the plaintiffs, Sarah A. Toomey and Richard T. Toomey,
claim that the defendants, Central Mutual Insurance
Company (Central Mutual) and The Travelers Home
and Marine Insurance Company (Travelers), breached
their homeowners' policies when they denied coverage
for the "collapse" of the basement walls of their home
and that the denial of their claim also constituted a
violation the Connecticut Unfair Trade Practice Act and
the Connecticut Unfair Insurance Practices Act (CUTPA/
CUIPA) The defendants, whose homeowners' policies
in this case contain the same definition of "collapse,"
have moved for summary judgment on all counts of
the complaint, for essentially the same reasons. The
plaintiffs have opposed both motions. The parties have
thoroughly briefed the issues in this case and the court
has heard arguments. This court has recently had occasion
to consider the policy language at issue here in a case
involving very similar facts in *Jemiola v. Hartford Casualty
Ins. Co.,* Superior Court, judicial district of Tolland,
Docket No. CV–15–6008837–S (March 2, 2017, Cobb, J.)
*(Jemiola),* in which this court granted summary judgment
in favor of the defendant insurance company. Having
considered the parties' arguments and submissions in this
case, the court sees no reason to depart from its analysis in

*Jemiola,* and therefore concludes that the defendants are
entitled to judgment on all of the plaintiffs' claims for the
same reasons.

**UNDISPUTED MATERIAL FACTS**

The plaintiffs purchased their home, which was built in
1986 and is located at 511 Old Stafford Road in Tolland,
in the summer of 2009. Prior to purchasing the property,
the plaintiffs had it inspected. At that time, one-half of
the basement was finished. The plaintiffs did not notice
any cracks in the basement walls, but the inspection
report indicated that the walls had "typical cracks" for
the age of the house and recommended that the plaintiffs
seal the cracks. After purchasing the home, the plaintiffs
installed shelving throughout the unfinished portion of
the basement for storage purposes, which obscured the
concrete walls.

In the fall of 2014, the plaintiffs listed the home for sale
in connection with their pending divorce. In November
2014, a prospective buyer had the home inspected. The
prospective buyer's home inspector noticed cracks of
concern in the basement walls and recommended that they
be examined by a structural engineer. The prospective
buyer retained William F. Neal, P.E., to examine the
cracks, and he informed the plaintiffs that they had
"bad concrete." In his report, Mr. Neal stated that he
observed that the basement walls had numerous "spider-
web cracks," and that the basement walls had begun to
"bow inward" in a number of locations. Mr. Neal opined
that the likely cause of the "foundation distress is alkali-
silica-reaction (ASR)," which he explained is "a chemical
reaction between alkali aggregate and silica in the concrete
mix. It typically causes this type of distress to be visible
15 to 20 years after the foundation is poured. The ASR
will continue to deteriorate the concrete and the basement
walls will continue to bulge inward until they structurally
fail. There is no way to arrest the process and there is no
way to repair the existing damage. The basement walls at
this time are structurally unsound and corrective action
is necessary." He then stated that "it is not possible to
predict how quickly the foundation will deteriorate to the
point it is structurally dangerous. I therefore urge you to
develop a corrective plan with a licensed contractor as
soon as possible."

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**\*2** Upon receipt of this report, the prospective buyer decided not to purchase the home and the plaintiffs have since taken it off the market.

The plaintiffs retained David Grandpre, P.E., who inspected the home and confirmed Mr. Neal's findings. He also indicated that the house exhibits cracking, bulging, bending, leaning, shrinkage, and expansion. Mr. Grandpre believes that the pattern cracking condition is either caused by a ferrous sulfide reaction or an alkali silica reaction which causes the concrete to fracture internally. The internal fracturing exhibits itself as "map cracking" on the concrete walls. This pattern cracking in the plaintiffs' basement has occurred over time and, according to Mr. Grandpre, began when the concrete was poured. In his opinion, this condition will eventually lead to the basement walls being unable to support the upper structure and the entire home will fall to the ground. In his opinion, the basement walls are structurally impaired, but he cannot say when the condition of the basement walls will worsen such that the walls will fall into the basement.

The plaintiffs' home and basement walls remain standing. The plaintiffs have resided in the home continuously since they purchased it in 2009. The basement foundation walls have not fallen down or caved in. No evidence has been presented that the plaintiffs have been told that the home is not presently unsuitable for residential purposes or that they should move out of the house due to its dangerous condition. Although Richard Toomey does not live in the home any longer due to the divorce, he testified that they have not been informed that their home is unsafe to live in and that to his knowledge the basement is still used for storage and a play room for the children. Sarah Toomey lives in the home with the children and pets. Richard Toomey testified that he has not insisted that the family move out of the home but that if he was told or thought that the house was about to fall down, he would insist that they leave the premises. Sarah Toomey exercises in the finished portion of the basement five to seven times per week.

At all times since 2009, the plaintiffs have insured their home, first with the defendant Central Mutual from 2009 to 2012 and later with defendant Travelers. The plaintiff Richard Toomey indicated that he did not read any of the policies before he purchased them. Both of the defendants' policies provided "additional coverage" for "collapse" and define collapse as follows:

With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion.

**\*3** In 2014, the plaintiffs submitted a coverage claim to Travelers and, in 2015, submitted a coverage claim to Central Mutual under the collapse provisions of their policies. Both defendants reviewed and investigated the claims and denied them finding that the plaintiffs' home has not suffered a collapse under the policies.

## DISCUSSION

The plaintiffs' complaint is in four counts, the first two are against Central Mutual for breach of contract (count one) and violation of CUTPA/CUIPA (count two) and the third and fourth counts are asserted against Travelers on the same grounds. In the breach of contract claims, the plaintiffs assert that the defendants violated the terms of the homeowner's insurance policies that provided coverage for "collapse of a building or a part of a building caused by ... decay that is hidden from view ... use of defective materials or methods in construction, remodeling, or renovation." In counts two and four, the plaintiffs assert that the defendants violated CUTPA/CUIPA by engaging in a general business practice to deny coverage for similar concrete decay claims.

The defendant Travelers has denied the essential allegations of the plaintiffs' complaint and asserted seventeen special defenses. The defendant Central Mutual has also denied the essential allegations of the plaintiffs'

complaint and has asserted twenty-two special defenses. The defendants have both moved for summary judgment on the plaintiffs' complaint, not on their special defenses, and argue that the undisputed material facts establish that the plaintiffs' losses are not covered under the policy provisions and that if the court grants summary judgment on the breach of contract counts and finds that they correctly denied coverage, then the plaintiffs' remaining CUTPA/CUIPA counts cannot survive. The defendants also claim that their coverage positions were fairly debatable and liability not reasonably clear, and therefore even if there was a breach of the policies, they did not violate CUTPA/CUIPA.

The plaintiffs oppose the defendants' motions for summary judgment and assert, as to each, that the record suggests that the basement walls of their home have suffered a "collapse," and to the extent the record does not clearly demonstrate a covered collapse, the lack of clarity arises from factual issues that preclude summary judgment. They also assert that the defendants wrongfully denied their claim for coverage as a part of a general business practice to wrongfully deny their claim or, in the alternative, that there are issues of fact as to this claim.

The court considers both of the defendants' motions for summary judgment and the plaintiffs' oppositions together because the undisputed facts, arguments, and policy provisions are essentially the same.

### A. Summary Judgment Standards

The standards for considering motions for summary judgment are well established. Practice Book § 17–49 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Our Supreme Court has recently set forth the burden on each party: "In seeking summary judgment, it is the movant that has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must

make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent ... When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue ... Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [§ 17–45]." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co. v. Tully,* 322 Conn. 566, 573, 142 A.3d 1079 (2016); see *Stuart v. Freiberg,* 316 Conn. 809, 820–21, 116 A.3d 1195 (2015).

**\*4** "[S]ummary judgment is appropriate only if a fair and reasonable person could conclude only one way ... [A] summary disposition ... should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party ... [A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Dugan v. Mobile Medical Testing Services, Inc.,* 265 Conn. 791, 815, 830 A.2d 752 (2003); see *Farrell v. Twenty–First Century Ins. Co.,* 301 Conn. 657, 662, 21 A.3d 816 (2011).

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist ... Because [l]itigants have a constitutional right to have factual issues resolved by the jury ... motion[s] for summary judgment [are] designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted; internal quotation marks omitted.) *Maltas v. Maltas,* 298 Conn. 354, 365–66, 2 A.3d 902 (2010); see *Grenier v. Commissioner of Transportation,* 306 Conn. 523, 534–35, 51 A.3d 367 (2012).

### B. Counts One and Three—Breach of Contract

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Keller v. Beckenstein,* 117 Conn.App. 550, 558, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009). There is no dispute that the parties entered into contracts—homeowner's insurance policies—during relevant times, and that the plaintiffs paid all of their annual premiums over that period of time.

The defendants assert that they are entitled to summary judgment on the plaintiffs' breach of contract claims because the undisputed material facts establish that they did not breach the policies in denying coverage for this claim. In particular, the defendants claim that the definition of "collapse" is unambiguous, requiring "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." The defendants argue that the plaintiffs' claim is not covered under the policies and they are therefore entitled to summary judgment because the undisputed facts establish that the house has not "abruptly" "fallen down" or "caved in," rather, it is still standing and Sarah Toomey remains living in the home. The plaintiffs dispute the defendants' claims and argue that the policies' definition of collapse is internally inconsistent and ambiguous.

The standards governing interpretation of insurance policies are well established. "[A]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." (Internal quotation marks omitted.) *Shenkman–Tyler v. Central Mutual Ins. Co.,* 126 Conn.App. 733, 742, 12 A.3d 613 (2011); see *Connecticut Ins. Guaranty Assn. v. Fontaine,* 278 Conn. 779, 784–85, 902 A.2d 18 (2006). "[P]rovisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." (Internal quotation marks omitted.) *Vermont Mutual Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592, 966 A.2d 672 (2009). Where policy terms are unambiguous,

they should be accorded their natural and ordinary meaning and "the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (Internal quotation marks omitted.) *Jacaruso v. Lebski,* 118 Conn.App. 216, 233, 983 A.2d 45 (2009). "Contract language is unambiguous when it has a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion." (Internal quotation marks omitted.) *Isham v. Isham,* 292 Conn. 170, 181, 972 A.2d 228 (2009).

**\*5** Where a policy term is susceptible to more than one meaning, the term should be construed against the insurance company. See *New London County Mutual Ins. Co. v. Zachem,* 145 Conn.App. 160, 165, 74 A.3d 525 (2013). Ambiguous policy terms are construed in favor of coverage. See *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.,* 311 Conn. 29, 66, 84 A.3d 1167 (2014); *Johnson v. Connecticut Ins. Guaranty Assn.,* 302 Conn. 639, 642, 31 A.3d 1004 (2011). Where an insurance policy is ambiguous, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact. *Hartford Accident & Indemnity Co. v. Ace American Reinsurance Co.,* 284 Conn. 744, 762–63, 936 A.2d 224 (2007).

Before examining the specific policy language at issue, the court sets forth some relevant legal history. In 1986, the Connecticut Supreme Court considered an insurance coverage dispute in which the issue was whether the undefined word "collapse" in the homeowners' policy was ambiguous. *Beach v. Middlesex Mutual Assurance Co.,* 205 Conn. 246, 532 A.2d 1297 (1987). In *Beach,* the defendant insurance company denied the homeowners' claim and argued that the word "collapse" in the policy unambiguously connoted a sudden and complete catastrophe of a cataclysmic nature. The court disagreed and found that the word "collapse" in the policy was ambiguous. It then adopted the majority view of courts that had similarly considered policies that did not define the term, and determined that collapse meant "any substantial impairment of the structural integrity of a building." *Id.,* 252. In its decision, the Court invited the defendant insurance company to define the term "collapse" stating: "If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it has the opportunity expressly to define the term

to provide for the limited usage it now claims to have intended." *Id.*, 251.

The defendants in this case have included a definition of "collapse" in their policies which has been set forth above but the court repeats here:

With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following: ... Use of defective material or methods in construction, remodeling or renovation.

The use of the phrase "abrupt falling down or caving in of a building or part of a building" appears to be a response to the *Beach* court's suggestion that the defendant insurance company define the term "collapse," in that it clarifies that a "collapse" requires a sudden and catastrophic type event.

**\*6** As indicated, this court has had occasion to interpret this "collapse" definition in a JJ Mottes concrete case. [1] See *Jemiola, supra*, Superior Court, Docket No. CV–15–6008837–S. In *Jemiola*, this court followed a Connecticut Federal District Court, which is a similar JJ Mottes case, and other courts across the country in finding that this definition of collapse is unambiguous. See *Alexander v. General Ins. Co. of America*, United States District Court, Docket No. 3:16–CV–59 (SRU) (D.Conn. July 7, 2016), on reconsideration, *Alexander v. General Ins. Co. of America*, United States District Court, Docket

No. 3:16–CV–59 (SRU) (D.Conn. January 17, 2017) ("[p]laintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are cracking or ... they are bulging. Both conditions are expressly excluded under the definition of the policy and it is clear that no collapse has occurred"); see also *Squairs v. Safeco National Ins. Co.*, 25 N.Y.S.3d 502, 136 A.D.3d 1393, appeal denied, 27 N.Y.3d 907, 56 N.E.3d 900, 36 N.Y.S.3d 620 (2016) (determining that the collapse provision is unambiguous and finding there had not been a collapse because the building was still standing); *Rector St. Food Enterprises, Ltd. v. Fire & Casualty Ins. Co. of Connecticut*, 827 N.Y.S.2d 18, 35 A.D.3d 177 (2006) (rejecting the plaintiff's public policy arguments and determining the collapse provision is unambiguous); *Residential Management, Inc. v. Federal Ins. Co.*, 884 F.Sup.2d 3 (E.D.N.Y. 2012) (following New York precedent and determining that the four-section definition of collapse in the policy is clear enough to clarify any potential ambiguity); *Mount Zion Baptist Church v. Guideone Elite Ins. Co.*, 808 F.Sup.2d 1322 (N.D.G.A. 2011) (determining that the collapse provision was unambiguous because of the specific definition included within the policy); *Miller v. First Liberty Ins. Co.*, United States District Court, Docket No. 07–1338 (TNO) (E.D.P.A. June 17, 2008) (concluding that the collapse provision, including the four-part definition of collapse, is unambiguous).

[1]     There is a Connecticut Superior Court case that found in a different context this policy definition of collapse not to be ambiguous. *The Sports Domain, LLC v. Max Specialty Ins. Co.*, Superior Court, judicial district of New Haven, Docket No. CV–09–5025291–S (December 19, 2011, Hadden J.T.R.).

Applying the unambiguous definition of "collapse" in the *Jemiola* case, the court found that:

[T]here is no genuine issue of material fact that the plaintiff's loss is not covered because there has been no sudden or abrupt falling down or caving in, pursuant to subsection b(1). Subsection b(1), of the Additional Coverage section, provides the primary definition of "collapse" and the following subparts, (2), (3), and (4), provide additional clarification of that definition. The definition utilizes plain and ordinary language understandable to a layman. "Abrupt" is generally understood to mean "characterized by or involving

action or change without preparation or warning." Miriam–Webster's Collegiate Dictionary (11th Ed. 2003). Abrupt is also defined as "unexpectedly sudden." American Heritage College Dictionary (5th Ed. 2011). "Sudden" has recently been found to mean "a rapid or otherwise abrupt manner." See *Buell v. Greater New York Mutual Ins. Co.,* [259 Conn. 527, 791 A.2d 489 (2002) ] (concluding that the term "sudden," as used in an insurance policy's "pollution exclusion," to be clear and unambiguous, and expressly rejecting the plaintiff's argument that the "sudden" should be construed to mean "unexpected"). "Unexpected" is generally defined to mean "occurring without warning; unforeseen"; American Heritage College Dictionary (5th Ed. 2011); and is generally considered a synonym for "abrupt" or "sudden." The word "abrupt" is unambiguous and the damage to the plaintiff's basement walls was not "abrupt," but rather is happening over time.

The damage to the plaintiff's basement walls is due to defective material in the concrete that is causing it to deteriorate over time. The basement walls will, according to the plaintiff's expert, eventually give way, causing the house to fall into the basement. However, this has not happened yet. The plaintiff's expert offers no opinion as to when this event will occur. Thus, at this point in time, the plaintiff's home and or basement walls are only in danger of falling down or caving in and her home remains standing. Under these circumstances, the plaintiff cannot meet the "abrupt falling down and caving in" portion of the definition. Additionally, under these circumstances, the plaintiff's loss is excluded under subpart b(2) of the definition, which clarifies that a "collapse" does not include a building that "is in danger" of falling down or caving in.

**\*7** Furthermore, the plaintiff's home can still be occupied "for its intended current purposes," pursuant to the definition. It is undisputed that the plaintiff has lived in the home continuously since 1986 and still lives there today. In addition to living in her home, the plaintiff continues to use her basement. The home is still standing and has not been condemned and she has not been forced to move out of it due to any imminent risk that the basement walls will give way. Also, under these circumstances, the plaintiff's loss is also excluded under subpart b(4) of the definition which clarifies that a building is not in a state of "collapse" if "it is standing ... even if it shows evidence of cracking, bulging, sagging bending leaning, settling, shrinkage or expansion."

Thus, the court concludes that the policy definition of "collapse," when applied to the circumstances of this case, is unambiguous. Applying that unambiguous definition here, the court finds that the defendant did not breach the policies in place from 2005 forward, when it denied the plaintiff's insurance claim. Accordingly, the defendant is entitled to summary judgment on count one, the plaintiff's breach of contract count.

(footnote omitted). *Jemiola, supra*, Superior Court, Docket No. CV–15–6008837–S.

This case is indistinguishable from *Jemiola,* both factually and based on the arguments raised by the parties. The plaintiffs' home is still standing and habitable. The walls of the home have not fallen or caved in, and the deterioration of the walls is occurring over time not abruptly. Sarah Toomey continues to occupy the home and basement in the same way as when she moved into the house in 2009. The family continues to use the basement for all of the same purposes, including; storage, as a recreation room, and a space to use exercise equipment. They have not been advised or ordered to leave the home due to a dangerous condition. Although the plaintiffs' expert opines that the condition of the basement walls will continue to worsen and eventually fall or cave in, they have not yet done so and he could not say with any specificity as to when that could occur.

The court concludes that the policies' definition of "collapse," when applied to the circumstances of this case, is unambiguous, thus, the court finds that the defendants did not breach the policies when it denied the plaintiffs' insurance claim. Accordingly, the defendants are entitled to summary judgment on counts one and three, the plaintiffs' breach of contract counts.

### C. Counts Two and Four—CUTPA/CUIPA

The plaintiffs' CUTPA/CUIPA claims fail in view of the court's finding that there was not coverage under the policies, and, consequently, the plaintiffs have not sustained an injury.

See *Abrahams v. Young & Rubicam, Inc.,* 240 Conn. 300, 306, 692 A.2d 709 (1997) ("in order to prevail in a CUTPA action, a plaintiff must establish both that the defendant

has engaged in a prohibited act *and* that, 'as a result of this act, the plaintiff suffered an injury" [emphasis original] ). Thus, the defendants are entitled to summary judgment on counts two and four.

<div style="text-align:center">CONCLUSION</div>

For all of the foregoing reasons, the defendants' motions for summary judgment (# s 113 and 144) are granted as to all counts of the complaint. So ordered.

**All Citations**

Not Reported in A.3d, 2017 WL 4159820, 65 Conn. L. Rptr. 37

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

■ Caution
As of: March 27, 2018 9:05 PM Z

# *In re Trilegiant Corp.*

United States District Court for the District of Connecticut

March 28, 2014, Decided; March 28, 2014, Filed

CIVIL ACTION NO. 3:12-CV-00396 (VLB)

**Reporter**
2014 U.S. Dist. LEXIS 42570 *; 2014 WL 1315846

In re Trilegiant Corporation, Inc.

**Subsequent History:** Dismissed by, in part *In re Trilegiant Corp., 2014 U.S. Dist. LEXIS 42572 (D. Conn., Mar. 28, 2014)*

Dismissed by, in part, Motion to strike granted by *In re Trilegiant Corp., 2014 U.S. Dist. LEXIS 42573 (D. Conn., Mar. 28, 2014)*

Dismissed by, in part *In re Trilegiant Corp., 2014 U.S. Dist. LEXIS 42614 (D. Conn., Mar. 28, 2014)*

Dismissed by, in part *In re Trilegiant Corp., 2014 U.S. Dist. LEXIS 42616 (D. Conn., Mar. 28, 2014)*

**Counsel:** [*1] For Debra Miller, individually, and on behalf of all others similarly situated, William Thompson, individually, and on behalf of all others similarly situated, Plaintiffs: Andrew W. Skolnick, David L. Belt, David A. Slossberg, LEAD ATTORNEYS, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; David Pastor, LEAD ATTORNEY, PRO HAC VICE, Pastor Law Office,LLP, Boston, MA; Karen Leser Grenon, LEAD ATTORNEY, Sheperd Finkelman Miller & Shah, LLP-CT, Chester, CT; Kenneth G. Gilman, Thomas E Shea, LEAD ATTORNEYS, PRO HAC VICE, Gilman Law LLP, Bonita Springs, FL.

For Brittany DiCarolis, Annette Sumlin, Debbie Williams, Plaintiffs: Karen Leser Grenon, Sheperd Finkelman Miller & Shah, LLP-CT, Chester, CT.

For Hope Kelm, individually and on behalf of all others similarly situated, Barbara Timmcke, individually and on behalf of all others similarly situated, Regina Warfel, individually and on behalf of all others similarly situated, Brett Reilly, individually and on behalf of all others similarly situated, Juan M. Restrepo, individually and on behalf of all others similarly situated, Jennie H. Pham, individually and on behalf of all others similarly situated, Consol Plaintiffs: David A. Slossberg, [*2] LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; James Edward Cecchi, LEAD ATTORNEY, PRO HAC VICE, Caroline F Bartlett, PRO HAC VICE, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Roseland, NJ; James E. Miller, LEAD ATTORNEY, Shepherd, Finkelman, Miller & Shah, LLP - Chester CT, Chester, CT; James C. Shah, LEAD ATTORNEY, PRO HAC VICE, Shepherd, Finkelman, Miller & Shah, LLP - PA, Media, PA; Jamie E. Weiss, Jeffrey A. Leon, LEAD ATTORNEYS, PRO HAC VICE, Complex Litigation Group LLC, Highland Park, IL; Jay Douglas Dean, Robert J. Axelrod, LEAD ATTORNEYS, Pomerantz Haudek Grossman & Gross LLP, New York, NY; Karen Leser Grenon, Laurie Rubinow, LEAD ATTORNEYS, Sheperd Finkelman Miller & Shah, LLP-CT, Chester, CT; Nathan Zipperian, LEAD ATTORNEY, PRO HAC VICE, Shepherd, Finkelman, Miller & Shah, LLP - FL, Weston, FL.

For Lucy Schnabel, Edward Schnabel, Ind & o/b/o all others similarly situated, Brian Schnabel, Ind & o/b/o all others similarly situated, Consol Plaintiffs: David A. Slossberg, LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; James Edward Cecchi, LEAD ATTORNEY, PRO HAC

2014 U.S. Dist. LEXIS 42570, *2

VICE, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.,  **[*3]** Roseland, NJ; Jay Douglas Dean, Robert J. Axelrod, LEAD ATTORNEYS, Pomerantz Haudek Grossman & Gross LLP, New York, NY; Jeffrey A. Leon, LEAD ATTORNEY, PRO HAC VICE, Complex Litigation Group LLC, Highland Park, IL; Karen Leser Grenon, LEAD ATTORNEY, Sheperd Finkelman Miller & Shah, LLP-CT, Chester, CT; Nathan Zipperian, LEAD ATTORNEY, PRO HAC VICE, Shepherd, Finkelman, Miller & Shah, LLP - FL, Weston, FL; Rose F. Luzon, LEAD ATTORNEY, PRO HAC VICE, Shepherd, Finkelman, Miller & Shah, LLP, San Diego, CA.

For 1-800-Flowers.com, Inc., Defendant: Karen L. Cavalier, Thomas J. Kavaler, LEAD ATTORNEYS, PRO HAC VICE, Cahill, Gordon & Reindel, LLP, New York, NY; Margaret M. Sheahan, Robert Burdette Mitchell, LEAD ATTORNEYS, Mitchell & Sheahan, P.C., Stratford, CT.

For Affinion Group, LLC, Defendant: James H. Bicks, LEAD ATTORNEY, Wiggin & Dana LLP-Stfd, Stamford, CT; Kenneth M. Kliebard, LEAD ATTORNEY, Howrey LLP-IL, Chicago, IL.

For Apollo Global Management, LLC, Defendant: Edward N. Moss, Jonathan Rosenberg, LEAD ATTORNEYS, PRO HAC VICE, O'Melveny & Myers-NY, New York, NY; James K. Robertson , Jr., Sarah S. Healey, LEAD ATTORNEYS, Carmody Torrance Sandak & Hennessey, LLP - NH, New Haven, CT.

For  **[*4]** Bank of America, N.A., Capital One Financial Corporation, Defendants: David J Fioccola, Jessica Kaufman, Mark P. Ladner, LEAD ATTORNEYS, PRO HAC VICE, Morrison & Foerster - NY, New York, NY; Pierre-Yves Kolakowski, LEAD ATTORNEY, Zeichner, Ellman & Krause, Greenwich, CT.

For Beckett Media LLC, Defendant: Gregory T. Fouts, Kenneth M. Kliebard, LEAD ATTORNEYS, Howrey LLP-IL, Chicago, IL; Romeo S. Quinto , Jr., LEAD ATTORNEY, Morgan, Lewis & Bockius, L.L. P.-IL, Chicago, IL.

For Buy.com, Inc., Defendant: Gregory T. Fouts, Kenneth M. Kliebard, LEAD ATTORNEYS, Howrey LLP-IL, Chicago, IL; Romeo S. Quinto , Jr., LEAD ATTORNEY, Morgan, Lewis & Bockius, L.L. P.-IL, Chicago, IL; Rowena Amanda Moffett, LEAD ATTORNEY, Brenner, Saltzman & Wallman, New Haven, CT.

For Chase Bank USA, N.A., Defendant: Andrew A. Ruffino, LEAD ATTORNEY, PRO HAC VICE, Covington & Burling LLP-NY, New York, NY; Thomas J. Donlon, LEAD ATTORNEY, Robinson & Cole LLP, Stamford, Stamford, CT; Robert D Wick, PRO HAC VICE, Covington & Burling, LLP-DC, Washington, DC.

For Citibank, N.A., Defendant: John Warren Herrington, John C. Pitblado, LEAD ATTORNEYS, Carlton Fields Jorden Burt, P.A., Simsbury, CT; Robert D. Helfand, LEAD ATTORNEY,  **[*5]** Jorden Burt-Smsby, Simsbury, CT.

For Classmates International, Inc., FTD Group, Inc., Memory Lane, Inc., United Online, Inc., Defendants: Carl Alan Roth, Eric S. Waxman, Lance A Etcheverry, LEAD ATTORNEYS, PRO HAC VICE, Robert B Cummings, Skadden, Arps, Slate, Meagher & Flom - LA, CA, Los Angeles, CA; James T. Shearin, Bridgeport, CT; Steven J. Stafstrom , Jr., LEAD ATTORNEY, Pullman & Comley - Bpt, Bridgeport, CT.

For Days Inns Worldwide, Inc., PeopleFindersPro, Inc., Wyndham Worldwide Corp, Defendants: Bryan James Orticelli, LEAD ATTORNEY, Day Pitney LLP-HTFD, Hartford, CT.

For IAC/InteractiveCorp, Inc., Shoebuy.com, Inc., Defendants: Gregory T. Fouts, Kenneth M. Kliebard, LEAD ATTORNEYS, Howrey LLP-IL, Chicago, IL; James H. Bicks, LEAD ATTORNEY, Wiggin & Dana LLP-Stfd, Stamford, CT; Romeo S. Quinto , Jr., LEAD ATTORNEY, Morgan, Lewis & Bockius, L.L. P.-IL, Chicago, IL.

For Trilegiant Corporation, Inc., Defendant: Gregory T. Fouts, Kenneth M. Kliebard, LEAD ATTORNEYS, PRO HAC VICE, Howrey LLP-IL, Chicago, IL; James H. Bicks, LEAD ATTORNEY, Wiggin & Dana LLP-Stfd, Stamford, CT; Romeo S. Quinto , Jr., LEAD ATTORNEY, PRO HAC VICE, Morgan, Lewis & Bockius, L.L. P.-IL, Chicago, IL; Thomas  [*6] F. Clauss , Jr., LEAD ATTORNEY, Wiggin & Dana LLP-Stfd, Stamford, CT.

For Wells Fargo Bank, NA, Defendant: Philip C. Pires, LEAD ATTORNEY, Cohen & Wolf- Bpt, Bridgeport, CT; Stewart I. Edelstein, LEAD ATTORNEY, Cohen & Wolf, P.C., Bridgeport, CT.

For Hotwire, Inc., Defendant: Bradley S. Keller, Joshua B. Selig, LEAD ATTORNEYS, PRO HAC VICE, Byrnes Keller Cromwell, LLP, Seattle, WA; Michael T. McCormack, William H. Champlin , III, LEAD ATTORNEY, Hinckley Allen Snyder LLP-Htfd, Hartford, CT.

For Priceline.com, Inc., Defendant: Thomas D. Goldberg, LEAD ATTORNEY, Day Pitney LLP-Stmfd, Stamford, CT.

For Chase Paymentech Solutions, LLC, Defendant: Thomas J. Donlon, LEAD ATTORNEY, Robinson & Cole LLP, Stamford, Stamford, CT.

For Citigroup Inc., Consol Defendant: John Warren Herrington, John C. Pitblado, LEAD ATTORNEYS, Carlton Fields Jorden Burt, P.A., Simsbury, CT; Robert D. Helfand, LEAD ATTORNEY, Jorden Burt-Smsby, Simsbury, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

# Opinion

MEMORANDUM OF DECISION GRANTING DEFENDANTS BANK OF AMERICA, N.A.'S AND CAPITAL ONE FINANCIAL CORPORATION'S MOTION TO DISMISS [DKT. 185]; DEFENDANT HOTWIRE, INC.'S MOTION TO DISMISS [DKT. 191]; DEFENDANTS  [*7] PEOPLE FINDERSPRO, INC.'S, DAYS INNS WORLDWIDE, INC.'S AND WYNDHAM WORLDWIDE CORPORATION'S JOINT MOTION TO DISMISS [DKT. 192]

I. Introduction

The Plaintiffs, Debra Miller ("Miller"), Brittany DiCarolis ("DiCarolis"), Hope Kelm ("Kelm"), Jennie H. Pham ("Pham"), Brett Reilly ("Reilly"), Juan M. Restrepo ("Restrepo"), Brian Schnabel, Edward Schnabel, Lucy Schnabel, Annette Sumlin ("Sumlin"), Regina Warfel ("Warfel"), and Debbie Williams ("Williams"), bring this proposed class action against three groups of Defendants, the Trilegiant Defendants, which includes Affinion Group, LLC ("Affinion"), Trilegiant Corporation, Inc. ("Trilegiant"), and Apollo Global Management, LLC ("Apollo"), the Credit Card Defendants, which includes Bank of America, N.A. ("Bank of America"), Capital One Financial Corporation ("Capital One"), Chase Bank USA, N.A. ("Chase"), Citibank, N.A. ("Citibank"), Citigroup, Inc. ("Citigroup"), Chase Paymentech Solutions, LLC ("Paymentech"), and Wells Fargo Bank, N.A. ("Wells Fargo"), and the E-Merchant Defendants, which includes 1-800-Flowers.com, Inc. ("1-800 Flowers"), Beckett Media LLC ("Beckett"), Buy.com, Inc. ("Buy.com"), Classmates International, Inc. ("Classmates"),  [*8] Days Inns WorldWide, Inc. ("Days Inns"), Wyndham WorldWide Corporation ("Wyndham"), FTD Group, Inc. ("FTD"), Hotwire, Inc. ("Hotwire"), IAC/InterActiveCorp ("IAC"), Shoebuy.com, Inc. ("Shoebuy"), PeopleFindersPro, Inc. ("PeopleFinder"), Priceline.com, Inc. "Priceline"), and United Online, Inc. ("United Online").

The Plaintiffs allege several causes of action against the Defendants, including violations of the Racketeer Influenced Corrupt Organizations Act, *18 U.S.C. § 1962(c)* (RICO), against all Defendants; conspiring to violate RICO, *18 U.S.C. § 1962(d)*, against all Defendants; aiding and abetting RICO, *18 U.S.C. §§ 1961-1968*, against the Credit Card Defendants; aiding and abetting commissions of mail fraud, *18 U.S.C. § 1341*, wire fraud, *18 U.S.C. § 1343*, and bank fraud, *18 U.S.C. § 1344*, against the Credit Card Defendants; violations of the Electronic Communications Privacy Act, *18 U.S.C. §§ 2510, et seq.* (ECPA), against Trilegiant, Affinion, and the E-Merchant Defendants; aiding and abetting ECPA violations under *18 U.S.C. §§ 2510, et seq.*, against the Credit Card Defendants; violations of the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110a, et seq.* (CUTPA), against **[*9]** the Trilegiant Defendants and E-Merchant Defendants; aiding and abetting and conspiracy to violate CUTPA, *Conn. Gen. Stat. § 42-110a, et seq.*, against the Credit Card Defendants; violations of the *California Business and Professional Code § 17602* (Automatic Renewal Statute), against the Trilegiant Defendants and E-Merchant Defendants; and claims of unjust enrichment against all Defendants.

Before the Court are three motions to dismiss. The first was filed by Defendants Bank of America and Capital One [Dkt. 185; Memorandum of Law in Support, Dkt. 185-1, hereinafter "BOA MTD"]; the second was filed by Defendant Hotwire [Dkt. 191; Memorandum of Law in Support, Dkt. 191-1 hereinafter "Hotwire MTD"]; and the third was filed by Defendants PeopleFinder, Days Inns, and Wyndham. [Dkt. 192; Memorandum of Law in Support, Dkt. 192-1, hereinafter "Wyndham MTD"]. Each of the Defendants moves to dismiss the Plaintiffs' Consolidated Amended Class Action Complaint. [Dkt. 141, hereinafter "CAC at ¶"]. For the reasons stated below, the motions are GRANTED.

II. Background

A full recitation of the background and facts is set forth in the Court's Memorandum of Decision Granting In Part and Denying In Part **[*10]** Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint or, in the Alternative, to Strike Portions of the Complaint. [Dkt. 276, hereinafter "Court Order at Dkt. 276"]. The Plaintiffs do not allege that any of the named Plaintiffs made online purchases through or had credit cards issued by Bank of America, Capital One, Hotwire, or Wyndham (hereinafter the "Defendants").

III. Standard of Review

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. United States, 678 F.3d 147, 152 (2d Cir. 2012)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))*. While *Rule 8* does not require detailed factual allegations, "[a] pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal, 556 U.S. at 678* (citations and internal quotation marks omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility **[*11]** of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations and internal quotation marks omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010)*. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal, 556 U.S. at 679*). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true,

'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal, 556 U.S. at 679*). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 556 U.S. at 678* (citations and internal quotation marks omitted).

In general, the Court's review **[*12]** on a motion to dismiss pursuant to *Rule 12(b)(6)* "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)*. The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)*; *Patrowicz v. Transamerica HomeFirst, Inc., 359 F. Supp. 2d 140, 144 (D. Conn. 2005)*.

IV. Discussion

The Defendants contend that the Complaint should be dismissed as against them because the Plaintiffs lack constitutional standing to bring the action. Bank of America, Capital One, Hotwire, and Wyndham argue that the Plaintiffs have failed to allege sufficiently Article III standing because none of the named Plaintiffs have claimed that they were harmed, either directly or indirectly, by any of the Defendants. BOA MTD p. 4-9, Hotwire MTD p. 2, Wyndham MTD p. 2-3. In the alternative, Bank of America, Capital One, and Hotwire argue that even **[*13]** if Article III standing is found, the Plaintiffs' RICO claims must still fail because the RICO statute has a specific causation requirement that the Plaintiffs have failed to plead sufficiently. BOA MTD p. 9-14.

1. Article III Standing

To prove Article III standing, the Plaintiffs must allege (1) a personal "injury-in-fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)* (citations and internal quotation marks omitted). A plaintiff cannot abrogate these constitutional requirements by styling the claim as a class proceeding. *See In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010)*. "To establish Article III standing in a class action," a plaintiff must allege that "for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant . . . ." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007)* (citations and internal quotation marks **[*14]** omitted). Courts in this circuit have also made clear that the Article III standing inquiry must precede class certification. *See Forth Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 332-33 (S.D.N.Y. 2012)*.

Accordingly, a defendant in a class action proceeding must have either directly or indirectly caused the alleged injury to one of the named plaintiffs for the plaintiffs to have constitutional standing to assert a claim against that defendant. For example, in *Lehman Bros.*, the plaintiffs brought a putative securities class action for the sale of mortgage pass-through certificates, a type of mortgage-backed security, sold in ninety-four separate offerings. *See In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d at 487-88*. The named plaintiffs, however, "purchased Certificates issued only in nine of the ninety-four offerings alleged in the complaint." *Id.* The court found that the plaintiffs only had standing to bring suit against the nine offerings in which they purchased securities because they could not demonstrate a traceable injury to the other offerings. *Id. at 490*.

The Second Circuit recently affirmed that named plaintiffs in a class action **[*15]** do not have Article III standing against "non-injurious defendants." *See Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62-66 (2d*

*Cir. 2012)*. In *Mahon*, the court held that the named plaintiffs in a class action must be able to demonstrate an injury directly traceable to the defendants to have Article III standing. *Id. at 64*. None of the named Plaintiffs here have alleged that Bank of America, Capital One, Hotwire, or Wyndham caused their injuries. Therefore, it would be impossible for this Court to find that the Plaintiffs have stated a "concrete, particularized, and actual . . . injury . . . that is traceable to [the] defendant's conduct." *Woods v. Empire Health Choice, Inc., 574 F.3d 92, 96 (2d Cir. 2009)*.

The Plaintiffs argue that they do not need to allege that every Defendant was the direct or indirect cause of one of the Plaintiffs' injuries because the Plaintiffs have adequately alleged that their injuries were caused by a conspiracy in which Bank of America, Capital One, Hotwire, and Wyndham were involved as co-conspirators. [Dkt. 219, Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 71-79, hereinafter "Opp."]. The Court agrees that if the Plaintiffs **[*16]** adequately alleged a conspiracy, they would not be required to allege direct harm caused by every defendant as long as the harm is directly traceable to the acts of the conspiracy *See Rios v. Marshall, 100 F.R.D. 395, 404 (S.D.N.Y. 1983)*. However, as detailed in the Court Order at Dkt. 276, the Plaintiffs have not sufficiently pled a RICO conspiracy because, among other reasons, they failed to allege that all of the Defendants formed one agreement to engage in the alleged racketeering activity. The Court has also held that the Plaintiffs have insufficiently pled a conspiracy to violate CUTPA. *See* Court Order at Dkt. 276.

Accordingly, the Defendants' motion to dismiss for want of standing is GRANTED.

2. RICO Causation

Defendants Bank of America, Capital One, and Hotwire argue that even if constitutional standing is found, the Plaintiffs have not sufficiently pled the elements of a RICO claim because RICO requires specific causation. BOA MTD 9-14.

When alleging predicate acts of wire or mail fraud, a plaintiff must allege "but for" causation, "meaning that but for the RICO violation, [the plaintiff] would not have been injured," and "that the defendant's unlawful acts were in a legal sense **[*17]** the cause of the plaintiff's economic loss." *UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 132 (2d Cir. 2010)*; *Moore v. PaineWebber, Inc., 189 F.3d 165, 167 (2d Cir. 1999)*. This element is satisfied "if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged." *Lerner v. Fleet Bank. N.A., 318 F.3d 113, 121 (2d Cir. 2003)*.

The Court previously held that the Plaintiffs have not sufficiently alleged a substantive RICO claim because, among other reasons, they have failed to allege a RICO enterprise. *See* Court Order at Dkt. 276. The Plaintiffs have also failed to allege sufficiently a RICO conspiracy because they did not plead any facts to show that an agreement had been reached by all of the Defendants to participate in the scheme. Court Order at Dkt. 276. Since there was no conspiracy or enterprise, the Plaintiffs cannot allege that Bank of America, Capital One, and Hotwire indirectly caused their RICO-related injuries because there was no scheme for them to be a part of. Therefore, the Plaintiffs have not alleged the requisite causation element to maintain a RICO claim against Bank of America, Capital One, or Hotwire.

For the foregoing reasons, **[*18]** the Defendants' [Dkt. 185], [Dkt. 191], and [Dkt. 192] Motions to Dismiss the Consolidated Amended Class Action Complaint are GRANTED. As none of the named Plaintiffs have standing in this matter, Bank of America, Capital One, Hotwire, and Wyndham are terminated as Defendants.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

2014 U.S. Dist. LEXIS 42570, *18

United States District Judge

Dated at Hartford, Connecticut: March 28, 2014

---

**End of Document**

2015 WL 1499208
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

XL SPECIALTY INSURANCE COMPANY, Plaintiff,

v.

OTTO NAUMANN, LTD., Defendant
and Third–Party Plaintiff,

v.

Julius Lowy Frame & Restoring
Co. Inc., Third–Party Defendant.

No. 12–CV–8224 (DAB).
|
Signed March 31, 2015.

Opinion

*MEMORANDUM AND ORDER*

DEBORAH A. BATTS, District Judge.

**\*1** Plaintiff XL Specialty Insurance Company ("XL") brings this suit against Defendant Otto Naumann, Ltd. ("Naumann") for rescission of an insurance payment made for a missing painting. The painting was later found in the possession of Julius Lowy Frame & Restoring Co. Inc. ("Lowy"). Naumann in turn brings a third-party complaint against Lowy alleging negligent handling of the painting. XL moved for judgment on the pleadings against Naumann. That Motion is DENIED. Lowy moved to dismiss the third-party complaint by Naumann. That Motion is GRANTED.

I. *BACKGROUND*

The following facts are based on the respective pleadings.[1]

[1]   Naumann attaches affidavits to its brief, which the Court will ignore in deciding the Rule 12(c) and 12(b)(6) motions. *See* Fed.R.Civ.P. 12(d).

A. *Allegations of XL's Complaint*

Naumann, a fine art dealer in New York, purchased an insurance policy from XL, a Connecticut insurance company. (Compl.¶¶ 1–2, Ex. C.) In July 2007, Naumann

submitted a claim to XL for a stolen painting worth $450,000. (*Id.* Ex. B.) After investigation, XL paid Naumann $357,500 on the claim. (*Id.* ¶¶ 14–15, 23.)

In April 2012, Naumann's insurance broker informed XL that the painting was found at Lowy, a framing company located on the same street as Naumann. (*Id.* ¶¶ 8, 24–25.) According to XL, back in May 2007, Naumann had delivered the painting to Lowy for reframing and then lost track of it. (*Id.* ¶¶ 9–10.) XL attached to its complaint what appears to be a receipt from Lowy for Naumann's work order on the painting. (*Id.* Ex. A.)

Naumann refused to return the $357,500 to XL. (*Id.* ¶ 27.)

B. *Allegations of Naumann's Third–Party Complaint*

Naumann's answer to XL's complaint denied that Naumann gave the painting to Lowy. (First Amended Answer and Third Party Complaint ("Answer") ¶¶ 9–10, Dkt. 16.) In the same document, however, Naumann asserted a negligence claim against Third–Party Defendant Lowy that included allegations that Lowy picked up the painting from Naumann for reframing. (*Id.* ¶¶ 42–43.)

According to Naumann, it never received any documentation from Lowy regarding the restoration. (*Id.* ¶¶ 49–50.) The painting "was not in the same condition as when it was last in Naumann's possession," and it "no longer has the value it had when [Lowy] took possession." (*Id.* ¶¶ 64–65.)

II. *DISCUSSION*

A. *Standard of Review*

"Judgment on the pleadings" under Rule 12(c) is "appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988). Accordingly, a 12(c) movant must establish "that no material issue of fact remains to be resolved and that [she] is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland,* 901 F.2d 266, 269 (2d Cir.1990) (internal quotation marks omitted).

On a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint are accepted as true,

and all reasonable inferences are drawn in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). The complaint need only include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### B. *Naumann's Inconsistent Pleadings*

**\*2** Naumann has made conflicting assertions of fact with respect to how Lowy came to possess the painting. In its answer, Naumann denies that it gave Lowy the painting for restoration. Yet, in its third-party complaint against Lowy (part of the same document as the answer), Naumann states—presumably in order to create a duty in Lowy—that it hired Lowy to fix the painting. Naumann then clarifies in its brief that Lowy's obtainment of the painting is disputed and that Naumann is merely making a conditional allegation: "if in fact Lowy took possession from Naumann," then Lowy failed to handle the painting with care. (Naumann Br. at 6, Dkt. 24.)

Naumann cannot, as the saying goes, have its cake and eat it too. Although Rule 8(d)(3) allows parties to plead alternative legal theories, it does not permit "inconsistent *assertions of facts* within the allegations." *In re Livent, Inc. Noteholders Secs. Litig.,* 151 F.Supp.2d 371, 407 (S.D.N.Y.2001); *see also United States v. Gotti,* 771 F.Supp. 535, 540 (E.D.N.Y.1991) ("There is a significant difference between pleading alternative theories of law based upon given facts and pleading alternative statements of fact to support a given principle of law.").

Naumann has made clear that it disputes XL's account of Lowy's attainment of the painting. The Motions before the Court will be evaluated in light of that contention.

### C. *XL's Rule 12(c) Motion for Judgment on the Pleadings*

XL argues that it is entitled to rescission of the insurance money paid to Naumann because the payout was based on a mutually mistaken understanding that the painting was stolen. This argument is premised on Naumann admitting to giving the painting to Lowy, which Naumann does not.

Nor does XL suggest that the purported receipt attached to the complaint by itself establishes how the painting arrived at Lowy. That dispute creates a question of fact, and the rescission claim will continue.

XL next asserts a claim for negligent misrepresentation, which requires that Naumann made a false statement. *See, e.g., Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000). XL submits that Naumann falsely told XL that the painting was stolen. Again, there is a question of fact as to the falsity of that statement.

Finally, XL asks for a finding that Naumann was unjustly enriched, which requires a showing that equity militates against the defendant retaining the property in question. *See, e.g., Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir.2004). Given the dispute over Lowy's attainment of the painting, the Court cannot conclude, based on the pleadings alone, that it would be inequitable for Naumann to keep the insurance money.

### D. *Lowy's 12(b)(6) Motion To Dismiss The Third–Party Complaint*

Naumann seeks to hold Lowy liable for negligent handling of the painting. To bring a negligence claim, Naumann must establish that Lowy owed a "duty" to Naumann. *Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111, 114 (2d Cir.2000). As the Court previously stated in dismissing Naumann's initial third-party complaint against Lowy, "[i]t is plausible that a duty would arise when the owner of a painting takes it to a shop to be restored." Opinion, Mar. 28, 2014, Dkt. 15 at 6. Naumann's initial third-party complaint against Lowy did not, however, allege that Naumann hired Lowy to restore the painting. *Id.* Accordingly, no duty arose in Lowy based on that pleading. *Id.* [2]

[2]  Nor had Naumann alleged any injury to the painting. Rather, Naumann indicated only that the painting was "not in the same condition as when it was last in Naumann's possession." Dkt. 15 at 7.

**\*3** Similarly, Naumann has not properly made any such allegation in its amended third-party complaint. Naumann's decision to dispute how Lowy obtained the painting means Naumann has not alleged a duty in Lowy. The negligence claim against Third–Party Defendant Lowy once again fails.

III. *CONCLUSION*

There is a disputed issue of fact as to how Lowy came to possess the painting in question. Given that circumstance, XL's Motion for Judgment on the Pleadings is DENIED.

In the absence of allegations that create a duty in Lowy to Naumann, Lowy's Motion to Dismiss the Third–Party Complaint is GRANTED. On the facts claimed by Third–Party Plaintiff Naumann, leave to replead would be futile, so the dismissal is WITH PREJUDICE.

The remaining Parties are to appear for a Rule 16 Conference on April 16, 2015 at 10:30 AM.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1499208

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 950116
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Bart ZAMICHIEI and Tammy Zamichiei, Plaintiffs,

v.

CSAA FIRE & CASUALTY
INSURANCE COMPANY, Defendant.

No. 3:16-cv-739 (VAB)
|
Signed 02/20/2018

**Attorneys and Law Firms**

Brian D. Danforth, Tolisano & Danforth, LLC, Ellington, CT, for Plaintiffs.

Daniel P. Scapellati, Carl R. Ficks, Jr., Halloran & Sage, Hartford, CT, for Defendant.

**Opinion**

**RULING AND ORDER ON MOTION
FOR SUMMARY JUDGMENT**

VICTOR A. BOLDEN, UNITED STATES DISTRICT JUDGE

**\*1** Bart and Tammy Zamichiei ("the Zamichieis" or "Plaintiffs") sued CSAA Fire & Casualty Insurance Company ("CSAA" or "Defendant"), after CSAA denied coverage for visible cracking in concrete in the Zamichieis' unfinished basement, claiming breach of contract.

CSAA moves for summary judgment, arguing that the insurance policy at issue unambiguously covers only abrupt collapses—not, according to CSAA, an ongoing condition from which damage results. CSAA argues that it properly denied coverage and did not breach its contract.

For the following reasons, the motion is **GRANTED**.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A. FACTUAL ALLEGATIONS** [1]

1

The relevant factual allegations are taken from Defendants' Local Rule 56(a)(1) Statement ("Def.'s SMF"), ECF No. 32, and attached exhibits, ECF Nos. 32-1–10, and the Zamichieis' Local Rule 56(a)(2) Statement ("Pls.' SMF"), ECF No. 37-1, and the attached exhibit, ECF No. 37-1 at 17. *See* D. Conn. L. Civ. R. 56.

> The Court notes that in the Zamichiei's Statement, they qualified their admission throughout—*e.g.*, with phrases such as "[a]dmitted that statement was made." The Zamichieis Statement is improper. *See* D. Conn. L. Civ. R. 56(a)(2) (requiring that the party opposing summary judgment "admit[ ] or deny[ ] the facts and/or object[ ] to the fact as permitted by Federal Rule of Civil Procedure 56(c)"); Fed. R. Civ. P. 56(c) (permitting objections when "material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence"). "The caveats placed on their admissions frustrate Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists." *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 3:16-cv-510 (JCH), slip op. at 2, n.2 (D. Conn. Dec. 15, 2017).

> The Court therefore deems admitted all qualified admissions for purposes of resolving this motion. *See* D. Conn. L. Civ. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1...."). Accordingly, all factual allegations are undisputed.

The Zamichieis live at 39 Old Monson Road in Stafford Springs, Connecticut ("Property"). Def.'s SMF ¶ 4.

**1. The Policy**

CSAA issued a homeowners insurance policy ("Policy"), effective January 23, 2015 through January 23, 2016. The Policy provides, in pertinent part:

SECTION I: PERILS INSURED AGAINST

A.    COVERAGE    A—DWELLING    AND
   COVERAGE B—OTHER STRUCTURES

   1. We insure against risk of direct physical loss to property described in Coverages A and B.

   2. We do not insure, however, for loss:

a. Excluded under Section 1—Exclusions;

\* \* \*

c. Caused by:

\* \* \*

(6) Any of the following:

(a) Wear and tear, marring, deterioration;

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes to damage or destroy itself;

\* \* \*

(f) Settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations, [and] walls....

**\*2** *Id.* ¶ 7.

SECTION I—EXCLUSIONS

I. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

\* \* \*

3. "Water" Damage "Water" Damage means:

a. Flood or surface "water" from rain or snow, waves, tidal "water", or spray from any of these, whether or not driven by wind;

b. "Water" or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

c. "Water" or water-born material below the surface of the ground, including "water" which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure, caused by or resulting from human or animal forces or any act of nature.

\* \* \*

II. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

A. Weather Conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in A. above to produce this loss.

B. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

C. Faulty, inadequate or defective;

a. Planning, zoning, development, surveying, siting;

b. Design, specification, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;

*Id.* ¶ 8.

E. Additional Coverages

8. Collapse

\* \* \*

a. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or any part of the building cannot be occupied for its current purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

\* \* \*

(6) Use of defective material or methods in construction, remodeling or renovation.

c. Loss to a[ ] ... foundation ... is not included under c.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

**\*3** *Id.* ¶ 9.

## 2. The Property

The Zamichieis built the Property in 1989, moved into it in January 1990, and have lived there continuously since it was completed. *Id.* ¶¶ 11–12. Three-to-four years ago, Mr. Zamichiei observed a horizontal crack in the basement adjacent to the hatchway door of the external stairs. *Id.* ¶ 14.

On September 16, 2015, William Neal, P.E., a consulting engineer, inspected the Property. Pls.' SMF ¶ 53. He attributed the "spider-web cracks" to Alkali Silica Reaction ("ASR") and recommended replacement of the concrete. *Id.*, Neal Letter., Ex. AA, ECF No. 37-1 at 17. Mr. Neal testified that putting "poor aggregate" into the concrete when it was mixed was a "singular event" that "caused" the cracking. Neal Dep. at 38:22–24, Def.'s

SMF, Ex. I, ECF No. 32-9. He also testified that, if he had issued a report at the time of his deposition, he would haved indicated that "most likely cause of the foundation distress" is a chemical reaction involving iron pyrrhotite in the concrete. *Id.* at 51:3–11. He further testified that defective material manifested in the spider-web cracking. *Id.* at 48:12–18. According to Mr. Neal, the concrete was "doomed" from the day it was poured, and impairment of it was "inevitable" based on the use of defective materials. *Id.* at 48:16–49:1.

At the time of Mr. Neal's inspection, the Property's foundation did not require immediate replacement and was not structurally dangerous. Def.'s SMF ¶¶ 29–30. Mr. Neal stated instead that "[t]he ASR will continue to deteriorate the concrete and the basement walls will bulge inward until they structurally fail." Neal Letter at 17. The Zamichieis are using the Property for its intended purpose, namely to live in it. Def.'s SMF ¶ 32. The Property has neither caved in, fallen down, nor is it in imminent danger of falling down or caving in. *Id.* ¶¶ 36–37.

On October 16, 2015, the Zamichieis filed a claim with CSAA for damages to the Property's foundation caused by a chemical reaction. *Id.* ¶ 47. The Zamichieis sought coverage under the Policy's Collapse provision. *Id.* ¶ 48. On November 5, 2015, CSAA denied coverage of the Zamichieis' claim. *Id.* ¶ 50.

## B. PROCEDURAL HISTORY

The Zamichieis filed this lawsuit on April 14, 2016, and CSAA removed the case here on May 17, 2016. ECF No. 1. The Zamichieis amended their complaint to include a single count: breach of contract. Am. Compl., ECF No. 23.

CSAA now moves for summary judgment on multiple grounds. First, CSAA argues that the Zamichieis' claim is barred by the Policy's two-year lawsuit limitation provision. Def.'s Mot. for Summ. J. at 1, ECF. No. 30. Second, coverage for the Zamichieis' loss is barred because the alleged loss occurred outside the policy period. *Id.* Third, the Policy does not provide coverage for the Zamichieis' loss because the loss does not constitute a "collapse" under the policy. *Id.* Fourth, the Policy does not provide coverage for the Zamichieis' loss because it covers "fortuitous" losses only. *Id.* Finally, the unambiguous exclusions in the Policy bar recovery for the Zamichieis' loss. *Id.*

## II. STANDARD OF REVIEW

**\*4** A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).

Any inferences drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). An inference of a genuine dispute of material fact will not be drawn from conclusory allegations or denials, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and summary judgment will be granted only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

This case, like a number of other recent decisions in the District of Connecticut, requires the Court to examine the provisions of an insurance policy, after homeowners have discovered that the concrete supporting the walls of their house is deteriorating. *See, e.g., Cyr v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-85 (DJS), slip op. (D. Conn. Jan. 29, 2018); *Makufka v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-00567 (VLB), 2018 WL 465775 (D. Conn. Jan. 18, 2018); *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2017 WL 6731713 (D. Conn. Dec. 29, 2017); *Allstate Ins. Co. v. Swaminathan*, No. 3:16-cv-1708 (VAB), 2017 WL 6614092 (D. Conn. Dec. 27, 2017); *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-510 (JCH), 2017 WL 6459552, (D. Conn. Dec. 15, 2017); *Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050 (VAB), 2017 WL 5906613 (D. Conn. Nov. 30, 2017); *Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS), 2017 WL 3821791 (D. Conn. Aug. 31, 2017); *Adams v.*

*Allstate Ins. Co.*, No. 3:16-cv-1360, 2017 WL 3763837 (JBA) (D. Conn. Aug. 29, 2017); *Clough v. Allstate Ins. Co. et al.*, No. 3:17-cv-140 (JBA) (D. Conn. Aug. 29, 2017); *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-1686 (SRU), 2017 WL 3710786 (D. Conn. Aug. 28, 2017); *Valls v. Allstate Ins. Co.*, No. 3:16-cv-1310 (VAB), 2017 WL 4286301 (D. Conn. Sept. 27, 2017); *Metsack v. Liberty Mut. Fire Ins. Co.*, 3:14-cv-1150 (VLB), 2017 WL 706599 (D. Conn. Feb. 21, 2017).

The issue here is whether progressive deterioration caused by a chemical reaction and resulting in cracking concrete falls within a provision of Plaintiffs' homeowner's insurance policy covering collapses. Amend. Compl. ¶ 11. Because the Zamicheis' policy covers only "an abrupt falling down or caving in of a building," Def.'s SMF, Ex. D-1, ECF No. 32-4 at 21, and not the gradual deterioration of property over time, the Court finds that CSAA's policy excludes coverage for the damage to the Zamicheis' basement, and grants CSAA's motion for summary judgment.

Under Connecticut law, "the terms of an insurance policy are to be construed according to the general rules of contract construction"; that is, the Court must discern the intent of the parties as articulated in the provisions of the policy. *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 967 A.2d 1, 21 (Conn. 2009).

**\*5** The Court reads the words of the policy with "their natural and ordinary meaning," and resolves any ambiguity in favor of the insured. *Wentland v. Am. Equity Ins. Co.*, 840 A.2d 1158, 1163 (Conn. 2004). The Court must construe the contract language in favor of the insured unless there is " 'a high degree of certainty' that the policy language clearly and unambiguously excludes the claim." *Liberty Mut. Ins. Co.*, 967 A.2d at 22 (quoting *Kelly v. Figueiredo*, 610 A.2d 1296, 1299 (Conn. 1992)).

"[T]he insured bears the burden of showing that an insurance coverage covers the loss, but the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim." *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011). The Court resolves any doubts in favor of the insured. *Id.* Whether a contract is unambiguous is a question of law for the Court, appropriately decided at the summary judgment stage. *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010). If the Court finds that the contract is

unambiguous, "the plain meaning of its terms control." *MBIA Inc.*, 652 F.3d at 158.

## A. POLICY COVERAGE FOR COLLAPSE

CSAA argues that the Policy does not cover the Zamichieis' alleged loss because the loss does not constitute a "Collapse" under the Policy. Def.'s Br. at 31, ECF No. 31. Specifically, CSAA argues that "because the [Property] is still standing, has not sustained an abrupt falling down or caving in and is still being used for its intended purpose, the [Property] has not 'collapsed' as contractually defined." *Id.* CSAA also argues that the Policy unambiguously does not cover losses caused by a chemical reaction because the technical source of the cracking is irrelevant when the Zamichieis' loss consists of the foundation settling, shrinking, bulging or expanding. Def.'s Reply Bf. at 9–10, ECF No. 38.

The Zamichieis respond that the walls in their basement are "essentially caving in and, as such, the damages and losses should be covered under the [ ] [P]olicy." Pls.' Opp. Br. at 6. They also contend that the Policy does not exclude chemical reactions and that the Policy language "risk of direct physical loss" "expand[s]" what is considered "direct physical loss to property" under the Policy. Pls.' Opp. Br., ECF No. 37 at 8–9. They argue that "[t]he cracking, deterioration, and even the purported 'defective materials' are simply the result of the chemical reaction that is going on in the concrete." *Id.* at 9. The Zamichieis therefore argue that, "[t]he conditions purported barring recovery are [s]imply manifestations of a physical loss that is occurring." *Id.*

Under Connecticut law, the substantial impairment of a wall's structural integrity is sometimes considered a collapse. *See Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 252 (1987) ("[T]he term 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building."); *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 163 (D. Conn. 2014) (finding that collapse provision applied where the plaintiffs had "alleged that the cracks in the basement walls are a substantial impairment to [the] walls' structural integrity"). In *Beach*, the Connecticut Supreme Court considered whether a policy that excluded coverage for damage unless the "collapse of a building ... not otherwise excluded ensues." *Beach*, 205 Conn. at 250. The court observed that the policy, which contained no terms to qualify "collapse," did not "unambiguously limit

its liability to a 'collapse' of a sudden and catastrophic nature." *Id.* at 251-52 ("If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended."). *Id.* The term "collapse," therefore, was, in that policy, "sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Id.* at 252.

**\*6** Here, the contract's language, unlike the language in *Beach*, includes the phrase "abrupt," and not the word "ensue." This case turns on whether "abrupt," attached to "falling down or caving in," "expressly ... define[s] the term to provide for the limited usage." *See Beach*, 205 Conn. at 250. The Zamichieis acknowledge that the chemical reaction that resulted in the impairment of the concrete was "inevitable," and suggested that the concrete was "doomed" from the day it was poured, Neal Dep. at 48:16–49:1, but argue that the definition of "collapse" is merely a definition of terms, whereas the remaining provisions clarify instances when collapse has not occurred. Pls.' Br. at 6. The Zamichieis therefore argue that the term "collapse" is ambiguous in light of the qualifying language in the policy, *e.g.*, the Policy covers hidden decay, which the Zamichieis argue is a gradual process. *Id.* at 7. The Court disagrees.

The Connecticut Supreme Court held in an environmental contamination case that modifiers such as "sudden and accidental" in a pollution context signal "a temporal quality, which requires that the onset of the release in question occurs quickly or happens abruptly." *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 791 A.2d 489, 496 (Conn. 2002).

Courts in this District have applied *Buell*'s reasoning in the cracking concrete context. In *Metsack*, for example, the court considered whether an insurance policy that covered "sudden and accidental direct physical loss," covered cracking concrete. 2017 WL 706599, at *3. The court explained that, "[w]hile *Beach* and the numerous JJ Mottes concrete cases that have been heard in this district have held that a collapse need not be 'sudden' to be covered, none of the policies evaluated included the word 'sudden' within their 'collapse' provisions." *Id.* at *7 (declining to follow conclusion in *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262, 1268 (M.D. Fla. 2012, that "the inclusion of [the term] 'sudden' in

the definition of LOSS for a policy that covers insect damage creates an ambiguous policy provision"). *Id.* The Court noted that the parties had both acknowledged that the basement walls deteriorated over many years, and concluded that the limiting term "sudden" unambiguously excluded coverage for long-term deterioration of concrete. *Id.* at *8.

Other decisions in this District considering similar language have found that when an insurer added "sudden and accidental"—temporal, limiting language—to the term "collapse," the phrase was unambiguous. *See Adams v. Allstate Ins. Co.*, No. 3:16-cv-1360, 2017 WL 3763837, slip op. at 5 (JBA) (D. Conn. Aug. 29, 2017) (granting Allstate's motion to dismiss claims for coverage of cracking concrete damages, which plaintiff admitted was a progressive deterioration over time, under policy that covered "sudden and accidental direct physical loss to property"); *Valls*, No. 3:16-cv-1310 (VAB) (D. Conn. Sept. 27, 2017) (granting Allstate's motion to dismiss because, under collapse provision that provided coverage for accidental and sudden collapse, the plaintiffs alleged "progressive deterioration" and not suddenness); *Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS), 2017 WL 3821791, at *5 (D. Conn. Aug. 31, 2017) ("[T]he term 'sudden,' used in the context of the phrase 'sudden and accidental' is unambiguous, and must be accorded a temporal quality."); *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-1686 (SRU), 2017 WL 3710786, at *4 (D. Conn. Aug. 28, 2017) (noting policy contained "a number of qualifiers, ... which operate to reduce the scope of coverage" and finding that plaintiffs had not shown that their basement walls had undergone an "entire collapse"); *Clough v. Allstate Ins. Co. et al.*, No. 3:17-cv-140 (JBA) (D. Conn. Aug. 29, 2017) (finding that the plaintiffs had alleged "progressive deterioration that may in the future be punctuated with sudden breaks or collapses," but that "[w]ithout any allegation of suddenness, and with allegations that explicitly contradict the possibility that any sudden loss has already occurred, Plaintiff's claim is not plausibly covered by the plain language of the policy unless it falls under the limited exception for certain kinds of collapses"); *Metsack v. Liberty Mut. Fire Ins. Co.*, 2017 WL 706599 (D. Conn. 2017) (finding sudden collapse unambiguous); *Lajeunesse v. Allstate Ins. Co.*, 3:16-cv-937 (AVC) (D. Conn. Aug. 31, 2017) ("By any reasonable interpretation, a contract provision requiring a 'sudden' collapse in order to trigger coverage, would not include a barely perceivable chemical reaction that slowly reduces the structural integrity of concrete over a period of years."); *Carlson v. Allstate Ins. Co.*, 3:15-cv-1045 (MPS) (D. Conn. Sept. 27, 2017) ("Because the term 'sudden,' as used in the collapse coverage provision, means temporally abrupt, the Carlsons must point to evidence that the loss for which they seek coverage occurred abruptly, and not merely unexpectedly, for it to be a covered collapse."); *Carney v. Allstate Ins. Co.*, 3:16-cv-592 (VLB) (D. Conn. Feb. 14, 2017) (finding no bad faith when Allstate denied coverage for cracking concrete where the "impairment to the property is caused by a gradual chemical reaction and the property retains its structural integrity").

***7** The Policy at issue requires "an abrupt falling down or caving in," and this Court sees no reason to depart from the analyses in these cases, finding that a sudden loss must occur abruptly, not gradually over time. Other decisions in this District also have rejected arguments that insurance policies requiring abrupt collapse are ambiguous. *See, e.g., Liston-Smith*, slip op. at 8 (finding that a CSAA policy requiring "an abrupt falling down or caving in" did not cover plaintiffs' home because "the walls were deteriorating as a result of a progressive condition, remained upright, and the home was still inhabitable for its intended purpose"); *id.* at 8–9 (collecting cases); *England v. Amica Mut. Ins. Co.*, No. 3:16-CV-1951 (MPS), 2017 WL 3996394, at *5 (D. Conn. Sept. 11, 2017) (finding no ambiguity in the meaning of "abrupt collapse" where such a collapse was defined as an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose"); *Alexander v. General Ins. Co. of Am.*, No. 3:16-cv-59 (SRU), transcript of oral ruling, ECF No. 22 at 23 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "abrupt falling down or caving in" and the building at issue was "in danger of falling down").

The term "abrupt" therefore is unambiguous and must be "accorded its natural and ordinary meaning." *Connecticut Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008). "To ascertain the commonly approved usage of a word in an insurance policy, it is appropriate to look to the dictionary definition of the term." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 42 n.8 (2014) (internal citation and alteration omitted). "The ordinary meaning of the word 'abrupt' is 'characterized by or involving action or change without preparation or warning.' " *England v. Amica Mut. Ins. Co.*, No. 3:16-

CV-1951 (MPS), 2017 WL 3996394, at *5 (D. Conn. Sept. 11, 2017) (quoting *Merriam Webster's Collegiate Dictionary* (10th ed. 1994)).

The insurance policy at issue here unambiguously covers only "abrupt" collapse, and the Zamichieis have not shown that their home has collapsed within the meaning of the Policy. The Zamichieis' expert stated that, at the time of inspection, the Property's foundation did not require immediate replacement and was not structurally dangerous. Def.'s SMF ¶¶ 29–30. Furthermore, the Zamichieis continue to use the Property for its intended purpose, *id.* ¶ 32, and it has neither caved in nor fallen down, and it is not in imminent danger of falling down or caving in. *Id.* ¶¶ 36–37. The Court therefore concludes that CSAA did not breach its contract with the Zamichieis by denying coverage for the cracked concrete in their basement walls.

The Zamichieis cite to *Dalton v. Harleysville Worcester Mut. Ins. Co.* to support their argument that the term collapse is ambiguous in light of qualifying language in other provisions in the policy. 557 F.3d 89, 93 (2d Cir. 2009). Their reliance on *Dalton* is misplaced. In *Dalton*, the court held that "[t]he policy language, read as a whole, does not resolve the question of whether 'total or near total destruction' is required." *Id.* Unlike here, however, the policy at issue in *Dalton* did not require a collapse to be "abrupt." *See id.* ("The policy at issue expressly provides coverage for collapse caused by 'hidden decay' and 'hidden insect or vermin damage.' "); *see also Beach*, 532 A.2d at 1300 (finding that "[b]y its reference to a 'collapse' that 'ensues,' the policy in this case can reasonably be understood to have contemplated coverage for a 'collapse' that follows consequentially from excluded activity" and therefore "the defendant's policy does not unambiguously limit its liability to a 'collapse' of a sudden and catastrophic nature"). Here, too, the Policy qualifies coverage of hidden decay by adding: "unless the presence of such decay is known to an 'insured' prior to collapse." Def.'s SMF ¶ 9. Put another way, if the presence of the decay is known to the insured at the time of collapse, the collapse cannot reasonably be understood to be abrupt. Here, the Policy's collapse provision is unambiguous, and the *Dalton* decision is inapplicable.

**\*8** The Zamichieis also cite to *130 Slade Condominium Association, Inc. v. Millers Capital Ins. Co.*, No. CIV.A. CCB-07-1779, 2008 WL 2331048, (D. Md. June 2, 2008).

But the court's conclusion in *Slade Condo. Association, Inc.*, did not turn on whether the policy language was ambiguous. Instead, the plaintiffs were entitled to coverage after a column buckled approximately three inches down and three inches over, the ceiling of the master bedroom separated from the wall, and the building was evacuated for several days until [the] columns were stabilized. 2008 WL 2331048, at *1. *Slade Condo. Association, Inc.* did not concern facts analogous to those at issue here.

The Zamichieis therefore have raised no genuine dispute of material fact as to whether the Policy covers their loss under the Additional Coverage.

## B. POLICY COVERAGE FOR A CHEMICAL REACTION

Alternatively, the Zamichieis argue that a chemical reaction constitutes a "risk of direct physical loss to property" under the Policy and therefore would be a covered loss. CSAA responds that the Zamichieis "cannot plausibly allege that the 'loss' was the chemical reaction itself while at the same time alleging that the 'loss' consists of 'damages caused by a chemical reaction.' " Def.'s Reply Br. at 8 (quoting *England*, 2017 WL 3996394, at *6). The Court, however, notes that under Federal Rule of Civil Procedure 8, a party may plead alternative and inconsistent legal theories. *See* Fed. R. Civ. P. 8(d)(2)–(3); *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 62 (2d Cir. 2004) (citing Fed. R. Civ. P. 8(d)(2) in rejecting the defendants argument that the plaintiffs' claim regarding overcharge was waived because it was inconsistent with the mark-up theory they advanced in the court below).

In essence, the Zamichieis argue that, independent from how it manifests itself, the chemical reaction is a "risk of direct physical loss to the property." "This is not a plausible reading because the terms 'direct physical loss' and 'loss,' as used in the Polic[y], unambiguously require some change to the detriment of the insured, and a chemical reaction—without any physical manifestations—does not fit that bill." *England*, 2017 WL 3996394, at *6. The Policy excludes "risk of direct physical loss ... [c]aused by ... settling, shrinking, bulging or expansion, including resultant cracking, of ... foundations [and] walls." Def.'s SMF ¶ 7. "In other words, the 'loss' is the damage or the detrimental change to the insured that is the product of these excluded processes and events. A 'loss' then can be the result of an originating chemical reaction but it

cannot be the originating chemical reaction itself absent any physical manifestation." *Id.* at 7; *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-CV-01686 (SRU), 2017 WL 3710786, at *3 (D. Conn. Aug. 28, 2017) (finding that the "loss—if not considered an imminent collapse—clearly 'consist[s] of ... settling, cracking, shrinking, bulging or expansion of ... foundations [or] walls.' The technical cause of the cracking or bulging is irrelevant." (internal citations omitted)).

"Risk" paired with "direct physical loss to the property" does not change the outcome. Even if the Court were to read "risk" as broadening the scope of coverage under Policy, the Policy nonetheless excludes coverage for "risk of direct physical loss" caused by "bulging ..., including resultant cracking, of ... foundations [and] walls." Def.'s SMF ¶ 7. The risk to the Property is that "basement walls will bulge inward until they structurally fail." Neal Letter at 17; *see also Liston-Smith*, slip op. at 12 (finding, under terms substantially similar to those at issue here, no genuine issue of material fact where the "risk of damage to the plaintiff's home is posed by bulging in the concrete and resulting cracking"); *Manseau*, 2017 WL 3821791, at *4 ("The cracking Plaintiffs allege to have occurred falls squarely within the Policy language in the definition of 'collapse' excluding coverage for 'settling, cracking, shrinking, bulging or expansion.' "); *Agosti*, 2017 WL 3710786, at *3 (finding that plaintiffs' loss was excluded even though the "insurance policy does not exclude by name losses that are caused by chemical reactions," but "expressly exclude[d] 'loss consisting of or caused by ... settling, cracking, shrinking, bulging or expansion of ... foundations [or] walls' "). Importantly, the Policy also excludes coverage for "latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself," Def.'s SMF ¶ 7, and "[f]aulty ... [m]aterials used in ... construction," *id.* ¶ 8. Here, the cracking concrete at issue was faulty at the time it was used in the construction of the Property. Neal Dep. at 48:12–18.

**\*9** These exclusions distinguish the Policy and condition of the Property from the facts in *401 Fourth Street, Inc. v. Investors Insurance Group*, where the court determined that a policy with "risks of direct physical loss" language "clearly broaden[ed] the policy's coverage to include something less than a structure completely falling to the ground." 823 A.2d 177, 179 (Pa. Super. Ct. 2003), *aff'd*, 879 A.2d 166 (Pa. 2005). Unlike in *401 Fourth Street, Inc.*, here, the several exclusions follow the "risk of loss"

language. *401 Fourth Street, Inc.*, therefore is inapposite to this case.

The Zamichieis therefore have not raised a genuine issue of material fact as to whether the Policy covers chemical reactions.

## C. POLICY COVERAGE FOR REASONABLE REPAIRS

The Zamichieis also argue that the cost to them for replacing the foundation should be covered under the "Additional Coverage" for reasonable repairs. Pls.' Opp. Br. at 10. CSAA responds that the Policy's "Additional Coverage" for "Reasonable Repairs" only applies where "covered property" is damaged by a "Peril Insured Against." Def.'s Reply Br. at 6. The Court agrees.

The policy's Additional Coverage provision states: "We will pay the reasonable cost incurred by you for the necessary measure taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." Pls.' SMF ¶ 52. The provision covers losses resulting from collapse. The provision, however, states that a part of a building that is standing is not considered to be in a state of collapse within the meaning of the policy even if "it has separated from the building" or "shows evidence of cracking [or] bulging." Def.'s SMF ¶ 9. Moreover, the provision expressly excludes loss to a foundation unless such loss is a "direct result of the collapse." *Id.* The Zamichiei have presented no evidence that their home or any part of their home has collapsed within the meaning of the provision; rather, they continue to live at the property. The specific exclusions under the Additional Coverage provision therefore preempt coverage for the loss suffered by the Zamichieis.

The Property has not been "damaged by a Peril Insured Against," and thus the Additional Coverage cannot be reasonably read to include the loss at issue here. *See* Def.'s SMF ¶¶ 7, 9; *see also Liston-Smith*, slip op. at 13 ("Because the 'risk' plaintiffs identify is not covered under the Policy, the Additional Coverage for reasonable repairs does not apply.").

The Zamichieis therefore have not raised a genuine issue of material fact as to whether the Policy's "reasonable repairs" provision would cover their loss.

**D. POLICY COVERAGE FOR ENSUING LOSS**

Finally, the Zamichieis argue that they can recover under the Policy's "ensuring loss" provision. Pls.' Opp. Br. at 10. This provision, however, expressly provides that: "We do not insure for loss to property described in Coverages A and B caused by any of the following." Def.'s SMF ¶ 8. Under a subsection, the Policy excludes "[f]aulty, inadequate or defective ... [m]aterials used in ... construction." *Id.* As discussed above, the cracking concrete at issue here was faulty at the time it was used in the construction of the Property. Neal Dep. at 48:12–18. The Zamichieis thus have not raised a genuine issue of any material fact as to whether the Policy's "ensuring loss" provision covers the cracking concrete at issue here.

The Zamichieis therefore have not raised a genuine issue of material fact as to whether the Policy's "ensuing loss" provision would cover their loss.

**\*10** Because the Court finds that the Zamichieis' claim is not covered under the collapse provision and is precluded by exclusions in the Policy, the Court need not, and does not, address the issue of timeliness or whether the policy is an "all-risk" policy.

## IV. CONCLUSION

CSAA therefore is entitled to summary judgment as a matter of law. *See Cont'l Ins. Co.*, 603 F.3d at 180 (summary judgment is appropriate when a contract's terms are unambiguous).

For the reasons discussed above, the motion for summary judgment is **GRANTED**.

The Clerk of the Court is instructed to enter judgment for Defendant and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of February, 2018.

**All Citations**

Slip Copy, 2018 WL 950116

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.